UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION at ASHLAND

CRIMINAL ACTION NO. 0:15-cr-15-DLB-EBA-1

UNITED STATES OF AMERICA,                                                                 PLAINTIFF,

V.               **MAGISTRATE JUDGE'S
                  REPORT AND RECOMMENDATION**

RICHARD E. PAULUS, M.D.,                                                                   DEFENDANT.

\* \* \* \* \* \* \* \* \*

The Defendant, Richard E. Paulus, M.D., was indicted by a Grand Jury with offenses charging that he provided unnecessary medical services and made false statements in connection with claims to Medicare, Medicaid, and private insurers. This matter is now before the Court on the Defendant's Motion to Strike Surplusage from the Indictment. [R. 23]. Defendant's motion requests the Court strike paragraphs 28–30, 31–33, and 35–39 from the indictment, on grounds the allegations in these paragraphs are not essential to the charges and may prejudicially impress jurors. [R. 23-1 at 1].

Specifically, in paragraphs 28–30, Defendant moves to strike comparisons between Defendant's cardiac stent procedure volume and the volumes of other doctors:

> 28.   At times relevant to this Indictment, PAULUS performed more cardiac stent placements than any cardiologist in Kentucky. From 2006 to 2011, PAULUS was ranked amongst the top fifteen cardiologists in the United States for the number of inpatient cardiac stent placements for Medicare patients that he performed. From 2006 to 2011, PAULUS was ranked first amongst all cardiologists in the United States for total units billed to Medicare for cardiac catheterizations and stent placements.

> 29. Other cardiologists at KDMC[1] also performed a large number of cardiac stent placements. For example, from 2008 to 2011, KDMC performed more cardiac stent placement procedures for Medicare patients than Mayo Clinic, *Johns* Hopkins, Cleveland Clinic, the University of Kentucky, the University of Louisville, Kosair Hospital, Baptist Healthcare and Saint Joseph Healthcare.
> 30. From 2008 to 2011, PAULUS performed more cardiac stent placements for Medicare patients than were performed by all the cardiologists in either the University of Kentucky or University of Louisville healthcare systems.

[R. 23-1 at 4–5]. In paragraphs 31–33, Defendant moves to strike details concerning his salary and the compensation he earned from these procedures;

> 31. At all times relevant to this Indictment, PAULUS's compensation was based upon his productivity. In July 2008, PAULUS entered into a Physician's Employment Agreement with KHVI[2]. Pursuant to this agreement, PAULUS received a $200,000 signing bonus. PAULUS's total compensation was determined by his professional fees collected, his per capita share of all ancillary and technical fees, minus his direct expenses and his allocable share of all general expenses. His employment agreement also required that PAULUS receive a Bi-Weekly salary of $49,197.78.
>
> 32. In 2009, PAULUS's compensation from KDMC was $2,686,103; in 2010 it was $2,552,839; in 2011 it was $2,598,737; in 2012 it was $1,717,673; and in 2013 it was $692,197.
>
> 33. From 2006 to 2012, Medicare paid KDMC in excess of $30,000,000 for inpatient cardiac stent placements performed by PAULUS.

Id. at 6–7. Lastly, in paragraphs 35–39, Defendant moves to strike references to his settlement agreement with the Kentucky Board of Medical Licensure (KBML), and to the KBML consultant's findings:

> 35. On November 7, 2012, the Kentucky Board of Medical Licensure ("KBML") received an anonymous grievance alleging fraud, abuse and negligence by PAULUS.

---

[1] King's Daughters Medical Center.
[2] Kentucky Heart & Vascular Physicians, Inc.

