**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT ASHLAND**

**CRIMINAL ACTION NO. 15-15-DLB-EBA**

**UNITED STATES OF AMERICA**                                             **PLAINTIFF**

**v.**                          **MEMORANDUM ORDER**

**RICHARD E. PAULUS, M.D.**                                             **DEFENDANT**

* *   * *   * *   * *   * *   * *   * *   * *

This matter is before the court on several motions regarding expected expert testimony, including the United States' Motion for a *Daubert* Hearing (Doc. # 78), Dr. Paulus's Motion to Exclude All Altered and Distorted Angiograms Offered by the Government as Evidence (Doc. # 79), and Dr. Paulus's Motion to Exclude the Testimony of Doctors Ragosta and Moliterno Concerning their Review of Altered and Distorted Angiograms (Doc. # 80). The Court having heard testimony and oral argument on July 25-26, 2016, the motions are fully briefed (Docs. # 88, 89, 93, 94, 95, 152, and 153) and ripe for review.

## I.    BACKGROUND

The United States alleges that Dr. Paulus performed unnecessary cardiac procedures, including catheterizations and stent placements, on approximately 140 patients and has charged him with one count of health care fraud[1] and twenty-six counts of false

---

1    18 U.S.C. § 1347 ("Whoever knowingly and willfully executes, or attempts to execute a scheme or artifice – (1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services ..." is guilty of health care fraud.)

1

statements relating to health care matters.[2] (Doc. # 1 at 11-14; Doc. # 149, 30:1-5).  The suspect procedures occurred while Dr. Paulus was working at King's Daughters Medical Center in Ashland, Kentucky.[3]

Kentucky Heart & Vascular Physicians, Inc. ("KHVI"), a subsidiary of Ashland Hospital Corporation, d/b/a King's Daughters Medical Center, and its affiliates treat patients who suffer from a variety of cardiac conditions, including coronary artery disease ("CAD"). *Id.* at 4.  CAD develops when plaque builds up along artery walls, thus restricting blood flow to the heart muscle. *Id.*  Cardiologists can diagnose CAD via non-invasive testing methods, such as a physical, electrocardiogram, echocardiogram, stress testing, nuclear stress testing, and blood work. *Id.*  They can also use an invasive imaging procedure, called cardiac catheterization, to diagnose this condition. *Id.* at 4-5.  This procedure involves the insertion of a catheter in the patient's blood vessel. *Id.* at 5.  The catheter is guided up to the coronary arteries, where contrast material is injected.  *Id.*  X-ray machines capture images of the heart, known as angiograms, with the arteries highlighted by the contrast material. *Id.*  Cardiologists use these angiograms to determine whether the arteries are narrowed, and if so, by how much. *Id.*

---

2   18 U.S.C. § 1035 ("Whoever, in any matter involving a health care benefit program, knowingly and willfully – (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact; or (2) makes any materially false, fictitious, or fraudulent statements or representations, or makes or uses any materially false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry, in connection with the delivery of or payment for health care benefits, items, or services ..." is guilty of making false statements relating to health care matters.)

3   In 2008, Kentucky Heart & Vascular Physicians, Inc. ("KHVI"), a subsidiary of Ashland Hospital Corporation, d/b/a King's Daughters Medical Center ("KDMC"), purchased Cumberland Cardiology, Dr. Paulus's professional services corporation, and entered into a Physician's Employment Agreement with Dr. Paulus.  (Doc. # 1 at 1-2).  In exchange, Dr. Paulus assigned his billing rights to KHVI, thus permitting it to submit claims for his services to Medicare and Medicaid. *Id.* at 2.

Patients who suffer from significant CAD, defined by the American College of Cardiology ("ACC") as a 70 percent blockage of at least one major epicardial artery segment, often require a cardiac stent placement. *Id.* This procedure involves threading a catheter, with a balloon and a stent attached, through the body to the blockage site. *Id.* at 6-7. The balloon is then inflated, pushing the plaque against the artery wall and restoring blood flow through it. *Id.* Finally, the stent is positioned so that it holds the artery open, and the balloon and catheter are removed. *Id.*

Medicare and Medicaid reimburse physicians for a wide variety of procedures, including cardiac catheterizations and cardiac stent placements, so long as they are "reasonable and necessary" for the diagnosis and treatment of a qualifying patient's illness.[4] *Id.* at 7. To obtain reimbursement, physicians must submit claim forms to the Centers for Medicare and Medicaid Services ("CMS") and certify that the services rendered were "medically indicated and necessary for the health of the patient." *Id.* CMS then makes coverage and necessity determinations based on the information provided. *Id.*

