UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
COVINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | INDICTMENT NO. 0:15-CR-15-DLB-EBA |
| ) | |
| RICHARD E. PAULUS, M.D. ) | |
| ) | |
| Defendant ) | |

**DR. RICHARD PAULUS'S MEMORANDUM IN SUPPORT OF HIS MOTION
TO FOR A JUDGMENT OF AN ACQUITTAL**

There are four reasons why the Court should grant Dr. Paulus's motion for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure.

First, the government has not presented any evidence that Dr. Paulus made any false statement in connection with the angiogram interpretations at issue in Counts 2, 6, 7, 9, 13, 15, 16, 19, 22, 23, and 26. None of the cardiologists presented by the government testified that they disagreed with Dr. Paulus's interpretation of the blockage of the angiograms referenced in those 11 counts. Because there has been no substantive evidence concerning those angiograms (including any difference of interpretations), those 11 counts should be dismissed.

Second, prior to trial, the government alleged that there were 147 procedures at issue in Count 1, but has not presented any testimony at all about 86 of those procedures. Without any testimony about those 86 procedures, the government has failed to produce sufficient evidence that those procedures were part of a scheme to defraud. Because no reasonable juror could find

1

Dr. Paulus guilty of Count 1 because of those procedures, a judgment of acquittal should be entered with respect to those 86 procedures in Count 1 of the indictment.

Third, with respect to the remaining procedures in Count 1, the government has failed to present evidence that would permit a reasonable jury to find beyond a reasonable doubt that Dr. Paulus had any intent to defraud or engaged in any scheme to defraud. In deciding the motion to dismiss, the Court held that "[t]he law clearly states that § 1347 is not intended to criminalize questionable decision-making or even medical malpractice." Docket Entry No. 108 at 2. Even with all reasonable inferences drawn in its favor, the government's case-in-chief has consisted of testimony that: (i) other cardiologists disagreed with some of Dr. Paulus's treatment decisions; (ii) Dr. Paulus worked more hours and placed a higher number of stents than many other cardiologists; and (iii) Dr. Paulus received higher compensation than many other cardiologists received. Even if the jurors thought that the government's cardiologists were right and that Dr. Paulus was wrong about his angiogram interpretations, that evidence would not permit any reasonable juror to infer that Dr. Paulus knowingly and willfully engaged in a scheme to defraud. When the government's own expert testifies that cardiologists "completely" disagree about the significance of lesions of moderate size, and when that evidence is equally consistent with an honest mistake or disagreement, no reasonable jury could find that the difference of interpretations proves fraud beyond a reasonable doubt.

Fourth, no reasonable juror could find that the government has proven, beyond a reasonable doubt, that Dr. Paulus willfully and knowingly made a false statement of an objective fact. Even in civil fraud claims, "[a] mere difference of opinion between physicians, without more, is not enough to show falsity." *United States v. AseraCare Inc.*, No. 2:12-CV-245-KOB, 2016 WL 1270521, at *1 (N.D. Ala. Mar. 31, 2016) (emphasis in the original). In the 15 false

statement counts where the government did introduce some evidence of a disagreement, the government only produced evidence that one other cardiologist disagreed with Dr. Paulus. The government has produced no other substantive evidence regarding the angiogram interpretations in Counts 2 through 27. No one testified that Dr. Paulus suggested that he was not being truthful in these angiogram interpretations. No one testified that the records were ever changed. Even when viewed in the light most favorable to the government, the government's case-in-chief produced evidence that is fully consistent with honest mistakes or disagreements, and a reasonable jury cannot find Dr. Paulus guilty of false statements beyond a reasonable doubt in these circumstances.

Because the government has failed to produce sufficient evidence to sustain a conviction, Dr. Paulus respectfully requests that the Court dismiss Counts 1 through 27 and enter a judgment of acquittal.

## BACKGROUND

In its case-in-chief, the government has presented testimony from numerous witnesses. For the purposes of this motion, the relevant testimony was provided by six patients, four cardiologists, and nine employees from King's Daughters Medical Center.

