**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**COVINGTON**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| v. | ) | INDICTMENT NO. 0:15-CR-15-DLB-EBA |
| RICHARD E. PAULUS, M.D., | ) | |
| Defendant. | ) | |

**DR. RICHARD PAULUS'S MEMORANDUM IN SUPPORT**
**<u>OF HIS MOTION FOR A NEW TRIAL</u>**


Robert S. Bennett
Michael P. Kelly
Hilary H. LoCicero
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600 (telephone)
(202) 637-5910 (facsimile)

C. David Mussetter
MUSSETTER LAW OFFICE
P.O. Box 192
2709 Louisa Street
Catlettsburg, KY 41129-0192
(606) 931-0050 (telephone)
(606) 931-0051 (facsimile)

COUNSEL FOR DR. RICHARD E. PAULUS

# TABLE OF CONTENTS

**INTRODUCTION** .......... 1

**BACKGROUND** .......... 3

**STANDARD OF REVIEW** .......... 4

**DISCUSSION** .......... 5

A. A New Trial Should Be Granted Because the Verdict Was Against the Manifest Weight of the Evidence .......... 5

1. The Evidence Did Not Demonstrate Any Criminal Intent .......... 6

2. The Evidence Did Not Demonstrate Any False Representation or Statement .......... 10

3. The Jury Could Not Reach a Verdict Based on Improper Speculation About Altered Angiograms Offered By the Government .......... 14

4. The Jury Could Not Reach a Verdict Based on the Improper Evidentiary Inferences Argued By the Government .......... 19

a. The KBML Settlement Was Not a Finding .......... 19

b. Dr. Paulus's Overall Compensation and Number of Procedures Was Not Indicative of Any Wrongdoing .......... 22

c. The Court Should Not Credit Testimony From Cardiologists Who Could Not Remember Any Specific Procedures .......... 24

5. The Jury Could Not Reach a Verdict Based on the Government's Repeated Misstatements of the Evidence .......... 24

B. A New Trial Should Be Granted Because There Was a Substantial Legal Error .......... 27

1. Altered Angiograms Should Not Have Been Admitted Into Evidence, and Experts Should Not Have Been Permitted to Opine on Them .......... 27

a. The Altered Angiograms Were Not Admissible Under Rule 901 or 1003 .......... 27

b. The Altered Angiograms Should Have Been Excluded Under Rule 403 ..........29

c. Dr. Moliterno and Dr. Ragosta Should Not Have Been Permitted to Testify Concerning the Altered Angiograms ..........30

2. The Jury Should Have Received More Extensive and Particularized Instructions Concerning a Physician's Right to Choose the Appropriate Treatment ..........32

3. The Jury Instructions Did Not Include an Instruction on an Essential Element of the Offense ..........35

4. The Jury Should Have Received a "Unanimity of Theory" Instruction ..........36

5. The Court's *Allen* Charge Should Not Have Been Given to the Jury ..........38

**CONCLUSION** ..........42

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bond v. United States*,
No. 06-1652-JO, 2008 WL 655609 (D. Or. Mar. 10, 2008) ....................13

*Eid v. Saint-Gobain Abrasives, Inc.*,
377 F. App'x 438 (6th Cir. 2010) ....................21

*Fong v. Poole*,
522 F. Supp. 2d 642 (S.D.N.Y. 2007) ....................40

*Glenn v. Dallman*,
686 F.2d 418 (6th Cir. 1982) ....................35

*Rose v. Truck Ctrs., Inc.*,
388 F. App'x 528 (6th Cir. 2010) ....................32

*Schad v. Arizona*,
501 U.S. 624 (1991) ....................37

*Tamraz v. Lincoln Elec. Co.*,
620 F.3d 665 (6th Cir. 2010) ....................31, 32

*United States v. Algee*,
599 F.3d 506 (6th Cir. 2010) ....................37, 38

*United States v. Autuori*,
212 F.3d 105 (2d Cir. 2000) ....................6

*United States v. Burgos*,
55 F.3d 933 (4th Cir. 1995) ....................40

*United States v. Carman*,
No. 14-CR-20-DLB-EBA-2, 2016 WL 2596034 (E.D. Ky. May 4, 2016) ....................4, 5

*United States v. Carpenter*,
405 F. Supp. 2d 85 (D. Mass. 2005), *aff'd by* 494 F.3d 13 (1st Cir. 2007) ....................19

*United States v. Carter*,
236 F.3d 777 (6th Cir. 2001) ....................24

*United States v. Clinton*,
338 F.3d 483 (6th Cir. 2003) ....................39

*United States v. Damra*,
621 F.3d 474 (6th Cir. 2010) ....................33

*United States v. Evanston*,
651 F.3d 1080 (9th Cir. 2011) ....................41

*United States v. Green-Bowman*,
No. 13-CR-2023-LRR, 2014 WL 1370746 (N.D. Iowa Apr. 8, 2014)....................19

*United States v. Jackson-Randolph*,
282 F.3d 369 (6th Cir. 2002) ....................23

*United States v. Jakeway*,
783 F. Supp. 590 (M.D. Fla. 1992)....................19

*United States v. Knight*,
800 F.3d 491 (8th Cir. 2015) ....................5

*United States v. Kurlemann*,
736 F.3d 439 (6th Cir. 2013) ....................36

*United States v. Lewis*,
521 F. App'x 530 (6th Cir. 2013) ....................5, 6

*United States v. Lutz*,
154 F.3d 581 (6th Cir. 1998) ....................4

*United States v. Mack*,
159 F.3d 208 (6th Cir. 1998) ....................33

*United States v. McElhiney*,
275 F.3d 928 (10th Cir. 2001) ....................39

*United States v. Miller*,
734 F.3d 530 (6th Cir. 2013) ....................36, 37, 38

*United States v. Munoz*,
605 F.3d 359 (6th Cir. 2010) ....................5

*United States v. Nelson*,
27 F.3d 199 (6th Cir. 1994) ....................35

*United States v. Poulsen*,
No. CR2-06-129, 2008 WL 271659 (S.D. Ohio Jan. 30, 2008) ....................26

*United States v. Richter*,
826 F.2d 206 (2d Cir.1987)....................26

*United States v. Scott*,
547 F.2d 334 (6th Cir. 1977) ....................39, 40

*United States v. Shankman*,
13 F. Supp. 2d 1358 (S.D. Ga. 1998)....6

*United States v. Souder*,
436 F. App'x 280 (4th Cir. 2011)....5

*United States v. Stacks*,
821 F.3d 1038 (8th Cir. 2016)....5

*United States v. Taylor*,
814 F.3d 340 (6th Cir. 2016)....38

*United States v. Volkman*,
797 F.3d 377 (6th Cir. 2015)....34

*United States v. Waechter*,
771 F.2d 974 (6th Cir. 1985)....13, 36

*United States v. Waldren*,
431 F. App'x 374 (6th Cir. 2011)....35

*Williams v. United States*,
458 U.S. 279 (1982)....13, 35

**STATUTES**

18 U.S.C. § 1010....36

18 U.S.C. § 1014....36

18 U.S.C. § 1035....6, 35, 36

18 U.S.C. § 1347....6, 33, 34

## I. INTRODUCTION

In this case, the jury has convicted an innocent cardiologist. Because the evidence at trial (particularly with respect to intent) was such that no reasonable jury could find him guilty, Dr. Paulus has filed his original and renewed motions for a judgment of acquittal. Now, in the interests of justice and to prevent Dr. Paulus from being convicted of crimes that he did not commit, Dr. Paulus also respectfully requests that the Court grant this motion for a new trial.[1]

The Court should grant a new trial because the verdict was against the manifest weight of the evidence. There was no evidence that Dr. Paulus had any criminal intent (much less specific intent) or that he made any false statement. In its efforts to prove both intent and the existence of a false statement, the government continually tried to rely on the opinions of cardiologists who disagreed with Dr. Paulus's interpretations, usually by 35% to 50%. A detailed analysis of its evidence shows that the government was relying on the interpretation of only one cardiologist in the vast majority of cases. However, the evidence at trial demonstrated that, even in a small sample size, the government cardiologists disagreed with each other by 30% to 40% when looking at the *same* angiogram. The government cardiologists, of course, were looking at altered angiograms and not the original angiograms viewed by Dr. Paulus, and the government's own imaging expert admitted that the alteration could make a difference. None of the government's cardiologists spoke with the patients, examined the patients, or spoke with the emergency room or referring doctors. A jury cannot return a guilty verdict based on speculation or a guess. The government did not prove a criminal fraud or false statement case, and the jury's guilty verdict on 11 counts was against the manifest weight of the evidence.

---

[1] The Court has the right to grant both a judgment of acquittal and a new trial, which would provide the Sixth Circuit with the ability to review both decisions in the event that the government files an appeal. Dr. Paulus intends to file a reply brief in support of his motion for a judgment of acquittal 20 days after the government files its response, as ordered by the Court.

When the Court reviews the evidence in this case as the 13th juror, it should be particularly troubled by the government's misleading use of evidence to invite the jury to infer guilt without any appropriate basis. For instance, the government invited the jury to treat a settlement with the Kentucky Board of Medical Licensure as the equivalent of a formal finding that Dr. Paulus was a danger to the community. The government appealed to class prejudice by continually highlighting Dr. Paulus's lifetime savings and his substantial salary even though the government only put a small percentage of his stent procedures at issue. The government continually misstated the testimony in closing arguments, including whether its own imaging physicist told the jury that they could rely on "these angiograms" (which he did not). The government introduced evidence – such as accusations of Dr. Paulus sleeping – that was not relevant to any fraud or false statement claim and that was merely an attempt to humiliate Dr. Paulus and denigrate his medical judgment. None of this evidence is relevant to the fraud or false statement charges, but that evidence played a large part in the trial. Once this inflammatory and non-probative evidence is cast aside and not given any weight, the Court should find that the evidence presented by the government was not enough to convict a man who spent decades caring for patients in eastern Kentucky.

