**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**COVINGTON**

**CRIMINAL ACTION NO. 15-CR-15-DLB**

**UNITED STATES OF AMERICA**                                                    **PLAINTIFF**

**vs.**                                      **RESPONSE IN OPPOSITION TO**
                                  **DEFENDANT'S MOTION FOR A NEW TRIAL**

**RICHARD E. PAULUS**                                                    **DEFENDANT**

* * * * * * * * *

Richard Paulus put stents into the hearts of people who did not need them. He then falsified the medical records to justify these procedures and receive payment. A jury has found Paulus guilty of health care fraud for this conduct.

Paulus committed fraud upon his patients, subjecting them to unnecessary and potentially life-threatening surgeries. Paulus committed fraud upon Medicare, Medicaid and private insurers, receiving millions of dollars in payment for procedures he should never have done. Paulus committed fraud upon his community, deceiving people into believing they needed stents and perpetuating the myth that he was saving lives. Now he is attempting to commit fraud on the jury's verdict, making baseless claims about the admissibility of evidence and jury instructions.

Paulus's fraud must stop. Despite his best efforts, Paulus's deception has finally been exposed. The jury heard from three separate cardiologists who identified over 70 unnecessary procedures — procedures where human beings had a piece of metal inserted into their hearts that they did not need and cannot remove. Former colleagues at Kings' Daughters Medical Center testified that Paulus's conduct was "outrageous," that he had a reputation for doing unnecessary

procedures, and that Paulus was "untouchable" at KDMC.[1]  Cardiologists that worked with Paulus saw his fraudulent activity but were powerless to stop it.  These cardiologists also thoroughly debunked Paulus's fanciful claim the angiograms are not accurate representations of the images seen in the catheterization lab at the time of the procedure.

Despite the overwhelming proof of guilt, Paulus continues to make false claims of innocence.  His motion for a new trial should be denied and he should be held accountable for his egregious acts.

## ARGUMENT

Federal Rule of Criminal Procedure 33 allows the Court to vacate "any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Cr. P. 33(a).  A jury verdict should be vacated "only in the extraordinary circumstance where the evidence preponderates heavily against the verdict."  *United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988).  Because a jury verdict is presumptively valid, the defendant has the burden of showing that the jury's verdict is against the weight of the evidence.  *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007).

Here, the Defendant cannot carry his heavy burden of proving the jury's decision was against the evidence.  Indeed, the Defendant spends most of his brief rehashing the same "facts" and arguments that he did in his pretrial motions, throughout trial, in his closing argument and in his judgment for acquittal.  Incredibly, the Defendant completely ignores his admission that he was assessing the degree of blockage in his patients' arteries in a manner contrary to the

---

[1] Dr. Arshad Ali, R. 206 at 32, 59; Dr. Henry Goodman, Ex. 523; Dr. Jingesh Shad, R. 203 at 23.

guidelines and Appropriate Use Criteria used by every other practicing cardiologist the jury

heard from in this case.[2]

### 1. The Jury's Verdict Is Supported by Overwhelming Evidence of Guilt

#### A. The Defendant Intended to Commit Health Care Fraud

The evidence presented at trial thoroughly refutes the Defendant's claim there was no

proof he had any criminal intent or made any false statements. *See* R. 298 at 1. The United

States has addressed the Defendant's criminal intent in its Supplemental Rule 29 response and

incorporates these arguments in this response. [R. 300.] These facts can be briefly summarized

as follows:

- Three medical experts testified the Defendant performed medically unnecessary cardiac procedures and recorded an inaccurate degree of stenosis in the medical records. [R. 203: Dr. Michael Ragosta at 89–196; R. 218: Dr. Howard Morrison, TR at 29–46, 80–84; R. 223: Dr. David Moliterno, TR at 69–123.] The difference between the actual and recorded blockages was significant. [*Id.*, *see also* Ex. 529.]

- Several former colleagues and other practicing cardiologists testified the Defendant performed unnecessary procedures. [R. 206: Dr. Arshad Ali at 28–60; R. 195: Dr. Robert Touchon at 34–38; R. 203: Dr. Jingesh Shah at 22–33; R. 204: Dr. John Kelleman at 80–94, 126; R. 223: Dr. Ahmad Elesber at 15–19; R. 206: Dr. Raghuraman Srinivasan at 14–17; R. 192: Dr. Henry Goodman at 80–89; R. 195: Dr. Mark Studeny at 87–125.]

- Several former patients testified the Defendant made false statements or otherwise misled them about their true condition. [R. 198: Gary Jenkins at 43–45; R. 200: Charles Clark at 80–84; R. 198: Wayne Clark at 9–10; R. 198: Douglas Chatfield at 180.]

- The Defendant made millions of dollars during his scheme to defraud. [R. 195: Paul McDowell at 189–208; R. 223: Special Agent Sara Sampson at 165.]

- The Defendant performed vastly more procedures than his peers, and even outpaced entire hospitals. [R. 198: Ashley Marina at 83–110; Exs. 429–437e; 443a–443r; 527.]

---

[2] The Defendant attempted to argue Dr. Terry Ferguson also assessed lesions by area rather than diameter. [R. 258 at 184.] His counsel, however, carefully avoided asking Dr. Ferguson, and everyone else, of the propriety of Paulus assessing lesions under his own system. Regardless, Dr. Ferguson is not a practicing cardiologist and does not do interventions. [Dr. Moliterno. R. 259 at 184.] The jury was therefore entitled to afford little weight to his opinion.

- The Defendant admitted he measured stenosis by area rather than diameter. [R. 258: Richard Paulus at 185.] The Defendant acknowledged this is inconsistent with cardiology guidelines and the practice of other cardiologists. [R. 258 at 188–190; R. 259 at 33–35.]

The testimony of any of the three expert witnesses, alone, is sufficient to convict the Defendant. *See Tucker v. Palmer*, 541 F.3d 652, 658-59 (6th Cir. 2008) (holding that the testimony of a single victim is sufficient to support a conviction). When coupled with the testimony of former colleagues, the compelling evidence of the Defendant's financial motive to perform unnecessary procedures, the sheer volume of his procedures, and his admission he had created his own system of assessing lesions that was inconsistent with accepted cardiology practice, the jury was presented with powerful evidence the Defendant's improper stenting was not merely negligent, but rather was part of a knowing and willful scheme to defraud. The guilty verdict is therefore proper.

The Defendant's attempt to re-argue his failed trial strategy should be denied. Here, the Defendant simply disagrees with the jury's finding of guilt, arguing the Court should accept alternate ways to view the evidence that the jury heard and rejected. This is improper, as the Court must respect the jury's finding and assume that it "resolved all contradictions in testimony in favor of the Government." *United States v. United Med. And Surgical Supply Corp*., 989 F.2d 1390, 1401 (4th Cir. 1993).

The Defendant raises a number of specific factual claims, none of which have merit. The Defendant argues that he did not perform catheterizations on 50 – 60 percent of his patients. *See* R. 298 at 6. He then claims he stented only 35% of those patients.[3] He relies only upon his own testimony for this dubious proposition. He also ignores that he was performing an order of

---

[3] This is seemingly refuted by Government Exhibit 527, which shows the Defendant performed 11,233 caths and 5,680 stents from 2007 – 2011.

magnitude more procedures than his peers, both nationwide and in his own hospital. He also claims he did not place a stent without examining the patient and did not have a standing order to place unnecessary stents. *Id*. at 7. This is hardly exonerating, as it is difficult to understand how a stent could be placed if the physician did not examine the patient. Nor would it be expected that a fraudster would be so bold as to issue a standing order expressing his intent to commit fraud. Regardless, the fact the Defendant did not commit fraud on *every* patient does not mean he did not commit fraud of *some*, or indeed many, of his patients.

