# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
### NORTHERN DIVISION
### COVINGTON

———————————————————— )
)
UNITED STATES OF AMERICA, )
)
) INDICTMENT NO. 0:15-CR-15-DLB-EBA
v. )
) **ORAL ARGUMENT REQUESTED**
)
RICHARD E. PAULUS, M.D., )
)
Defendant. )
)
———————————————————— )


## REPLY IN SUPPORT OF DR. PAULUS'S MOTION
## FOR A NEW TRIAL


Robert S. Bennett&#x9;&#x9;&#x9;C. David Mussetter
Michael P. Kelly&#x9;&#x9;&#x9;MUSSETTER LAW OFFICE
Hilary H. LoCicero&#x9;&#x9;&#x9;P.O. Box 192
HOGAN LOVELLS US LLP&#x9;&#x9;2709 Louisa Street
555 Thirteenth Street, NW&#x9;&#x9;Catlettsburg, KY 41129-0192
Washington, DC 20004&#x9;&#x9;&#x9;(606) 931-0050 (telephone)
(202) 637-5600 (telephone)&#x9;&#x9;(606) 931-0051 (facsimile)
(202) 637-5910 (facsimile)

COUNSEL FOR DR. RICHARD E. PAULUS

The government's brief illustrates how an overzealous prosecution can lead to the conviction of an innocent man.  A new trial is warranted because there was no evidence of any criminal intent or any false statement.  The government asks the Court to find fraudulent intent and the existence of false statements based on unreasonable inferences and vitriol.  But once the government's rhetoric is cast aside, the Court is left with a series of substantive medical disputes between cardiologists as to the best way to treat serious heart disease.  Is it better to interpret the blockage of coronary arteries through diameter or area stenosis?  Should a cardiologist's interpretation of an angiogram be shaped at all by medical considerations such as patient symptoms and family history?  What was the best way to help patients facing serious health problems?  The overwhelming weight of the evidence was only that these cardiologists disagreed with each other in fundamental ways about how to properly treat a patient with heart disease, not that one cardiologist was committing fraud on anyone.  Acting as the thirteenth juror and making credibility determinations, the Court should prevent injustice, set aside the conviction of an innocent man, and find that disagreement among cardiologists does not prove either fraudulent intent or the existence of a false statement.

Throughout its brief, the government asks the Court to draw inferences that cannot be reasonably drawn from the evidence presented at trial.  The government asks the Court to infer that these patients – with crushing chest pain and other crippling symptoms, long personal history with heart disease, and history of close relatives dying from heart disease – were not truly sick and did not need treatment.  It asks the Court to ignore the opinions of other treating physicians and infer that Dr. Paulus must have been lying if some other cardiologists disagreed with him after the fact.  It asks the Court to look away from the fact that its own cardiologists disagreed with each other by 30 to 40 percent in the few instances when the government showed

them the same angiograms. It asks the Court to speculate that the altered angiograms were not significantly different than the original angiograms and to ignore the fact that no one knows how each angiogram was altered by the archiving process. It asks the Court to infer fraud because Dr. Paulus interpreted area stenosis – which even the government's own witness acknowledged to be the most important issue in interpreting stenosis. These are the types of unreasonable inferences that pave the way for the conviction of an innocent man and should be emphatically rejected by the Court.

The government offers equally unreasonable arguments about the substantial legal errors that occurred in the trial, most of which were invited by the government. It asks the Court to affirm the rulings about the altered angiograms when no one could testify that the altered angiograms in this case were accurate. It urges the Court to endorse the failure to provide jury instructions that accurately stated the law and that were central to Dr. Paulus's ability to mount a defense. Finally, it argues that holdout jurors in a deadlocked jury would not have been influenced by the Court's commentary which undercut two central themes of Dr. Paulus's defense and endorsed two of the government's themes. The flaws in these arguments speak for themselves, and the Court should conclude that the substantial legal errors require a new trial. The interest of justice requires it when an innocent man like Dr. Paulus has been convicted.

**I.**     **<u>The Manifest Weight of the Evidence Favors Dr. Paulus's Innocence</u>.**

         **A.**      **The Government's Brief Misstates the Standards <u>that Must Be Used to Decide the Rule 33 Motion</u>.**

As an initial matter, the government misstates the Rule 33 standards throughout its brief. The government wrongly argues that the Court cannot weigh credibility of witnesses when it decides a Rule 33 motion. *See, e.g.*, Docket Entry No. 306 at 4, 6 (arguing that "it was for the

jury to weigh the evidence"), 18 (arguing that "credibility determinations are left for the jury").[1]

The Sixth Circuit, however, has repeatedly held that "[w]hen considering a motion for new trial based upon the weight of the evidence, district judges can act in the role of a 'thirteenth juror' and consider the credibility of the witnesses and the weight of the evidence to insure that there is not a miscarriage of justice." *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998); *see also United States v. Lewis*, 521 F. App'x 530, 531 (6th Cir. 2013) (affirming the granting of a Rule 33 motion).

If the weight of the evidence shows that Dr. Paulus was not guilty of any criminal act, the Court is not required to "respect the jury's finding." Docket Entry No. 306 at 4. The Court's task on a Rule 33 motion is to decide whether a new trial is warranted in "the interest of justice." FED. R. CRIM. P. 33(a). The interest of justice requires a new trial if the Court "harbor[s] a real concern that an innocent person may have been convicted." *United States v. Serrano*, No. 16 cr 169, 2016 WL 7335666, at *5 (S.D.N.Y. Dec. 15, 2016) (granting a new trial). Deciding a Rule 33 motion is a heavy responsibility, and it is one of the most important tasks assigned to the Court.