2

> 36. The KBML reviewed the patient medical file referenced in the anonymous complaint, as well as fourteen additional patient medical files of PAULUS.
>
> 37. Based upon this review, the KBML concluded that Paulus had engaged in conduct "which departed from or failed to conform to the standards of acceptable and prevailing medical practice within the Commonwealth of Kentucky" in regard to all fifteen charts reviewed.
>
> 38. The KBML consultant concluded, in part: The prevailing scenario in these cases seemed to be a patient with few risk factors for heart disease presented with chest pain that had some typical and some atypical features, and the patient would be admitted to [the] hospital and receive limited cardiac medications. Then, rather than receiving a cardiac stress test, would directly undergo coronary angiography. A number of these cases had rather trivial-to-mild coronary artery disease, but by report would be said to have severe disease . . . [T]here appears to be a consistent pattern of (a) patients not receiving adequate medical therapy nor the therapy being appropriately advanced; (b) angiograms being performed for uncertain or incorrect diagnoses and their results being misinterpreted; (c) stents being inappropriately placed into coronary artery lesions not requiring stents to be placed or being placed in the wrong location; and (d) procedural complications occurring requiring one or more stents to be placed.
>
> 39. On November 7, 2014, PAULUS entered into an "AGREED ORDER OF RETIREMENT" with the KBML wherein, in lieu of revocation of his license to practice medicine, PAULUS agreed to retire indefinitely from the practice of medicine.

Id. at 7–8.

In support, Defendant cites to Federal Rule of Criminal Procedure 7(c)(1), which requires an indictment to be "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Id. at 2. Defendant also cites Fed. R. Crim. P. 7(d), which authorizes a court to "strike surplusage" from an indictment, emphasizing that Rule 7(d) is "properly invoked when an indictment contains nonessential allegations that could prejudicially impress the jurors." Id. (citing United States v. Kemper, 503 F.2d 327, 329 (6th Cir. 1974)).

On October 22, 2015, the government filed a response, [R. 36], objecting to Defendant's

3

motion to strike surplusage on grounds that: 1) the inclusion of peer comparison data in paragraphs 28–30 is proper, as the Sixth Circuit has expressly affirmed use of such information; 2) paragraphs 31–33's references to Defendant's salary and pay bonus are relevant evidence of financial motive to commit a scheme to defraud medical insurance companies; and 3) no misrepresentations occur in paragraphs 35–39, because all excerpts from the KBML consultant report and Agreed Order of Retirement were direct quotations taken verbatim from these sources. [R. 36 at 1–2, 6].

On November 5, 2015, the Defendant filed a reply, [R. 39], alleging that the government's response misconstrued the governing standard for striking surplusage. Defendant further denied that the peer comparisons, financial data, and citations to the KBML retirement order and consultant report were proper, relevant inclusions in his indictment. Id. For the reasons stated below, the undersigned recommends that the Defendant's Motion to Strike Surplusage [R. 23] be granted in part, and denied in part.

## STANDARD

Courts should grant a motion to strike surplusage only where the indictment's language is clearly both irrelevant and prejudicial. United States v. Moss, 9 F.3d 543, 550 (6th Cir. 1993). Put another way, courts should strike indictment allegations "only where it is clear that the allegations are not relevant to the criminal charges and . . . contain inflammatory and prejudicial matter." United States v. Garton, No. CRIMA 3:08-CR-31-JMH, 2009 WL 1424429 at * 2 (E.D. Ky. May 21, 2009) (citing United States v. Davis, 714 F. Supp. 853, 866 (S.D. Ohio 1988)). "[I]f the language in the indictment is information which the government hopes to properly prove at trial, it cannot be considered surplusage no matter how prejudicial it may be (provided, of

4

course, it is legally relevant.)" Moss, 9 F.3d at 550 (quoting United States v. Thomas, 875 F.2d 559, 562 n. 2 (6th Cir. 1989), cert. denied, 493 U.S. 867 (1989)).

The determinative question underlying any motion to strike surplusage is not the potential prejudice, but the *relevance* of the allegation to the crime charged in the indictment. See United States v. Jimenez, 824 F. Supp. 351, 370 (S.D.N.Y. 1993) (emphasis added). "If the evidence of the allegation is admissible and relevant to the charge, then despite prejudice, the language will not be stricken." Id.