Between 2006 and 2011, Dr. Paulus ranked first among all cardiologists in the United States for total units billed to Medicare in connection with cardiac catheterizations and stent placements. *Id.* at 8. He also performed more cardiac stent placements than any other cardiologist in Kentucky. *Id.* On November 7, 2012, the Kentucky Board of Medical Licensure ("KBML") received an anonymous complaint alleging fraud, abuse, and

---

4    Patients must meet certain conditions to obtain Medicare or Medicaid benefits. Generally speaking, Medicare is a health care benefit program that provides medical services to elderly or disabled individuals. *See* 42 U.S.C. § 1395 *et seq.* Medicare Part A covers medically necessary inpatient hospital care, while Medicare Part B covers doctors' services, outpatient care, and supplies. *Id.* Medicaid is a health care benefit program, jointly funded by the states and the federal government, that provides medical services to low-income individuals. *See* 42 U.S.C. § 1396 *et seq.*

negligence by Dr. Paulus. *Id.* at 9.  Ultimately, the KMBL opted to resolve the matter without further investigation or an evidentiary hearing, choosing instead to enter into an Agreed Order of Retirement with Dr. Paulus on November 26, 2014.

On September 3, 2015, Dr. Paulus was indicted by a federal grand jury. (Doc. # 1). The Indictment alleges that from approximately July 24, 2008 through July 31, 2013, Dr. Paulus performed cardiac catheterizations on patients at KDMC and falsely recorded the existence and extent of lesions observed during the procedure, performed medically unnecessary cardiac stent procedures, and then submitted the false and fraudulent claims to health care benefit programs. *Id.* at 10-11.  Dr. Paulus previously moved to dismiss the Medically Unnecessary Services Theory of Count 1 of the Indictment (Doc. # 29) and the False Statement Portion of Count 1 and the Entirety of Counts 2 through 27 (Doc. # 27). The Court denied both motions by prior Order on May 4, 2016. (Doc. # 108).

After the parties exchanged expert-witness disclosures, the United States filed a motion requesting a *Daubert* hearing (Doc. # 78), which the Court granted. (Doc. # 106). Dr. Paulus also filed multiple pre-trial motions, including a Motion to Exclude All Altered and Distorted Angiograms Offered by the Government as Evidence (Doc. # 79) and a Motion to Exclude the Testimony of Doctors Ragosta and Moliterno Concerning their Review of Altered and Distorted Angiograms (Doc. # 80).  Because the criminal charges appear to rise and fall with the angiogram evidence, the Court will first consider Dr. Paulus's Motions regarding the "altered and distorted angiograms."

## II.   ANALYSIS

Dr. Paulus's Motions regarding the angiograms focus on two main aspects: authentication and admissibility (Doc. # 79) and propriety of the testimony under Rule 702

and *Daubert*. (Doc. # 80).

As part of his practice, Dr. Paulus relied on and interpreted angiograms to make diagnostic and treatment decisions. *Id.* Cardiologists typically view angiograms live. *Id.* During the live imaging, Dr. Paulus viewed 1024 x 1024 images containing 1,048,576 pixels and 1,024 shades of gray. (Doc. # 80-1 at 5). KDMC then stored these angiograms, deleting the original and creating an archived, compressed, and downscaled version. The archiving process downscaled the images to a 512 x 512 matrix and used only 256 shades of gray. *Id.* Thus, the number of pixels were decreased by 75 percent to 262,144 pixels. This particular downscaling process "calculated an average shade of gray" for every four pixels and then created one new pixel to take their place. *Id.* at 6-7. The parties agree that the original angiograms no longer exist and that the angiograms the United States seeks to introduce as evidence are an archived, compressed, and downscaled version of the original. However, they dispute the propriety of the archived angiogram evidence.

### 1. Dr. Paulus's Motion to Exclude All Altered and Distorted Angiograms Offered by the Government as Evidence

Dr. Paulus offers three arguments in support of his Motion to Exclude All Altered and Distorted Angiograms. First, Dr. Paulus argues that the angiograms cannot be authenticated under Rule 901(a) because the United States cannot meet their burden of showing that the archiving system produced an "accurate result" when it "altered and distorted" the angiograms. (Doc. # 79-1 at 6-8). Specifically, Dr. Paulus relies upon the differences between the live imaging Dr. Paulus saw and relied upon in making his stenting decisions and the archived images that the United States now seeks to introduce as evidence – KDMC's archiving system decreased the number of pixels in each image from

1,048,576 to 262,144, changed every single pixel by averaging the colors of every four pixels and creating one new pixel in its place, and drastically reduced the shades of gray. *Id.* at 8.  Dr. Paulus also argues that "there are no other means of authenticating" the altered angiograms because they "did not exist when Dr. Paulus performed the procedures," are "substantively different than the original images," and "no witness can testify that the altered angiograms reflected what Dr. Paulus saw." *Id.*