**A.    Testimony of Patients**

The government presented testimony from six patients who had been treated by Dr. Paulus: A.L., C.C., W.C., G.J., D.C., and B.K.[1] None of these patients were recruited to the hospital; every one of these patients sought treatment from the hospital because they suffered from chest pain and/or other debilitating symptoms. *See, e.g.*, Docket Entry No. 192 at 100-102,

---

[1] *See* Docket Entry No. 192 at 96-110 (A.L.); Docket Entry No. 195 at 142-172 (C.C.); Docket Entry No. 198 at 6-28 (W.C.); *id.* at 41-62 (G.J.); *id.* at 175-200 (D.C.); Docket Entry No. 206 at 75-95 (B.K.).

3

108 (A.L. testimony that she had chest pain for over 20 years and how she returned to the emergency room to seek treatment on numerous instances for chest pain); Docket Entry No. 195 at 145 (C.C. testimony that he arrived at the emergency room because he "was having all kinds of trouble," including that he "couldn't breathe" and had "[n]o energy"); Docket Entry No. 198 at 8 (W.C. testimony that "I was having so much chest pain"); *id.* at 43 (G.J. testimony that "I was having chest pain, short of breath"); *id*. at 179 (D.C. testimony that he was "[t]ired all the time" and had "[n]o energy");[2] Docket Entry No. 206 at 77 (B.K. testimony that he "still was having some chest pains").

In addition to suffering from chest pain and/or other symptoms, many of these patients had serious medical histories. A.L. had quintuple bypass surgery in 1996 and had chest pain since she was 38 years old. Docket Entry No. 192 at 98, 108. C.C. suffered from chronic obstructive pulmonary disease and asthma, and previously had a pacemaker installed for an irregular heartbeat. Docket Entry No. 195 at 144. G.J. testified that "I'd had chest pain back in '99, 2001, and 2009," stated that "my whole family, you know, we've all had heart troubles, had bypasses and stents put in, open heart surgeries," and observed that both his mother and brother passed away at the age of 49. Docket Entry No. 198 at 42, 52. D.C. had previously suffered a minor heart attack in 2004. *Id.* at 176. B.K's two brothers had suffered from heart attacks, including one brother who died of a heart attack at the same age of 52 years old as B.K. was when he sought treatment. Docket Entry No. 206 at 85.

B.K. testified that Dr. Paulus accurately wrote down the interpretation of the blockage that Dr. Paulus orally discussed with him. Docket Entry No. 206 at 87. D.C. did not recall being

---

[2] D.C. provided inconsistent testimony about whether he had recurrent chest pain. *Compare* Docket Entry No. 198 at 197 ("Yeah, recurrent chest pain, that would be right") with *id.* at 199 ("I do have some chest pain. I never thought it was heart-related, though.").

told the percentage of blockage that Dr. Paulus interpreted, Docket Entry No. 198 at 180, and A.L. and W.C. were not asked about whether Dr. Paulus contemporaneously reported his interpretation of the blockage to them. C.C. provided inconsistent testimony, could not remember whether Dr. Bush or Dr. Paulus told him about the percentage of the blockages, and was also confused about whether Dr. Bush or Dr. Paulus told him that he had a 25 percent blockage or that 25 percent of his heart was affected by the blockage. *Compare* Docket Entry No. 195 at 148 with *id*. at 162, 170-71. C.C. was sedated at the time of the procedure, which occurred in 2010. *Id.* at 161.

C.C. and D.C. remain fully satisfied with the treatment they received from Dr. Paulus even after hearing the government's allegations. Docket Entry No. 195 at 163 (C.C. acknowledging he had no complaint at all about the treatment provided by Dr. Paulus); Docket Entry No. 198 at 195, 200 (D.C. acknowledging that he was satisfied with Dr. Paulus's care and would most likely seek care from Dr. Paulus if he were still practicing). Some patients continue to struggle with the chest pain that they experienced before ever seeing Dr. Paulus. *See* Docket Entry No. 198 at 8 (W.C. testimony that "I started doctoring for it about six years ago" and "anything I've done . . . it don't help"); Docket Entry No. 206 at 83 (B.K. testimony that he still had chest pain). Other patients felt better after the stent placements. Docket Entry No. 195 at 163 (C.C. testimony that "[y]es, I sure did" feel better after receiving a stent); Docket Entry No. 198 at 182 (D.C. testimony that he did feel better for a few months after a second stent was placed).