The Court should also grant a new trial because we respectfully submit there were substantial legal errors in the trial, most of which were encouraged by the government. The altered angiograms should not have been admitted into evidence because they were not accurate or authentic, as the testimony of the government's own imaging expert conceded. The altered angiograms were powerfully misleading evidence that caused the jury to reach a verdict based on speculation that Dr. Paulus saw what they saw. Dr. Ragosta and Dr. Moliterno should not have been permitted to speculate on the altered angiograms, which further compounded their

misleading effect. The jury instructions contained a number of errors, including the failure to instruct the jury on an essential element of the offense. Moreover, by commenting on specific pieces of evidence in its *Allen* charge (including expressing its confidence that the jury spent quite a bit of time reviewing the altered angiograms), the Court may have unintentionally swayed the jury's verdict in favor of the government. We respectfully submit that each of these errors constitutes reversible error and provides a basis for a new trial.

## II. BACKGROUND

For every false statement count, the evidence in this case followed the same pattern. First, there was a serious problem that brought the patient to the emergency room or to seek other medical help. Second, after the patient was referred to Dr. Paulus by another doctor, he treated the patient and used his medical judgment in deciding to provide the stent. Third, the government produced evidence that one cardiologist disagreed with Dr. Paulus for that specific procedure, usually based on an abbreviated review of an altered angiogram. Fourth, Dr. Kahn substantively disagreed with the reasoning by the government's cardiologist and found Dr. Paulus's actions to be reasonable and appropriate.

For each of the procedures in the false statement counts, the government presented the testimony of one cardiologist who testified that his interpretation of the altered angiogram was 35% to 50% apart from Dr. Paulus's interpretation of the original angiogram. In reaching this conclusion, the government's cardiologist (either Dr. Michael Ragosta or Dr. David Moliterno) did not consider tools or factors relied upon by Dr. Paulus in reaching these conclusions. Most prominently, Dr. Ragosta and Dr. Moliterno did not generally consider when Dr. Paulus used IVUS in forming his interpretation of the patient's blockage. In interpreting angiograms, Dr. Ragosta and Dr. Moliterno also placed little-to-no emphasis on factors that Dr. Paulus considered

to be important such as patient symptoms (including the existence of substantial chest pain), patient presentation, patient history, family history (including close family members who died of heart disease at the same age), the medications they already tried unsuccessfully, and the opinions of emergency room physicians and other referring doctors.

The same type of differences marked the government's evidence concerning Count 1. Individual cardiologists disagreed with respect to specific procedures by similar ranges. There were three cases where Dr. Ragosta's interpretation of the altered angiogram differed from Dr. Paulus's interpretation of the original angiogram by as much as 60%, but those cases involved situations where Dr. Ragosta ignored factors considered to be important to Dr. Paulus (such as the fact that Dr. Paulus had a different opinion of the artery structure and that another cardiologist performed the angiogram) or where another cardiologist agreed with Dr. Paulus.

To assist the Court in its review of the evidence, Dr. Paulus has provided a summary of evidence for each procedure on every count to which the jury returned a verdict of guilty. Dr. Paulus has attached that compilation as Appendix A.

## III. <u>STANDARD OF REVIEW</u>

A district court may grant a new trial "if the interest of justice so requires." FED. R. CRIM. P. 33(a). A new trial can be granted if "the verdict was against the manifest weight of the evidence" or "if a substantial legal error occurred during the proceedings." *United States v. Carman*, No. 14-CR-20-DLB-EBA-2, 2016 WL 2596034, at *9 (E.D. Ky. May 4, 2016). "When considering a motion for new trial based upon the weight of the evidence, district judges can act in the role of a 'thirteenth juror' and consider the credibility of the witnesses and the weight of the evidence to insure that there is not a miscarriage of justice." *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998). A district court is entitled to "credit [a defendant's] innocent

explanations for [his] actions over the sinister interpretation posited by the government," *United States v. Souder*, 436 F. App'x 280, 292 (4th Cir. 2011), and "it is precisely this kind of credibility determination that is the trial court's call to make on a motion for a new trial." *Id.* Courts can grant new trials when they find the testimony of government witnesses to be "internally inconsistent, unreliable, and lacking corroboration." *United States v. Lewis,* 521 F. App'x 530, 532 (6th Cir. 2013).

Moreover, "[a]ny legal error that is significant enough to require reversal on appeal is an adequate ground for granting a new trial." *Carman*, 2016 WL 2596034, at *9; *see also United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010) ("[A]ny error of sufficient magnitude to require reversal on appeal is an adequate ground for granting a new trial."). A substantial legal error can occur where "the substantial rights of the defendant have been jeopardized by errors or omissions during trial" or where the defendant "shows reversible error at his trial." *Munoz,* 605 F.3d at 373.

## IV. DISCUSSION

### A. A New Trial Should Be Granted Because the Verdict Was Against the Manifest Weight of the Evidence.

The verdict was against the manifest weight of the evidence because: (i) the evidence did not demonstrate any criminal intent; (ii) the evidence did not demonstrate any false statement or representation; (iii) the jury had to speculate that the altered angiograms reflected what Dr. Paulus saw on the original angiograms; (iv) the government relied on misleading evidence not probative of any intent; and (v) the government repeatedly misstated the evidence in its closing argument. *United States v. Stacks*, 821 F.3d 1038, 1045-46 (8th Cir. 2016) (affirming grant of new trial where the defense's evidence "negated any inference of intent to defraud"); *United States v. Knight*, 800 F.3d 491, 510-11 (8th Cir. 2015) (affirming grant of new trial where the

government's evidence was "highly circumstantial, tenuously connected, and largely invited only speculation and conjecture"); *United States v. Lewis*, 521 F. App'x 530, 532 (6th Cir. 2013) (affirming grant of new trial where the district court's concerns about the credibility of government witnesses "call[ed] into question a large portion of the government's proof").

**1. <u>The Evidence Did Not Demonstrate Any Criminal Intent</u>.**

The evidence at trial failed to show that Dr. Paulus had any criminal intent that would meet the standards of either 18 U.S.C. § 1347 or § 1035. *United States v. Autuori*, 212 F.3d 105, 120-21 (2d Cir. 2000) (affirming grant of new trial where the "testimony was riddled with inconsistency and was often contradicted by other government witnesses"); *United States v. Shankman*, 13 F. Supp. 2d 1358, 1366 (S.D. Ga. 1998) (granting new trial where "the instances of wrongdoing do not evidence any specific intent to defraud but, instead, appear to be innocent mistakes"). Dr. Paulus will not repeat all of the arguments made in connection with his motion for a judgment of acquittal, but those arguments apply equally to his motion for a new trial.

In weighing the evidence as the 13th juror, the Court should credit the substantial testimony that Dr. Paulus was treating patients with serious medical conditions. None of these patients were healthy. *See, e.g.*, Appendix A. Every patient had symptoms that were consistent with serious heart issues such as crushing chest pain, shortness of breath, and fatigue. *Id.* These patients sought out treatment because they knew they were sick – as they acknowledged in their own testimony. *See, e.g.*, Docket Entry No. 232 at 106-10; Docket Entry No. 235 at 154-57.

The Court should also credit the evidence that Dr. Paulus exercised his medical judgment in treating these patients. He did not perform a catheterization at all on 50 or 60 percent of the patients that he saw. Docket Entry No. 246 at 10. When he performed diagnostic catheterizations for patients, Dr. Paulus only provided stents to approximately 35% of those

patients, which was within the national average. *See* Paulus Exs. 1.229A-C.; Docket Entry No. 241 at 133-37. He never placed a stent without examining the patient. He did not have a standing order that resulted in any stents being provided without any exercise of medical judgment. None of these facts are consistent with a physician abdicating his medical judgment and committing a fraud.

Moreover, the Court should credit the evidence that Dr. Paulus had medical explanations for why he interpreted the angiograms as he did. Even from the altered angiograms, he was able to identify the locations where he thought the blockages existed. He used standard diagnostic tools, such as IVUS, to confirm the blockage where he believed there was ambiguity. *See, e.g.*, Docket Entry No. 249 at 60-61; *see also id.* at 65; Paulus Ex. 4.3; Paulus Ex. 5.3. Another independent cardiologist, Dr. Kahn, agreed that Dr. Paulus's interpretations were reasonable in the angiograms he reviewed. *See, e.g.*, Docket Entry No. 244 at 131-32. Moreover, as demonstrated in Appendix A, Dr. Paulus and Dr. Kahn always had substantive medical reasons for their disagreements with Dr. Moliterno and Dr. Ragosta.

The government tries to argue that fraud should be inferred because it was able to show that another cardiologist disagreed with Dr. Paulus. But, as discussed below, no one could infer dishonest intent from a difference of opinion about the interpretations of blockages, even significant differences of opinion. And there are many reasons why the Court should not credit the testimony of the government's two main expert witnesses, Dr. Moliterno and Dr. Ragosta. First, these cardiologists frequently ignored the results of critical tests such as IVUS[2] and

[2] *See, e.g.*, Docket Entry No. 203 at 100, 116-17, 129-30, 135-36 (examples of Dr. Ragosta failing to acknowledge that IVUS procedures even occurred for patients C.S., J.D., K.P., and A.S.); Docket Entry No. 223 at 142-43 (example of Dr. Moliterno failing to examine an IVUS for C.C. even though it was readily available). These patients were the subject of Counts 5, 8, 18, 24, and 25.

diagnostic caths,[3] which no responsible cardiologist would do. Second, the cardiologists frequently dismissed the importance of facts – such as symptoms, family history and patient characteristics – that no responsible cardiologist would dismiss when deciding how to treat patients and interpret an angiogram.[4] Third, as discussed below, these cardiologists had no way of knowing how the angiograms had changed through the archiving process. Their testimony rested on pure speculation that the angiograms had not changed in any material way. Speculation is not a basis on which anyone can reasonably infer fraud.

Finally, the Court can also consider that Dr. Ragosta repeatedly testified inconsistently with his own books. In his textbook, Dr. Ragosta wrote that an intermediate lesion was between was 40% to 70%, Docket Entry No. 244 at 33, that angiograms alone are "notoriously misleading," Docket Entry No. 203 at 207, and that doctors "completely disagree regarding the significance of the same lesions," *id.* In another place in his book, Dr. Ragosta wrote that "[t]he clinical significance of coronary lesions of moderate severity (*30 percent to 70 percent*) is unclear based on angiogram alone . . . ." Docket Entry No. 44 at 209 (emphasis added). At trial, however, Dr. Ragosta arbitrarily changed his definition of intermediate stenosis to 50% to 70%, Docket Entry No. 203 at 209, and claimed that angiography was not misleading for other sizes of lesions, *id*.