The Defendant falsely claims Dr. Ragosta and Dr. Moliterno did not consider IVUS results or other information in the records. *See* R. 298 at 3, 7–8. To the contrary, Dr. Ragosta and Dr. Moliterno were fully aware of IVUS procedures, as well as the entire patient charts. [Dr. Ragosta, R. 203 at 213; R. 204 at 47; Dr. Moliterno, R. 223 at 73.] Critically, IVUS was used in only a small fraction of the cases presented.[4] Almost none of the IVUS procedures were available for review. In one of the few IVUS films the hospital kept, Dr. Ragosta found the Defendant's measurements to be nowhere near accurate. [*See* R. 204 at 47; Ex. 4f.] The Defendant's claim the experts did not consider the IVUS procedures is not true.

The Defendant next alleges that Dr. Ragosta "repeatedly testified inconsistently with his own books." R. 298 at 8. In support of this, the Defendant cites to three excerpts from Dr. Ragosta's testimony.[5] *Id*. This cannot fairly be characterized as "repeatedly." Nor could any fair evaluator of facts view his testimony as inconsistent with his textbook. As Dr. Ragosta explained, context matters. [R. 204 at 40 – 41.] Dr. Ragosta testified clearly and in great detail about the Defendant's improper stenting practices. There are no inconsistencies in his testimony.

---

[4] There was an IVUS procedure in counts 3, 4, 5, 8, 14, 18, 24 and 25.
[5] The Defendant also cites to two excerpts he testified about. Presumably the defense would have asked these questions to Dr. Ragosta had they thought there was any impeachment value to them.

The Defendant also claims Dr. Ragosta reached his conclusions before looking at any medical records, did not review records from referring doctors and did not speak to the patients. R. 298 at 9. The Defendant says these alleged shortcomings require vacatur of his conviction. Again, the Defendant's argument is factually and legally incorrect. It is the jury's responsibility to weigh the evidence and reach a verdict. They are free to consider – and reject – arguments the Defendant made against a Government witnesses' credibility. The Defendant repeatedly highlighted these complaints during cross examination, in opening statement, and in closing. The jury did not find this persuasive, convicting the Defendant on 11 counts.

The verdict is fully supported by the facts. Dr. Ragosta testified he looked at thousands of pages of medical records. [R. 204 at 47.] He reviewed and discussed each individual's presentation and subsequent unnecessary procedure. [R. 203 at 89–196.] He, and every other cardiologist that testified, told the jury that there are numerous causes of chest pain that are non-cardiac or otherwise do not require a stent. [R. 203 at 53–59.] While Dr. Ragosta did not speak to the patients, neither did the Defendant's expert, Joel Kahn. This is because nothing the patients can say will change their angiograms. Here, the Defendant falsely claimed significant blockages existed when they did not. He then caused claims to be submitted for these unnecessary procedures. The jury properly convicted him of this crime.

Regardless, it was for the jury to weigh the evidence, evaluate the credibility of the witnesses, resolve any inconsistencies and reach a verdict. Here, the jury found Dr. Ragosta and Dr. Moliterno to be credible, while they found the Defendant to be a criminal. No basis exists to disturb this conclusion.

Finally, the Defendant falsely alleges that if the Government can convict him, it "can convict innocent cardiologists and stretch these criminal statutes beyond what Congress ever

intended." R. 298 at 10. The Court should not be persuaded by this alarmist rhetoric. The United States previously addressed these unfounded allegations in its response to the Defendant's constitutional challenge to the indictment. *See* R. 44 at 4–20. The Court properly rejected this argument previously and should do so again. *See* R. 108.

The criminal health care fraud laws clearly prohibit conduct such that occurred here. The Defendant is not an innocent cardiologist. His former colleagues testified he performed unnecessary procedures, but was protected by a complicit hospital administration that put profit above patient care. Three independent experts testified about over 70 improper stent procedures. He undoubtedly performed thousands more unnecessary interventions. The Defendant billed for more procedures than all but five other cardiologists in the United States, all while working in a town of approximately 20,000 people. He even outperformed entire hospitals, such as the University of Kentucky. The Defendant claims he used his own system for assessing lesions, yet failed to share this important information with his patients, colleagues or insurers. He received millions of dollars for these procedures. This is why the Defendant was charged and convicted. Innocent cardiologists need not fear a similar fate.

### B. The Angiograms Accurately Depict Patients' Arteries

Words have meaning. To a cardiologist, a percent blockage assessed by angiogram means the diameter blockage of the artery. If a cardiologist wishes to measure the area of a blockage, an intravascular ultrasound must be used. Area cannot be assessed by looking at an angiogram. [Dr. Moliterno, R. 259 at 140.] Cardiologists have been assessing blockages by diameter "since the beginning of angiography." *Id*.

Yet that is exactly what the Defendant claims he did. Incredibly, this fact remained hidden through numerous pretrial motions, Rule 16 disclosures, a *Daubert* hearing, six weeks of

trial, and the testimony of 15 cardiologists. Throughout this time period, everyone involved in this matter – except, apparently, the defense team – believed the cardiologists were all measuring blockage the same way. And then, in the sixth week of trial, the Defendant said on cross examination that when he used a word, it meant what he chose it to mean. The jury was entitled to discredit his testimony and his entire defense based upon this unbelievable, desperate attempt to avoid responsibility for his crimes.

Here, the evidence conclusively proved the Defendant made false statements and representations in his patients' medical records. He recorded a significant stenosis where none existed. The degree of blockage was material to whether Medicare, Medicaid and private insurers would pay for the procedures. [Dr. Berman, R. 195 at 254; Jennifer Gibson, R. 198 at 34–35; Lee Guice, R. 198 at 213–214.]

The Defendant's attempt to blame his criminal acts upon inter-observer variability, both at trial and in his post-conviction motions, is deceptive. The Defendant admitted he was using a system of assessing lesions that was different than other cardiologists. [R. 258 at 190.] This was known to his counsel. "It took me a while [to explain this] with the lawyers, believe me, okay? Sessions. Not once." [R. 254 at 65.] Yet both pretrial and throughout the presentation of evidence the Defendant repeatedly argued that the differences between his assessments and that of the Government's witnesses was due to inter-observer variability. [R. 214 at 17; R. 203 at 207; R. 206 at 61–62; R. 212 at 49; R. 223 at 25; R. 223 at 134.] In reality, as the Defendant and his team well knew, he was assessing lesions using his own method, not the method used by other cardiologists. Remarkably, the Defendant continues to claim inter-observer variability requires his guilty verdict to be set aside. *See* R. 298 at 1, 3, 36.

Inter-observer variability cannot be a viable defense to these charges because the Defendant was, by his own sworn testimony, observing and recording blockages differently than the United States's experts. As evidenced by his own exhibit and testimony, "if it's a concentric stenosis, and I write down 75 percent, that would be a 50 percent diameter reduction." [Richard Paulus, TR 258 at 191–92; Ex. 1.240.]

Strangely, the Defendant's cardiology expert, Dr. Joel Kahn, did not tell the jury the Defendant had created his own method for assessing lesions. The jury could reasonably wonder, if the Defendant is to be believed and a 75% by area stenosis is only a 50% diameter reduction, how Dr. Kahn confirmed the Defendant's assessments in the medical record for every case he reviewed? Regardless, it is misleading to suggest the differences between what the Defendant falsely recorded and what actually existed in the patients' arteries is due to inter-observer variability when the observers were using two completely different methods for assessing stenosis.