### B.    The Government Asks the Court to Find Fraudulent Intent Based on Unreasonable and Untrue Inferences.

The government's brief requests that the Court find fraudulent intent based on unreasonable and untrue inferences. For instance, the government's brief heavily focuses on the opinions of other physicians, and argues that fraud should be inferred because Dr. Paulus

---

[1]    The government erroneously cites to the standards used by circuit courts in reviewing a challenge to the sufficiency of the evidence on appeal. Docket Entry No. 306 at 4 (citing *United States v. United Med. and Surgical Supply Corp.*, 989 F.2d 1390, 1401 (4th Cir. 1993)). The Sixth Circuit, however, has emphasized that the district court must use a different standard to decide a Rule 33 motion than a circuit court uses to decide the sufficiency of the evidence on appeal. *See United States v. Lutz*, 154 F.3d, 581, 589 (6th Cir. 1998) (explaining that, in contrast to a district court, the circuit court "is not to sit as a 'thirteenth juror'").

practiced medicine differently than other physicians would have. *See, e.g.*, Docket Entry No. 306 at 3-7 (arguing that Dr. Paulus did not comply with "accepted cardiology practice").[2] But the government never addresses that it failed to present any proof that *Dr. Paulus* did not believe the stents were medically necessary or that he did not believe the amount of blockage recorded. By claiming that Dr. Paulus's independent disagreements with three cardiologists are "sufficient to convict the Defendant," *id.* at 4, the government again confuses a civil malpractice case with a federal criminal fraud case, something the Court cannot do when deciding a Rule 33 motion.[3]

Moreover, the manifest weight of the evidence showed that these patients were very sick and that they needed treatment, which is inconsistent with any fraudulent intent by Dr. Paulus. In its brief, the government wholly ignores the suffering that each patient endured, and generically argues that Dr. Paulus "deceiv[ed] people into believing they needed stents and

---

[2]     The government's brief is also filled with false and inflammatory allegations that have no evidentiary support anywhere in the record and are directly contradicted by the record in many instances. There was no evidence that Dr. Paulus received "millions of dollars in payment for procedures he should never have done." Docket Entry No. 306 at 1. No patients "testified the Defendant made false statements or otherwise misled them about their true condition." *Id.* at 3. There *is* a dispute whether "cardiologists measure stenosis by diameter rather than by area when interpreting an angiogram." *Id.* at 11. The defense did not "hide" information about how Dr. Paulus interpreted blockage, *id.* at 13, because Dr. Paulus volunteered this information on his direct examination and provided a chart describing his method of interpreting angiograms, Docket Entry No. 254 at 59-66; Paulus Ex. 1.240. And these are only a few examples. It is sad that the U.S. Attorney's Office has misstated the record so often in its zeal to obtain a conviction. A motion for a new trial should not be denied based on government representations that are not supported anywhere in the record.

[3]     The government does not dispute that its arguments consistently encouraged the jury to decide the case as though this were a malpractice case and not a fraud case. *See, e.g.*, Docket Entry No. 298-1 at 10 n.5 (collecting examples). Indeed, the government repeats the same types of arguments in its brief. *See, e.g.*, Docket Entry No. 306 at 13 (government argument that "[w]hen a doctor places a piece of metal into someone's heart, that doctor must follow appropriate medical guidelines").

perpetuat[ed] the myth that he was saving lives."[4]  Docket Entry No. 306 at 1.  But the patients'

own testimony unequivocally established how sick they were and that their serious illness was

not some deception by Dr. Paulus.  For instance, Dr. Paulus did not deceive Patient J.D. (who

was the subject of Count 8) into clenching his chest when he arrived at the hospital while he was

unable to speak.  Docket Entry No. 232 at 107.  He did not trick J.D. into feeling "almost an

instant relief" when the stent was placed, *id.* at 109, and did not use any sleight-of-hand to

convince J.D. that he saw the artery "flared out" as "blood rush[ed] through it," *id.* at 114.  Dr.

Paulus was not performing an optical illusion when J.D.'s wife reported following the procedure

that this was the first time in a month that J.D.'s skin color was not gray in appearance.  *Id.* at

109.  J.D.'s testimony that Dr. Paulus "saved my life," *id.* at 110, was based on symptoms he

personally experienced, and cannot be dismissed as the product of a lie.

Similarly, the overwhelming evidence showed that the few patients who testified at the

request of the government were equally sick and needed medical treatment.  For instance, Patient

A.L. was the subject of Count 12 and was called to testify by the government.  When she

reported to the emergency room, Dr. Pavan Kolluri (an experienced emergency room physician)

worried that her "pretty dramatic" symptoms were evidence of a heart attack.  Docket Entry No.

230 at 95-96, 100, 103.  The emergency room doctor reached this conclusion before Dr. Paulus

ever examined A.L., so no one could conclude her suffering was the result of some type of

---

[4]     When the government's brief makes inflammatory and misleading assertions about
"potentially life-threatening surgeries" and "piece[s] of metal inserted into their hearts," Docket
Entry No. 306 at 1, it becomes even more important that the Court examine the serious medical
condition that each patient was facing.  Dr. Paulus has set forth the circumstances confronting
each patient whose treatment was the subject of a false statement count and summarized the
circumstances for the patients grouped together in Count 1.  *See* Docket Entry No. 263-1 at 18-
21; Docket Entry No. 298-2.  The government's briefs have not focused on any individual
patient's situation (despite the Court's request), but rather on generic allegations that do not
reflect their serious medical needs.

deception by Dr. Paulus. While Dr. Paulus was at A.L.'s bedside, he did not fool A.L. into suffering an episode of crushing chest pain rated 10 out of 10 in severity, with nausea, sweating, shortness of breath, and active vomiting. Docket Entry No. 246 at 134-37; Paulus Ex. 12.5. Dr. Paulus did not invent A.L.'s "awful family history of coronary artery disease, with multiple siblings dying from artery disease in their 20s and 30s." Docket Entry No. 241 at 236-38. Nor did he conjure up her own long history of coronary artery disease, including her coronary bypass surgery. *Id.*; Paulus Ex. 12.4. With this evidence in the record, the Court cannot simply assume that A.L. would have survived her serious illness if Dr. Paulus had not treated her with a stent.

Just as importantly, the evidence also showed that the physicians who actually treated these patients *agreed* with Dr. Paulus about the seriousness of the patients' conditions. For instance, Dr. John Van Deren examined Patient M.H. (the subject of Count 10) and found that she was suffering from a 90% blockage in her coronary artery. Docket Entry No. 249 at 211-12, 216-17; *see also* Docket Entry No. 235 at 225 (testimony of cardiologist David Bush that he found a "significant blockage" for patient C.C. when he performed a catheterization). Emergency room doctors and referring cardiologists sent patients to Dr. Paulus because they feared that those patients were having active heart attacks or were in serious danger. *See, e.g.*, Docket Entry No. 235 at 221 (testimony of Dr. Bush that he was worried that patient J.C., the subject of Count 4, had "a high likelihood of coronary artery disease"); Docket Entry No. 230 at 106-10 (testimony of emergency room doctor Pavan Kolluri about his concern that patient K.P., the subject of Count 18, was suffering a heart attack). Because the patients were very ill and needed medical treatment, Dr. Paulus had every reason to believe that stents were a medically necessary treatment. The patients' illnesses were flatly inconsistent with any fraudulent intent.