The concept of relevancy within an indictment is broad; the indictment need not comprise essential elements of the crime nor be essential to the charges, so long as it is generally relevant to the overall scheme charged in the indictment. See United States v. Giampa, 904 F. Supp. 235, 271–72 (D.N.J. 1995). Further, the inclusion of a "background" or "general allegations" section is a permissible method of providing the relevant context and circumstances surrounding a fraud charges in order for the charges to be understood. See Jimenez, 824 F. Supp. at 370.

Importantly, the standard under Rule 7(d) "has been strictly construed against striking surplusage," Kemper, 503 F.2d at 329, and "only rarely has surplusage been ordered stricken." Davis, 714 F. Supp. at 866. The decision whether to grant a party's motion to strike surplusage lies within the "sound discretion of the court." Kemper, 503 F.2d at 329.

## ANALYSIS

Defendant specifically alleges that: 1) paragraphs 28–30's peer comparisons to other doctors at unrelated hospitals are irrelevant to whether Defendant's specific procedures were improper; 2) paragraphs 31–33's references to Defendant's work-related income are irrelevant to the allegations of wrongdoing; and 3) paragraphs 35–39's references to the KBML settlement are

5

non-essential misstatements of fact, while references to the consultant's opinions constitute inadmissible hearsay. [R. 23-1]. Stressing that Rule 7 is designed to prevent prosecutors from "attempting to influence a jury by making allegations that could prejudicially impress jurors and are not essential to the charges in the indictment," he claims the government has improperly made such allegations here. Id.

However, courts should only grant Defendant's motion to strike "where it is clear that the language is both irrelevant and prejudicial," Moss, 9 F.3d at 560, mindful that the analysis is "strictly construed against striking surplusage." Kemper, 503 F.2d at 329. For the reasons explained below, the Court recommends that the Defendant's Motion to Strike Surplusage [R. 23] be granted in part, and denied in part.

### 1. PEER COMPARISON DATA

The Sixth Circuit has affirmed the use of such peer comparison information in an indictment. See United States v. Weinstock, 153 F.3d 272 (6th Cir. 1998). In Weinstock, the Sixth Circuit rejected the podiatrist-defendant's argument that unfair prejudice outweighed the probative value of the comparisons between defendant's practices and those of other physicians – the "Physician Practice Profile" – in his indictment for insurance mail fraud:

> The Physician Practice Profile did not suggest an improper basis upon which the jury decided the case. *Instead, the profile was used to provide a context for the jury to evaluate the allegations against Weinstock. While the profile is detrimental to the merits of Weinstock's case, it provides competent evidence of the charges of fraud.* If all evidence adverse to a defendant was subject to exclusion under Rule 403, then no government evidence would ever be deemed admissible. The test under Rule 403 is not whether the evidence is detrimental, but whether it is so unfairly prejudicial as to substantially outweigh its probative value. We find no such unfair prejudice with the profile in question, especially because Weinstock

> had an opportunity to argue to the jury about the weight it should give the document.

Weinstock, 153 F.3d at 278 (emphasis added). It follows that Defendant retains the same opportunity to argue before the jury how much weight should be attributed to these peer comparisons. The government also cites to numerous cases in which courts have upheld an indictment's inclusion of cardiac stent-specific peer comparison data, in very similar circumstances involving unnecessary stent procedure allegations. See United States v. McLean, No. 10-0531 (D. Md. July 15, 2011) (government permitted to admit cardiologist's peer comparison data, to compare against similar patient populations); United States v. Patel, 485 F. App'x 702, 717 (5th Cir. 2012) (court found cardiac-related peer data was probative, "with its weight and effect left to the jurors." Id.).