Second, Dr. Paulus claims that the altered and distorted angiograms should be excluded as irrelevant under Rule 401 because they do not reflect what Dr. Paulus saw and thus, fail "to make any fact more or less probable than it would be without the evidence." *Id.* at 10-11.  And lastly, Dr. Paulus argues that the altered and distorted angiograms should be excluded pursuant to Rule 403 because any conceivable probative value is substantially outweighed by the danger of unfair prejudice to Dr. Paulus and misleading the jury. *Id.* at 11-13.

In response, the United States argues that the key question under Rule 901 is whether the matter in question is what its proponent claims it is. (Doc. # 88 at 4).  Here, the United States claims to seek admission of images of "the angiograms the Defendant relied on when he placed unnecessary stents in patients' hearts and falsely recorded the percentage of stenosis in their medical records." *Id.*  For authentication purposes, the United States plans to present witnesses from KDMC and the manufacture of the catheterization laboratory equipment. *Id.* at 4-5.  Further, the United States argues that being "metaphysically identical" to what Dr. Paulus saw is not the legal standard for authentication under Rule 901.  *Id.* at 5.  Instead, the United States claims that any question about the accuracy of the angiograms "goes only to the weight the jury should

6

afford" the angiograms, not their admissibility. *Id.* Finally, the United States argues that the angiograms are highly relevant under Rule 401 and not unduly prejudicial under Rule 403. *Id.* at 6-9.

### A.    Authentication

"To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." FED. R. EVID. 901(a).  Coronary angiograms are created with x-ray technology (Doc. # 1 at 5) and the Federal Rules of Evidence consider an x-ray a "photograph" for purposes of authentication and admission. *See* FED. R. EVID. 1002 Advisory Committee's Note.  "Photographs are admissible evidence if the content is authenticated." *United States v. Smith*, 27 F. App'x 577, 582 (6th Cir. 2001) (citing FED. R. EVID. 901).  "To prove the content of a photograph, the original is required except as provided by the Rules." *Id.* (citing FED. R. EVID. 1002).

However, a "duplicate is admissible to the same extent as an original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." FED. R. EVID. 1003.  "A 'duplicate' means a counterpart produced by a mechanical, photographic, chemical, electronic, or other equivalent process or technique that accurately reproduces the original." FED. R. EVID. 1001(e).  "A counterpart produced by means of photograph, including enlargements and miniatures, is a duplicate under FRE 1001(4)." 31 Fed. Prac. & Proc. Evid. § 7167(4).  But, "if the photograph of a negative or print is of poor quality, the court may conclude that it is not a duplicate because it fails to 'accurately reproduce the original.'" *Id.*  If the original has been changed, it typically must be shown that the changes that exist in the duplicate are not material or

misleading. *Id.* Thus, "where the photocopy is of poor quality or has other characteristics that raise suspicions concerning its reliability, the court may either decline to give it status as a duplicate or exclude it on the ground its admission would be unfair under FRE 1003." *Id.*

The archived, compressed, and downscaled angiograms are a "counterpart produced by electronic processes" and "accurately reproduce the original." FED. R. EVID. 1003. Thus, the archived angiograms constitute "duplicates" under Rule 1003. While the archived angiograms are a *lesser quality* than the originals Dr. Paulus viewed, the angiograms are not *poor quality*. In fact, the United States' expert opined that the 512 x 512 is the "defined industry standard resolution," that the images are of diagnostic quality, and are "sufficient to make treatment decisions." (Doc. # 149, 26:21-26:4; 37:7-10). Dr. Paulus's own expert, Mr. Keith Strauss, testified that "[t]he difference in resolution" is "not a linear relationship." *Id.* at 137:21-25. Although, the archived "image was clearly inferior to the 1024 image" and "not as high a quality," Mr. Strauss admitted that he "would never say the blockages are going to disappear" in the archiving process. *Id.* at 153:1-2; 174:23-24.

Therefore, giving credence to the parties' conflicting expert testimony, the Court finds that the archived angiograms are an "accurate reproduction" of the original, live images Dr. Paulus viewed, interpreted, and relied on. While the angiograms have been compressed and downscaled, the changes are not material or misleading and the original angiograms no longer exist; thus, their admission is not unfair to Dr. Paulus. Accordingly, the angiograms' admission comports with Rules 901, 1002, and 1003. However, Dr. Paulus will be free to challenge the angiogram evidence through cross-examination and the

8

testimony of his own expert witnesses, and can argue to the jury that the angiograms deserve little weight as they are not the exact images that Dr, Paulus observed.