**B.** **Testimony of Other Cardiologists**

The government presented testimony from four cardiologists who expressed specific disagreements with Dr. Paulus's interpretation of angiograms. These four cardiologists were Dr.

Michael Ragosta, Dr. David Moliterno, Dr. Howard Morrison, and Dr. Arshad Ali.[3] These cardiologists testified about the following procedures:

- Dr. Ragosta testified that he disagreed with Dr. Paulus's angiogram interpretations for sixty-six (66) patients. *See* Docket Entry No. 203 at 89-196. Of those 66 patients, 13 patients were named in the false statement counts (specifically Counts 4, 8, 10-12, 14, 17-18, 20-21, 24-25, 27) and 53 patients were alleged to be at issue in Count 1.

- Dr. Moliterno testified that he disagreed with respect to Dr. Paulus's angiogram interpretations for seven (7) patients. Of those 7 patients, 2 patients were named in the false statement counts (specifically Counts 3, 5) and 5 patients were alleged to be at issue in Count 1.

- Dr. Morrison testified that he disagreed with respect to Dr. Paulus's angiogram interpretations for four (4) patients. *See* Docket Entry No. 212 at 17-91. All four of these patients are alleged to be at issue in Count 1.

- Dr. Ali testified that he disagreed with respect to Dr. Paulus's angiogram interpretations for three (3) patients. All three of these patients are alleged to be at issue in Count 1.

---

[3] The government also introduced testimony from cardiologists who disagreed generically about some unspecified procedures, but had no recollection of the patients at issue. *See, e.g.*, Docket Entry No. 195 at 44 (testimony of Dr. Robert Touchon that he did not know the names of patients where he disagreed with Dr. Paulus); *id.* at 117 (testimony of Dr. Mark Studney that he did not have a list of patients where he disagreed with Dr. Paulus); Docket Entry No. 203 at 25 (testimony of Dr. Jignesh Shah that he could not remember the procedures where he had concerns and did not know which procedures were performed by Dr. Paulus); Docket Entry No. 204 at 89-90 (testimony of Dr. John Kelleman about concerns of stents where he did not name the patients). Dr. Ahmad Elesber also could not identify the names of patients for procedures where he had concerns. Another cardiologist, Dr. Raghuraman Srinivasan, did not have any personal knowledge of concerns about Dr. Paulus. Docket Entry No. 206 at 16.

None of these four cardiologists testified about the angiograms of the patients alleged to be at issue in Counts 2 (G.A.), 6 (S.C.), 7 (J.D.), 9 (R.H.), 13 (A.M.), 15 (B.M.), 16 (D.M.), 19 (V.P.), 22 (E.R.), 23 (B.R.), and 26 (D.T.). None of these cardiologists therefore expressed any disagreement with Dr. Paulus about his interpretation of those angiograms alleged in these eleven counts. Moreover, these cardiologists did not opine on procedures for eighty-six other patients that the government previously identified as relevant to Count 1. The names of the patients at issue in these procedures are set forth in Exhibits A and B, which Dr. Paulus has filed under seal in order to protect the patients' identities.

For those procedures where the four cardiologists did express disagreement with specific interpretations, the cardiologists formed those interpretations based on altered angiograms. In addition to the altered angiograms, the cardiologists sometimes based their testimony on whatever medical records were made available to them by the U.S. Attorney's Office. None of these cardiologists spoke with the patients at issue, took any kind of medical history from the patients, or based any of their treatment conclusions on the patients' desires. Because of the nature of their after-the-fact review, none of the government's cardiologists bore any responsibility if their treatment conclusions turned out to be incorrect.