Similarly, Dr. Ragosta wrote in his textbook that "[c]linical correlation is imperative for interpreting properly the findings on angiography," Docket Entry No. 204 at 10, and that the

---

3 *See, e.g.*, Docket Entry No. 203 at 222 (Dr. Ragosta admitting that he was aware that 13 of the cases that he reviewed involved a diagnostic angiogram that was performed by another physician who determined the degree of obstruction and stating "I didn't think it was relevant. I was reporting on what Dr. Paulus reported in his angiogram.").

4 *See, e.g.*, Docket Entry No. 204 at 25 (Dr. Ragosta stating that "it doesn't matter if there's pain or not pain" for patient W.M. because "[i]t doesn't change the opinion of the angiogram because we know that there are other causes of chest pain"); Docket Entry No. 259 at 148 (Dr. Moliterno testifying that "[i]t doesn't matter if you have a family history or not").

significance of moderate lesions "is unclear based on [the] angiogram alone and often requires adjunctive techniques to further delineation." Docket Entry No. 244 at 209. Yet, Dr. Ragosta admitted that he reached his conclusions before looking at any medical records, Docket Entry No. 203 at 205-06, that he did not review records from the patients' referring doctors, *id*. at 210, and that he did not talk to or examine any of the patients that were the subject of his testimony, *id*. at 206. The government cannot prove that Dr. Paulus had fraudulent intent because he based his angiogram findings on factors (such as symptoms, patient history, family history, IVUS results, and stress test results) to which Dr. Moliterno or Dr. Ragosta did not assign the same importance.

Weighing all of this evidence together, the manifest weight of the evidence was that Dr. Paulus did not *knowingly* and *willfully* perform unnecessary procedures or *knowingly* and *willfully* make false statements. It may be that some cardiologists disagreed with him on his interpretation of individual angiograms, even strongly. In its closing argument, the government claimed that "[w]hen he talked about his patients, every one of them sounded to be on death's door until he did a procedure on them." Docket Entry No. 293 at 147. But the government never produced any proof that suggested that *Dr. Paulus* did not believe that his patients were truly sick and needed stents. That was a fatal failure in the government's proof. No reasonable person should expect that all cardiologists (regardless of their personal experience and patient populations) look at angiograms in the same way. It is possible that Dr. Paulus could have been mistaken in his treatment of some of these patients. Uncertainty and subjectivity are inherent in the practice of complicated areas of medicine such as cardiology. But that is not the same as fraud, and the government has never proven that Dr. Paulus had any criminal intent.

If the government is able to convict Dr. Paulus on these facts, it can convict innocent cardiologists and stretch these criminal statutes far beyond what Congress ever intended. When Dr. Paulus previously made this point, the Court denied Dr. Paulus's motions to dismiss because it did not know what proof the government would present at trial. *See* Docket Entry No. 108. That is no longer the case. In winning the motions to dismiss, the government promised the Court that it had more evidence than just disagreement among cardiologists. Docket Entry No. 107 at 29. The Court has now seen that promise was empty. Over six weeks, the Court has seen how the government tried to present a malpractice case and then argue it had proven fraud.[5] That is not enough to obtain a conviction of a cardiologist. A disagreement among cardiologists based on altered angiograms does not prove fraud or false statements beyond a reasonable doubt.

**2. The Evidence Did Not Demonstrate <u>Any False Representation or Statement</u>.**

For similar reasons, the manifest weight of the evidence is that Dr. Paulus did not make any false representation or statement with respect to any of his angiogram interpretations. On the ten false statement counts, the government's only evidence of a false statement consists of the testimony of one other cardiologist that his interpretation of an altered angiogram was anywhere from 35% to 50% different than Dr. Paulus's interpretation of the original angiogram. For Count 1, the vast majority of the procedures were within the same range, with only three as high as

[5] Examples of the government's attempts to prove malpractice can be found throughout its whole case, right through its closing arguments. *See, e.g.*, Docket Entry No. 293 at 39 ("He had a need to constantly be in [the] cath lab. . . . 15, 20, sometimes more procedures in a day. This was reckless"); *id.* ("He would sometimes fall asleep in patients' beds, fall asleep in the cath lab. That's reckless"); Docket Entry No. 293 at 145 ("Medically necessary doesn't mean that just one doctor in Ashland, Kentucky thinks that this patient needs a procedure"); *id.* at 148-49 ("We're not in the wild west where doctors can do whatever they want"); *id.* at 148 ("If someone had done their job, we would not be here. If the defendant had treated these people appropriately, if he had followed the guidelines, if he had only stented blockages that were severe, if he had accurately recorded these blockages in the cath report, we would not be here").

60%. In presenting its evidence, the government failed to make any showing that a cardiologist's opinion could confirm that there was an objectively untrue statement.

This failure of proof is confirmed by the government's own cardiologists. In the few instances where the government's cardiologists happened to review the same angiogram, they frequently disagreed amongst themselves by 30% to 40%. For instance, for patient B.C., Dr. Ragosta interpreted the angiogram to show a 50% blockage, while Dr. Moliterno thought the blockage was trivial, a word that he said described the bottom of the 0 to 30% range. *See, e.g.*, Docket Entry No. 223 at 134-35; Docket Entry No. 254 at 45. For patient R.B., Dr. Ragosta thought there was a 60% blockage, but Dr. Moliterno thought there was only a 30% blockage. Docket Entry No. 223 at 135. For patient D.C., Dr. Ragosta testified there was only a 25% blockage, but Dr. Moliterno wrote in his notes that there was a 60% blockage. Docket Entry No. 249 at 114-15. For patient M.C., Dr. Ragosta believed there was a 30% blockage, but Dr. Elesber had written in a cath report for M.C. that the blockage was 60%. Docket Entry No. 254 at 56-57; Paulus Ex. 65.6. Sometimes, the government's cardiologist even disagreed with himself, such as when Dr. Ragosta testified that patient R.R. had "no more than about 30 percent" blockage, Docket Entry No. 203 at 189, and Dr. Ragosta earlier interpreted the same blockage as a 50 to 60 percent blockage, *see* Government Exhibit 529. When the government's own cardiologists disagreed amongst themselves by 30% to 40% when reviewing the *same* angiogram in an extremely small sample size, the government cannot prove the existence of a false statement by showing that one cardiologist's interpretation of an *altered* angiogram was 35% to 50% different than Dr. Paulus's interpretation of the *original* angiogram.

In determining that a cardiologist's opinion fails to establish a false representation or statement, the Court should further credit the statements in Dr. Ragosta's own book that

angiography "alone is notoriously misleading" on the "subject of lesions that appear only modestly narrow" because "[n]ot only are experienced interventional cardiologists unable to discriminate significant from non-flow limiting lesions by angiography alone, but also they *completely disagree* regarding the significance of the same lesions." Docket Entry No. 203 at 207 (emphasis added). Dr. Ragosta's textbook confirmed the evidence at trial, which repeatedly showed that even government cardiologists had substantial differences when one of those cardiologists only interpreted a 30% blockage or less. For instance, no one could find Dr. Moliterno or Dr. Ragosta guilty of making a false statement with respect to patient D.C. just because their interpretations were 35% apart from each other (25% vs. 60%). If there is not a false statement when Dr. Ragosta and Dr. Moliterno disagree with each other by 35%, there cannot be a false statement when Dr. Paulus disagrees with one of them by similar amounts. This is particularly true when another cardiologist, Dr. Kahn, agrees with Dr. Paulus's interpretations and when Dr. Paulus was reviewing the original angiogram and not an alteration.

Finally, the Court should consider the government's wholesale failure to produce a *single* medical study providing any empirical basis for the belief that cardiologists cannot disagree by more than 30% without the involvement of fraud. Throughout the course of this litigation, Dr. Paulus provided several independent and objective medical studies – not conducted as part of any litigation – establishing that cardiologists substantially disagree about the extent of blockages. *See* Docket Entry No. 27-9 at 10-13 (compiling six medical studies describing interobserver variability). The Leape study alone documented 51 instances where some cardiologists thought there was no reportable disease and other cardiologists thought there were blockages of 50% or more (including 25 instances where some cardiologists thought there was no reportable disease and other cardiologists thought there were blockages of 70% or higher).

Docket Entry No. 27-5 at 109. In 2012, the American College of Cardiology relied on the Leape study when discussing the limitations of coronary angiography. Docket Entry No. 27-4 at 37. Dr. Paulus corroborated those medical studies by producing a federal case in which cardiologists disagreed by as much as 40% concerning a blockage. *Bond v. United States*, No. 06-1652-JO, 2008 WL 655609 (D. Or. Mar. 10, 2008).

In trying to persuade the Court to deny the motions to dismiss, the government promised it would show "interobserver variability is 10 percent, maybe 20 percent. No more than that." Docket Entry No. 107 at 34. At trial, the government elicited conclusory testimony from Dr. Ali that "40 percent is never going to go to 70 percent," Docket Entry No. 206 at 41, and a few other cardiologists expressed similar conclusory beliefs, *see, e.g.*, Docket Entry No. 223 at 25 (testimony of Dr. Elesber). But that conclusory speculation was refuted by the actions of the government's own witnesses in this case, by the independent medical studies, and by the government's own real-life experience in *Bond*, so that speculation cannot be reasonably credited as a reason to find the existence of a false statement. Conclusory speculation without the support of any scientific medical studies is exactly the type of junk science that cannot be credited as a basis on which to infer a false statement. Nor can anyone infer a false statement merely because the government argues in a conclusory fashion that "[i]nterobserver variability, it doesn't explain what you've seen here in these last seven weeks. It just doesn't." Docket Entry No. 293 at 38. The Court should reject the government's appeal to ignore the obvious.

In ruling on the motion to dismiss, the Court observed that "[a] false statement must be a 'factual assertion' or 'a proposition that is subject to proof or disproof.'" Docket Entry No. 108 at 14 (quoting Williams v. *United States*, 458 U.S. 279, 284 (1982) and *United States v. Waechter*, 771 F.2d 974, 978 (6th Cir. 1985)). The Court also noted that the government has to

prove the alleged statement "is untrue." *Id.* The evidence concerning the patients – including the large amount of evidence showing that they were very ill – was consistent with the blockages that Dr. Paulus interpreted on the original angiograms. Dr. Kahn's testimony was fully consistent with Dr. Paulus's interpretations. When the evidence shows that cardiologists substantially disagree with each other about the interpretations of angiograms (even by 40% or 70% or more), the manifest weight of the evidence is that the government did not establish a false statement by presenting a contrary opinion by another cardiologist.