Nonetheless, the Defendant argues that because cardiologists sometimes disagree, their opinions on blockages cannot be a false statement.[6] *See*. R. 298 at 11. But the Defendant was not assessing lesions the way other cardiologists assess lesions:

> Q. Do you agree that other cardiologists are measuring lesions by diameter?
> A. Yes. Other -- I'm not saying all others. Some others do. I am here to represent myself and how I practice medicine in the cohort of my patients, and that's my job here right now today.

[R. 258 at 190.] The Defendant cannot, in good faith, claim that he should be exonerated on the basis of inter-observer variability when he observed the blockages using an entirely different

---

[6] The Defendant cites specific examples of alleged inter-observer variability. R. 298 at 11. They allege Dr. Ragosta and Dr. Moliterno disagreed on 3 cases of the 14 stent procedures Dr. Moliterno reviewed. But the defense never asked Dr. Ragosta about his assessments on these cases. Those facts were never before the jury. More importantly, both experts agreed none of the procedures were necessary.

system than all other cardiologists. If the Defendant is to be believed, even if he and the nine other cardiologists that said he stented minimally diseased arteries agreed on the degree of blockage, they would still record different numbers, as the Defendant claims he was using area reduction while everyone else was using diameter reduction.

The Defendant admitted that "I don't look at lesions as a diameter reduction." [R. 258 at 185.] He admitted each time he recorded a 70% lesion, it was by area rather than by diameter. "I wrote down 70 percent, but I didn't write down 70 percent diameter reduction. I wrote down 70 percent lesion. What's a 70 percent lesion? A 70 percent lesion is a blockage that, by area, is a 70 percent reduction in the area within that artery." [R. 258 at 192.]

The Defendant acknowledged the Appropriate Use Criteria describes 70% by luminal diameter as the standard for a significant lesion, but that he disagreed with this standard:

> Q. Do you acknowledge that the appropriate use criteria
> defined 70 percent by luminal diameter narrowing?
> A. Yeah, I know, and that's just what I referenced, okay.
> Q. That's not what you're doing?
> A. No, I'm not, and I disagree with that part of the guidelines.

[R. 259 at 35.] "There is one aspect of the guidelines in terms of 70 percent reduction that I don't happen to agree with if you're talking about solely diameter reduction."

When asked how other cardiologist assess lesions, he replied:

> Q. You understand that cardiologists assess lesions by diameter; do you not?
> A. I'm a cardiologist. I express lesions by diameter reduction and it's that -- by area
> reduction, and that's what is important. [R. 258 at 187.]

And:

> Q. Doctor, are you aware that when other cardiologists are
> discussing lesions, they're talking about it in diameter, not
> area? Do you acknowledge that?
> A. Well, I don't think you represent other cardiologists,
> you know. And when I -- you know, when I talk about a lesion
> and when I deal with it, I deal with what I believe is the
> area reduction within that artery. [R. 259 at 34.]

…

Q. Here's the question: Is a 70 percent by diameter a well-established standard for a severe lesion, Doctor? Yes or no, please.
A. Not in my view. I don't view it that way, okay. I view it from what my particular understanding, okay. And I disagree with the guidelines, that part of the guidelines where it says that.  [R. 259 at 33–34.]

Words cannot mean this many different things.  As Dr. Moliterno explained, "We can't come up with our own systems."  [R. 259 at 144.]  Yet the Defendant did exactly that, purporting to use his own system to measure lesions – a system that conveniently resulted in the Defendant recording a percent stenosis that is considered significant by other cardiologists and the insurers that pay for these procedures.

There is no dispute that cardiologists measure stenosis by diameter rather than by area when interpreting an angiogram.  [Dr. Moliterno, R. 259 at 139–144; Dr. Ragosta, R. 204 at 49; Dr. Ali, R. 206 at 23; Dr. Touchon, R. 195 at 31.]  Yet the Defendant never asked any of the cardiologists if they were measuring by diameter rather than by area, or if they knew that was how the Defendant purported to assess lesions.  The jury was well within its rights to disregard the Defendant's inconsistent theory.

The Defendant relies on academic articles as evidence that inter-observer variability precludes cardiologists from agreeing on the degree of blockage.  It is troubling that the Defendant cites these studies in his defense despite the fact they measure stenosis by diameter rather than area.  *See* Lucian Leape, et al, *Effect of variability in the interpretation of coronary angiograms on the appropriateness of use of coronary revascularization procedures*, 139 Circulation at 108 (2000), R. 27, Ex. 5; Leonard Zir, et al, *Interobserver variability in coronary angiography*, 53 Circulation at 147 (1976), R. 27, Ex. 1; K. M. Detre, et al, *Observer Agreement in Evaluating Coronary Angiograms*, 52 Circulation at 979 (1975), R. 27, Ex. 2; Timothy

DeRouen, et al, *Variability in the Analysis of Coronary Angiograms*, 55 Circulation at 324, R. 27, Ex. 3.  Again, it is misleading to cite these studies to support the notion of inter-observer variability when the method of assessing lesions used by the study is different than the method the Defendant used.

Finally, the various cardiology guidelines and appropriate use criteria produced by the Defendant and discussed at trial by defense expert Dr. Richard Baer, the psychiatrist, clearly indicate stenosis is measured by diameter rather than area.  *See, e.g.,* 1997 ACC-AHA Guidelines for Coronary Angiography at 936; 1988 Guidelines for PTCA at 488; 1993 Guidelines for PTCA at 2036; 1999 ACC-AHA Guidelines for Coronary Angiography at 1759; 2001 Guidelines for PCI at 2239; 2005 Guidelines for PCI at 7; 2007 Focused Update to Guidelines for PCI at 266; 2009 Appropriate Use Criteria for Coronary Revascularization at 534; 2010 ACC-AHA Guidelines for Assessment of Cardiovascular Risk in Asymptomatic Adults at 80; 2012 Update to Guidelines for Coronary Revascularization at 862; 2012 Appropriate Use Criteria for Diagnostic Catheterizations at 46; 2014 Update on PCI at 2634.  Yet the Defendant failed to ever advise the jury, or the Court, about the inconsistency between the guidelines, Dr. Baer's testimony, and his method of assessing lesions.

Neither Dr. Kahn nor Dr. Baer told the jury the Defendant was using his own system for assessing lesions, in contradiction of the entirety of the guidelines and literature referenced in this case.  Instead, the defense chose to hide this critical information.  It is troubling if the defense "experts" did not realize the Defendant was using his own system yet still opined his procedures were both medically necessary and properly payable.  It is even more troubling if the Defendant, fully aware of his own system for assessing lesions, presented misleading testimony to the jury in the form of experts that assumed the Defendant was following appropriate

cardiology standards. Either Dr. Kahn and Dr. Baer deliberately misled the jury through material omissions, or they simply lacked the knowledge to realize what the Defendant had actually done.

Regardless, words have meaning. When a doctor places a piece of metal into someone's heart, that doctor must follow appropriate medical guidelines. A physician cannot simply make up his own practice standards, particularly when that standard results in unneeded heart surgeries. And physicians can never deceive their patients or the insurers who pay the bills. But the Defendant did exactly that. To everyone but the defense, the words "70% reduction" meant a 70% diameter reduction of the arteries. The defense had every opportunity to tell the jury what the Defendant was doing and to question the Government's – and his own – witnesses about the propriety of the Defendant's system. Instead, the defense chose to hide this critical fact from the jury, to be discovered only on cross examination in the sixth week of trial.