This undisputed evidence highlights why the second-guessing of altered angiograms by the government cardiologists, Dr. Moliterno and Dr. Ragosta, does not demonstrate fraudulent intent. The government cannot dispute that those cardiologists and Dr. Paulus had profoundly different philosophical approaches to cardiology and the interpretation of angiograms. Dr. Moliterno and Dr. Ragosta did not assign the same importance to symptoms (such as crushing chest pain), personal medical history, and family medical history that Dr. Paulus did. Docket Entry No. 298-1 at 8. These factors influenced how Dr. Paulus interpreted angiograms; it apparently did not influence those other cardiologists when they interpreted altered angiograms. No one can reasonably infer fraud from a medical disagreement when the cardiologists have such profoundly different medical philosophies. The government's brief has no response on this point.

The lack of fraudulent intent is even more pronounced when Dr. Moliterno and Dr. Ragosta could not offer *any* suggestions as to how to treat these patients' serious heart problems. They did not suggest how they would have alleviated the painful conditions that J.D., A.L., A.S. or any of the other patients were experiencing – except to say that they would not have provided a stent to the patient or that they would have placed the stent in a different place. For instance, Dr. Ragosta complained that Patient A.L. had not received a stress test, Docket Entry No. 203 at 125, but he did not explain how she was supposed to undergo a stress test when she was suffering crushing chest pain, nausea, vomiting, and shortness of breath. Similarly, Dr. Ragosta complained that A.S. (the subject of Count 25) should not have received a stent, *id.* at 135-36, but he had no solution for how to treat a patient who was experiencing 8 out of 10 chest pain despite having already taken eight different heart medications. Docket Entry No. 252 at 139, 142-44. In summary, the overwhelming evidence is that Dr. Paulus responded to the serious

problems facing these patients according to his best medical judgment and that the government cardiologists would have simply assumed the problems away. No one can reasonably find fraudulent intent from this evidence.

Similarly, when addressing the altered angiograms, the government's brief does not explain how any inference of fraudulent intent can be drawn when its own cardiologists disagreed with *each other* about the extent of stenosis by 30 to 40 percent when looking at the *same* angiogram. The government weakly argues that these examples were not in evidence, Docket Entry No. 306 at 9 n.6, but that is flatly wrong. That evidence was admitted without government objection. *See* Docket Entry No. 298-1 at 11 (collecting all of the record cites where this evidence was admitted). There was even one case where Dr. Moliterno thought a patient's circumflex artery was "completely blocked," Docket Entry No. 223 at 111, whereas Dr. Ragosta did not identify that artery as being blocked at all, Docket Entry No. 203 at 156-58. When even Dr. Moliterno conceded that Dr. Ragosta was not lying just because they reached different interpretations about the same angiogram, Docket Entry No. 223 at 135, it is against the weight of the evidence to draw any inference of fraudulent intent from disagreements with Dr. Paulus.

The government's brief also does not have any good explanation for why Dr. Ragosta's testimony on the stand was so different from the textbooks he wrote. The government tried to minimize Dr. Ragosta's inconsistent testimony by arguing that "[c]ontext matters." Docket Entry No. 306 at 5. But context does not explain how the government can base its theory of guilt on a view that directly contradicts the published views of its own expert witness. For instance, context does not explain how anyone could rely on the difference in angiogram interpretations as evidence of fraudulent intent when the government's own expert witness wrote that"[t]he clinical significance of coronary lesions of moderate severity (30 percent to 70 percent) is unclear based

on [the] angiogram alone . . . ." Docket Entry No. 244 at 209. The government's description of its expert testimony has similar problems. For instance, the government claims that Dr. Ragosta and Dr. Moliterno were "fully aware" of the IVUS procedures, Docket Entry No. 306 at 5, but cannot explain why they did not mention the IVUS procedures in their testimony about specific patients. *See, e.g.*, Docket Entry No. 298-1 at 7 n.2 (listing specific IVUS procedures never acknowledged by the government's experts).

The government also wrongly argues that fraudulent intent should be inferred because Dr. Paulus interprets blockages in terms of area and not diameter. There was a good medical reason for Dr. Paulus to estimate area stenosis: even the government's own expert witness, Dr. Moliterno, conceded that area and not diameter was the important measurement in assessing coronary lesions. Docket Entry No. 223 at 52. Dr. Moliterno agreed with the formula for the measurement and only disagreed about the accuracy of the measurement. Docket Entry No. 259 at 140. The 1991 ACC/AHA Guidelines (which were issued at the very same time that Dr. Paulus was finishing his training as a cardiologist at Texas Heart Institute) specifically stated that

> [t]he traditional method of assessing coronary stenoses by visual estimation of percent diameter stenosis is associated with a high degree of inter- and intraobserver variability. *Geometric and nongeometric techniques of quantitating lesional significance have been validated and have become increasingly important in clinical research.* There remains some controversy as to the preferable technique . . . . *The actual lesional cross-sectional area has greater physiological importance than does percent diameter stenosis.*

Exhibit 1 at 2241 (emphasis added).[5] Dr. Paulus did not "create[] his own method for assessing lesions" as the government wrongly claims, Docket Entry No. 306 at 9, because the undisputed

---

[5] Although it was not part of the trial record, the Court can take judicial notice of the fact that the ACC/AHA Guidelines opined in 1991 that actual lesional cross-sectional area has greater physiological importance than diameter stenosis. *United States v. Garland*, 991 F.2d 328, 330 (6th Cir. 1993) (taking judicial notice of a foreign criminal judgment and ordering a

evidence was that the Texas Heart Institute taught cardiologists to measure lesions that way when Dr. Paulus was there, Docket Entry No. 239 at 153.  A false statement cannot be inferred because Dr. Paulus estimated blockages in a way that some other cardiologists did not, particularly when there was a good medical reason to do so.