Defendant seeks to distinguish his case from Weinstock, McLean, and Patel, arguing in his reply that the indictment's comparisons to "faraway doctors" and "procedures not at issue" are overly broad in terms of scope and geography, relative to the comparisons allowed in the government's cases. However, Paragraph 28 compares Defendant's stent volume with the nation's top cardiologists, and also with *all other Kentucky cardiologists*, thereby providing a state-specific, geographically narrow comparison as well as a national comparison. [R. 1 at 8]. Just like Weinstock permitted comparisons to other podiatrists in defendant's community, paragraph 28's comparisons to other cardiologists in Kentucky's medical community are also permissible.

Paragraph 29 compares "other cardiologists at KDMC" with non-KDMC doctors from eight local and national hospitals. Id. Though Defendant argues these comparisons are

7

irrelevant, [R. 39 at 3–6], the relevance is apparent: comparisons with other KDMC cardiologists illustrate how Defendant's inflated volumes "cannot be attributed to being the only cardiologist in the region, or even at his hospital," [R. 36 at 4], where even those above-average volumes of similarly-situated KDMC doctors were surpassed by Defendant's higher volumes. The undersigned finds paragraph 29's peer data comparisons are not "irrelevant and prejudicial." Moss, 9 F.3d at 560.

Lastly, Paragraph 30 alleges Defendant "performed more cardiac stent procedures for Medicare patients . . . than were performed by all the cardiologists in either the University of Kentucky or University of Louisville healthcare systems." [R. 1 at 8]. He claims this allegation is irrelevant but also claims it improperly invites a "mini-trial" regarding why other local doctors did or did not place stents in their patients. [R. 23-1 at 5]. Such "mini-trial" concerns are baseless; paragraph 30 does not seek to ascertain why *other doctors* may or may not have conducted stent procedures, but rather, solely seeks to ascertain *Defendant's* reasons and motives behind his procedural decisions. While he may challenge the alleged explanations for these statistical anomalies, "the truth of the Indictment's allegations are to be tested at trial, not through pretrial motion." Garton, 2009 WL 1424429 at *3. Defendant's contention that the government "seeks to compare [Defendant] with distant cardiologists treating different patient populations with different symptoms in different conditions" is misplaced. [R. 39 at 6].

The Court agrees the volume comparisons in paragraphs 28–30 equally provide "*context for the jury to evaluate the allegations against [Paulus]*." Weinstock, 153 F.3d at 278 (emphasis added). While perhaps detrimental to Defendant's case, these comparisons provide "competent evidence of the charges of fraud" similar to Weinstock's Physician Practice Profile. Id. at 278.

As previously discussed, the Rule 403 balancing test is not "whether the evidence is detrimental, but whether it is so unfairly prejudicial as to substantially outweigh its probative value," Id. Bound to the "relevance and prejudice" standard, the undersigned finds the allegations are not "clearly irrelevant to the criminal charges," Id. at *2, nor overly prejudicial to justify granting Defendant's motion to strike under the standard heavily construed against such motions. Kemper, 503 F.2d at 329.

The Court disagrees that such peer comparisons, Defendant's higher volumes relative to other doctors in other hospitals, are either irrelevant or overly prejudicial. [R. 23-1 at 4]. In accordance with the Sixth Circuit's refusal to strike peer comparison data in Weinstock, and with McLean and Patel's permitting stent-specific comparisons, the undersigned finds paragraph 28–30 to be sufficiently relevant and narrow in scope. The Court denies the motion to strike these paragraphs.

### 2. STATEMENTS OF COMPENSATION

Next, Defendant moves to strike paragraphs 31–33, on grounds they contain specific data regarding his salary and the compensation he received for performing stent procedures. [R. 23-1 at 6]. He deems these paragraphs non-essential, inflammatory, and prejudicial in that they "improperly invite[] jurors to convict based on the extent of . . . total compensation (regardless of whether . . . related to the placement of stents at all, let alone any allegedly improper stents)." Id. at 7.

However, motive is a proper purpose for introducing relevance, [R. 36 at 5], and the Sixth Circuit has established that evidence of income is relevant "to demonstrate financial gain was the motive for the crimes charged." United States v. Logan, 250 F.3d 350, 369 (6th Cir.