## B.    Relevancy and 403 Considerations

Under Rule 402, "[e]vidence which is not relevant is not admissible." "The standard for relevancy is 'extremely liberal.'" *United States v. Whittington*, 455 F.3d 736, 738 (6th Cir. 2006) (citing *Douglass v. Eaton Corp.*, 956 F.2d 1339, 1344 (6th Cir. 1992)). "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401. "[E]ven if a district court believes the evidence is insufficient to prove the ultimate point for which it is offered, it may not exclude the evidence if it has the slightest probative worth." *Whittington*, 455 F.3d at 738-39 (quoting *DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 475 (6th Cir. 1996)).

However, relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence." FED. R. EVID. 403. "'Unfair prejudice' in the context of Rule 403 means an undue tendency to suggest a decision based on improper considerations; it does not include the prejudicial 'damage to a defendant's case that results from the legitimate probative force of relevant evidence.'" *United States v. Wright*, 102 F. App'x 972, 979 (6th Cir. 2004) (citing *United States v. Bilderbeck*, 163 F.3d 971, 978 (6th Cir. 1999) & *United States v. Lucas*, 357 F.3d 599, 606 n. 2 (6th Cir. 2004)).

Despite Dr. Paulus's arguments to the contrary, the angiograms are highly relevant. Although archived, compressed, and downscaled, the angiograms are the only evidence

9

of the patients' blockages.  The angiograms are the subject of Dr. Paulus's alleged false statements and the linchpin of his alleged health care fraud scheme.  Furthermore, the angiograms, and the extent of the blockages (or lack thereof) that they show, effects the probability of the existence of several facts.  While the angiograms' reliability has been attacked and they do not directly prove that Dr. Paulus committed health care fraud or made false statements, they do help prove the extent or absence of a blockage.  The lack of blockage shown on the angiograms make it more likely that Dr. Paulus made false statements and performed medically unnecessary stent procedures; thus, the angiogram evidence aids the United States in establishing that the asserted proposition (the extent of the blockage) is untrue - one element of the defendant's guilt. *See e.g. United States v. Waechter*, 771 F.2d 974, 978 (6th Cir. 1985) ("The government has established one element of the defendant's guilt when its evidence demonstrates that the asserted proposition is untrue.").  Therefore, the angiogram evidence is highly relevant.

The probative value of the angiogram evidence is not substantially outweighed by the danger of unfair prejudice.  Although the angiograms introduced into evidence are not the original live images viewed by Dr. Paulus, he can attack the evidence through cross-examination and the testimony of his own expert witnesses.  Therefore, for the reasons stated above, the archived, compressed, and downscaled angiograms are admissible as evidence.  Accordingly, Dr. Paulus's Motion to Exclude All Altered and Distorted Angiograms Offered by the Government as Evidence (Doc. # 79) is **denied**.

### 2. Motion to Exclude the Testimony of Doctors Ragosta and Moliterno Concerning their Review of Altered and Distorted Angiograms

Dr. Paulus also asks the Court to exclude the testimony of Dr. Michael Ragosta and

Dr. David Moliterno concerning their review of the altered and distorted angiograms. (Doc. # 80).   As factual background, Dr. Paulus asserts that angiography requires the best possible image quality, that Dr. Paulus viewed high-resolution angiograms, that KDMC altered and downscaled the angiograms and discarded the originals, that KDMC's high-resolution images have been tested and determined to be "significantly better" than the altered and distorted images, and that the United States' proposed experts rely on the altered and degraded angiograms to form their opinions about the extent of the blockage for patients they never examined. (Doc. # 80-1 at 3-10).   Accordingly, Dr. Paulus argues that the United States cannot meet its burden under *Daubert* because neither the altered evidence nor the proposed methodology can satisfy the standard. *Id.* at 11.   Dr. Paulus further claims that the opinions of Doctors Ragosta and Moliterno are not reliable or relevant because they relied on the altered evidence.   *Id.*  Specifically, Dr. Paulus points to *Rose v. Truck Ctrs., Inc.*, 388 F. App'x 528 (6th Cir. 2010), where the Sixth Circuit determined a qualified mechanic's opinion as to the cause of an accident was not sufficiently reliable because he examined the truck six months after the accident and assumed the state of the bolts had not changed.  *Id.* at 11-12.