## C. Testimony of Other Witnesses Employed By KDMC

The government produced testimony from nine other employees of King's Daughters Medical Center, including a few employees who worked in the catheterization laboratory. None of these employees provided any testimony concerning any specific patients. None of these employees reported that Dr. Paulus told them one percentage of blockage and then wrote down another percentage. None of the witnesses from the hospital testified that Dr. Paulus told them to change medical records to reflect a different percentage than the one he initially announced in

7

the lab. None of the employees testified that Dr. Paulus ever suggested that the stent procedures were unnecessary or that the medical records were anything but accurate.

## STANDARD OF REVIEW

"After the government closes its evidence . . . , the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." FED. R. CRIM. P. 29(a). In deciding a Rule 29 motion, the Court must determine whether, "after viewing the evidence in the light most favorable to the prosecution, *and after giving the government the benefit of all inferences that could reasonably be drawn from the testimony*, any rational trier of fact could find the elements of the crime beyond a reasonable doubt." *United States v. Villarce*, 323 F.3d 435, 438 (6th Cir. 2003) (emphasis in the original).

Although the movant carries a "very heavy" burden, it is not an insurmountable burden. *See, e.g.*, *United States v. Embry*, 644 F. App'x 565, 569 (6th Cir. 2016) (reversing the district court's denial of a Rule 29 motion). "[I]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (affirming granting of Rule 29 motion). If the jury would have to rely on unreasonable inferences or if no reasonable jury could find the elements of the crime beyond a reasonable doubt, the Court "must enter a judgment of acquittal . . . ." FED. R. CRIM. P. 29(a); *see also Lorenzo*, 534 F.3d at 159 (observing that a court cannot allow the jury to draw "specious inferences").

**DISCUSSION**

There are four reasons why the Court should grant Dr. Paulus's motion for a judgment of acquittal.

**A.  Counts 2, 6, 7, 9, 13, 15, 16, 19, 22, 23, and 26 Should
Be Dismissed For a Complete Lack of Evidence.**

These eleven counts relate to patients with the initials G.A., S.C., J.D., R.H., A.M., B.M., D.M., V.P., E.R., B.R., and D.T.  Title 18, United States Code, Section 1035 requires the government to prove beyond a reasonable doubt that there was a "materially false, fictitious, or fraudulent statement[] or representation[]."  To establish a violation of Section 1035, the government must provide evidence that "the asserted proposition is untrue."  Docket Entry No. 108 at 14 (quoting *United States v. Waechter*, 771 F.2d 974, 978 (6th Cir. 1985).  The government did not ask any cardiologist to testify concerning their opinion of Dr. Paulus's interpretation of the angiograms concerning these 11 patients.  Because there is no evidence concerning any disagreement with Dr. Paulus's interpretation of these angiograms, no jury could find that Dr. Paulus made any type of false statement.  These eleven counts should therefore be dismissed pursuant to Rule 29.

**B.  The Jury Should Not Be Permitted to Consider Any Procedure in
Count 1 Where the Government Did Not Produce Any Testimony.**

For the same reasons, the Court should enter a judgment of acquittal for all of the procedures in Count 1 where the government did not produce any testimony about those procedures.  "It is axiomatic that a conviction upon a charge not made *or upon a charge not tried* constitutes a denial of due process."  *Jackson v. Virginia*, 443 U.S. 307, 314 (1979) (emphasis added).  Prior to the trial in this case, the government had suggested that Count 1 was based on its allegations about 147 procedures.  However, in its case-in-chief, the government failed to

produce any testimony at all concerning 86 of those procedures, let alone any evidence they were improper. Those 86 procedures are listed in Sealed Exhibit A. Because the government has failed to produce sufficient evidence concerning those 86 procedures, and because it would violate Dr. Paulus's due process to be convicted on procedures not tried, the Court should grant a judgment of acquittal concerning those 86 procedures in Count 1.

### C. Count 1 Should Be Dismissed Because Attempts to Prove Malpractice Do Not Constitute Federal Health Care Fraud.

Count 1 must be dismissed because no rational jury could conclude that the government has proven beyond a reasonable doubt that Dr. Paulus was not exercising his medical judgment and instead had a specific intent to defraud. As this Court has held, "[t]he law clearly states that § 1347 is not intended to criminalize questionable decision-making or even medical malpractice." Docket Entry No. 108 at 2. "Liability only attaches to physicians who *knowingly and willfully* devise a scheme to defraud a healthcare benefit program." *Id.* (emphasis in the original).