### 3. The Jury Could Not Reach a Verdict Based on Improper Speculation About Altered Angiograms Offered By the Government.

Moreover, a new trial should be ordered because the jury had to speculate that the altered angiograms were the same as the angiograms that Dr. Paulus saw. In its closing argument, the government urged the jury to use the altered angiograms to decide whether Dr. Paulus's interpretations of the original angiograms were right.

> [Cardiologists] use their eyes. You have eyes too. You have the angiograms in front of you. You can look at these films and tell that they are not blocked, that they are not what the defendant described them as.

Docket Entry No. 293 at 146-47. It is a theme that the government relentlessly pursued throughout the case. Over the six-week trial, the government continually put the altered angiograms in front of the jury and asked them to draw conclusions from the altered angiograms about what Dr. Paulus saw in the original angiograms.[6]

---

[6] *See, e.g.*, Docket Entry No. 293 at 40 (arguing that if patients were having acute heart attacks, "you would have seen blockages in these angiograms"); *id.* at 59-60 ("Folks, don't be fooled by this argument. You've seen it with your own eyes. These angiograms are accurate. They accurately depict what was seen"); *id.* at 70 ("Look at the angiograms, see whether or not there's a blockage"); *id.* at 144 ("Consider the angiograms that are in evidence. Consider the photos that you have in front of you. Consider the false cath reports that are in evidence. That is enough.").

But there was no basis for the jury to reach a verdict based on this speculation. The government stipulated that "the images that were viewed live in the cath lab at whatever date are not what was on the films that were presented during the trial." Docket Entry No. 259 at 136. There was no dispute that the archiving process: (i) reduced the number of pixels in every angiogram from 1,048,576 pixels to 262,144 pixels; (ii) averaged the shading of every four pixels and assigned that new color to one new pixel; (iii) reduced the high-contrast resolution of the angiograms; and (iv) reduced the low-contrast resolution of the angiograms. Keith Strauss, an imaging physicist employed by Cincinnati Children's Hospital, testified that there was a "significant" difference between the original and altered angiograms and that the altered angiograms did not meet industry standards based on his testing of the equipment at KDMC. Docket Entry No. 232 at 53, 57.

The government's witness on the alteration of the angiograms, Dr. Ehsan Samei, complained that Mr. Strauss "has no way to prove" that the alteration of the angiograms had a real impact on the appearance of the images. Docket Entry No. 212 at 171. But then Dr. Samei simply substituted his own speculation that the alteration of the angiogram would not make a difference in 99 percent of cases. *Id.* at 139 ("I will say *probably* 99 percent of the cases.") (emphasis added). Dr. Samei admitted that he could not identify any study analyzing the error rate when cardiologists review altered angiograms. *Id.* at 159. No one has ever tested such a

proposition, let alone with the patient population that Dr. Paulus was seeing. And Dr. Samei readily conceded that the identity of the patients might drastically alter his guess as to the error rate in evaluating these angiograms:

> Q. And, again, statistically speaking, what would you expect from this 1024 to 512? What type of impact would you expect it to have?
>
> A. So the impact would be somewhat dependent on the prevalence of the subtle cases that we're talking about. *So if you show me [a] hundred cases and 50 of these cases are very, very difficult cases, maybe 80 of those cases are very, very difficult cases, then you will have a more significant impact on the results.* If the prevalence is low, if you have 1 or 2 percent of the cases that are difficult, those are the only ones that the confidence would be affected in such a way that your medical decision would be altered.

*Id.* at 149 (emphasis added). Dr. Samei never testified that he reviewed any specific angiograms of the patients at issue in this case, and never opined about whether any specific altered angiograms in this case would have changed. He simply assumed that problem away. *Id.* ("I don't know the population of the patient[s] that are imaged here"); *id.* at 150 ("I would imagine we have the same population in different states and so on, by and large" and "[t]herefore, I do not anticipate that we have a lot of abnormal and subtle or very difficult cases in the corpus of patients that we are looking at.").[7] Because a jury cannot speculate that these angiograms had not changed, it had no basis on which to conclude that the altered angiograms were substantially the same as what Dr. Paulus saw.

And even after adopting groundless assumptions about the angiograms, Dr. Samei still had to concede that the alterations could have changed the perception of the angiograms in a

[7] After talking about what he "imagined" the population in Ashland to be, Dr. Samei made a cryptic statement that "I have looked at just a few cases, and I just pulled a few, five or six, and these look like typical cases to me." *Id.* at 150. But there is no evidence that Dr. Samei ever reviewed any angiograms interpreted by Dr. Paulus. Dr. Samei did not name the "few" cases he supposedly reviewed. He never identified any angiograms from this case. The government never made any Rule 16 disclosure about any angiograms Dr. Samei reviewed in this case.

material way. *Id.* at 159 (agreeing that "sometimes these changes can make a difference"); *id.* at 160 (agreeing that "[i]t's a guess" as to what Dr. Paulus saw in the cath lab). And Dr. Samei was not even focusing on the right issue, because he was answering the government's question of whether the archiving process would make a lesion "magically disappear." *Id.* at 166. Questions about "magically disappear[ing]" lesions were another way that the government tried to confuse the jury and the Court. But the evidence was undisputed that the blockages never magically disappeared: even Dr. Ragosta and Dr. Moliterno could identify the blockages in every single patient. The question was whether the alteration affected Dr. Ragosta's interpretation of a blockage when he saw a 30 percent blockage on the patient's altered angiogram and when Dr. Paulus saw a 70 percent blockage on the original angiogram. The Court should not allow a conviction based on a *guess* by Dr. Samei that the alteration of the angiograms did not matter when Dr. Samei never reviewed any specific angiograms in this case.

Moreover, in deciding whether to grant a new trial, the Court should consider that the government seriously misstated Dr. Samei's testimony in its closing argument. The government told the jury that "Dr. Samei told you you can rely *on these angiograms*" and that "[h]e told you there's no substantial degradation *of these angiograms*." Docket Entry No. 293 at 58 (emphasis added). This is a total perversion of his testimony. Dr. Samei never offered any such conclusions about the angiograms interpreted by Dr. Paulus. Instead of the angiograms in this case, the government asked Dr. Samei to focus on still images not related to this case (*i.e.*, a color photograph of Mona Lisa, a "typical case" from Duke, and an angiogram photo that Dr. Samei obtained from a Russian website named dxline.info). Docket Entry No. 212 at 151-155, 163. Because the jury relied on the altered angiograms in its deliberations and had to speculate (like Dr. Samei) as to how the altered angiograms in this case were different from what Dr.

Paulus saw, the government's misstatement of Dr. Samei's testimony should further concern the Court that the jury's verdict was a miscarriage of justice.

In weighing Mr. Strauss's and Dr. Samei's testimony, the Court should find as the 13th juror that Mr. Strauss's testimony was far more credible than Dr. Samei's. In contrast to Dr. Samei, Mr. Strauss tested the equipment at KDMC. Docket Entry No. 232 at 13-16. In performing his testing, Mr. Strauss arrived at results that Dr. Samei could not and did not dispute. Docket Entry No. 212 at 171 (Dr. Samei agreeing that the alteration has a real impact on low-contrast resolution and high-contrast resolution). Moreover, Mr. Strauss explained why Dr. Samei's reasons did not support his conclusions. Because one pixel in an altered image covers 0.4 millimeters of a 2 millimeter blockage (*i.e.*, 20% of a blockage in a large coronary artery), even one pixel that changes color could affect a cardiologist's ability to measure a blockage. Docket Entry No. 232 at 80. The changing of two pixels would affect the interpretation even more. On cross-examination, Mr. Strauss explained this point to the government:

> Q. There are more than enough pixels to see a two millimeter or larger blockage; is there not?
>
> A. To see a blockage, yes. To discern the degree of blockage, no.

*Id.* at 81. The government had no substantive response to this answer, as shown by the entirety of its closing argument about Mr. Strauss's testimony:

> Defense presented Mr. Strauss. He told you blockages don't disappear. Talked to you a lot about pixels. We're not here about pixels. Mr. Strauss doesn't tell you anything of value in this case.

Docket Entry No. 293 at 93. The government could not dispute Mr. Strauss's logic, so it told the jury to ignore him. That is not a reasonable inference for the Court to draw.

The Court should also credit the witnesses who testified that the alterations of the angiograms do make a difference. *See, e.g.*, Docket Entry No. 231 at 150 (testimony of Dr. Preston that there is a difference between a live image and how it looks afterward at the viewing station); Docket Entry No. 232 at 117 (testimony of J.D. that the altered angiogram "doesn't look like anything I saw while we were doing it"); Docket Entry No. 235 at 195 (testimony of Dr. Bush that blockages appear more clearly when looking at a live angiogram); Docket Entry No. 252 at 31 (testimony of Dr. Paulus that the altered angiograms "are seriously downgraded or down scanned from what I saw"). Because the weight of the evidence showed that the altered angiograms were different than the original angiograms, the Court should grant a new trial because the jury's verdict was based on speculation.

**4. The Jury Could Not Reach a Verdict Based on the Improper Evidentiary Inferences Argued By the Government.**

In evaluating whether a new trial is warranted, the Court should further consider the unfair and misleading use of evidence by the government. Courts have granted new trials when the government has presented evidence that has the tendency to confuse juries or to persuade them to convict on impermissible bases. *See, e.g.*, *United States v. Green-Bowman*, No. 13-CR-2023-LRR, 2014 WL 1370746, at *10-11 (N.D. Iowa Apr. 8, 2014) (granting new trial because defendant was prejudiced under Rule 403 where government introduced evidence for impeachment purposes, but then argued it as substantive evidence in the closing); *United States v. Carpenter*, 405 F. Supp. 2d 85, 101-03 (D. Mass. 2005) (granting new trial where government seized onto a remark attributed to the defendant by a witness to "build an extended metaphor" about recklessness), *aff'd* 494 F.3d 13 (1st Cir. 2007); *United States v. Jakeway*, 783 F. Supp. 590, 599 (M.D. Fla. 1992) (stating that it would grant new trial "in light of the jury's possible

reliance on [one defendant's] unethical conduct and potential violations of civil regulations in determining guilt").