The jury was well within its discretion to discredit the Defendant's argument that inter-observer variability required acquittal in light of his admission he simply chose words to mean what he wanted them to mean. Indeed, having been misled by the defense for six weeks about the key issue in the case, the jury was well within its rights to discredit every argument the Defendant made as not trustworthy. Similarly, the Court should deny the Defendant's audacious request to vacate his guilty plea simply because he chose his words to mean something different than their universally accepted meaning. The jury's verdict should stand.

### C. The Angiograms Accurately Reflect the True Degree of Blockage

The angiograms were direct evidence of the Defendant's fraud. R. 298 at 14. While it is understandable the Defendant wishes the jury had not seen him commit the crime, the angiograms were nonetheless properly admitted.

Prior to trial, the Court conducted an extensive *Daubert* hearing concerning the admissibility of the angiograms. The United States previously responded to the Defendant's arguments the angiograms should be excluded. [R. 88.] At the conclusion of this hearing, the Court found the angiograms were relevant and that the Government's experts were qualified to testify. [R. 155 at 8–10, 20.] The Court's prior Order was appropriate and there is no basis to grant a new trial based upon the admission of the angiograms.

The jury properly rejected the Defendant's allegation the angiograms are "altered." R. 298 at 14. First, the Defendant presented a completely inconsistent defense theory. He argued both that the angiograms had degraded, yet he and Dr. Kahn also claimed an ability to discern a significant lesion in each case. Had the angiograms actually degraded, the Defendant and Dr. Kahn should have opined, in at least some of the cases, that the lesion on the archived angiograms was significantly less than the degree of stenosis recorded in the medical records. But they did not, claiming instead that a significant lesion was visible in each procedure. Either the angiograms "degraded" or they did not; the Defendant simply cannot have it both ways. The jury was entitled to reject this internally inconsistent and unbelievable explanation.

The jury properly ignored the Defendant's false characterization of the angiograms as "degraded." At trial, the United States presented evidence that prior to the Government's investigation, no cardiologist at KDMC, including the Defendant, ever complained about the quality of the angiograms despite consistently seeing these same archived images in the reviewing room next to the catheterization lab and during peer reviews. In fact, it was the attorneys for another cardiologist that first identified the alleged issue, not the Defendant. [R. 233 at 62–63.]

Doctors Kelleman, Touchon, Ali, Elesber and Shah all previously worked at KDMC and testified the archived angiogram quality was fine. [Dr. Touchon, R. 195 at 38; Dr. Shah, R. 203 at 17; Dr. Ali, R. 206 at 34; Dr. Elesber, R. 223 at 19.] Doctors Ragosta, Moliterno, Morrison, and Studeny all reviewed the angiograms and found them to be of appropriate diagnostic quality. [Dr. Ragosta, R. 203 at 40; Dr. Morrison, R. 212 at 29; Dr. Moliterno, R. 223 at 69; Dr. Studney, R. 195 at 114.] The jury was well founded to credit this testimony. Additionally, Dr. Ragosta, Dr. Moliterno and Dr. Morrison each testified about angiograms where a significant blockage was still visible along with an insignificant blockage the Defendant stented in the same angiogram. [Dr. Ragosta, R. 203 at 142; Dr. Morrison, R. 212 at 31; Dr. Moliterno, R. 223 at 80.] If these angiograms had actually been "altered" or "degraded," no significant lesions should have been visible.

The United States also presented evidence that the archived angiograms were sent to over a dozen other hospitals, none of whom complained about the quality of the films. [See Ex. 480; Agent Sampson, R. 223 at 164.] Witnesses from the manufacturer were brought in to confirm that nobody at KDMC ever complained about the quality of the archived angiograms. [Dan Cullen, R. 204 at 259; Chad Phipps, R. 212 at 95.] And further testimony was presented that there are hospitals today using the 512 x 512 pixel matrix the Defendant says is insufficient to assess lesions. [Dan Cullen, R. 204 at 260.]

Finally, Dr. Ehsan Samei, a Ph.D. in nuclear imaging, testified the angiograms were of sufficient diagnostic quality to accurately assess lesions. [R. 212 at 139.] Dr. Samei even presented images which showed the jury exactly what the difference between a 1024 x 1024 and 512 x 512 resolution actually looks like. *See* Ex. 451.

The Defendant argues the jury should have rejected Dr. Samei's testimony. R. 298 at 14 – 19. Again, the Defendant asks the Court to substitute its evaluation of the evidence for the jury's. But the "credibility of witnesses is exclusively the province of the jury." *United States v. Bonds*, 22 F.3d 662, 667 (6th Cir. 1994). Regardless, the Defendant's complaints about Dr. Samei are meritless. First, he argues Dr. Samei did not look at any angiograms at issue in this case. This is not true. [R. 212 at 133, 150.] Had the Defendant wished to inquire more about which cases Dr. Samei looked at, he was of course free to do so. Or presumably his own expert could have testified about any differences between angiograms, but did not. The issue is the compression of 1024 x 1024 to 512 x 512. The equipment compressed all of the angiograms at this ratio. [*Id*. at 135–36.] Any attempt to argue that some angiograms were compressed at a different ratio has no factual basis.

The Defendant then tries to take statements from Dr. Samei out of context, *see* R. 298 at 17, and alleges the Government misrepresented Dr. Samei's testimony. The Defendant is wrong again. Dr. Samei testified to the following:

- The images seen in the cath lab were 1024 x 1024 matrix size. This was archived at 512 x 512. [R. 212 at 135]

- There is no 1-1 correspondence between the reduction in pixel numbers and the clinical attribute of the image. [*Id*. at 138]

- While there may be subtle differences between the original and archived image, but not for the typical case. [*Id*. at 139]

- The angiograms "have sufficient degree of detail to be able to discern what needs to be characterized. [*Id*. at 139]

- Cardiologists can accurately discern the images in "99 percent of the cases." [*Id*. at 139, 142, 157]

- In the one percent, it is a "very small" difference. [*Id*. at 140]

- "Things do not disappear in the same way things do not appear. They're just there, but perhaps they're a little bit more blurrier than they need to be." [*Id*. at 140]

- Any differences between the original and archived image is small. "You would not go from 50 percent of stenosis to 30 percent of stenosis. Just, I mean, logically it is impossible."  [*Id*. at 141]

- Images with even fewer pixels than 512 x 512 would accurately depict the lesions.  [*Id*. at 141]

- The relevance of pixel size comes into play when you consider the viewing distance.  The further you get away from an image, such as in the cath lab, the harder it is to see the image.  It becomes more difficult to discern pixel size. [*Id*. at 142]

- The archived images depict the same amount of gray image as seen in the cath lab.  [*Id*. at 143]

- "There is no accident that we have designed our display devices to only show eight bits of display, because there was no point of going beyond that."  [*Id*. at 145]

- There is no issue regarding the display resolution of the angiograms.  [*Id*. at 145]

- Regarding Mr. Strauss's testing, Dr. Samei opined the issue is the degree of blockage in the arteries.  "And that is not what LCR or HCR or matrix size or pixel size or bit depth actually qualify at all."  [*Id*. at 147]

- "Things do not appear.  Things do not disappear.  Things just become more ambiguous.  And in this case, very little ambiguity will be added."  [*Id*. at 148–149]

- Only a small number of cases would be affect.  "It can be 1 percent, can be 0.1 percent."  [*Id*. at 149]

- Dr. Samei then walked the jury through a demonstration, showing them exactly what the change from 1024 x 1024 to 512 x 512 looks like.  "So what I'm trying to demonstrate here; that even though I am doubling the number of pixels, the size of the pixel, and even though I am reducing the number of pixels by 75 percent, you can still see the stenosis."  [*Id*. at 153]

- "So the difference is so subtle that I have to go back and forth ten times before it actually registers with you that there is a change.  Because I can't see the change myself.  I have to really gaze at this."  [*Id*. at 153]

The Defendant complains the Government told the jury they could rely upon these angiograms because there is no substantial degradation.  R. 298 at 17.  But counsel is allowed to make reasonable inferences from the evidence.  *See United States v. Crosgrove*, 637 F.3d 646, 663 (6th Cir. 2011).  As evidenced by the above, Dr. Samei clearly testified the angiograms were accurate depictions of the original images.  In the small number of cases where there could be a

difference, the difference would be very subtle. But a 20% difference – smaller than the differences in the cases presented – "is impossible." And the jury saw what the change from 1024 x 1024 matrix to a 512 x 512 matrix actually looked like, and could decide for themselves whether the angiograms are accurate. No error occurred by allowing the jury to review this evidence.