The government argues that it is "alarmist" to suggest that innocent cardiologists can be convicted by its overly broad theories.  Docket Entry No. 306 at 7.  But the facts cited by the government (*i.e.*, the number of stent procedures performed, his disagreements with some former colleagues and government experts, and his measurement of lesions by area) are not the ingredients of a criminal case.  Using the same kind of broad theories, the government could level exactly the same types of allegations against any doctor who practices medicine in a way that the government disapproves.  Yet, there is no legal requirement that cardiologists have to practice the same type of cookie-cutter medicine.  Cardiologists are *supposed to be* exercising their independent clinical judgment, and fraudulent intent cannot be inferred simply because one cardiologist disagrees with opinions of other cardiologists.  "[A] line must be drawn between valid circumstantial evidence, and evidence which requires a leap of faith in order to support a conviction."  *United States v. White*, 932 F.2d 588, 590 (6th Cir. 1991).  The overwhelming weight of the evidence was that Dr. Paulus was responding to the medical needs of his patients and that he disagreed with other cardiologists who second-guessed him after the fact.  Because the overwhelming weight of the evidence showed there was no criminal intent, Dr. Paulus should be granted a new trial.

---

new trial).  Judicial notice is particularly appropriate in this case when the government did not develop this new theory of criminal liability until its closing argument.

**C.    The Government Asks the Court to Find the Existence
of a False Statement Based on Unreasonable Inferences.**

The government also asks the Court to rely on unreasonable inferences to find the

existence of a false statement.  In particular, the government argues that (i) the Court can infer

the existence of a false statement if a cardiologist records the area and not diameter blockage in

his medical records, and (ii) inter-observer variability is irrelevant if the cardiologist recorded an

area blockage.  *See* Docket Entry No. 306 at 7-13.  Neither argument has any merit.  The

government had the burden to prove the existence of a false statement beyond a reasonable

doubt, and it has failed to do so.

First, a false statement cannot be inferred because Dr. Paulus estimated blockages by

their area and not their diameter.  The government cannot offer any legal authority for the novel

proposition that cardiologists are required to express interpretations of lesions by diameter when

Medicare, Medicaid, and private insurers do not require it.  No voluntary medical guidelines

have banned cardiologists from interpreting area stenosis, and the ACC/AHA Guidelines have

even endorsed the idea that area and not diameter is the most important consideration.  Exhibit 1

at 2241.  The government does not dispute that Medicare, Medicaid, or private insurers could

have asked cardiologists to record their interpretations in the form of diameter stenosis, but none

have chosen to do so.  Similarly, Medicare, Medicaid, or private insurers could have asked

cardiologists to enter a code reflecting the extent of diameter stenosis, but none have chosen to

do so.  If the government or any insurer wanted to audit Dr. Paulus's records, they could have

asked him how he interpreted blockages, but none chose to do so.  A false statement cannot be

inferred because a cardiologist did not record an interpretation in a form that no one requested.[6]

Second, a false statement cannot be inferred when there is no objective way to prove that the statement is untrue (whether expressed in area or diameter). The government's own cardiologist, Dr. Ragosta, acknowledges that he does not use percentages at all, but instead uses more amorphous terms when describing his interpretation of blockages in his catheterization reports. Docket Entry No. 204 at 31. Dr. Ragosta testified that "a lot of folks" use categories and not specific numbers in describing stenosis and that he considers the use of numbers to be "misleading." *Id.* The lack of any objective measure was also established in the trial testimony when the government's own expert witnesses' interpretations of the same angiograms differed by 30 to 40 percent.

This problem also illustrates why interobserver variability is so important, regardless of whether stenosis is measured by diameter or area. The government must prove the existence of a false statement beyond a reasonable doubt. *See, e.g.*, Docket Entry No. 108 at 14 (observing that the government must prove that "the asserted proposition is untrue"). When the government's own cardiologists look at the same angiogram and arrive at substantially different estimates, the government has not proven the existence of a false statement. When the government's own testifying expert acknowledges that angiograms are "notoriously misleading" and that it would be misleading to use specific numbers in an angiogram interpretation, the government has not proven the existence of a false statement. Dr. Paulus's use of area interpretation does not excuse

---

[6]     In the same way, the government tried unsuccessfully to argue for a rule that stents could not be placed unless there was a 70 percent lesion and other symptoms of blockage. But the health care fraud statute was never intended to allow the government to use a criminal case as a vehicle to promulgate substantive medical rules. *See, e.g.*, Docket Entry No. 306 at 7 (purporting to set forth a rule that "percent blockage assessed by angiogram means the diameter blockage of the artery"); *id.* (claiming to set forth a rule that "area cannot be assessed by looking at an angiogram."); *id.* (attempting to create a new rule that "[i]f a cardiologist wishes to measure the area of a blockage, an intravascular ultrasound must be used").

the government from showing the falsity of any statement. If anything, the use of area stenosis only meant that his disagreements with the government cardiologists were not as stark as the government has portrayed them to the jury and to the Court. Because the overwhelming evidence showed that the government has not proven a false statement, the Court should grant a new trial to Dr. Paulus.

### D. The Government Cannot Reasonably Deny That the Jury Had to Speculate About the Altered Angiograms.

Acting as the thirteenth juror, the Court should reject the government's arguments that the altered angiograms "accurately reflect the true degree of blockage," Docket Entry No. 306 at 13-19. The government asks the Court to speculate that the altered angiograms reflected what Dr. Paulus saw when he interpreted the original angiograms. However, the government cannot dispute that its own imaging expert, Dr. Ehsan Samei, admitted that the alterations could change the angiograms depending on whether the angiograms reflected "difficult cases." Docket Entry No. 212 at 149, and that he did not "know the population of the patient[s] that are imaged here." *Id.* The government cannot dispute that Dr. Samei conceded that the alterations "can make a difference," *id.* at 159, and that "[i]t's a guess" as to what Dr. Paulus saw in the cath lab, *id.* at 160. These admissions from Dr. Samei demonstrate that a factfinder would have to speculate that the altered angiograms reflected what Dr. Paulus saw when he interpreted the original angiograms.

The government argues that Dr. Samei did examine the altered angiograms in this case, citing his testimony that he "just pulled a few, five or six, and these look[ed] like typical cases to me." Docket Entry No. 306 at 16 (citing Docket Entry No. 212 at 150). But the government never identified the 5 or 6 angiograms that Dr. Samei supposedly examined, either in trial, at the *Daubert* hearing, or in pretrial discovery. The Court cannot draw any inferences about these 5 or

6 angiograms when no one knows which angiograms are being discussed.  These angiograms could have been at issue in the 16 counts that were voluntarily dismissed by the government or on which the jury acquitted.  Or the angiograms could have been wholly unrelated to Dr. Paulus. The Court has no basis to conclude that these 5 or 6 angiograms were accurate when it cannot identify which angiograms were supposedly examined by Dr. Samei.[7]  Nor does Dr. Samei ever explain, besides generic references to his experience and his credentials, how visual examination of five or six angiograms would allow him to infer how those angiograms must have appeared to someone prior to the alterations.  And the largest and most obvious problem is that Dr. Samei did not try to claim he examined the vast majority of the altered angiograms; he cannot even make a "guess" about angiograms that he never saw.