9

2001) (citing Pointer v. United States, 151 U.S. 396, 414 (1894) (proof of motive is always welcome); United States v. Kurlemann, No. 1-10-CR-14, 2011 WL 1113266 at *2 (6th Cir. March 23, 2011), rev'd in part on other grounds, 736 F.3d 439 (2013) ("personal advancement and financial gain . . . are two well recognized motives for unlawful conduct.").

Defendant's supporting case law is again distinguishable from this case. In United States v. Mihsen, the Sixth Circuit struck an indictment's first paragraph which stated defendant "was born in Syria . . . became a naturalized United States citizen in 1991 . . . live[d] in the Dallas/Fort Worth area . . . is a licensed private investigator, a licensed pilot, and . . . [and] has a license to drive commercial vehicles." United States v. Mihsen, No. 05-CR-80206, 2005 WL 1984466 at *3 (E.D. Mich. Aug. 15, 2005). This Court understands how such information was "immaterial to the pending [smuggling] charges," Id.; here, the compensation data in paragraphs 29–31 is not "immaterial," because it is relevant to and indicative of a possible motive underlying the alleged medical fraud.

Defendant also cites to United States v. Cooper, 384 F. Supp. 2d 958 (W.D. Va. 2005), where the Fourth Circuit struck references to a defendant's past dealings with environmental and health agencies, finding them non-essential to his pending Clean Water Act charges. Id. at 958–60. Again, paragraphs 31–33's financial data is distinguishable from the Cooper defendant's prior, relatively disconnected interactions with environmental agencies; importantly, the Cooper court struck only those portions of the indictment involving past agency dealings, but *did not strike* those paragraphs involving defendant's business interests, tax returns, and financial information. Id.

Ultimately, the determinative question underlying any motion to strike surplusage is the

*relevance* of the allegation to the crime charged.  Jimenez, 824 F. Supp. at 351 (emphasis added). Pursuant to Federal Rule of Evidence 401, evidence is "relevant" if it "has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action."  Id.  Accordingly, the income-related data in paragraphs 31–33 is relevant to providing a possible motive for the alleged unnecessary procedures.  This Court cannot in good faith disregard the inherent relevance of income earned for procedures performed in the context of these charges, and so Defendant's motion to strike paragraphs 31–33 is denied.

### 3.  REFERENCES TO THE KBML SETTLEMENT AND CONSULTANT REPORT

Finally, Defendant moves to strike paragraphs 35–39, which reference both his settlement agreement with the Kentucky Board of Medical Licensure ("KBML") and the "unverified opinions of [the KBML's] consultant."  [R. 23-1 at 7].  He provides three reasons: 1) the indictment misstates his settlement agreement with the KBML, and attributes a consultant's findings to the KBML which the board never formally adopted; 2) references to the KBML settlement are nonessential and would prejudicially impress the jury; and 3) the consultant's opinions constitute inadmissible hearsay.  Id. at 7–10.

This Court agrees that the inclusions of paragraphs 36–37 are more prejudicial than probative where they constitute misrepresentations of fact.  Specifically, paragraph 36 states that "[t]he KBML reviewed the patient medical file referenced in the anonymous complaint, as well as fourteen additional patient medical files of [Defendant], and paragraph 37 states that, "[b]ased upon this review, *the KBML concluded* that Paulus had engaged in conduct 'which departed from or failed to conform to the standards of acceptable and prevailing medical practice within the Commonwealth of Kentucky' in regard to all fifteen charts reviewed."  [R. 1 at 9] (emphasis