Dr. Paulus also claims that Doctors Ragosta's and Moliterno's opinions are not reliable or relevant because they do not "fit the facts" of the case and assist the trier of fact, as required by Rule 702. *Id.* at 13.   The testimony of the United States' experts cannot fit the facts of the case, Dr. Paulus argues, because the opinions are not based on the same angiograms that Dr. Paulus saw when he treated his patients. *Id.*  Additionally, Dr. Paulus relies upon Supreme Court's holding in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), that all experts must employ "the same level of intellectual rigor that characterizes

the practice of an expert in the relevant field" and argues that no practicing cardiologist would forego high-resolution angiography on the assumption that a low-resolution angiogram would deliver the same result and specificity regarding the stenosis. *Id.* at 14.

Lastly, Dr. Paulus argues that the expert testimony of Doctors Ragosta and Moliterno should be excluded under Rule 403, as the risk of confusing and misleading the jury by relying on the altered and distorted angiograms are high and will unfairly prejudice Dr. Paulus. *Id.* at 16-17.

In response, the United States claims that the archived angiograms are accurate depictions of the patients' conditions when Dr. Paulus made the decision to stent. (Doc. # 88 at 5-6). In support of this argument, the United States has retained a clinical imaging physician, Dr. Ehsan Samei, who will testify that KDMC's imaging systems are well within the current standard of practice. *Id.* at 6. The United States counters Dr. Paulus's "altered and distorted" argument by claiming that "until the Defendant needed a legal defense," he did not complain about the angiogram's "degradation" and regularly reviewed the archived images in his practice. *Id.* Furthermore, the United States claims that "the actual review of the archived angiograms dispels any notion that the films have been degraded" because their experts have reviewed the angiograms and found them to be sufficient medical grade. *Id.* at 7. Lastly, the United States asserts that it will rely on the testimony of individuals who were with the Defendant in the catheterization lab and can testify that they could not see any noticeable blockage which would necessitate the stent procedures. *Id.*

The United States also disputes Dr. Paulus's argument that the opinions of Doctors Ragosta and Moliterno should be excluded. The United States claims that Rule 702 should be interpreted broadly, and that even if the angiograms are degraded, such a "weakness

in the factual basis of an expert witness's opinion ... bear[s] on the weight of the evidence rather than on its admissibility." *Id.* at 9 (citing *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2010)).  Finally, the United States argues that Dr. Paulus's reliance on *Rose* is misplaced because their experts are interpreting angiograms – a common and well-established process for trained interventional cardiologists – and the angiograms accurately depict the extent of stenosis present. *Id.* at 10-11.  Accordingly, the United States asserts that the methodology and opinions of their proposed experts are reliable and there is no basis to exclude their testimony.

### A.    Rule 702 & *Daubert*

Under Rule 702, a proposed expert's opinion is admissible if (1) the witness is qualified by knowledge, skill, experience, training, or education; (2) the testimony of that expert witness is relevant, meaning that it will assist the trier of fact to understand the evidence or to determine a fact in issue; and (3) the testimony of that expert is reliable. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008).  Generally, Rule 702 "should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact." *Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 505, 516 (6th Cir. 1998).

"In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court explained that Rule 702 confers a 'gatekeeping role' on trial judges to 'ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *United States v. Semrau*, 693 F.3d 510, 520 (6th Cir. 2012) (citing *Daubert*, 509 U.S. 579, 579 (1993)). "The inquiry is a 'flexible one' focused on 'principles and methodology.'" *Id.* (citing *Daubert*, 509 U.S. at 594-95).  "There is no 'definitive checklist or test' for balancing the liberal

13

admissibility standards for relevant evidence and the need to exclude misleading 'junk science.'" *Id.* (citing *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176 (6th Cir. 2009)). The proponent of the evidence has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence. *See Bourjaily v. United States*, 483 U.S. 171 (1987); *see also Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001).

### B.   Dr. Moliterno and Dr. Ragosta

Dr. Paulus does not challenge the qualifications of either Dr. Moliterno or Dr. Ragosta; instead, Dr. Paulus argues that their testimony is neither relevant nor reliable under Rule 702 and *Daubert*. (Doc. # 149, 72:4-19).  At the *Daubert* hearing, the United States proffered the testimony of Dr. Moliterno and Dr. Ragosta, who both testified that they had reviewed the archived angiograms and assessed the degree of stenosis.

### i.   Relevance

Despite Dr. Paulus's contentions, there can be no serious doubt of the relevance of Dr. Moliterno's and Dr. Ragosta's testimony, which sheds light on a matter critical to the jury's decision.  Relevant testimony "help[s] the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702(a).  "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 591-592.  Dr. Paulus claims that both doctors' testimony is irrelevant because they relied on the "altered and distorted angiograms" to form their opinions and because their opinions do not fit the facts of the case "because they are not opining on the same angiograms that Dr. Paulus saw when he treated patients." (Doc. # 80 at 13).