The government has not presented evidence of fraudulent intent by Dr. Paulus. The government has presented evidence that, at various times, Dr. Ragosta, Dr. Moliterno, Dr. Ali, and Dr. Morrison disagreed with some of Dr. Paulus's angiogram interpretations and with some of his decisions to provide stents to patients who had complained of chest pain and/or other symptoms. Even if the jury construed that evidence in favor of the government and believed that the subjective interpretations by the other cardiologists of altered angiograms were preferable to Dr. Paulus's interpretations of the original angiograms, no reasonable jury could conclude from that disagreement that the government has shown beyond a reasonable doubt that Dr. Paulus therefore "knowingly and willfully" devised a scheme to defraud a healthcare benefit program.

The evidence at trial has established that cardiologists in general disagree with each other frequently concerning the extent of lesions and the appropriateness of providing a stent. *See, e.g.*, Docket Entry No. 195 at 41 (testimony of Dr. Touchon that disagreements among cardiologists about the need for stents happen all of the time); Docket Entry No. 203 at 208 (testimony of Dr. Ragosta that he previously wrote "[t]he wide interobserver variability of coronary angiography is well known"). Dr. Ragosta agreed with a statement from his own book that angiography "alone is notoriously misleading" on the "subject of lesions that appear only modestly narrow" because "[n]ot only are experienced interventional cardiologists unable to discriminate significant from nonflow limiting lesions by angiography alone, but also they *completely disagree* regarding the significance of the same lesions." Docket Entry No. 203 at 207 (emphasis added).

Because the government's own expert witness testified that experienced cardiologists "completely disagree" about the significance of modest lesions, no rational jury could find beyond a reasonable doubt that *fraud* explains the difference between another cardiologist's interpretations and Dr. Paulus's interpretations. If experienced cardiologists can "*completely disagree*" about lesions in the 50% to 70% range (as Dr. Ragosta testified), there is no way for a reasonable jury to infer that cardiologists cannot reasonably disagree *at all* about lesions simply because one cardiologist sees 30% lesions and another cardiologist sees 70% lesions. Even if the jury determined Dr. Ragosta's interpretations were right and Dr. Paulus's interpretations were wrong (for instance), that evidence is wholly consistent with (i) different philosophies in interpreting angiograms, (ii) honest mistakes, or (iii) even "questionable decision-making." Docket Entry No. 108 at 2. The Court's Order on the Motion to Dismiss also recognized that there is a distinction between the concept of fraud and malpractice: one is covered by the

11

criminal statute and one is not. Docket Entry No. 108 at 2. Because the appearance of modest lesions in angiograms are "notoriously misleading" (to use Dr. Ragosta's words), there is no evidence in the government's case-in-chief from which a reasonable jury could find, *beyond a reasonable doubt*, that fraud – and not any of these other reasons – was the explanation for the difference in opinions.

In other words, if the jury believed Dr. Ragosta's testimony, a jury might infer that there was a mistake if one cardiologist sees a 30% blockage while the other interprets a 70% blockage. But a jury cannot reasonably make the jump from "mistake" to "fraud" without considering a whole range of other possibilities, including those described above. Even with all inferences drawn in its favor, the government's evidence is equally consistent with honest mistakes by a cardiologist working 18-hour days and not fraud by a dishonest cardiologist. In that case, a Rule 29 judgment of acquittal is appropriate "because a reasonable jury must necessarily entertain a reasonable doubt." *Lorenzo*, 534 F.3d at 159.