**a. <u>The KBML Settlement Was Not a Finding</u>.**

The government's evidence relied heavily on falsely implying to the jury that the KBML made a *substantive* finding that Dr. Paulus was a danger to society if he were to practice medicine again. It was an error for the KBML settlement to be admitted in the case at all. Dr. Paulus objected to the KBML settlement from the beginning of the case. Docket Entry No. 39 at 8-10. The Magistrate Judge found the KBML settlement to be relevant under the mistaken assumption that Dr. "Paulus entered into the settlement and Retirement Order with the KBML in lieu of revocation – *only upon becoming aware of the surrounding federal investigation* . . . ." Docket Entry No. 77 at 6 (emphasis added). The Court found that the settlement was relevant because "it explained how the KBML investigation resolved and why." *Id.* at 7. As the government always knew but never admitted to the Court, the Court's assumption about the KBML investigation was mistaken: Dr. Paulus entered the settlement with the KBML in November 2014, more than three years after the Justice Department served its subpoena and its investigation was widely known, including to Dr. Paulus. The government told Dr. Paulus in June 2012 that it intended to indict him– months before the KBML ever received an anonymous letter or opened any inquiry.

Moreover, civil settlement agreements are not supposed to be admitted as an admission of liability against a defendant, even when the settlement is with a state administrative agency and is later offered by the government in a criminal case. FED. R. EVID. 408(a)(1). Even in those circumstances, "an offer or acceptance of a compromise of any civil claim is excluded under the Rule if offered against the defendant as an admission of fault." FED. R. EVID. 408 advisory

committee's note to 2006 amendment. The reason is that "unlike a direct statement of fault, an offer or acceptance of a compromise is not very probative of the defendant's guilt." *Id.* "[D]isputes are often settled for reasons having nothing to do with the merits of a claim," *Eid v. Saint-Gobain Abrasives, Inc.*, 377 F. App'x 438, 444 (6th Cir. 2010) – such as when the Justice Department is conducting a criminal investigation of an individual, working with that administrative agency, and hoping to build its case by collecting evidence about the individual from any administrative hearing. Dr. Paulus denied the allegations and did not make any statement of fault that would fall under Federal Rule of Evidence 408(a)(2). The KBML settlement as a whole was not probative of any guilt.

Having obtained the admission of the KBML settlement on a false assumption, the government then misled the jury into believing that the KBML settlement represented a *substantive* finding by the KBML against Dr. Paulus. The government used the settlement in a misleading way from its opening statement[8] to its closing argument.[9] After having a witness read the settlement agreement into the record, Docket Entry No. 195 at 63-71, the government asked multiple witnesses whether their license had ever been revoked, or if the KBML made a finding that they were a danger to the public if they practiced medicine.[10] On the 14th trial day, the Court ultimately ordered the government not to ask further questions about the settlement on

---

8 *See, e.g.*, Docket Entry No. 213 at 3 (government promising that the jury would hear "fun stuff" about the defendant retiring in lieu of having his medical license revoked).

9 *See, e.g.*, Docket Entry No. 293 at 45 (arguing that Dr. Paulus agreed in the settlement "that his practice will be a danger to the public"); *id.* at 109 (government asking "Why did the Kentucky Board of Medical Licensure say the defendant's practice would be a danger [to] the public if he did it again?").

10 *See, e.g.*, Docket Entry No. 235 at 285 (government question to Dr. Bush: "Have you ever agreed that your practice would be an immediate danger to your patients?"); Docket Entry No. 259 at 31 (government question to Dr. Paulus: "Of all the doctors that have been in this courtroom, you're the only one that has entered into an Agreed Order of Retirement in Lieu of Revocation; is that correct?").

the grounds that the questions were cumulative. Docket Entry No. 239 at 65-66. The government then reiterated this point in closing argument. Docket Entry No. 293 at 45.

The damage was done. The KBML would not have received the benefit of the bargain if there was no mechanism to enforce the agreement expeditiously. There was no statement of fault by Dr. Paulus in the settlement, who expressly denied any wrongdoing multiple times in the settlement. Docket Entry No. 195 at 67-68, 82. And the Court had already held that "[b]ecause the KBML disposed of the matter before holding a hearing, it follows there was no formal finding of misconduct." Docket Entry No. 77 at 8.

But the government confused the jury into believing that the KBML made a finding that he was a danger to society if he practiced medicine. By repeating this misleading statement over and over again, the government misled the jury into believing that Dr. Paulus's entry into a settlement was not merely a procedural mechanism by the KBML to enforce the agreement, but rather a substantive finding by the KBML about his fitness to practice medicine. By tarring Dr. Paulus with this misleading argument and with the implication that a state administrative agency already found that his medical practice was a danger to society, the government helped to ensure that the jury would overlook the government's own evidentiary failings.

**b. Dr. Paulus's Overall Compensation and Number of Procedures Was Not Indicative of Any Wrongdoing.**

The Court should also consider how a jury was further misled by the government's repeated references to Dr. Paulus's overall income and overall savings, which amounted to an appeal to class prejudice. The government asked ten witnesses about Dr. Paulus's overall salary without regard to whether that salary was connected to any allegedly improper procedures, seeking to prejudice the jury against Dr. Paulus because of his salary. To drive the point home to the jury, the government also asked twelve witnesses about their own salaries, or other KDMC

employees' or cardiologists' salaries, in order to further highlight the differences with Dr. Paulus's salary – again without tying it to any allegedly improper procedure. To emphasize its argument that Dr. Paulus made too much money, the government even introduced his brokerage statement (with his life savings) into evidence – over Dr. Paulus's objections and without regard to whether any of that money was improperly earned. Government Ex. 526; Docket Entry No. 223 at 164-65.

These references were designed to mislead the jury into drawing an improper inference that the bulk of Dr. Paulus's income must have been obtained because of improper procedures. The government essentially asked the jury to infer that Dr. Paulus must have been engaged in misconduct if he was earning more money than other cardiologists in different circumstances. *United States v. Jackson-Randolph*, 282 F.3d 369, 377 (6th Cir. 2002) ("[I]t is illogical and improper to equate financial success and affluence with greed and corruption."). It was also an appeal to class prejudice that should not be credited. The government never asked any witness how much money was attributable to a single procedure, because the amount was not nearly as salacious as Dr. Paulus's lifetime savings. As the 13th juror, the Court should not credit Dr. Paulus's overall compensation as probative evidence of fraudulent intent.

The same is true with the overall number of procedures performed by Dr. Paulus. Through nearly every witness, the government tried to elicit testimony that Dr. Paulus performed a high number of stent procedures compared to other cardiologists. In doing so, the government asked the jury to infer that some of those procedures necessarily must have been improper. This was a major theme of the government's opening statement, questioning of witnesses, and closing arguments. But that is simply not a reasonable inference that can be drawn. Otherwise, any physician who performed more procedures than his or her peers would be subject to prosecution.

In this type of case (where there was no dispute about whether Dr. Paulus actually performed the procedures), the government's heavy reliance on the number of procedures was an effort to smear Dr. Paulus, damage his credibility as a cardiologist, and distract the trier of fact from the government's inability to prove beyond a reasonable doubt that any specific procedure was improper. In weighing the inferences, the Court should not credit those efforts.

**c. The Court Should Not Credit Testimony From Cardiologists Who Could Not Remember Any Specific Procedures.**

The government also placed heavy reliance on a number of cardiologists who disagreed with Dr. Paulus even though those cardiologists could not remember any specific procedure. *See, e.g.*, Docket Entry No. 195 at 44 (Dr. Touchon); *id.* at 117 (Dr. Studeny); Docket Entry No. 203 at 25 (Dr. Shah); Docket Entry No. 223 at 21-22 (Dr. Elesber). This testimony is generic and cannot be credited because it is impossible to evaluate without knowing what procedures they were alleging. Moreover, this testimony is even less trustworthy because these witnesses were testifying about what happened years and, in some cases, decades ago. In analogous circumstances, the Court rightly excluded similar attempts to elicit generic testimony from a lab technician. Docket Entry No. 207 at 91 ("The fact that there's no date, there's no time, there's no patient, . . . the Court would exclude it under 403 because it's simply impossible to cross-examine . . . in a vacuum."). The Court should not credit similarly generic testimony from these cardiologists.

**5. The Jury Cannot Reach a Verdict Based on the Government's Repeated Misstatements of the Evidence.**

The government misstated the evidence on critical issues on numerous occasions in the trial. "The law is clear that, while counsel has the freedom at trial to argue reasonable inferences from the evidence, counsel cannot misstate evidence . . . ." *United States v. Carter*, 236 F.3d

777, 784 (6th Cir. 2001). The Sixth Circuit "has consistently recognized that a prosecutor's misrepresentation of material evidence can have a significant impact on jury deliberations because a jury generally has confidence that a prosecuting attorney is faithfully observing his obligation as a representative of a sovereignty." *Id.* at 785-86.

In this case, the government's misstatements related to key issues and should shake the Court's faith in the jury's verdict. For example, the government's misstatements in the closing argument included the following:

(i) As described above, the government stated that "Dr. Samei told you you can rely on these angiograms" and that "[h]e told you there's no substantial degradation of these angiograms." Docket Entry No. 293 at 58. In fact, Dr. Samei testified that "I don't know the population of the patient[s] that are imaged here." Docket Entry No. 212 at 149. By misstating the evidence, the government unfairly misled the jury into thinking that Dr. Samei examined the angiograms interpreted by Dr. Paulus in this case.

(ii) The government stated that "a bunch of lawyers" identified the alteration of the angiograms as a problem. *See, e.g.*, Docket Entry No. 293 at 47. In fact, the undisputed testimony was that an imaging physicist, Keith Strauss, identified the problem after he personally tested the equipment at KDMC. Docket Entry No. 232 at 63. By falsely implying that lawyers had identified the imaging problem, the government misled the jury into believing that the alteration did not present any legitimate concerns.

(iii) The government stated repeatedly to the jury that "you have seen that these arteries were not blocked." Docket Entry No. 293 at 146; *see also id.* at 146-47 ("You can look at these films and tell that they are not blocked . . . ."). In fact, the government's own experts consistently acknowledged that there were blockages in the arteries. *See, e.g.*, Docket Entry No. 203 at 109. By falsely stating that there were no blockages, the government misled the jury about the nature of the disagreement between its experts and Dr. Paulus.