Again, the Defendant urges the Court to reject the jury's decision, and instead accept the testimony of Mr. Strauss. And again this is improper, as credibility determinations are left for the jury. *Bonds*, 22 F.3d at 667. Further, the jury had good reason to reject Mr. Strauss's testimony. First, Dr. Samei is significantly more qualified to offer an expert opinion. *See* Ex. 450; Ex. 1.223. Moreover, Mr. Strauss's testimony does not support the Defendant's argument that the blockages have disappeared:

> • Mr. Strauss estimated there would be no difference 85 percent of the time. [R. 233 at 64.]
>
> • Mr. Strauss acknowledged the blockages will not disappear. [R. 233 at 64, 67, 83.]
>
> • Mr. Strauss acknowledged the 512 x 512 is within the current DICOM standards for storage. [R. 233 at 69.]
>
> • 512 x 512 is the industry standard for storage. [R. 233 at 69.]
>
> • Nowhere in his analysis did Mr. Strauss account for the distance an operator in the cath lab was from the monitor when assessing lesions. [R. 233 at 81–82.]
>
> • When shown the 1024 x 1024 and 512 x 512 images, Mr. Strauss could not tell a difference. [R. 233 at 90.]

The Defendant complains that because the Government did not refute Mr. Strauss's logic, it simply ignored him in the closing argument. R. 298 at 18. As evidenced by the above, Mr. Strauss was refuted in the cross examination. Mr. Strauss testified the number of pixels decreased by 75%. But that is not the issue. The Defendant did not place stents into pixels; he

unnecessarily put them into the hearts of human beings.  The Government ignored Mr. Strauss

because he had nothing of any importance to say.  The jury agreed.  Their verdict should stand.

### 2.  The Court Did Not Commit Evidentiary Errors

### A.  The Agreed Order of Retirement Was Properly Admitted

The Defendant's complaint about the United States's use of his Agreed Order of

Retirement in lieu of revocation is misplaced, as the Order is a public record the Defendant

signed.  It is an admission of the party opponent and was properly placed into evidence under

Fed. R. Evid. 801(d)(2).  While the Defendant may not like the language contained in the Agreed

Order, it is nonetheless his admission.

The Defendant complains about the timing of the KBML investigation.  R. 298 at 20.

This is confusing.  At trial, the Government produced Dr. Goodman, the author of the

anonymous complaint, to fully read and explain the complaint to the jury. [R. 192 at 82 – 86.]

Then it brought the KBML investigator, Jon Marshall, who explained and read the entire Agreed

Order in the record precisely so the Defendant could not argue the United States was taking

anything out of context.  [R. 195 at 63 – 72.]  The Agreed Order clearly sets forth the chronology

of the investigation and sanction.  Finally, the Government brought the KBML's expert, Dr.

Moliterno, who fully explained his opinion that the Defendant had performed unnecessary

cardiac procedures and was a danger to the public.  [R. 223 at 67 – 123.]  The jury was fully

advised of the timing, scope and resolution of the KBML's investigation and order requiring the

Defendant to retire in lieu of revoking his license.  Any argument to the contrary is meritless.

The Defendant next argues the agreement should not have been admitted as a settlement

negotiation under Rule 408.  The Defendant is wrong, as even a cursory reading Rule 408

indicates.  *See* Fed. R. Evid. 408(a)(2) (holding statements made during negotiations are

admissible in criminal cases.)  The case law also supports the Agreed Order.  *See, e.g., United States v. Davis*, 596 F.3d 852, 860 (D.C. Cir. 2010); *United States v. Gannaway*, 477 F. App'x 618, 621-22 (11th Cir. 2012) ("Under Rule 408, statements during compromise negotiations about a claim are ordinarily inadmissible 'except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.'").

The Defendant next alleges it is error for the Government to have asked if various witnesses were aware he had entered into an Agreed Order of Retirement in lieu of revocation. R. 298 at 21.  These questions were asked witnesses who opined the Defendant was an excellent physician.  The Federal Rules of Evidence expressly allow such a question.  Under Rule 405, a witness may opine about a person's reputation.  And on cross-examination, "the court may allow an inquiry into relevant specific instances of the person's conduct."  Fed. R. Evid. 405(a).  Here, it was reasonable to ask witnesses who opined the Defendant was an excellent doctor whether they were aware he had signed an Agreed Order of Retirement in lieu of revocation with the medical licensing board.  Presumably such knowledge might impact the witnesses' opinion, or at least provide additional information for the jury to consider in weighing that particular person's endorsement of the Defendant.  The Defendant signed the Agreed Order, wherein he admitted certain facts and agreed to no longer practice medicine.  This occurred based upon a review of fifteen unnecessary procedures he performed.  Questions about this Order, while certainly damaging to the Defendant, were nonetheless proper under the rules of evidence.

### B.  The Millions of Dollars the Defendant Made from Cardiac Procedures Was Relevant

The Defendant negotiated an "eat what you kill" compensation agreement with KDMC. [Paul McDowell, R. 195 at 200.]  He ate very well.  The Defendant sold his practice to KDMC

for $1,810,000. [R. 195 at 189.] He negotiated a biweekly salary of $48,197.78. [*Id.* at 201.]

In 2009, the Defendant made $2,664,103; in 2010, $2,530,839; in 2011, $2,576,737. [*Id.* at 207.]

Special Agent Sara Sampson testified the Defendant had $17,918,601.58 in his brokerage

account, reflecting an increase of approximately $7 million during the timeframe at issue in the

Indictment. [R. 223 at 165.] The jury was entitled to infer the Defendant had a financial motive

for executing the fraudulent scheme. *See United States v. McLean*, 715 F.3d 129, 139 (4th Cir.

2013); *see also United States v. Logan*, 250 F.3d 350, 369 (6th Cir. 2001) ("[W]e find that the

income evidence was relevant to demonstrate that financial gain was the motive for the crimes

charged."); *United States v. Kurlemann*, No. 10-cr-14, 2011 WL 1113266, *2 (6th Cir. March 23,

2011), *rev'd in part on other grounds*, 736 F.3d 439 (2013) ("personal advancement and

financial gain, for example, are two well recognized motives for unlawful conduct."). The

Defendant's complaint that the jury was presented evidence of the fruits of his fraud are

misplaced.

### C. The Peer Comparison Evidence Is Relevant

Evidence of the number of procedures performed by the Defendant was properly

admitted. *See United States v. Weinstock*, 153 F.3d 272, 277 (6th Cir. 1998) (affirming use of

peer comparison is admissible: "While the profile is detrimental to the merits of [the defendant's]

case, it provides competent evidence of the charges of fraud."). The volume of procedures done

by the Defendant was "astronomical." [R. 198 at 83, 110.] The Defendant performed more

cardiac procedures than any other doctor in the Commonwealth of Kentucky, and was number

five in the United States. [*See* Exs. 425a–c, 426, 428; 429–437e; 443a–443r.] His revenue from

procedures was more than twice that of the next closest biller at KDMC. [R. 192 at 61–62; Ex.