The government also tries to glide past an equally important point:  its misstatements of Dr. Samei's testimony.  In its brief, the government tries to frame the issue as whether *it* was allowed to argue to "the jury they could rely upon these angiograms . . . ."  Docket Entry No. 306 at 17.  The problem, however, was that the government falsely told the jury that "*Dr. Samei told you* you can rely *on these angiograms*" and that "*[h]e told you* there's no substantial degradation *of these angiograms*."  Docket Entry No. 293 at 58 (emphasis added).  Those statements were not, as the government argues, "reasonable inferences from the evidence."  Docket Entry No. 306 at 17.  Those arguments were clear misstatements of Dr. Samei's testimony, because Dr. Samei conceded that the error rate would differ depending on whether the procedures were "difficult cases," Docket Entry No. 212 at 149, and Dr. Samei did not purport to look at the vast

---

[7]    The government tries to blame Dr. Paulus for not "inquir[ing] more about which cases Dr. Samei looked at," Docket Entry No. 306 at 16, but the question under Rule 33 is whether the Court can infer fraudulent intent based on the evidence actually presented at the trial.  The answer to that question is no.

majority of angiograms in this case. A new trial should be granted because the government misstated (among other things) the testimony of its key expert on an issue central to the case.

The Court also cannot draw any inferences from government arguments that misstate the nature of the alterations made to the angiograms. The government tries to frame the issue as one of "compression," Docket Entry No. 306 at 16, which fails to acknowledge that the angiograms were altered because of downscanning and not compression. *See* Docket Entry No. 232 at 97 (testimony of Mr. Strauss that "[t]hey're two completely different processes . . . ."). In contrast to the process of compression, no one can recover the images when they have been downscanned. Docket Entry No. 232 at 10-11. Similarly, the government also misleads when it claims that "[t]he equipment compressed all of the angiograms at this ratio." Docket Entry No. 306 at 16. The government ignores that the archiving process averaged the shading differently for each patient's angiogram because of each patient's unique anatomy, Docket Entry No. 232 at 31-33, which makes it impossible for the process to affect each angiogram in exactly the same way (as the government claimed).

The government also wrongly argues that the angiograms could not have been altered if Dr. Paulus and Dr. Kahn were able to interpret the altered angiograms. Docket Entry No. 306 at 14. Dr. Paulus saw the original angiograms, and his memory assisted his interpretation of the altered angiograms. Docket Entry No. 246 at 156. Dr. Kahn did not see the original angiograms and readily conceded the speculative nature of his review. Docket Entry No. 244 at 21-22; *see also id.* at 153 (testimony of Dr. Kahn that "there's this unknown of how [much] more clarity there may be on films that we cannot reproduce at this time"). Speculative testimony is no basis

from which to infer that the original angiograms had the same appearance as the altered angiograms.[8]

The government's speculation also defies science. The government cannot counter simple physics: when it is undisputed that a single pixel can cover 0.4 millimeters of a 2 millimeter lesion (20%), and when none of the government witnesses can know how many (or which) pixels changed colors or shading, *all* of the expert witnesses had to speculate how the alterations would have changed the appearance of these specific angiograms. Docket Entry No. 298-1 at 18. Even Dr. Samei agreed that every pixel changed in the archiving process. Docket Entry No. 212 at 164. The government's brief continually fails to address these points, and instead relies on an irrational response that "Defendant did not place stents into pixels . . . ." Docket Entry No. 306 at 18. Crediting that type of argument is how an innocent man can be wrongly convicted.

Finally, the government asks the Court to infer that the altered angiograms were accurate because cardiologists should have objected earlier to them or because the government experts believed them to be of "diagnostic quality." Docket Entry No. 306 at 14-15. But those arguments ignore that cardiologists were not treating patients based on altered angiograms and therefore had no reason to complain about them, and the government's own experts acknowledged that they did not know how the angiograms were changed. This is no basis from which to infer that the angiograms were accurate.

---

[8]     The government's argument is also internally contradictory and makes no sense. It asks the Court to accept Dr. Kahn's testimony that Dr. Paulus's interpretations were reasonable (so the government can argue the angiograms were not altered) and then asks the Court to reject Dr. Kahn's testimony that Dr. Paulus's interpretations were reasonable (so the government can argue that there were smaller blockages than Dr. Paulus reported). It is the government's argument that cannot "have it both ways." Docket Entry No. 306 at 14.

### E. The Government Cannot Provide Any Valid Basis for the Improper Evidentiary Inferences That It Argued During the Trial.

The Court should not be swayed by the government's repeated use of other improper and unreasonable evidentiary inferences, which also created legal errors in the trial.

*The Use of the KBML Agreed Order of Retirement*

The government is wrong that the KBML Agreed Order of Retirement was admissible or deserves any weight in deciding whether to grant a new trial. Federal Rule of Evidence 408(a)(1) specifically prohibits the introduction of a settlement offer or acceptance into evidence – which is exactly what the Agreed Order of Retirement was. The government argues that the settlement agreement was a "statement made during compromise negotiations about the claim" under Rule 408(a)(2), Docket Entry No. 306 at 19-20 – but that argument would render Rule 408(a)(1) meaningless because the government could then claim that every settlement agreement was "a statement made during compromise negotiations." Dr. Paulus did not admit any violation in the settlement agreement and only agreed to a procedural mechanism that would allow the KBML to enforce the agreement. That is a settlement agreement covered under Rule 408(a)(1) and not a statement made during compromise negotiations covered by Rule 408(a)(2). *See United States v. Babajian*, No. CR 07-00755 DDP, 2009 WL 412333, at *3 (C.D. Cal. Feb. 17, 2009) (holding that a stipulation was not admissible under Rule 408(a)(1) and therefore Rule 408(a)(2) did not apply).[9]

The government also disingenuously claims that it asked its KBML settlement questions only to witnesses testifying about Dr. Paulus's reputation because "[p]resumably such

---

[9] Neither of the two cases cited by the government allowed the actual terms of a settlement agreement to be admitted into evidence and are therefore distinguishable. *United States v. Davis*, 596 F.3d 852, 860 (D.C. Cir. 2010); *United States v. Gannaway*, 477 F. App'x 618, 621 (11th Cir. 2012) (addressing a situation where the defendant "admitted that he was civilly responsible").

knowledge might impact the witnesses' opinion . . . ." Docket Entry No. 306 at 20. That is not an accurate statement of the record: the government used the KBML settlement repeatedly as a way to smear Dr. Paulus with the suggestion that the KBML made a serious substantive finding against him:

- In its opening statement, the government introduced the Agreed Order of Retirement as substantive evidence of guilt. Docket Entry No. 213 at 3 (promising the jury would hear "fun stuff" about Dr. Paulus retiring in lieu of having his medical license revoked).