11

added).  However, in the "Stipulations of Fact" section of the Agreed Order of Retirement, the order states that "the Board *consultant* reviewed" the charts, "[t]he Board *consultant* further found the licensee's care reached the level of gross negligence," and "[t]he Board *consultant* believed that the practice of medicine by the licensee constituted a danger to the health or welfare of patients."  [R. 23-2 at 2, 3].  It was not the KBML itself that reviewed patient files and formed conclusions; rather, the Board's consultant did these things.  Where the indictment misattributes these procedures and conclusions to the KBML, while as a factual matter it was their consultant who conducted procedures and formulated conclusions, paragraphs 36–37 are factual misrepresentations.  Accordingly, they pose a significant risk of prejudice to potential jury members, who could easily conclude that the Board itself reached these conclusions.  The risk of prejudice surrounding paragraphs 36–37 outweighs their probative value, and for that reason they should be stricken.  However, the remaining paragraphs should not be stricken, where no such factual misrepresentation or risk of prejudice occurs there.

      Defendant additionally claims that all references to the settlement are "nonessential allegations that could prejudicially impress the jurors."  [R. 23-1 at 10] (citing Kemper, 503 F.2d at 329).  He further argues that "prosecutors in this case helped to orchestrate the KBML proceedings in an effort to circumvent [his] Fifth Amendment rights."  [R. 39 at 8].  However, the Agreed Retirement Order's relevance is readily apparent; Defendant entered into the settlement and Retirement Order with the KBML "in lieu of revocation" – only upon becoming aware of the surrounding federal investigation – thereby increasing the probability that he was taking preemptive, ameliorative measures to defend himself rather than opting to retire of his own volition.  His assertion that "prosecutors . . . helped to orchestrate the KBML proceedings in

12

an effort to circumvent" his rights is a factual allegation towards the veracity of the indictment, and as previously stated, "the truth of the . . . allegations are to be tested at trial," not through a pretrial motion to strike surplusage. Garton, 2009 WL 1424429 at *3 (citing Knox, 396 U.S. at 83).

Finally, the government's response illustrates how Defendant's hearsay concerns are unfounded. The Sixth Circuit has held that an indictment may be based entirely on hearsay, United States v. Reyes, 51 F. App'x 488 (6th Cir. 2002), but more importantly, the government assures he will offer his expert opinion at trial, his statements will not be introduced as hearsay, and the defense will have the opportunity to cross-examine him. [R. 36 at 6]. Defendant's hearsay objections are unwarranted.

## **CONCLUSION**

To summarize, the Defendant's reply alleges that the government "never disputes that the allegations [he seeks to strike] are 'nonessential' or that they could 'prejudicially impress' jurors." [R. 39 at 3]. The undersigned finds that the government has systematically provided evidence of relevance for the peer comparison data in paragraphs 28–30, and the compensation data in paragraphs 31–33. Their inclusions may be prejudicial, but prejudice is not the determinate factor; "[i]f the evidence of the allegation is admissible and relevant to the charge, then despite prejudice, the language will not be stricken." Jimenez, 824 F. Supp. at 370.

However, while the references to the settlement and to the KBML consultant's findings in paragraphs 35 and 38–39 are also relevant and permissible, the Court finds paragraphs 36–37 to be prejudicial misrepresentations of fact which should be struck from the indictment. For the reasons set forth above,

IT IS RECOMMENDED THAT the Defendant's Motion to Strike Surplusage from the Indictment [R. 23] be GRANTED IN PART to the extent that the undersigned recommends the Court strike paragraphs 36-37 of the Indictment, and DENIED IN ALL OTHER RESPECTS.

Specific objections to this Report and Recommendation must be filed within fourteen (14) days from the date of service thereof or further appeal is waived. United States v. Campbell, 261 F.3d 628, 632 (6th Cir. 2001); Bituminous Cas. Corp. v. Combs Contracting Inc., 236 F. Supp. 2d 737, 749-750 (E.D. Ky. 2002). General objections or objections that require a judge's interpretation are insufficient to preserve the right to appeal. Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004); Miller v. Currie, 50 F.3d 373, 380 (6th Cir. 1995).

Signed November 25, 2015.

Signed By:
Edward B. Atkins   *EBA*
United States Magistrate Judge