Dr. Paulus's arguments concerning the doctors' reliance on the "altered and distorted angiograms" are more appropriately characterized as a challenge to the reliability of the doctors' principles and methods, not the relevance of their opinions. *See Powell v. Tosh*, 942 F. Supp. 2d 678, 691-92 (W.D. Ky. 2013) (finding an argument couched in terms of relevance that otherwise recapitulates reliability-related arguments unpersuasive). Dr. Paulus's contention that the doctors' opinions are irrelevant because their opinions, which are based on the archived angiograms, "do not fit the facts of the case" must also be rejected. As the Court previously explained, the angiogram evidence is highly relevant. Despite Dr. Paulus's argument that Dr. Moliterno and Dr. Ragosta cannot testify about the specifics of the archival process and how it may have affected their interpretation of the angiogram, as trained and highly-qualified cardiologists, they can testify about the extent of the blockage on each angiogram. The Court finds that such testimony would educate the jury. Coronary angiography and CAD are highly complex medical specializations about which only cardiologists are able to testify, and are undoubtedly beyond the ordinary knowledge of most, if not all, lay jurors. Contrary to Dr. Paulus's argument, the angiograms would mean nothing to the jury without experts to interpret them; and thus, the experts' testimony will "help the trier of fact to understand the evidence" and "to determine a fact in issue." FED. R. EVID. 702(a). Therefore, Dr. Moliterno's and Dr. Ragosta's testimony will aid the jury in evaluating the accuracy of Dr. Paulus's statements regarding the blockages and satisfies the second prong under Rule 702.

### ii.    Reliability

With regard to reliability, the trial judge should determine that the expert testimony has a "grounding in the methods and procedures of science," and that any inferences or

15

assertions are "derived by the scientific method" and "supported by the appropriate validation." *Daubert*, 509 U.S. at 590.  To ascertain whether expert testimony is reliable, the trial court should consider:

> (1) whether a theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) the known potential rate of error in using a particular scientific technique and the existence and maintenance of standards controlling the technique's operation, and (4) whether the theory or technique has been generally accepted in the particular field.

*United States v. Bonds*, 12 F.3d 540, 555 (6th Cir.1993) (citing *Daubert*, 509 U.S. at 591-594).

To satisfy Rule 702, Dr. Moliterno's and Dr. Ragota's methods and conclusions must be reliable. *See Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671 (6th Cir. 2010) (rejecting an expert's conclusions as too speculative and attenuated).  In judging the reliability of the doctors' methods, the Court primarily looks to the *Daubert* factors.  In his Motion, Dr. Paulus highlights each factor and claims that "[t]here is no methodology to recreate the original angiograms that (i) has been tested, (ii) has been peer reviewed or published, (iii) has a known error rate or standards controlling its operation, or (iv) has been generally accepted in the scientific community." (Doc. # 80-1 at 13-14).  Specifically, Dr. Paulus argues that the doctors "cannot premise their testimony on an arbitrary and untestable guess that there were no material differences between the altered angiograms and the high-resolution angiograms reflecting different-colored pixels, sharper details, substantially more shades of gray, and greater high-contrast and low-contrast resolutions." *Id.* at 14.

The Court finds that Dr. Moliterno's and Dr. Ragosta's opinions are the product of a reliable application of an acceptable method. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136,

16

146 (1997) ("[C]onclusions and methodology are not entirely distinct from one another ... A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). Specifically, Dr. Moliterno testified that he frequently reviews "downscaled images" for interpretation and evaluation of patients and believes that the 512 x 512 images were of sufficient "diagnostic quality to make a diagnosis." (Doc. # 149, 116:2-15). Similarly, Dr. Ragosta testified that the 512 x 512 images he reviewed "were what [he] use[s] routinely for clinical decisions on a day-to-day basis" and that, based on his experience looking at thousands of angiograms, he "can tell when something is of quality that [it] can be interpreted or not." *Id.* at 269:18-20; 277:14-16. On the other hand, Dr. Paulus's expert, Dr. Joel Kahn, opined that he would not make a degree of stenosis determination on a 512 x 512 angiogram that had been downscaled; however, he did note that he formed opinions, by looking at the archived angiograms, about whether Dr. Paulus's treatment was "appropriate or not appropriate." *Id.* at 234:20-235:6; 243:2-5). Therefore, it appears that both parties' experts acknowledge and agree that there is at least some degree of value in the archived images, because at the very least, an appropriateness determination can be made.[5]

Furthermore, considering the four *Daubert* factors, Dr. Moliterno's and Dr. Ragosta's opinions are sufficiently reliable. The first *Daubert* factor weighs in favor of admitting the angiograms. "[W]hether the theory or technique can be and has been tested" is a "key