A rational jury also cannot draw this inference beyond a reasonable doubt because it cannot reasonably ignore that the treating cardiologist was influenced by what he saw and heard when treating the patient. For instance, the treating cardiologist has to take into account the patient's symptoms and family history in a way that the government cardiologist can safely minimize after the fact. *Compare* Docket Entry No. 198 at 42, 52 (testimony of G.J. that "I'd had chest pain back in '99, 2001, and 2009," that "[m]y whole family, . . . we've all had heart troubles, had bypasses and stents put in, open heart surgeries," and that both his mother and brother passed away at the age of 49) with Docket Entry No. 203 at 196 (testimony of Dr. Ragosta neglecting to mention G.J.'s mother and brother died of heart conditions at almost the same age as G.J. was when he sought treatment for chest pains).

12

There is no other evidence that would allow a jury to infer that Dr. Paulus had fraudulent intent. The government did not produce any testimony that Dr. Paulus told medical personnel that he interpreted the angiogram to show one blockage, but wrote down another. There was no evidence that the percentages in any of the medical records were changed after the fact. The government did not provide any testimony that Dr. Paulus suggested to anyone that he did not believe the stents were necessary or that he did not believe the percentage he reported. The government tried to elicit testimony from patient C.C. that Dr. Paulus told him one blockage was only 25 percent, but C.C. later testified that he could not remember whether Dr. Paulus or Dr. Bush made that statement and that he did not know whether that statement referred to 25 percent of his heart being affected by the blockage. *Compare* Docket Entry No. 195 at 148 with *id*. at 162, 170-71. A jury cannot find fraud beyond a reasonable doubt because of internally-conflicting testimony from a patient who was sedated at the time of the conversation six years ago.

Finally, a jury could not find fraud beyond a reasonable doubt because Dr. Paulus placed more stents than other cardiologists or because Dr. Paulus was compensated when he performed procedures. If that were the case, then the government could turn any case alleging "questionable decision-making or even medical malpractice" into a fraud case. Docket Entry No. 108 at 2. If that were the case, a criminal case could be brought against any physician who worked harder than other physicians and performed more procedures. Numerous witnesses have confirmed that Dr. Paulus worked grueling hours, and there has been no witness who raised any question about whether Dr. Paulus actually examined the patients at issue, performed the catheterizations, and exercised his judgment as to whether the stents were in the best interests of

13

the patients. Because no jury could find fraud beyond a reasonable doubt in these circumstances, a judgment of acquittal should be entered with respect to Count 1.

**D.    Counts 2 through 27 Should Be Dismissed
for Failure to Prove a False Statement.**

All of the false statement counts (Counts 2 to 27) should be dismissed because there is not sufficient evidence to prove that Dr. Paulus "knowingly and willfully" made an objectively false statement that is subject to confirmation or contradiction. Even in civil fraud claims, "[a] mere difference of opinion among physicians, *without more*, is not enough to show falsity." *AseraCare Inc.*, No. 2:12-CV-245-KOB, 2016 WL 1270521, at *1 (N.D. Ala. Mar. 31, 2016) (emphasis in the original); *see also United States ex rel. Roby v. Boeing Co.*, 100 F. Supp. 2d 619, 625 (S.D. Ohio 2000) ("Expressions of opinion, scientific judgments, or statements as to conclusions about which reasonable minds may differ cannot be false."), *aff'd*, 302 F.3d 637 (6th Cir. 2002).

In this case, the government's case-in-chief asks the jury to conclude that Dr. Paulus made a false statement in fifteen counts because one other cardiologist disagreed with him. For the angiograms at issue in Counts 3 and 5, the government only presented evidence that Dr. Moliterno disagreed with Dr. Paulus's interpretations. For the angiograms at issue in Count 4, 8, 10-12, 14, 17-18, 20-21, 24-25, and 27, the only evidence is that Dr. Ragosta disagreed with Dr. Paulus's interpretations. The government apparently tried to avoid asking two cardiologists to review the same angiogram procedures for fear that they would reach different conclusions and undermine the government's chances of conviction.[4]

---

[4]    That happened in a few of the procedures that are subject to Count 1. For patient D.C., Dr. Moliterno interpreted a 50% blockage in the posterior left ventricular branch of the right coronary artery. Government Exhibit 301 at 22. For that same artery for the same patient, Dr. Ragosta interpreted a 26% blockage. Docket Entry No. 203 at 158.