(iv) The government stated that Lance White "once suggested to a patient that he might not need a cath" and that "Dr. Paulus got upset, told him knock it off. Don't do that." Docket Entry No. 293 at 49. In fact, Mr. White stated that he did not "know how much of [the conversation]" Dr. Paulus had heard and that Dr. Paulus simply shook his head at him without making any statement at all. Docket Entry No. 212 at 8-9. The government misled the jury into believing that Dr. Paulus made statements that he did not make.

(v) The government stated that, following her challenged stent procedure with Dr. Paulus, A.L. came under the care of Dr. Studeny and was diagnosed with GERD-induced chest pain. Docket Entry No. 293 at 52 ("She's under the care of Dr. Studeny now. New diagnosis for chest pain. Her diagnosis is GERD."). In fact, no witness ever testified that A.L. had since been treated by Dr. Studeny. Additionally, A.L. had been receiving treatment for GERD since as early as 1995, and was taking two medications for GERD on the day of her challenged procedure. *See* Docket Entry No. 246 at 147, 149. By misrepresenting A.L.'s treatment, the government improperly suggested that Dr. Paulus ignored other possible sources of A.L.'s chest pain.

These were not isolated events. In the government's questioning, it also inserted facts into questions that were simply untrue and for which there was no evidentiary basis. Even though there was no good faith basis to suggest that any IVUS images had been altered in this case, the government tried to elicit testimony that IVUS could be manipulated. *See, e.g.*, Docket Entry No. 259 at 13 (the government's suggestion that "[y]ou can do an IVUS and draw a reference segment wherever you want to"). The government falsely represented to Dr. Kahn that Dr. Paulus did not use nitroglycerine when performing IVUS procedures. Docket Entry No. 244 at 163. At various times in the trial, the government misstated other key facts about the challenged procedures.

The government also engaged in other improper forms of questioning and argument. Frequently throughout the case, the government:

- improperly asked Dr. Paulus to opine on whether other cardiologists were lying about their opinions and improperly argued to the jury that they must convict if they believed the cardiologists presented by the government. *United States v. Richter*, 826 F.2d 206, 209 (2d Cir.1987) (finding reversible error and stating that "prosecutors have been admonished time and again to avoid statements to the effect that, if the defendant is innocent, government agents must be lying").

- improperly asked hypothetical questions that assumed Dr. Paulus's guilt. *United States v. Poulsen*, No. CR2-06-129, 2008 WL 271659, at *6 (S.D. Ohio Jan. 30, 2008) ("Such questions have the potential to confuse the jury (and usurp its role) by making it appear as though the witness is implicitly testifying that Defendants are guilty of the crimes of which they stand accused.").

In weighing the evidence and determining whether the interests of justice require a new trial, the Court should consider how the jury's verdict was shaped by the government's misstatements of the evidence and frequent use of innuendo in the place of probative evidence. Because the manifest weight of the evidence was against a guilty verdict on any count, and because there was frequent and misleading use of evidence and argument designed to poison the jury's view of Dr. Paulus in fundamentally unfair ways, a new trial should be granted to prevent the conviction of an innocent man.

### B. A New Trial Should Be Granted Because There Was a Substantial Legal Error.

#### 1. Altered Angiograms Should Not Have Been Admitted Into Evidence, and Experts Should Not Have Been Permitted to Opine on Them.

##### a. The Altered Angiograms Were Not Admissible Under Rule 901 or 1003.

The Court made substantial legal errors in admitting the angiograms into the trial and in finding that the opinions of Dr. Ragosta and Dr. Moliterno about those altered angiograms satisfied the *Daubert* standard. First, the Court erred in ruling that the archiving process "accurately" reproduced the original angiograms and that the altered angiograms were therefore "duplicates" under Federal Rule of Evidence 1003 because the changes were not "material." Docket Entry No. 155 at 8-9. None of the imaging experts agreed that the angiograms were duplicates or accurate. At the *Daubert* hearing, Dr. Samei testified that it would be "an overstatement" to say that one could "accurately" assess the lesions in an altered angiogram. Docket Entry No. 149 at 78. At trial, Dr. Samei continued to acknowledge that "sometimes these changes can make a difference," Docket Entry No. 212 at 159, and that it depends on whether there were "subtle cases," *id*. at 149, which Dr. Samei cannot determine because he did not know the patient population at issue, *id.* at 150. Dr. Samei did not testify about any specific angiogram

interpreted by Dr. Paulus. When even the government's expert acknowledges that the angiograms are not accurate and that the changes could be material, and when he cannot say that the altered angiograms were duplicates of the originals, there was a substantial legal error under Rules 901 and 1003 in holding that the altered angiograms were duplicates, accurate, and authentic.

The other testimony relied upon by the Court did not change the nature of the error. The Court believed that the parties had "conflicting expert testimony," Docket Entry No. 155 at 8, but none of the experts opined that the altered angiograms were accurate. There was a dispute over whether the altered angiograms were "poor quality," but the government's testimony still relied on the same speculation that the angiograms had not changed. The Court should reject the misleading arguments that the government has repeatedly made (such as those about magically disappearing lesions and "diagnostic quality"), because they cannot overcome the undisputed evidence that the altered angiograms are not accurate and that the alterations can make a difference in deciding whether to provide a stent.

Indeed, throughout the case, the government repeatedly invited the Court to make evidentiary errors with respect to the altered angiograms. Every time this issue has been discussed, the government made a series of affirmative statements that the Court can see, particularly in hindsight, lack any support. These misstatements include the following:

> The only real issue is on these pixels. This isn't a pixel counting contest. Pixels are not what's in people's arteries. It's the lesions. With all due respect Mr. Bennett, he's got it completely wrong. He said the question is not whether the experts can see the blockages. That's the only question we have. The only question is whether or not they can see blockages. At issue here is what the government has alleged, is that Dr. Paulus placed stents in arteries that essentially weren't blocked.

Docket Entry No. 151 at 13-14.

> It is a fair and accurate representation. Does not have the exact same pixels, but that's not the question. It has the same blockage.

*Id*. at 31.

> These images retain the integrity and accuracy of the angiograms seen in the catheterization lab at the time of the procedure.

Docket Entry No. 88 at 8.

> The compression that occurred was the result of a routine, electronic process that accurately reproduced an image of the original blockage.

Docket Entry No. 153 at 4. By misleadingly framing the issue as whether experts "can see blockages" and assuring the Court that it did not have to confront the problem that individual pixels can make the difference in interpreting the extent of blockages in microscopic coronary arteries, the government has led the Court to this error. The government consistently over-stated what Dr. Samei could and did actually say. The government should have no room to complain about the need for a new trial.

**b. The Altered Angiograms Should Have <u>Been Excluded Under Rule 403</u>.**

The Court also made a substantial legal error in failing to exclude the angiograms under Federal Rule of Evidence 403. Because a picture tells a thousand words, the jury was destined to place undue reliance on the altered angiograms because the jury could not see *how* the angiograms had changed through the alteration process. The jurors could only see the altered angiograms, and it would be only natural for them to "trust" their eyes. But that is why the altered angiograms were so highly prejudicial – they lulled the jury into speculating that Dr. Paulus must have seen the same thing. The government capitalized on the powerfully misleading nature of the angiograms, repeatedly urging the jury to look at the altered angiograms and speculate that Dr. Paulus must not have seen blockages when he looked at the original

angiograms. The government urged the jury not to think about pixels and the testimony of Keith Strauss. And this drumbeat continued day after day, drowning out the testimony of witnesses such as Dr. Preston and Dr. Bush and even a patient (J.D.), all of whom confirmed that the image quality of the altered angiograms was not nearly as high as what they saw in the cath lab. Because of the unduly prejudicial nature of this powerfully misleading evidence, which caused the jury to reach a verdict based on speculation, this evidence should have been excluded from the trial.[11]

**c. Dr. Moliterno and Dr. Ragosta Should Not Have Been Permitted to Testify Concerning the Altered Angiograms.**

The Court also made a substantial legal error in permitting Dr. Ragosta and Dr. Moliterno to testify about the altered angiograms. Docket Entry No. 155 at 10-20. The Court found that "Dr. Moliterno's and Dr. Ragosta's opinions are the product of a reliable application of an acceptable method." *Id.* at 16. In doing so, the Court relied on the testimony of Dr. Moliterno and Dr. Ragosta that they rely on 512 x 512 angiograms in the course of making clinical decisions in their practices, and inferred that there was "some degree of value" in the archived images. *Id.* at 17.

The Court erred because it overlooked the testimony of Dr. Moliterno and Dr. Ragosta that they did not know how the angiograms had changed. Docket Entry No. 149 at 63 (Dr. Moliterno acknowledging he did not now know how many pixels changed colors in the angiograms); *id.* at 276 (same testimony by Dr. Ragosta). No cardiologist can know whether an altered angiogram is of "diagnostic quality" if the cardiologist does not know whether that

---

11 The Court expressed concern that "the angiograms are the only evidence of the patients' blockages." Docket Entry No. 155 at 9-10. But the problem was that the angiograms were not authentic and required the jury to speculate as to what Dr. Paulus saw. Inaccurate and unreliable evidence does not become admissible simply because there is no other evidence supporting the government's case.

angiogram was substantially changed from the original. An altered angiogram may have appeared usable to a cardiologist such as Dr. Ragosta, but critical details may have changed, as acknowledged by the imaging physicists Samei and Strauss. As described above, if even one pixel (covering a distance of 0.4 millimeters) changed its appearance, that alteration can change the appearance of a 2 millimeter blockage and the perception of the extent of blockage. The Court erred in speculating that the specific angiograms in this case must not have changed substantially if a cardiologist somewhere was willing to rely on altered angiograms. *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 673 (6th Cir. 2010) ("[A] low threshold for making a decision serves well in the clinic but not in the courtroom, where decision requires not just an educated hunch . . . ."). Because neither Dr. Moliterno nor Dr. Ragosta knows what was changed in the altered angiograms, their testimony is not reliable and cannot pass the *Daubert* standard.[12]

Moreover, a review of the four *Daubert* factors favored Dr. Paulus and not the government. When there is no reliable formal or informal study identifying the error rate in interpreting an altered angiogram, *Daubert* does not allow courts to admit evidence simply because there had been "some exposure within the scientific peerage" about the problem of downscanning. Docket Entry No. 155 at 18. Similarly, the Court identified interobserver variability as helping to define the error rate, Docket Entry No. 155 at 19, but interobserver variability addresses the error rate when cardiologists are looking at the *same* angiograms and not altered angiograms. No reliable error rate has been identified with respect to the

[12] Dr. Ragosta had trouble coming to terms with the realization that the angiograms had been altered. Dr. Ragosta testified that the prosecutors did not tell him that the images he was viewing were different than what Dr. Paulus saw, that he "would be surprised if they were altered," that he "do[es]n't believe they were altered," and finally admitted that he had no knowledge of whether the films were altered. Docket Entry No. 203 at 214-15. Similarly, Dr. Moliterno admitted that he "didn't know the difference between compression and downscaling," and that he did not "mechanically know how they were altered" because he did not see the original films. Docket Entry No. 223 at 132, 134.

interpretation of the altered angiograms in this case or generally. The Court also relied on competing estimates from Mr. Strauss and Dr. Samei about when an alteration might affect a cardiologist's interpretation, *id.*, but those estimates were guesses not based on any assessment of the angiograms in this case. As Dr. Samei admitted at trial, even his guess can vary greatly depending on the number of "subtle" cases presented in the angiograms at issue. Docket Entry No. 212 at 149. None of the *Daubert* factors allow guesses to be admissible.