428.] The Defendant, himself, performed more cardiac procedures than all of the cardiologists at

the University of Kentucky or the University of Louisville. [Exs. 437a–437d.] And as Dr. Kellerman testified, the number of procedures increased dramatically when the Defendant arrived at KDMC, though the population was not any sicker than they had been prior to his arrival. [R. 204 at 83.] The jury could properly conclude from this information the Defendant falsely represented medical necessity where none existed. *See Patel*, 485 F. App'x at 709.

### D. Testimony of Former Colleagues Was Properly Admitted

The Defendant claims, with no supporting case law, that the testimony of former colleagues at KDMC should not have been admitted because the cardiologists could not remember specific names of the patients. But evidence from former cardiologists that the Defendant did unnecessary procedures for decades was relevant to whether he committed health care fraud.

Under Federal Rule of Evidence 602, a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness had personal knowledge of the matter. *See* Fed. R. Evid. 602. Evidence to prove personal knowledge may consist of the witness's own testimony. *Id*. The threshold for admissibility under Rule 602 is low. *See United States v. Franklin*, 415 F.3d 537, 549 (6th Cir. 2005). Testimony should not be excluded for lack of personal knowledge "unless no reasonable juror could believe that the witness had the ability and opportunity to perceive the event that he testifies about." *Id*. Because the Defendant failed to object, his claim is reviewed for plain error only. Thus, the Defendant must show that an error (1) occurred, (2) was plain, i.e, obvious or clear, (3) affected his substantial rights, and (4) seriously affected the fairness, integrity or public reputation of the judicial proceedings. *United States v. Abboud*, 438 F.3d 554, 583 (6th Cir. 2006).

Here, no error occurred.  While the Defendant complains that Dr. Touchon, Dr. Shah and Dr. Elesber testified about the Defendant's unnecessary procedures, there is no dispute each witness is a trained cardiologist capable of determining an insignificant lesion.  Nor is there any dispute each of the physicians worked at KDMC, thereby having access to review the angiograms.  Similarly, there is no dispute Dr. Studeny is a trained cardiologist who saw angiograms of the Defendant's former patients.  Each of these witnesses' testimony was properly admissible.  To the extent the Defendant complains they cannot remember specific patients' names and the date of the unnecessary cardiac procedure, this goes to the weight of the evidence, not the admissibility.

### E.  The Government Did Not Misrepresent the Evidence

For six weeks the Defendant misled the Court and the jury about the true manner by which he assessed arterial blockages.  Yet despite this material deception, the Defendant now accuses the United States of misrepresenting the evidence.  He is wrong.

• The Defendant complains the Government "unfairly misled the jury" into thinking Dr. Samei had examined the angiograms in this case. 298 at 25.  In fact, he did examine archived angiograms from this case.  [R. 212 at 133, 150.]  And there can be no legitimate argument that Dr. Samei testified there was no significant degradation of the angiograms.  *See infra*, 16–17.

• The Defendant complains the Government referenced the involvement of Dr. Shotwell's lawyers in discovering the "degraded' angiogram issue. 298 at 25.  But that is what happened according to Mr. Strauss:

"I was asked to evaluate the equipment at King's Daughters to verify whether or not its performance was appropriate.
Q:  Now, you actually went there because lawyers for Dr. Shotwell asked you to come, didn't you?
A:  The lawyers from Dr. Shotwell functioned as my chaperone while I was there at King's Daughters and introduced me to the appropriate people and showed me where the labs were so that I could do my testing, yes.
Q:  In fact, it wasn't [the defense team] that brought up this issue, was it?
A:  At that time, I had not met them yet, no.
Q:  It was lawyers for another doctor; is that correct?

A:  They were.”
[R. 233 at 62–63.]

And the testimony of Agent Sampson:

Q:  Who was the first person to raise this in the course of your investigation?
A:  Attorneys for Dr. Shotwell.
Q:  So was it the defendant . . .  was not the first person to raise that?
A:  No.
Q:  Prior to Dr. Shotwell’s attorneys bringing this up, had your investigation revealed any concerns about the quality of the angiograms?
A:  No.
[R. 223 at 161.]

• The Defendant complains the Government falsely stated there were no blockages.  298 at 25.  Again, the Defendant’s argument is deceptive.  The United States took great pains to elucidate the nature of the blockages in the arteries. [*See, e.g.*, Ex. 529; R. 293 at 23, 38, 41, 61, 62, 64, 65, 67, 69, 73, 75, 82–89, 98, 100, 104, 108.]  The Defendant cannot, in good faith, argue the United States attempted to deceive the jury about the degree of the blockages in the arteries.

• The Defendant complains the Government stated Lance White “once suggested to a patient he might not need a cath.”  298 at 25.  He did:  “Did you ever suggest to them they might not need a cath?  Yes, sir.”  [R. 212 at 7.]  The Defendant heard this conversation.  [*Id*. at 8.]  He called White’s name and “then shook his head.”  [*Id*.]  White interpreted this to mean “[t]o cut off the conversation and proceed with getting the patient ready.”  [*Id*. at 9.]

• The Defendant falsely claims the Government misrepresented A.L.’s diagnosis of GERD.  R. 298 at 26.  Again, this is wrong:  “Do you have any new diagnosis for your chest pain?  Yes . . . GERD.”  [R. 192 at 104.]

Finally, the Defendant complains “there was no good faith basis to suggest that any IVUS images had been altered in this case.”  R. 298 at 26.  In fact, the Government showed the jury an IVUS image where the Defendant falsified the IVUS results.  *See* Ex. 4f.   In this case, nothing the Defendant said or recorded can be trusted.  His complaints the Government misstated the evidence are meritless.

### 3. No Legal Errors Occurred in Admitting the Angiograms

#### A. The Angiograms Were Not "Altered" and Were Properly Admitted

The United States has previously addressed the admissibility of the angiograms under Rules 901 and 1003. [*See* R. 88.] The Court found the angiograms to be admissible. [R. 155.] This was correct. "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." *United States v. Damrah*, 412 F.3d 618, 628 (6th Cir. 2005). Here, there is no question the angiograms are the images of the stent procedures, archived at 512 x 512. The angiograms are therefore admissible. The weight to be afforded the films was properly left to the jury.

The Defendant again accuses the Government of misstating the evidence and improperly "assuring the Court that it did not have to confront the problem that individual pixels can make the difference in interpreting the extent of blockages in microscopic coronary arteries." R. 298 at 29. But Dr. Samei directly addressed this issue. [R. 212 at 135–140.] While he did not provide the answer the Defendant wanted, he nonetheless explained why the films are accurate. No error existed in admitting the angiograms.

#### B. The Angiograms Were Not Unduly Prejudicial

Relevant evidence may be excluded only if "its probative value if substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. But evidence of the Defendant committing the crime charged is not unfairly prejudicial. "Unfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather, it refers to evidence which tends to suggest a decision on

an improper basis." *United States v. Johnson*, 581 F.3d 320, 327 (6th Cir. 2007).  Here, images of the Defendant placing stents in arteries with insignificant blockages is relevant evidence of the crime charged.