- It asked its own witness (Jon Marshall) to read the settlement agreement into evidence. Docket Entry No. 195 at 63-72, 84-85. It unsuccessfully tried to ask its own expert witness (Dr. Ragosta) if he had his license retired in lieu of revocation. Docket Entry No. 204 at 55.

- The government's questions to Dr. Paulus's witnesses were not inquiring about his reputation, but rather if those witnesses had entered into similar agreements themselves. *See, e.g.*, Docket Entry No. 230 at 140-41 (Dr. Kolluri); Docket Entry No. 232 at 153 (Dr. Workman); *id.* at 176-77 (Dr. Driedger); Docket Entry No. 235 at 285 (Dr. Bush).

- During cross-examination of Dr. Paulus, the government directed him to read aloud parts of the KBML Agreed Order of Retirement and the text of the Kentucky statutes referenced in them. Docket Entry No. 259 at 26-31. The government emphasized the statutory text, which lists the bases upon which the KBML is authorized to take action against a medical license, such as "dishonorable, unethical or professional conduct of a character likely to deceive, defraud or harm the public or any member thereof"; acts constituting "gross incompetence, gross ignorance, gross negligence or malpractice"; and "[c]onduct which is calculated or has the effect of bringing the medical profession in disrepute." *Id.* at 28-29. The government repeatedly referred to these provisions as language "that [Dr. Paulus] agreed to." *Id.* at 27-31.

- The government similarly referenced the KBML agreement in its closing argument, describing it yet again as an admission of wrongdoing on the part of Dr. Paulus. Docket Entry No. 293 at 45 ("Defendant agreed the Kentucky Board of Medical Licensure could conclude he violated some of these Kentucky statutes, particularly 311.595(9), that he engaged in dishonorable, unethical and unprofessional conduct. Defendant signed that order. He agreed to retire in lieu of revocation and he agreed if he practiced again, he agreed that his practice will be a danger to the public. Dr. Paulus signed this. He signed this Agreed Order, yet he told us he does nothing wrong, that all his procedures were appropriate. How can he sign this order and tell you that?").

The purpose of these questions and arguments were to mislead the jury into believing that the KBML made a finding that Dr. Paulus engaged in serious wrongdoing and that he admitted to such, not for any proper purpose under Rule 405.

Above all, the government fails to offer any reason why the Court should credit the settlement agreement as indicative of any fraudulent intent by Dr. Paulus. The Sixth Circuit is right: "disputes are often settled for reasons having nothing to do with the merits of a claim," *Eid v. Saint-Gobain Abrasives, Inc.*, 377 F. App'x 438, 444 (6th Cir. 2010). The Court should not give any weight to an argument that was intended to confuse the jury into believing that the KBML settlement was a substantive finding by the KBML or an admission by Dr. Paulus, neither of which can be fairly inferred from the evidence.

### Dr. Paulus's Compensation and Number of Procedures

The Court should reject the government's argument that fraudulent intent should be inferred from Dr. Paulus's compensation or the number of procedures he performed. With respect to compensation, the government continually refers to "millions of dollars," Docket Entry No. 306 at 1, 3, 7, 20-21, which gave a grossly misleading impression of the supposed financial motive for each procedure. The government never acknowledged the much smaller amount that Dr. Paulus actually earned for each procedure.[10] Besides an improper appeal to class prejudice, the purpose of the government's repeated and salacious comments about "millions of dollars" was to invite the jury to speculate that *some* of these procedures must have been unnecessary if Dr. Paulus was earning "millions of dollars." That type of speculation is not

---

[10] In the cases cited by the government, income was relevant to motive where the income was "was necessarily dependent upon" the fraudulent loan scheme. *See, e.g.*, *United States v. Logan*, 250 F.3d 350, 369 (6th Cir. 2001). That was not the case here.

a proper or reasonable inference for the Court or the jury to make. It is doubtful that the Court would have admitted this evidence at all if the government had acknowledged it intended to use repeated references to "millions of dollars" as a way of encouraging the jury to speculate that some of the procedures must have been improper.

Similarly, the government repeatedly asked the jury to infer that some of the procedures must have been improper if Dr. Paulus performed more procedures than other cardiologists or hospitals (like the University of Kentucky and University of Louisville) that did not specialize in stents. That is not proper because juries cannot be asked to assume wrongdoing. The only reasonable conclusion from the trial testimony was that Dr. Paulus performed more procedures because he worked more hours than any other cardiologist, because he specialized in stents, and because he had developed a strong reputation among referring doctors.

**F.      The Government Made Multiple Misstatements During Trial.**

The government fares no better in its attempts to justify its misstatements, which misled the jury. Docket Entry No. 306 at 23-24. For instance, Dr. Samei never told the jury that they "can rely *on these angiograms*" because Dr. Samei did not look at the vast majority of the angiograms in this case. Dr. Shotwell's lawyers did not "discover" the alteration of the angiograms; Keith Strauss, the imaging physicist, did. The government kept telling the jury that there were "no blockages" when its own experts acknowledged that every patient had some blockages in their coronary arteries.[11] The government argues repeatedly that "[w]ords have

---

[11]      The government also wrongly argues that Dr. Paulus falsified one IVUS result. Docket Entry No. 306 at 24. As Dr. Paulus earlier explained, Docket Entry No. 298-2 at 2, the government relies on the testimony of Dr. Ragosta, who used a novel method to measure one still frame from 1,084 frames of the IVUS and admitted that he did not know whether this still frame was the one relied upon by Dr. Paulus. Docket Entry No. 203 at 93. This is not a basis upon which any reasonable inference of fraud can be drawn.

meaning," Docket Entry No. 306 at 7, but it misled the jury at trial with words that were not true. That, by itself, is enough to warrant a new trial.