---

5    The Court finds *Rose v. Truck Ctrs., Inc.*, which Dr. Paulus cites heavily, distinguishable from the present case. In *Rose*, the Sixth Circuit determined a qualified mechanic's opinion as to the cause of an accident was not sufficiently reliable because he examined the truck six months after the accident and assumed the state of the bolts had not changed. The angiograms in this case, however, were not subject to the potential environmental and human manipulation the truck may have suffered. Instead, the angiograms were archived, compressed, and downscaled by a computerized algorithm. Therefore, unlike *Rose*, the Court and the experts know what changes occurred to the angiograms. Accordingly, *Rose* is not instructive in this case.

question." *Bonds*, 12 F.3d at 558 (citing *Daubert*, 509 U.S. 579).  At the *Daubert* hearing, the testimony established that there has been testing of the ability and accuracy of interpreting angiograms at different image sizes and compression levels. (Doc. # 149, 35:11- 37:6).   In fact, the testimony of the parties' imaging experts, Dr. Ehsan Samei and Mr. Keith Strauss, show that the adequacy of angiogram images has been and can be tested.

The second factor also lends support to Doctors Moliterno and Ragosta's reliability. "[P]eer review and publication is another consideration in determining whether scientific evidence is admissible under Rule 702." *Bonds*, 12 F.3d at 559.  However, "publication - just one element of peer review - is not essential for admissibility or synonymous with reliability." *Id.*  "The key here is that the theory and procedures have been submitted to the scrutiny of the scientific community, in part to increase the likelihood that substantive flaws in methodology have been detected." *Id.* (internal citations omitted). Here, it appears that making treatment decisions based on "altered" angiograms and image quality reduction produced by downscaling has received "at least some exposure within the scientific peerage to which [they] belong," even though there does not appear to be a specific study that "approve[s] or endorse[s] the use of compressed, downscaled 512 images to make clinical treatment decisions." *United States v. Kozminski*, 821 F.2d 1186, 1201 (6th Cir. 1987); (Doc. # 149, 116:20-118:10); (Docs. # 80-4 & 80-5).

The third *Daubert* factors also supports admitting the angiograms.  The Court "ordinarily should consider the known or potential rate of error" and "the existence and maintenance of standards controlling the technique's operation." *Daubert*, 509 U.S. at 594. In this case, there appears to be significant information regarding the potential rate of error.

First, there is an inherent rate of error in interpreting angiograms, known as "interobserver variability," which has enjoyed extensive attention by the medical community. (Doc. # 80-6). Furthermore, both parties' experts opined as to their belief regarding the potential rate of error when cardiologists interpret compressed and downscaled angiograms – Dr. Paulus's expert, Mr. Keith Strauss, testified that he believed that downscaling "might not alter the interpretation of 80 to 90 percent of the images," (Doc. # 149, 154:17-19), while the United States' expert, Dr. Ehsan Samei, testified that he believed downscaling would affect a doctor's interpretation in "maybe 1 in 100 case[s]." *Id.* at 118:1-4). Dr. Paulus will be permitted to argue about the rate of error to the jury, but the testimony elicited during the *Daubert* hearing does not warrant exclusion on this ground.

The fourth and final factor, general acceptance, also favors admitting the angiograms. *Daubert* indicates that the scientific validity analysis "does not require, although it does permit," the Court to consider the degree to which the principles and methodology are generally accepted in the relevant scientific community. *Daubert*, 509 U.S. at 594. "Widespread acceptance can be an important factor in ruling particular evidence admissible, and 'a known technique which has been able to attract only minimal support within the community,' may properly be viewed with skepticism." *Id.* "[G]eneral acceptance is [only] required as to the principles and methodology employed." *Bonds*, 12 F.3d at 563. "The assessment of the validity and reliability of the conclusions drawn by the expert is a jury question; the judge may only examine whether the principles and methodology are scientifically valid and generally accepted." *Id.* In the present case, the testimony supports the conclusion that reviewing 512 x 512, compressed, and downscaled angiograms and making a post-hoc determination regarding the treatment decision (whether specific degree

19

of stenosis or simply appropriate or inappropriate) is generally accepted. (Doc. # 149, 116:2-15; 269:18-20; 277:14-16; 234:20-235:6; 243:2-5).  Therefore, Dr. Moliterno's and Dr. Ragosta's expert testimony is both relevant and reliable, and therefore, will be admitted.