14

In these circumstances, no reasonable jury can conclude beyond a reasonable doubt that Dr. Paulus "knowingly and willfully" made an objectively false statement because one other cardiologist had a different subjective interpretation of an angiogram. As described above, the testimony in this case was similar to what the district court heard in *Bond*, which concluded "[a]ll experts agreed reading angiograms is a most difficult task and that reasonable minds could and did differ" as to the extent of a blockage. *Bond v. United States*, No. 06-1652-JO, 2008 WL 655609, at *8 (D. Or. Mar. 10, 2008). No jury could reasonably infer from a mere difference in subjective interpretations that there was proof beyond a reasonable doubt that Dr. Paulus knowingly and willfully made a false statement. The only other testimony concerning Counts 2 through 27 was the testimony offered by A.L., whose angiogram was the subject of Count 12 of the indictment. *See* Docket Entry No. 192 at 96-110. In that testimony, the government never asked A.L. whether Dr. Paulus told her a blockage other than the one recorded in her medical records.

"[I]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (affirming granting of Rule 29 motion). Even if the jury fully agreed with Dr. Ragosta's interpretation of the angiograms on any of his thirteen counts or with Dr. Moliterno's interpretation of the angiograms on his two counts, the evidence equally supports a conclusion that Dr. Paulus was simply mistaken when he interpreted a greater blockage than they did. For the same reasons expressed with respect to Count 1, that evidence would not allow a jury to find beyond a reasonable doubt that Dr. Paulus knowingly and willfully made a false statement.

15

The Court recognized this issue in ruling on the motion to dismiss. In that order, the Court stated that:

> [a]s a final matter, Dr. Paulus repeatedly urges the Court to dismiss the 'false statement' counts so that he will not run the risk of conviction, simply because the United States' expert disagrees with his subjective determinations. The Court believes that this risk is overstated because § 1035 also includes a specific intent requirement. Thus, even if Dr. Paulus misstated the extent of a patient's blockage, criminal liability can attach only if he did so *knowingly* and *willfully*.

Docket Entry No. 108 at 16-17 (emphasis in the original). The Court has now heard the government's case-in-chief. The government is asking the jury to infer that Dr. Paulus acted knowingly and willfully because *one* of the United States' experts disagreed with *some* of his subjective determinations (among the thousands of subjective determinations he made over the five years alleged in the indictment). That is not a reasonable inference that a jury can make. As the philosopher Blaise Pascal observed, "contradiction is not a sign of falsity, nor the lack of contradiction the sign of truth." *AseraCare Inc.*, No. 2016 WL 1270521, at *1. The Court should enter a judgment of acquittal on Counts 2 through 27.

## **CONCLUSION**

We agree with the government on one thing in this case: Dr. Paulus is "not . . . a bad person." Docket Entry No. 213 at 31 (opening statement of the government). Dr. Paulus is a very good person who worked very long hours and who saved many lives in Eastern Kentucky. Because the government has not produced evidence sufficient to sustain a conviction under 18 U.S.C. §§ 1347 or 1035, the criminal trial of this very good person should end. Dr. Paulus respectfully requests that the Court enter a judgment of acquittal with respect to Counts 1 through 27.

Dated: September 26, 2016

Respectfully submitted,

| | |
|---|---|
| /s/ Robert S. Bennett_____ | /s/ C. David Mussetter_____ |
| Robert S. Bennett | C. David Mussetter |
| Michael P. Kelly | MUSSETTER LAW OFFICE |
| Hilary H. LoCicero | P.O. Box 192 |
| HOGAN LOVELLS US LLP | 2709 Louisa Street |
| 555 Thirteenth Street, NW | Catlettsburg, KY 41129-0192 |
| Washington, DC 20004 | (606) 931-0050 (telephone) |
| (202) 637-5600 (telephone) | (606) 931-0051 (facsimile) |
| (202) 637-5910 (facsimile) | attmuss@windstream.net |
| robert.bennett@hoganlovells.com | |
| michael.kelly@hoganlovells.com | |
| hilary.locicero@hoganlovells.com | |

COUNSEL FOR DR. RICHARD E. PAULUS