The Court also erred in assuming that the alteration affected each angiogram in the same way, which is how the Court distinguished the Sixth Circuit's decision in *Rose v. Truck Ctrs., Inc.*, 388 F. App'x 528, 535-36 (6th Cir. 2010). Docket Entry No. 155 at 17 n.5. Because everyone's anatomy is uniquely reflected in an angiogram by a different assortment of white pixels, black pixels, and shades of gray pixels, the averaging process works differently for every angiogram. Docket Entry No. 232 at 54. Because the process works differently for each angiogram, no one can "know what changes occurred to the angiograms" in any individual case with any specificity. Docket Entry No. 155 at 17 n.5. Because it requires "speculative jumps" to reach those conclusions, the Court's *Daubert* ruling made a substantial legal error that warrants a new trial. *Tamraz*, 620 F.3d at 670-71, 677-78 (holding that it was an abuse of discretion to admit expert testimony where the expert had to make "speculative jumps").

### 2. The Jury Should Have Received More Extensive and Particularized Instructions Concerning a Physician's Right to Choose the Appropriate Treatment.

The Court also committed a substantial legal error by not providing more extensive and particularized jury instructions concerning the physician's right to choose among appropriate treatment options. The Court must "review the instructions as a whole, in order to determine whether they adequately informed the jury of the relevant considerations and provided a basis in

law for aiding the jury in reaching its decision." *United States v. Damra*, 621 F.3d 474, 498 (6th Cir. 2010). A district court's refusal to deliver a requested instruction is reversible only if that instruction is "(1) a correct statement of the law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense." *United States v. Mack,* 159 F.3d 208, 218 (6th Cir. 1998).

Dr. Paulus proposed a variety of instructions to the jury that a physician is not violating any criminal law merely because another cardiologist disagrees with him. Those instructions included the following:

> "A mere difference of opinion between physicians, without more, is not enough to show falsity." Docket Entry No. 293 at 3.
>
> "A defendant does not act with an intent to defraud if he is exercising his medical judgment in good faith when deciding how to treat a patient. If you find that Dr. Paulus was exercising his medical judgment in good faith (regardless of whether other physicians disagree and think that the treatment was inappropriate), you must find him not guilty of this charge." *Id.* at 3-4.
>
> "In deciding whether Dr. Paulus was exercising his medical judgment, you must allow Dr. Paulus to make his determination in light of all attendant circumstances – psychological and emotional, as well as physical – that might be relevant to the well-being of the patient." *Id.* at 4.

The Court rejected all of these proposed instructions on the grounds that they were argumentative and that they were covered in the generic good faith instruction. Docket Entry No. 292 at 42.

However, each of these instructions was a correct statement of law. Congress itself stated that Section 1347 "is not intended to penalize a person who exercises a health care treatment choice or makes a medical or health care judgment in good faith simply because there is a difference of opinion regarding the form of diagnosis or treatment." H.R. REP. No. 104-736 at 258 (1996) (Conf. Rep.), *reprinted in* 1996 U.S.C.C.A.N. 1990, 2071. In a pill mill case, the

Sixth Circuit has specifically approved jury instructions providing similar guidance for juries about what constitutes good faith in the context of medical practice. *See United States v. Volkman*, 797 F.3d 377, 387-88 (6th Cir. 2015). The Sixth Circuit praised that instruction as an "example of model instructions for cases such as this one." *Id.* at 387. If this was a model instruction in a pill mill case, there is no reason to refuse a comparable instruction in this case (which also asks a jury to determine whether good faith medical judgment was being applied) simply because the case involved Section 1347. Because a particularized instruction on good faith was not argumentative in the *Volkman* case, it was not argumentative in this case.

Dr. Paulus's proposed instructions were not covered in the other instructions given by the Court. Although the Court gave a generalized good faith instruction, Docket Entry No. 269 at 18, that instruction never addressed how the good faith instruction applied when other cardiologists disagreed with the defendant. The same is true with respect to the instruction that the Court gave concerning the application of medical guidelines. *Id.* at 23. Without a clarifying instruction, a jury may have believed that a defendant's disagreement with other cardiologists can be construed, by itself, to constitute a lack of good faith. This is particularly true when the government was eliciting testimony from its expert witness about whether Dr. Paulus was committing malpractice.

Finally, the failure to give these instructions substantially impaired Dr. Paulus's right to mount a defense. The absence of the instructions permitted a jury to infer that Dr. Paulus failed to exercise legitimate medical judgment and failed to act in good faith because he did not follow the opinions of other cardiologists. Indeed, the government did argue repeatedly that Dr. Paulus should be convicted because other cardiologists disagreed with him and because he did not "follow the rules." *See, e.g.*, Docket Entry No. 293 at 149. To mount a defense, Dr. Paulus

needed an instruction informing the jury that disagreements with other cardiologists were not, by themselves, sufficient to establish either a false statement or a lack of good faith.

**3. The Jury Instructions Did Not Include an Instruction on an Essential Element of the Offense.**

The Court also committed a substantial legal error by not including an instruction on an essential element of the offense. As part of the substantive instructions on the essential elements of 18 U.S.C. § 1035, Dr. Paulus proposed that the Court instruct the jury that it must find "the statement concerned a fact capable of confirmation." Docket Entry No. 292 at 48-54. The Court declined to give this instruction because it believed the instruction was argumentative and would give Dr. Paulus an "advantage over the [government] from a legal perspective." *Id.* at 55. Dr. Paulus timely objected to the omission of this instruction. Docket Entry No. 293 at 4.

The Sixth Circuit has held that district courts commit reversible error if they do not instruct a jury on an essential element of an offense. *See, e.g., United States v. Waldren*, 431 F. App'x 374, 377 (6th Cir. 2011) (stating that the Supreme Court has held that "where materiality is an essential element of the offense and is removed from consideration by the jury, the district court commits an error that is obvious or clear"); *United States v. Nelson*, 27 F.3d 199, 202 (6th Cir. 1994) ("The failure to instruct on an essential element of an offense is a fundamental error."); *Glenn v. Dallman*, 686 F.2d 418, 421 (6th Cir. 1982) ("The failure to instruct a jury on an essential element of a crime is error because it deprives a defendant of the right to have the jury told what crimes he is actually being tried for and what the essential elements of these crimes are.").

The "capable of confirmation" element was drawn from this Court's order on the motion to dismiss and from other controlling precedent concerning other false statement charges. Docket Entry No. 108 at 14; *Williams v. United States*, 458 U.S. 279, 284 (1982); *United States*

*v. Kurlemann*, 736 F.3d 439, 445 (6th Cir. 2013) (in an 18 U.S.C. § 1014 prosecution, "[w]hether made orally or offered through a written report, a 'false statement' must be that—a statement, a 'factual assertion' capable of confirmation or contradiction"); *United States v. Miller*, 734 F.3d 530, 543 (6th Cir. 2013) (same); *United States v. Waechter*, 771 F.2d 974, 978 (6th Cir. 1985) (in an 18 U.S.C. § 1010 prosecution, "[w]hen the government charges a person with violating section 1010 it must identify a statement made to HUD by the defendants which asserts a proposition that is subject to proof or disproof").

The jury was never instructed on what constitutes an actionable "statement or representation." *See* Docket Entry No. 269 at 19-20. The Court instructed the jury on what other terms in Section 1035 meant. *Id.* (instructing the jury on the meaning of other statutory terms such as "false," "healthcare benefit program," and "material"). The jury was never instructed on whether a "statement or representation" had to be "subject to proof or disproof" "or capable of confirmation" before the jury could convict. The omission of that instruction substantially impaired Dr. Paulus's defense because the jury received no guidance from the Court as to whether they should consider if any angiogram could ever confirm the existence or absence of a blockage. It also allowed the jury to improperly convict Dr. Paulus based on an unverifiable opinion of another cardiologist, which the government repeatedly urged it to do. Because the omission of this essential element of the offense was a substantial error, the Court should order a new trial.

#### 4. **The Jury Should Have Received a <u>"Unanimity of Theory" Instruction</u>.**

Because of the complexity of the evidence and actual jury confusion for Count 1, the Court should have given a unanimity-of-theory instruction to the jury. Prior to deliberations, Dr. Paulus asked the Court to instruct the jury that "in order to find the defendant guilty of Count 1,

all of you must agree that the same representation was false." Docket Entry No. 292 at 4. The Court declined to give the instruction because there was no Sixth Circuit cases requiring it in health care fraud statutes, the Sixth Circuit pattern instruction no longer included an instruction on unanimity, and because other circuits had not required a unanimity theory in other types of fraud cases. *Id.* at 14-16. The Court also reasoned that the jurors would not compromise on a verdict and that "this case kind of cries out for an all or nothing verdict." *Id.* at 16.

However, the jury deliberations illustrated why this instruction was necessary for Count 1. On the third day of deliberations, the jury reported that

> On Count 1 of the indictment, we are at a stall with 9Y & 3No. The question is based on the instructions for Health Care Fraud last paragraph. If there is doubt between all 12, do we rule Not Guilty or do we need to come to a conclusion. . . .