Strangely, the Defendant claims the angiograms were "powerfully misleading."  R. 298 at 29.  Again, the Defendant contradicts himself.  He repeatedly argued to the jury that a significant lesion was visible on the angiograms.  His expert, Joel Kahn, agreed he could see significant lesions.  Neither witness would identify a procedure wherein they agreed the stenosis recorded in the medical records was different than the blockage they saw in court.  Here, the Defendant attempted to argue two mutually exclusive defense theories:  that the angiograms had "degraded," yet also argue that significant lesions still can be seen.  The jury properly rejected this inconsistent defense.

### C.  The Testimony of Dr. Ragosta and Dr. Moliterno Was Proper

There is no dispute Dr. Ragosta and Dr. Moliterno are qualified to render an opinion regarding cardiac stent procedures.  [R. 155 at 14.]  The defense nonetheless challenges their opinions, arguing they "did not know how the angiograms had changed."  R. 298 at 30.  In making this argument, the Defendant once again attempts to focus on the reduction in the number of pixels in an attempt to misrepresent the image quality of the angiogram.  But as Dr. Samei explained, there is not a 1:1 correlation in reduction of pixels and the clinical attribute of the image.  [R. 212 at 138.]

Dr. Moliterno testified both at trial and at the *Daubert* hearing.  Dr. Moliterno explained that while he was at the Cleveland Clinic, he assessed image quality in angiograms that came from around the world.  [R. 223 at 65.]  He explained that a compression ratio of over 10:1 did not impact the ability to diagnose an image.  [*Id*. at 67.]  Here the compression ratio was only

4:1.  Dr. Moliterno also identified very fine detail that was visible, which further illustrated the diagnostic quality of the angiograms.  [*Id*.]

Likewise, Dr. Ragosta was fully aware of the Defendant's "degraded angiogram" theory, as he also testified at the *Daubert* hearing and at trial about the quality of the angiograms.  The Defendant's claim that Dr. Ragosta "had trouble coming to terms with the realization that the angiograms had been altered" is simply a false representation. R. 298 at n. 12.  Dr. Ragosta was asked in great detail about the angiogram quality on multiple occasions and was confident the films were of diagnostic quality.  [R. 203 at 40.]  Dr. Ragosta has performed over 10,000 catheterizations in his career.  [*Id*.]  He is more than qualified to opine about the images contained on an angiogram.

### 4.  The Jury Instructions Were Proper

The jury was properly instructed as to the applicable law.  The denial of a proposed jury instruction is reviewed under an abuse of discretion standard.  *United States v. Svoboda*, 633 F.3d 479, 483 (6th Cir. 2011) (citing *United States v. Adams*, 583 F.3d 457, 468-69 (6th Cir. 2009)).  The instructions actually given are considered "to determine whether they adequately informed the jury of the relevant considerations and provided a basis in law for aiding the jury in reaching its decision."  *United States v. Frederick*, 406 F.3d 754, 761 (6th Cir. 2005).  "Reversal of a judgment may occur 'only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial.'"  *Svoboda*, 633 F.3d at 483 (quoting *United States v. Harrod*, 168 F.3d 887, 892 (6th Cir. 1999)).  "A refusal to give requested instructions is reversible error only if (1) the instructions are incorrect statements of the law; (2) the instructions are not substantially covered by other delivered charges; and [(3)] the failure to give the instruction impairs the

defendant's theory of the case." *Adams*, 583 F.3d at 469 (alteration in original) (quoting *United States v. Hargrove*, 416 F.3d 486, 489 (6th Cir. 2005)).

## A. Fraud Is Never an "Appropriate Treatment" Option

The Defendant complains the Court erred by not proving "more extensive and particularized jury instructions concerning the physician's right to choose among appropriate treatment options." R. 298 at 32. Again, the Defendant seemingly forgets that he devised his own system to assess lesions unbeknownst to his patients and, apparently, everyone else. For this reason alone, his claim regarding the jury instructions fails.

The Defendant sought three specific additional instructions that were denied. R. 298 at 33. Essentially, the Defendant sought to argue that a physician can never be held liable for any conduct that physician chooses to describe as "medical judgment." *Id.* ("[Y]ou must allow Dr. Paulus to make his determination in light of all attendant circumstances – psychological and emotional, as well as physical – that might be relevant to the well-being of the patient." ).

This is not an accurate statement of the law. A physician has no right to lie to his patients or the insurers who pay the bills. And regardless of whether there is a psychological or emotional reason to subject a patient to an unnecessary and potentially life-threatening heart procedure – a rather dubious proposition – a physician can never falsify the medical records to justify payment for the procedure. A blockage is a blockage, regardless of any "psychological" or "emotional" factors. Put differently, had the Defendant decided a patient with a 20% blockage had an emotional desire for a stent that warranted a procedure, he should have documented the true degree of blockage and his reason for doing a procedure not medically indicated. This is not what happened.

Moreover, there is no factual basis for such an instruction. The Defendant did not identify a single procedure wherein he acknowledged a mild blockage yet decided to stent due to a "psychological" or "emotional" reason. Rather, the Defendant identified a significant lesion in each procedure presented to the jury. He was not entitled to a jury instruction on facts that were not presented to the jury.

The Defendant's reliance on *United States v. Volkman*, 797 F.3d 377 (6th Cir. 2015), a pill mill case, is misplaced. In *Volkman,* the jury instruction provided:

> If a physician dispenses a drug in good faith in the course of medically treating a patient, then the doctor has dispensed the drug for a legitimate medical purpose in the usual course of accepted medical practice. That is, he has dispensed the drug lawfully. 'Good faith' in this context means good intentions and an honest exercise of professional judgment as to a patient's medical needs. It means that the defendant acted in accordance with what he reasonably believed to be proper medical practice.

*Volkman*, 797 F.3d at 387. Good faith is an objective standard. In *United States v. Horwitz*, 459 F.3d 463, 478 (4th Cir. 2006), the Court held "we are squarely presented with the question of whether, in a § 841 prosecution against a doctor, the inquiry into a doctor's good faith in treating his patients is a subjective or objective one. We believe that the inquiry must be an objective one, a conclusion that has been reached by every court to specifically consider the question." (compiling cases). *See also United States v. Voorhies*, 663 F.2d 30, 34 (6th Cir. 1981) (affirming § 841 conviction of physician where jury was instructed that "Good faith…means good intentions and honest exercise of best professional judgment as to patient's medical needs. It connotes an observance of conduct in accordance with what the physician should reasonably believe to be proper medical practice."). And *Volkman* specifically held that "knowingly distributing prescriptions outside the course of professional practice is a sufficient condition to

convict a defendant under the criminal statutes relating to controlled substances." *Volkman*, 797 F.3d at 386.

The jury instruction from *Volkman*, therefore, is inapplicable in this case, where the Defendant chose to create his own system of assessing lesions, well outside the course of professional practice. Again, the facts do not support the Defendant's requested instruction, nor is it an accurate statement of the law.

Next, the notion of good faith and medical judgment was fully addressed in the jury instructions. *See* Instruction No. 12, Health Care Fraud ("The health care fraud statute is not intended to punish physicians for making judgment calls. It is also not intended to criminalize questionable decision making or even medical malpractice."); Instruction No. 13, Good Faith Defense; Instruction No. 16, Defense Theory; Instruction No. 17, Medical Guidelines ("It does not violate any criminal law if physicians do not comply with these guidelines, which change over time, and the guidelines are not intended to replace clinical judgment of the physician.")

Finally, and perhaps most importantly, the Defendant was allowed to make these arguments to the jury. Had the jury found these arguments persuasive, he would have been acquitted. He was not, and he cannot blame his conviction on the jury instructions.