II.    <u>A New Trial Should Be Granted Because of Substantial Legal Errors</u>.

   A.    **The Government's *Daubert* Arguments Require the
         Court to Ignore the Testimony in the *Daubert* Hearing.**

       The government cannot defend the admission of the altered angiograms, Docket Entry

No. 306 at 25, when no witness could testify that the altered angiograms were accurate.  Every

government witness had to concede that they did not know how any specific angiogram was

changed.  Docket Entry No. 149 at 63 (Dr. Moliterno); *id.* at 276 (Dr. Ragosta).  Dr. Samei, in

particular, denied that the altered angiograms could be described as accurate.  *Id.* at 78.  The

government argues that it authenticated that the altered angiograms as the angiograms in

KDMC's archiving system, but ignores that it was trying to use the altered angiograms as

evidence of what Dr. Paulus saw in the original angiograms.  That was reversible error.  *United

States v. Vayner*, 769 F.3d 125, 131-33 (2d Cir. 2014) (vacating a conviction and finding the

district court abused its discretion because the government authenticated evidence for a narrow

factual claim and then was allowed to use the evidence for a much broader factual claim).  It was

another error that the government has invited the Court to make.  *See, e.g.*, Docket Entry No. 152

at 3 (describing the government's efforts to change the subject from whether the altered

angiograms were "accurate" to whether they were of "diagnostic quality").

       With respect to Federal Rule of Evidence 403, the government again argues that the

altered angiograms were accurate, Docket Entry No. 306 at 25-26, but again fails to

acknowledge the speculative leap that the jury had to make in order to conclude that the altered

angiograms reflected what Dr. Paulus saw when he examined the original angiograms.  The

government also argues that the altered angiograms could not have been misleading if Dr. Kahn

agreed with Dr. Paulus on the angiograms, *id.* at 26, but that argument fails to recognize that the original angiograms could have shown the substantial blockages in the patients' coronary arteries much more clearly and removed any doubt.

Finally, the same problems plague the government's attempts to justify the testimony of Dr. Moliterno and Dr. Ragosta. The government argues that there was not a 1:1 correlation in the reduction of pixels, Docket Entry No. 306 at 26, but that does not change that these cardiologists did not know how the altered angiograms had been altered. The government confuses compression with downscanning again, *id.*, and does not recognize that a compressed image can be recovered but a downscanned image cannot be recovered. Finally, the government cannot rely on testimony about "diagnostic quality" by Dr. Moliterno and Dr. Ragosta to satisfy *Daubert* when both acknowledged that (i) the change of even one pixel could affect their interpretation of the lesion; and (ii) they did not know how many pixels had changed. Docket Entry No. 149 at 62-63, 276-77; *see also Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671 (6th Cir. 2010) (requiring a new trial because the trial court abused its discretion by allowing an expert neurologist to testify where the expert had to make speculative jumps to reach the conclusion).

### B. The Government Cannot Misstate the Law and Then Complain That Proper Jury Instructions Would Be Too Argumentative.

The government argues that Dr. Paulus should not have received particularized instructions about a physician's right to choose appropriate medical treatment because "fraud is never an appropriate treatment option." Docket Entry No. 306 at 28. The government's argument shows why these instructions were necessary. The government misled the jury into believing that fraud could be proven solely *because* one or more cardiologists disagreed with Dr. Paulus's assessment of a blockage. *See, e.g.*, Docket Entry No. 293 at 99-100 (government

closing argument that "[i]f you believe Dr. Ragosta, the defendant performed unnecessary cardiac procedures and submitted claims for them"). The government repeats this refrain in its brief. *See, e.g.*, Docket Entry No. 306 at 4 ("The testimony of any of the three expert witnesses, alone, is sufficient to convict the Defendant."). But the law distinguishes between a good faith disagreement about medical judgment and an intent to commit fraud. The absence of a jury instruction on this issue created a vacuum in which the jury was left unguided as to what constitutes fraud under the law and what constitutes an appropriate exercise of medical judgment when cardiologists disagree. This was another legal error that the government invited.

The government tries to distinguish the Sixth Circuit's approval of a similar instruction in *United States v. Volkman*, 797 F.3d 377 (6th Cir. 2015) and argues that a defendant's subjective good faith does not matter. Docket Entry No. 306 at 29. However, the government misses the point that the jury instructions did not provide *any* guidance on what constitutes legitimate medical judgment as a matter of law. By contrast, the jury instructions in *Volkman* provided a context that a jury could apply in deciding whether a physician had criminal intent simply because another physician disagreed with him. 797 F.3d at 387 ("'Good faith' *in this context* means good intentions and an honest exercise of professional judgment as to a patient's medical needs.") (emphasis added). The failure to provide similar particularized instructions about good faith medical judgment substantially inhibited Dr. Paulus's defense in a case where the government argued that Dr. Paulus could be convicted simply because one or more cardiologists disagreed with him.[12]

---

[12]     The government makes two other points that should be summarily rejected. It argues that there was no error because Dr. Paulus made these points in his closing arguments. Docket Entry No. 306 at 30. But these are points of law, and the Sixth Circuit has emphasized that it is reversible error when a defense would be substantially impaired by the failure to provide a legal instruction on a correct statement of the law. *United States v. Mack*, 159 F.3d 208, 218 (6th Cir.

## C. The Government Fails to Justify the Omission of an Essential Element in the Jury Instructions.

The government cannot distinguish three Sixth Circuit cases requiring that a false statement prosecution prove that a statement is "capable of confirmation or contradiction" or "subject to proof or disproof" as an essential element of the offense.[13]  In particular, the government argues that those cases only addressed statutes requiring "an affirmative false statement" and not alleged concealment of facts and that they therefore do not apply to charges under 18 U.S.C. § 1035.  Docket Entry No. 306 at 31.

But the Indictment only charged violations of Section 1035*(a)(2)*, which requires proof of affirmatively false statements and does not apply to allegations of concealments of fact.  *See* Counts 2-27; 18 U.S.C. § 1035(a)(2).  Because Section 1035(a)(2) requires proof of an affirmatively false statement (exactly like the statutes at issue in *Kurlemann*, *Miller*, and *Waechter*), the government must prove that the alleged false statement concerned a fact capable of confirmation or contradiction (exactly as the Sixth Circuit required in *Kurlemann*, *Miller*, and *Waechter*).