"The decision whether to admit the expert testimony in the first place is a matter of law for the trial judge." *Bonds*, 12 F.3d at 563 (citing *United States v. Stifel*, 433 F.2d 431, 438 (6th Cir. 1970)).  "Once a court admits the testimony, 'then it is for the jury to decide" how much weight to give it.  *Id.* (citing *Stifel*, 433 F.2d at 438).  "In the context of scientific evidence, this means that 'conflicting testimony concerning the conclusions drawn by experts, so long as they are based on a generally accepted and reliable scientific principle, ordinarily go to the weight of the testimony rather than its admissibility.'" *Id.* (citing *United States v. Brown*, 557 F.2d 541, 556 (6th Cir. 1977)).  *Daubert* made clear that "in determining the scientific validity and thus the 'evidentiary reliability' of scientific evidence, '[t]he focus ... must be solely on principles and methodology, not on the conclusions that they generate.'" *Id.* (citing *Daubert*, 509 U.S. at 595).  Therefore, "[q]uestions about the certainty of the scientific results are matters of weight for the jury." *Id.*

Although the Court acknowledges the parties' experts conflict and the conclusions the experts draw from the angiograms may be subject to attack, the expert opinions of Dr. Moliterno and Dr. Ragosta are certainly not "misleading junk science" that should be excluded under Rule 702 and *Daubert*.  *Best*, 563 F.3d at 176-177.  Instead, the angiogram evidence is the quintessential "shaky but admissible evidence" that *Daubert* permits. *Daubert*, 509 U.S. at 596.   Rather than exclusion, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the ... appropriate means of attacking" the angiogram evidence in this case. *Id.*

### 3.   United States' Motion for *Daubert* Hearing

The United States requested a *Daubert* hearing after Dr. Paulus made his disclosures pursuant to Rule 16. (Doc. # 79).  The Court granted that request (Doc. # 106) and then heard oral argument regarding the United States' objections on July 26, 2016. (Doc. # 151).  Several of the United States' objections were resolved at the hearing. *Id.* However, the United States' objections to Dr. Richard Baer and Dr. Dale Wortham remain.

First, the United States attacks the sufficiency of Dr. Paulus's Rule 16 disclosures as to both challenged experts.  In addition, the United States claims that Dr. Baer is "unqualified to offer opinions concerning the standard of care in interventional cardiology" or "any opinion concerning the Defendant's claims."  (Doc. # 78 at 4-5).  As for Dr. Wortham, the United States argues that his testimony is irrelevant and unreliable.

The United States' general objections regarding the sufficiency of Dr. Paulus's Rule 16 disclosures are overruled, as the Court finds the disclosures are sufficient.  The United States' objections to Dr. Baer are also overruled in part.  Rule 702 permits a witness to testify in the form of an opinion if "qualified as an expert by knowledge, skill, experience, training, or education." FED. R. EVID. 702.  When making qualification determinations, "the only question for the trial judge ... is whether his knowledge of the subject matter is such that his opinion will most likely assist the trier of fact in arriving at the truth." *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 850 (6th Cir. 1981).  Dr. Baer easily satisfies the qualification inquiry.  In fact, Dr. Baer is similarly situated to Dr. Berman, the United States' expert. Therefore, Dr. Baer will be permitted to testify in accordance with his Rule 16 disclosure, subject to the limitation that he cannot testify regarding any "indicia of fraud." (Doc. # 151, 45:10-17).  Lastly, the United States' withdrew their objection to Dr. Wortham at the July

21

26, 2016 hearing, provided that Dr. Wortham does not "rely upon any studies." *Id.* at 55:7-17). If Dr. Paulus intends to offer any expert testimony from Dr. Wortham regarding or based upon any "studies," he shall seek the Court's permission outside the jury's presence prior to asking any such questions.

### III.   CONCLUSION

Accordingly, for the reasons stated herein,

**IT IS ORDERED** as follows:

(1)    Defendant Dr. Richard E. Paulus's Motion to Exclude All Altered and Distorted Angiograms Offered by the Government as Evidence (Doc. # 79) is **denied**;

(2)    Defendant Dr. Richard E. Paulus's Motion to Exclude the Testimony of Doctors Ragosta and Moliterno Concerning their Review of Altered and Distorted Angiograms (Doc. # 80) is **denied**;

(3)    The United States' Motion for a *Daubert* Hearing (Doc. # 78) is **overruled in part** to the extent it seeks to object to the Dr. Richard Baer's qualifications, but **sustained in part** in regards to Dr. Baer's testimony regarding any "indicia of fraud," and **overruled** as to Dr. Dale Wortham.

This 15th day of August, 2016.



Signed By:

*David L. Bunning*

United States District Judge

J:\DATA\ORDERS\Ashland Criminal\2015\Paulus Orders\15-15 Daubert Order.wpd