Docket Entry No. 267-1. The Sixth Circuit has "consistently recognized that the need [for a specific unanimity instruction] arises when it is shown that there is a genuine risk that the jury is confused or that a conviction may occur as the result of different jurors concluding that a defendant committed different acts." *United States v. Algee*, 599 F.3d 506, 514 (6th Cir. 2010). While the Court was right that a unanimity-of-theory instruction is not necessarily required in every health care fraud case, it is required for cases that fit the scenario that the Sixth Circuit described in *Algee*. *See also United States v. Miller*, 734 F.3d 530, 539 (6th Cir. 2013) (denying a unanimity instruction only where "[t]he multiple documents in this case all contain substantially similar manifestations of the singular false statement charged"). The reason for this rule is that due process problems arise when jurors are allowed to reach a conviction without agreeing upon the same conduct. *Schad v. Arizona*, 501 U.S. 624, 651 (1991) (Scalia, J., concurring) ("We would not permit, for example, an indictment charging that the defendant assaulted either X on Tuesday or Y on Wednesday . . . .").

In this case, the jury was confused and there is a genuine risk that a conviction occurred as a result of different jurors concluding that Dr. Paulus committed different acts. *See Miller*, 734 F.3d at 539 (observing that a "mid-deliberation note from the jury" is evidence of "actual juror confusion"). The jury could have ultimately agreed to convict without agreeing on anything on Count 1, including the appropriateness of any specific procedure, the identity of any specific false representation, the identity of the party allegedly defrauded, or even the year that any alleged misrepresentation occurred. The jury did not even have to agree on the type of procedure at issue, since the government argued at various times about stent procedures, a catheterization, and stress tests. This is not a situation, like the case in *Algee*, where the conduct was "materially identical." 599 F.3d at 514. As the jury proved, this was not the type of a case where "if the jury rejected this defense theory as to one statement, it necessarily rejected the theory for all of the statements." *Id.* Because the jury should have been required to agree on the specific representation at issue in Count 1 before convicting, the Court should grant a new trial.

**5. <u>The Court's *Allen* Charge Should Not Have Been Given to the Jury</u>.**

Dr. Paulus should also be granted a new trial because the Court's *Allen* charge commented on evidence in a way that could have swayed jurors to render a verdict in favor of the government. When evaluating an *Allen* charge, "the operative question would be, whether in its context and under all the circumstances, the district court's jury charge was coercive." *United States v. Taylor*, 814 F.3d 340, 373 (6th Cir. 2016) (citing *Jenkins v. United States*, 380 U.S. 445, 446 (1965)). The jury does not have to be intentionally forced into a particular verdict for it to be considered coercive. Rather, "[t]he propriety of particular *remarks* made by a judge to a jury after retirement for deliberation must be measured by the language employed, . . . and from the language used, a fair and reasonable conclusion must be deduced as to the tendency to interfere

with the exercise of the free and unbiased judgment of the jurors." *United States v. McElhiney*, 275 F.3d 928, 941 (10th Cir. 2001) (emphasis in original). The Sixth Circuit has approved a variation of the *Allen* charge, set forth in *United States v. Clinton*, 338 F.3d 483, 488-89 (6th Cir. 2003), which is a portion of the charge the Court read to the jury on October 27, 2016. Docket Entry No. 296 at 5-13.

However, the Sixth Circuit has also cautioned district courts to "avoid substantive departures from the formulations of the charge that have already received judicial approval." *United States v. Scott*, 547 F.2d 334, 337 (6th Cir. 1977); *Clinton*, 338 F.3d at 488. The Sixth Circuit has "repeatedly emphasized that the instructions approved by the Supreme Court in *Allen* 'approach the ultimate permissible limits for a verdict urging instruction.'" Committee Commentary to Sixth Circuit Pattern Jury Instruction 8.04. "Our own circuit has determined that the wording approved at the turn of the century represents, at best, the limits beyond which a trial court should not venture in urging a jury to reach a verdict . . . . [A]ny variation upon the precise language approved in *Allen* imperils the validity of a trial." *Scott*, 547 F.2d at 336-37.

Over Dr. Paulus's objection, the Court issued the *Allen* charge after the jury sent a note stating, "We have not, and cannot reach a <u>unanimous</u> verdict on the remaining [counts]." Docket Entry No. 273. However, in addition to the language in *Clinton* approved by the Sixth Circuit, the Court made two statements concerning the evidentiary record that had the power to sway the jury to render a verdict against Dr. Paulus. These two statements are:

- "*And I'm confident*, based upon the fact that we're now in the fourth day of deliberations, *that you have spent quite a bit of time reviewing films, angiograms*." Docket Entry No. 296 at 10 (emphasis added).

- "The material misrepresentation, the alleged material misrepresentation. Writing down in the cath report whatever the particular stenosis was vis a vis *what you think it might have been based upon the evidence that you heard,*

> that's one element, the material misrepresentation." *Id.* at 11 (emphasis added).

These statements were likely understood by the jury to mean that the Court believed that (i) the jury should have been reviewing angiograms to reach a verdict; and (ii) the amount of stenosis could be determined based on the evidence presented. *See Scott*, 547 F.2d at 337 (analyzing how the "remarks could be understood by the jury"); *United States v. Burgos*, 55 F.3d 933, 940 (4th Cir. 1995) (evaluating an *Allen* charge from "the way in which reasonable jurors would interpret the court's remarks"). Both statements undermined two central theories of Dr. Paulus's defense.

By suggesting that it was "confident" that jurors had spent "quite a bit of time" reviewing angiograms over the past four days of deliberations, the Court's statements would have caused jurors to believe that they were justified or "on the right track" in poring through the altered angiograms. This statement undermined Dr. Paulus's core argument that the jurors should disregard the altered angiograms because they were misleading and were not what Dr. Paulus saw. *See, e.g., Fong v. Poole*, 522 F. Supp. 2d 642, 660 (S.D.N.Y. 2007) (raising concerns that the *Allen* charge "referred several times to the evidentiary record, thereby undermining defense counsel's theory during summation that the defendant's innocence had been established, not by what was in the record, but by what was not in the record"). Jurors who previously believed that the angiograms were irrelevant may have felt chastened by the Court's statement and interpreted it as a judicial rebuke to them that they should have been looking at the angiograms for "quite a bit of time." After hearing the Court's statement, jurors would have been influenced to give more weight to the altered angiograms. If jurors were resistant to examining the angiograms before the *Allen* charge, it became unlikely they would be so resistant afterwards. For all of the jurors, the Court's statement ensured they would be much less likely to advocate Dr. Paulus's position to others.

Similarly, when jurors heard the Court advise them to focus on Dr. Paulus "writing down in the cath report whatever the particular stenosis was" and "*what you think it might have been based upon the evidence that you heard*," the jury may have been more inclined to believe that a particular stenosis could be proven by looking at the altered angiograms and other evidence. This statement also lent credibility to the government's theory of the case and undermined one of Dr. Paulus's central arguments. For other jurors who may have believed that a stenosis could not be reliably proven in an angiogram by anyone, they may have interpreted the Court's remarks as a rebuke of the defense's theory that no one can know the amount of blockage in a patient's artery.[13] If jurors were initially resistant to the idea that a stenosis could be proved through the existing evidence, it was unlikely that they could maintain their objections after hearing the Court's statement. If minority jurors had been otherwise inclined to stand up to other jurors on this issue before hearing the Court's statement, it is unlikely they would have done so afterwards.

The impact of the Court's statements became more powerful because they were made to the jury after it had declared itself deadlocked with respect to a number of counts. Docket Entry No. 273. Courts have recognized that the jury deliberations are the most delicate stage of a trial, and any statements in the *Allen* charge beyond judicially-approved language carry the danger of an unsustainable verdict. *Harris*, 391 F.2d at 356 ("The very failure of the jury quickly to reach a conclusion has been suggested as an indication of a balance so delicate that any error on the judge's part may turn the scales."); *United States v. Evanston*, 651 F.3d 1080, 1084-85 (9th Cir. 2011) (stating that "[e]xtraordinary caution must be exercised when acting to break jury deadlock" because "the influence of the trial judge on the jury is necessarily and properly of great weight and his lightest word or intimation is received by the jury with deference, and may

---

13 The Court's statements exacerbated the problem that the jury instructions did not include an admonition to convict only if the statements were subject to confirmation or contradiction.

prove controlling"). By directly commenting on the key evidence in the case, the Court may have unintentionally swayed the jury's verdict. The jury must be allowed to deliberate in an atmosphere free from any outside bias or commentary on the evidence. This is particularly important when the jury had already indicated that they were deadlocked, and the Court was aware that a group of three jurors disagreed with the others. Because the *Allen* charge was coercive and because the Court's statements had the power to influence the deliberations by the jury in a way that was unfair to Dr. Paulus, Dr. Paulus should be granted a new trial.

## V. CONCLUSION

At the end of this case, the Court should have no confidence in the jury's verdict. The government invited the jury to use altered angiograms to speculate about what Dr. Paulus saw in the original angiograms. It asked the jury to second-guess Dr. Paulus's medical judgment based on a professional disagreement between cardiologists. It encouraged the jury to use these disagreements to find fraud where there was no evidence that Dr. Paulus did not believe what he interpreted and recorded. It asked the jury to find a false statement based on the opinion of cardiologists when its own cardiologists disagreed sharply with one another. It misleadingly used a settlement agreement in an effort to smear Dr. Paulus. It misstated the evidence, including what its own imaging physicist did. The jury was not instructed on important aspects of Dr. Paulus's defense, including on an essential element of the offense. The Court's comments on the evidence in the *Allen* charge endorsed the government's theory of the case and undermined two of Dr. Paulus's central arguments.

The interests of justice require a new trial in this case. Because the verdict was against the weight of the evidence and there were substantial legal errors, and because Dr. Paulus is

innocent of the crimes for which the jury returned a guilty verdict, Dr. Paulus respectfully requests that the Court grant a new trial.

Dated: November 21, 2016

Respectfully submitted,

/s/ Robert S. Bennett
Robert S. Bennett
Michael P. Kelly
Hilary H. LoCicero
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600 (telephone)
(202) 637-5910 (facsimile)
robert.bennett@hoganlovells.com
michael.kelly@hoganlovells.com
hilary.locicero@hoganlovells.com

/s/ C. David Mussetter
C. David Mussetter
MUSSETTER LAW OFFICE
P.O. Box 192
2709 Louisa Street
Catlettsburg, KY 41129-0192
(606) 931-0050 (telephone)
(606) 931-0051 (facsimile)
attmuss@windstream.net

COUNSEL FOR DR. RICHARD E. PAULUS