### B. The Instruction for Section 1035 Was Appropriate

The Court's instruction on 18 U.S.C. § 1035 addressed all of the statutory elements. *See* Instruction No. 14. The Defendant claims the instruction should have included the language that the "statement concerned a fact capable of confirmation." R. 298 at 35. This phrase appears nowhere in the statute or any case law interpreting Section 1035. Undeterred, the Defendant cites to case law interpreting fraud in loan applications under 18 U.S.C. § 1014 and § 1010. *See* R. 298 at 36 (citing *United States v. Kurlemann*, 736 F.3d 439, 445 (6th Cir. 2013); *United States*

*v. Miller*, 734 F.3d 530, 543 (6th Cir. 2013); *United States v. Waechter*, 771 F.2d 974, 978 (6th Cir. 1985).

Both *Waechter* and *Kurlemann* distinguish Section 1014 from 18 U.S.C. § 1001, in that the latter prohibits half-truths, concealments, tricks, schemes, and concealment of material facts while the former does not.  In prosecutions under Section 1014, there must be an affirmative false statement, as opposed to concealing by a trick, scheme or device a material fact, acts that are prohibited under Section 1001.  Such language is much more similar to Section 1035 prosecution that loan application prosecutions under Sections 1014 and 1010.   Accordingly, the cases the Defendant cites are not persuasive.

Moreover, the Defendant's proposed language is factually incorrect.  While he claims a cardiologist's ability to assess a lesion is not "capable of confirmation" or "subject to proof or disproof," these claims are obviously false.  The jury heard from nine cardiologists that had seen the Defendant put stents in arteries that were not significantly blocked.  All agreed the Defendant placed stents in arteries that were much less than 70% and did not warrant a stent.  Dr. Ragosta, Dr. Moliterno, Dr. Morrison and Dr. Ali spent significant time showing angiograms to the jury and accurately assessing lesions.

The Defendant attempts to mislead the Court by suggesting the cardiologists cannot agree on how significant a blockage is.  This defies common sense.  Cardiologists spend years training to learn their profession.  They understand when a lesion is significant and when it is not.  There are clear guidelines for the appropriate use of a stent which detail a percent stenosis.  In borderline cases, cardiologists have additional tools to use to determine whether a stent is needed.  But these are not borderline cases.   Rather, they are cases where the Defendant repeatedly assessed a significant blockage where none existed.  If it was not possible to assess

lesions by angiogram, there would be no accepted standards and no need to train cardiologists to measure stenosis.

Here, the Defendant attempted to substitute his flawed theory of the case with the statutory elements of Section 1035. The Court properly declined the Defendant's request to rewrite the statute. No error occurred in instructing the jury.

### C. A Unanimity Instruction Was Not Required

The Sixth Circuit Pattern Instructions recommend no unanimity of theory instruction be provided. The Court did not err by following this guidance.

Federal Rule of Criminal Procedure 7(c) permits the Government to allege in one count of an indictment that a defendant committed the offense by one or more specified means. The Supreme Court has held unanimity is not required when the means used to commit an offense satisfy an element of the crime. *See Schad v. Arizona*, 501 U.S. 624, 630-33 (1991) (plurality opinion). Likewise, in *Richardson v. United States*, 526 U.S. 813, 817 (1999), the Court held that if the fact is defined as a means of committing the crime, "a federal jury need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element, say, which of several possible means the defendant used to commit an element of the crime."

Here, there are numerous ways the Defendant could have committed health care fraud. Specifically, he could have performed unnecessary cardiac procedures on any number of patients. The critical fact is not that he performed a particular unnecessary procedure, but rather that he engaged in a scheme to defraud. *See, e.g., United States v. Hendrickson*, 822 F.3d 812, 823 (6th Cir. 2016) (finding no unanimity required where defendant charged with violation of two separate but related injunctions).

Moreover, the Defendant's complaint the jury "could have agreed to convict without agreeing on anything on Count 1, including the appropriateness of any specific procedure, the identity of any specific false representation . . ." is unfounded. Here, the Defendant was convicted of making false statements on nine specific procedures. Clearly the jury agreed on the fraudulent nature of, at a minimum, these procedures. The Court properly followed the pattern instructions by declining to give a unanimity instruction. No error occurred.

### D. The *Allen* Charge Was Proper

The Court's decision to issue an *Allen* charge is reviewed for abuse of discretion. "The presiding judicial officer is in the best position to decide when to give the charge." *United States v. Clinton*, 338 F.3d 483, 487 (6th Cir. 2003). The relevant inquiry is "whether, in its context and under all the circumstances, [the charge] . . . was coercive." *Id.* Here, the Court utilized the Sixth Circuit pattern instructions in issuing the *Allen* charge. Such language has consistently been upheld. *See, e.g., Clinton*, 338 F.3d at 487-88; *see also United States v. Reed*, 167 F.3d 984, 991 (6th Cir. 1999).

No fair reading of the Court's supplemental jury instruction suggests the Defendant was prejudiced. First, the Court read the pattern *Allen* charge. R. 272 at 4, 6–9. The Defendant requested the Court, in addition to the pattern *Allen* charge, to also instruct the jury that the Government bears the burden of proof. R. 272 at 5. The Court agreed and repeatedly instructed the jury that the burden of proof was on the United States to prove every element. *Id*. at 9–11. It is hard to imagine an instruction more favorable to the Defendant than what the Court provided.

Nonetheless, the Defendant alleges the Court erred when it noted the jury had "spent quite a bit of time reviewing films, angiograms," R. 298 at 39, and that the jury could consider what the stenosis "might have been based upon the evidence that you heard." *Id*. at 41. It is

difficult to see how the Defendant was prejudiced by this undoubtedly true observation. It is not surprising that the jury looked at the evidence. Nor is it clear how the Defendant can complain the jury looked at angiograms after the defense had spent four days showing angiograms to the jury. The jury can hardly be blamed for considering this evidence during the deliberations. And the Court cannot be blamed for stating the obvious, that the jury was looking at the evidence.

More importantly, in no way did the Court suggest a particular outcome or otherwise place undue influence on the angiograms. Indeed, the Court specifically stated that "it is not enough for the 12 of you to look at an angiogram by itself, without considering the other elements, to say, well, I think that's 20. Guilty. As long as you find that he did it with intent to defraud, then that's an appropriate verdict." R. 272 at 11. The Defendant asked the Court to depart from the pattern *Allen* charge and remind the jury of the Government's burden of proof. Having gotten what he requested, the Defendant now cries foul because the jury found him guilty. They did this because he is, in fact, guilty of placing unnecessary stents and lying in the medical records. No error occurred in instructing the jury.

## CONCLUSION

People trust their doctors. Paulus preyed on this trust. His patients trusted him when he told them they needed a stent. The insurers trusted him when he caused claims to be submitted for payment for these unneeded procedures. This trust was misplaced.

The jury sat through six weeks of trial. They heard from over seventy witnesses. They took their time deliberating, carefully reviewing the evidence. And then they convicted the Defendant. No basis exists to disturb this verdict.

Respectfully Submitted,

KERRY B. HARVEY

UNITED STATES ATTORNEY

By:  s/Andrew Sparks
     Andrew Sparks
     Kate K. Smith
     Assistant United States Attorneys
     260 W. Vine Street, Suite 300
     Lexington, Kentucky 40507-1612
     (859) 685-4831
     (859)685-4855
     Andrew.Sparks@usdoj.gov
     Kate.Smith@usdoj.gov

## CERTIFICATE OF SERVICE

On December 16, 2016, I electronically filed this document through the ECF system which provided notice to counsel of record.

s/Andrew Sparks
Assistant United States Attorney