Moreover, because the Indictment did not charge a violation of 18 U.S.C. § 1035(a)(1), it was a substantial legal error for the Court's jury instructions to include multiple references to the elements of 18 U.S.C. § 1035(a)(1).  *Stirone v. United States*, 361 U.S. 212, 217 (1960) ("[A] court cannot permit a defendant to be tried on charges that are not made in the indictment against him."); *see also United States v. Combs*, 369 F.3d 925, 936 (6th Cir. 2004) (finding *per se*

---

1998).  The government also argues that the evidence did not support the instruction, Docket Entry No. 306 at 30, but the existence of good faith medical judgment was at the heart of the trial.

[13]    *United States v. Kurlemann*, 736 F.3d 439, 445 (6th Cir. 2013); *United States v. Miller*, 734 F.3d 530, 543 (6th Cir. 2013); *United States v. Waechter*, 771 F.2d 974, 978 (6th Cir. 1985).

reversible error when a district court "intermix[ed] elements" of two offenses in the jury instructions).

The government has no response to the Sixth Circuit caselaw holding that "[t]he failure to instruct on an essential element of an offense is fundamental error." *United States v. Nelson*, 27 F.3d 199, 202 (6th Cir. 1994). The government therefore argues that the jury would have agreed with the government, had the jury been instructed on what constitutes an actionable "statement or representation." *See* Docket Entry No. 306 at 31 (claiming that Dr. Paulus's position on this point is "obviously false"). *Nelson* and the other Sixth Circuit cases in Dr. Paulus's opening brief show that the failure to instruct a jury on an essential element is a fundamental error, and it is no defense for the government to argue that it would have won anyway. This error in the jury instructions requires a new trial.

**D.    The Jury Instructions Required a Unanimity of Theory Instruction.**

The government simply ignores the Sixth Circuit law when it argues that no unanimity of theory instruction should have been given. Docket Entry No. 306 at 32. For instance, in *United States v. Algee*, which was decided after the Supreme Court precedent cited in the government's brief, the Sixth Circuit stated that a unanimity instruction is necessary when "there is a genuine risk that the jury is confused or that a conviction may occur as the result of different jurors concluding that a defendant committed different acts." 599 F.3d 506, 514 (6th Cir. 2010). Without this unanimity instruction, the jury could have returned a guilty verdict on Count 1 with different jurors concluding that Dr. Paulus committed different acts.

The government argues that the omission of a unanimity of theory instruction was harmless because the jury convicted Dr. Paulus on nine false statement counts. Docket Entry No. 306 at 33. But the jury was specifically deadlocked on Count 1 through at least the third and

(potentially) the final day of deliberations, Docket Entry No. 295 at 13, showing that the jury did not view Count 1 and the other counts to overlap and that it intended to consider them separately. Without the instruction, Dr. Paulus was deprived of the safeguard that the jury unanimously agree upon the same acts.

### E. The *Allen* Charge Was Not Favorable to Dr. Paulus When It Endorsed the Government's Theory of the Evidence.

The government argues that the Court's *Allen* charge did not prejudice Dr. Paulus because it was "favorable" to Dr. Paulus, stated a "true observation" that jurors were examining angiograms, did not "suggest a particular outcome," and was requested by Dr. Paulus. Docket Entry No. 306 at 33-34. None of these arguments are true.

The Court's departure from the pattern *Allen* charge prejudiced Dr. Paulus because it undercut two central themes of Dr. Paulus's defense and endorsed the government's theory of prosecution. By doing so, the Court influenced jurors into believing that they *should* be examining the altered angiograms and that stenosis *could* be determined by reviewing the altered angiograms. That type of influence does coerce jurors, particularly when they have already notified the Court that they are deadlocked and are vulnerable to suggestions by the Court as to how to break the impasse. Regardless of what else was said in the instructions, the *Allen* charge was not favorable to Dr. Paulus when it undercut two of his central arguments and suggested a particular path in the deliberations (*i.e.*, that the jurors should rely on the altered angiograms and make their assessment of the stenosis).

The government cannot reasonably dispute how a holdout juror would have been likely affected by the Court's commentary on the evidence. The commentary sent a clear message that the Court expected the jurors to be poring through the altered angiograms and arriving at their own view of the amount of stenosis shown by the altered angiograms. In that environment, it is

likely the Court's statements inhibited jurors from expressing contrary views or eliminated arguments that jurors otherwise might have been willing to make.

Finally, there is no truth to the government's suggestion that Dr. Paulus asked the Court to discuss the evidence in a way that supported the government. Dr. Paulus asked only that the Court remind the jury that the government bore the burden of proof. Docket Entry No. 296 at 6-7. Dr. Paulus did not have any notice that the Court intended to comment on whether the jury should be examining the altered angiograms and forming interpretations of stenosis from those altered angiograms. Because jury deliberations (and particularly a jury deadlock) should not be influenced by the Court's commentary on the evidence, the Court should order a new trial.

## CONCLUSION

Because the overwhelming evidence shows that an innocent man was convicted, and because there were substantial legal errors that will require the reversal of the verdict, Dr. Richard Paulus respectfully requests that the Court order a new trial in the interest of justice.

Dated: January 6, 2017

Respectfully submitted,

/s/ Robert S. Bennett
Robert S. Bennett
Michael P. Kelly
Hilary H. LoCicero
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600 (telephone)
(202) 637-5910 (facsimile)
robert.bennett@hoganlovells.com
michael.kelly@hoganlovells.com
hilary.locicero@hoganlovells.com

/s/ C. David Mussetter
C. David Mussetter
MUSSETTER LAW OFFICE
P.O. Box 192
2709 Louisa Street
Catlettsburg, KY 41129-0192
(606) 931-0050 (telephone)
(606) 931-0051 (facsimile)
attmuss@windstream.net

COUNSEL FOR DR. RICHARD E. PAULUS

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Reply in Support of Dr. Paulus's Motion for a New Trial has been served on all counsel of record this 6th day of January, 2017, by filing a copy of the same with the Electronic Court Filing System of the United States District Court for the Eastern District of Kentucky.

  /s/ Michael P. Kelly                                  
Counsel for Defendant, Richard E. Paulus M.D.