## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## NORTHERN DIVISION
## AT ASHLAND

**CRIMINAL ACTION NO. 15-15-DLB-EBA**

**UNITED STATES OF AMERICA**                                          **PLAINTIFF**

**V.**                         **MEMORANDUM OPINION AND ORDER**

**RICHARD E. PAULUS, M.D.**                                          **DEFENDANT**

* *   * *   * *   * *   * *   * *   * *   * *

Defendant Richard E. Paulus, M.D. has filed three motions, which are currently pending before the Court: a Motion for Judgment of Acquittal (Doc. # 220), a Renewed Motion for Judgment of Acquittal (Doc. # 263), and a Motion for a New Trial (Doc. # 298). The Government has filed its Responses (Docs. # 245, 300, and 306), and Dr. Paulus has filed his Replies (Docs. # 304 and 309). The Court having heard oral argument on February 22, 2017, the motions are ripe for review.[1] For the reasons stated herein, Dr. Paulus's Motion for Judgment of Acquittal (Doc. # 220) will be **granted**.[2] Accordingly, Dr. Paulus's Motion for a New Trial (Doc. # 298) will also be **conditionally granted**.

## I.     Factual Background

On September 3, 2015, Dr. Paulus was indicted by a federal grand jury. (Doc. # 1).

---

1    After oral argument, at the Court's request, Dr. Paulus filed a Notice of Record Citations. (Doc. # 314). The Government responded to this Notice (Doc. # 315) and Dr. Paulus replied. (Doc. # 317). The Court has also considered those filings.

2    Because the Court has granted Dr. Paulus's original Motion for Judgment of Acquittal, which he raised at the close of the Government's case-in-chief, there is no need to consider Dr. Paulus's Renewed Motion for Judgment of Acquittal (Doc. # 263).

The Indictment alleged that from approximately July 24, 2008 through July 31, 2013, Dr. Paulus performed unnecessary cardiac procedures, including catheterizations and stent placements, and falsely recorded the existence and extent of lesions observed during the procedure and then submitted the allegedly false and fraudulent claims to health care benefit programs.  *Id.* at 10-11.  The Indictment charged Dr. Paulus with one count of health care fraud and twenty-six counts of false statements relating to health care matters. (Doc. # 1 at 11-14; Doc. # 149, 30:1-5).  The suspect procedures occurred while Dr. Paulus was working at King's Daughters Medical Center ("KDMC") in Ashland, Kentucky.[3]

Dr. Paulus treated patients who suffer from a variety of cardiac conditions, including coronary artery disease ("CAD").  (Doc. # 1 at 4).  CAD develops when plaque builds up along artery walls, thus restricting blood flow to the heart muscle.  *Id.*  Cardiologists can diagnose CAD via non-invasive testing methods, such as a physical, electrocardiogram, echocardiogram, stress testing, nuclear stress testing, and blood work. *Id.*  They can also use an invasive imaging procedure, called cardiac catheterization, to diagnose this condition. *Id.* at 4-5.  This procedure involves the insertion of a catheter into the patient's blood vessel. *Id.* at 5.  The catheter is then guided up to the coronary arteries, where contrast material is injected.  *Id.*  X-ray machines capture images of the heart, known as angiograms, with the arteries highlighted by the contrast material.  *Id.*  Cardiologists use these angiograms to determine whether the arteries are narrowed, and if so, by how much.

---

3    In 2008, Kentucky Heart & Vascular Physicians, Inc. ("KHVI"), a subsidiary of Ashland Hospital Corporation, d/b/a King's Daughters Medical Center ("KDMC"), purchased Cumberland Cardiology, Dr. Paulus's professional services corporation, and entered into a Physician's Employment Agreement with Dr. Paulus.  (Doc. # 1 at 1-2).  In exchange, Dr. Paulus assigned his billing rights to KHVI, thus permitting it to submit claims for his services to Medicare and Medicaid.  (Doc. # 1 at 2).

*Id.* As part of his practice, Dr. Paulus relied on and interpreted angiograms to make diagnostic and treatment decisions. *Ia.* Cardiologists typically view angiograms live. *Ia.*

Dr. Paulus previously moved to dismiss the Medically Unnecessary Services Theory of Count One of the Indictment (Doc. # 29) and the False Statement Portion of Count One and the Entirety of Counts Two through Twenty-Seven (Doc. # 27). The Court denied both motions by prior Order on May 4, 2016. (Doc. # 108). Specifically, the Court rejected Dr. Paulus's arguments that the Government had failed to state an offense under 18 U.S.C. § 1347 and that § 1347 was unconstitutionally vague, but deferred consideration of Dr. Paulus's argument that statements relating to the interpretation of angiograms are not subject to proof or disproof. *Id.* Instead, the Court determined that the critical question in this case – whether Dr. Paulus knowingly and willfully devised a scheme to defraud a health care benefit program or simply engaged in "questionable decision-making" – was a question that would need to be determined at trial. *Id.*

After twenty-three days of trial and four days of deliberations, Dr. Paulus was convicted of eleven of the sixteen counts that were presented to the jury.[4] Count One alleged health care fraud in violation of 18 U.S.C. § 1347. Counts Four, Five, Eight, Ten, Twelve, Eighteen, Twenty, Twenty-One, Twenty-Four, and Twenty-Five alleged that Dr. Paulus made false statements relating to health care matters in violation of 18 U.S.C. §

---

[4]   At the close of the Government's case-in-chief, it voluntarily dismissed eleven of the false statement counts. Therefore, Counts Two, Six, Seven, Nine, Thirteen, Fifteen, Sixteen, Nineteen, Twenty-Two, Twenty-Three, and Twenty-Six were not presented to the jury. (Doc. # 223 at 192-93; Doc. # 225). Accordingly, Dr. Paulus's Motion for Judgment of Acquittal on those counts is moot.

1035. The jury acquitted on the other five counts.[5]  At the close of the Government's case, Dr. Paulus filed the pending Motion for Judgment of Acquittal.  (Doc. # 220).  Consideration of this motion was deferred pursuant to Rule 29(b).  After his conviction, Dr. Paulus renewed his Motion for Judgment of Acquittal (Doc. # 263) and filed the pending Motion for a New Trial (Doc. # 298).  The Court will address these motions in turn.

## II.   Analysis

### A.   *Motion for Judgment of Acquittal*

#### 1.   Standard of Review

In order to prevail on a motion for judgment of acquittal, the convicted defendant must demonstrate that the evidence was insufficient to prove the offense charged.  The jury's verdict must stand if, viewing the evidence in the light most favorable to the government, "any rational trier of fact" could have convicted the defendant.  *United States v. Stewart*, 729 F.3d 517, 526 (6th Cir. 2013) (citing *United States v. Wettstain*, 618 F.3d 577, 583 (6th Cir. 2010)).  The Court may not "weigh the evidence presented, consider the credibility of witnesses, or substitute [its] judgment for that of the jury," and must resolve all conflicts in evidence in favor of the government and draw all reasonable inferences in its favor as well.  *United States v. Siemaszko*, 612 F.3d 450, 462 (6th Cir. 2010) (citing *United States v. M/G Transp. Servs., Inc.*, 173 F.3d 584, 588-89 (6th Cir. 1999)).  Thus, a convicted defendant challenging the sufficiency of the evidence is presented with an "uphill battle."  *United States v. Wagner*, 382 F.3d 598, 610 (6th Cir. 2004).  However, "a judgment of acquittal must be granted if 'there is no evidence upon which a reasonable mind might

---

5   The jury found Dr. Paulus not guilty of Counts Three, Eleven, Fourteen, Seventeen, and Twenty-Seven.

4

fairly conclude guilt beyond a reasonable doubt.'" *United States v. Davis*, 981 F.2d 906, 908 (6th Cir. 1992) (quoting *United States v. Fawaz*, 881 F.2d 259, 261 (6th Cir. 1989)).

When the court reserves ruling on a defendant's acquittal motion pursuant to Federal Rule of Criminal Procedure 29(b), as the Court did here, it can wait to decide the motion until after the jury returns a guilty verdict.  *United States v. Wagner*, 382 F.3d 598, 611 n.2 (6th Cir. 2004).  However, when the court "reserves ruling on a motion for judgment of acquittal, the court 'must decide the motion on the basis of the evidence at the time the ruling was reserved,' even if the defendant has put on evidence in his or her own defense." *Id*.  Because there was insufficient evidence at the close of the Government's case-in-chief to support the jury's verdict, the Court need not address Dr. Paulus's renewed motion.

### 2. The evidence is insufficient to sustain the jury's guilty verdict for Health Care Fraud and False Statements Relating to a Health Care Matter.

To sustain a conviction for health care fraud under 18 U.S.C. § 1347, the Government must prove that Dr. Paulus "(1) knowingly devised a scheme or artifice to defraud a health care benefit program in connection with the delivery of or payment for benefits, items, or services; (2) executed or attempted to execute this scheme or artifice to defraud; and (3) acted with intent to defraud."  *United States v. Raithatha*, 385 F.3d 1013, 1021 (6th Cir. 2004), *Judgment vacated on other grounds*, 543 U.S. 1136 (2005); *see also United States v. White*, 492 F.3d 380, 393-94 (6th Cir. 2007).  Thus, the Government "must prove the defendant's 'specific intent to deceive or defraud.'" *Id*. (quoting *United States v. Frost*, 125 F.3d 346, 354 (6th Cir. 1997)).

"To establish guilt under 18 U.S.C. § 1035 for making false statements relating to health care matters, the Government must prove that the defendant knowingly and willfully

made false statements or representations in connection with the delivery of or payment for health care benefits, items, or services and in a matter involving a health care benefit program." *Hunt*, 521 F.3d at 647-648 (internal citations and quotation marks omitted).

Although § 1347 and § 1035 are distinct statutes which criminalize different conduct, both statutes require that the Government prove falsity and fraudulent intent.   As presented, the Government's theory is that Dr. Paulus "falsely recorded the existence and extent of his patients' coronary blockages and inserted stents into people's hearts that did not need them." (Doc. # 44).  Therefore, to convict Dr. Paulus under § 1347 or § 1035, the Government must prove that Dr. Paulus's assessment of the degree of stenosis constitutes a false statement, and that he made those false statements with fraudulent intent.  (*See* Doc. # 269, Instruction Nos. 12 and 14).  Even considering the evidence in the light most favorable to the Government, the Government failed to prove falsity and fraudulent intent at trial.  Accordingly, the Government's proof with regard to both the health care fraud and the false statement counts suffer from the same fatal flaws, and the Court will address the sufficiency of the evidence for all counts in tandem.

### a.    Parties' Arguments

The Government's theory on Count One is that Dr. Paulus "performed cardiac catheterizations on patients at KDMC and falsely recorded the existence and extent of lesions observed during the procedure in medical records required to be kept by health care benefit programs." (Doc. # 1 at ¶ 41).  More specifically, the Government alleged that Dr. Paulus committed health care fraud in violation of § 1347 when he allegedly "inserted cardiac stents in patients who did not have 70 percent or more blockage in the vessel that he stented and who did not have symptoms of blockage."  As to Counts Two through

6

Twenty-Seven, the Government alleged that Dr. Paulus "knowingly and willfully [made] a materially false, fictitious and fraudulent statement and representation" and made and used a "materially false writing and document" when he "caused an entry in the medical records of the listed patients that reflected a significant degree of stenosis," while knowing that "the degree of stenosis was substantially less than the amount" recorded. *Id.* at ¶ 50.

In his motion seeking acquittal, Dr. Paulus primarily argues that there was insufficient evidence of an objectively false representation and fraudulent intent.(Doc. # 220. As for the health care fraud count, Dr. Paulus argues that no reasonable jury could conclude that Dr. Paulus knowingly and willfully devised a scheme to defraud a healthcare benefit program simply because one expert witness disagreed with his treatment decision. (Doc. # 220-1 at 10). In support of his argument, Dr. Paulus points to testimony of Government witnesses at trial to establish that cardiologists often disagree with one another about the extent of stenosis and the appropriateness of stent procedures. *Id.* at 11. Dr. Paulus also argues that the Government's circumstantial evidence falls short because the Government's presentation of "internally-conflicting" patient testimony, the volume of stent placements, and Dr. Paulus's compensation do not permit a reasonable jury to conclude that Dr. Paulus had the requisite fraudulent intent. *Id.* at 13.

In regards to the false statement counts, Dr. Paulus argues that an opinion regarding degree of stenosis is not an objective fact capable of confirmation or contradiction. *Id.* at 14. Furthermore, Dr. Paulus cites several civil cases to support his argument that the Government cannot prove that he made a false statement merely by introducing testimony that one other cardiologist disagreed with his interpretation of the angiogram. *Id.* Dr. Paulus also highlights the significant disagreements between Government experts who

7

opined on the degree of stenosis for the same patient. *Id.* Thus, Dr. Paulus claims that "no reasonable jury can conclude beyond a reasonable doubt that Dr. Paulus 'knowingly and willfully' made an objectively false statement because one other cardiologist had a different subjective interpretation of an angiogram." *Id.* at 15.

In response to Dr. Paulus's acquittal arguments, the Government claims that it presented sufficient evidence for a reasonable jury to find Dr. Paulus guilty on each count. (Doc. # 245). The Government argues that circumstantial evidence alone can sustain a guilty verdict and that there is sufficient evidence of fraudulent intent. *Id.* at 4. In particular, the Government claims that the evidence established there is a "well known" and "objective standard" for stenting blockages, which Dr. Paulus violated when he placed stents in patients whose blockages were below that standard. *Id.* at 4-5. Thus, the fact that Dr. Paulus "lied about the amount of blockage in the patient's records" allows a reasonable jury to infer fraudulent intent. *Id.* at 4-5. The Government also claims that the jury viewed the angiograms themselves and could determine whether a significant lesion existed or not. *Id.* at 5. Lastly, the Government directs the Court's attention to circumstantial evidence of intent, including: the Defendant's profits from his fraudulent scheme, the fact that the Defendant performed more cardiac procedures than his peers, as well as testimony from other cardiologists and Dr. Paulus's patients regarding conversations they had with Dr. Paulus. *Id.* at 6.

The Government also argues that it presented sufficient evidence for a reasonable jury to convict Dr. Paulus of making false statements in connection with healthcare matters. Primarily, the Government points to the expert testimony of Doctors Ragosta and Moliterno, who disagreed with Dr. Paulus's angiogram assessments. *Id.* at 7. However, the

Government claims that "[i]t is not the mere fact of different assessments, but the degree to which those assessments differed that is determinative." *Id.* Lastly, the Government claims that the falsity element is supported by circumstantial evidence of profits, testimony by other KDMC physicians who believed Dr. Paulus was performing unnecessary procedures, the volume of procedures Dr. Paulus performed, and "the fact that the number of procedures he performed went down after the United States' investigation ... began." *Id.* at 8.

### b.   Sufficiency of the Evidence

The Government presented both direct and circumstantial evidence against Dr. Paulus. The Government's primary evidence consisted of angiograms and medical records of Dr. Paulus's patients, as well as expert opinion testimony by Dr. Ragosta,[6] Dr. Moliterno,[7] Dr. Morrison,[8] and Dr. Ali[9] that Dr. Paulus's angiogram assessments were incorrect and that the stent procedures were unnecessary. The Government also called several other physicians, including six cardiologists[10] and one neurologist,[11] who testified that they

---

6   Dr. Ragosta testified about 66 patients. (Doc. # 203 at 89-196). Out of those 66 patients, 53 were part of Count One and 13 constituted false statement counts (Counts 4, 8, 10, 11, 12, 14, 17, 18, 20, 21, 24, 25, and 27).

7   Dr. Moliterno's testimony involved 7 patients. (Doc. # 223 at 42-154). Out of those 7 patients, 5 were at issue in Count One and 2 constituted false statement counts (Counts 3 and 5).

8   Dr. Morrison testified about 4 patients. (Doc. # 212 at 17-91). Each of those patients were part of Count One.

9   Dr. Ali testified about 3 patients. (Doc. # 206 at 35-46). Each of those patients were part of Count One.

10   Doctors Shah (Doc. # 203), Kelleman (Doc. # 204), Srinivisan (Doc. # 217), Touchon (Doc. # 195), Studeny (*Id.*), and Elesber (Doc. # 223).

11   Dr. Henry Goodman (Doc. # 192).

believed Dr. Paulus performed unnecessary procedures.  The Government also presented testimony regarding the American College of Cardiology standard for stenting coronary blockages and details of payer requirements for stent procedures.  (Doc. # 245 at 4) (citing Doc. # 200 at 14-15 (Dr. Robert Touchon); Doc. # 206 at 35-46 (Dr. Arshad Ali); Doc. # 195 (Dr. Earl Berman); Doc. # 198 (Lee Guice)).  Additionally, the Government called several of Dr. Paulus's patients who "testified that he made statements about their conditions that were either inconsistent with the procedures he performed, or that were later shown to be false by other physicians."  (Doc. # 245 at 6).  Lastly, the Government presented circumstantial evidence of Dr. Paulus's "profit from his scheme," the volume of procedures he performed, comparisons of Dr. Paulus's volume to other doctors in the region and the nation-at-large, and the increase in cardiac procedures at KDMC after Dr. Paulus arrived and the decrease after the Government's investigation began.  *Id.*

Dr. Paulus's sufficiency arguments hinge on two essential elements - falsity and fraudulent intent.  The Court will examine each element in turn.

### i.    The Government failed to prove falsity.

The Government has alleged that Dr. Paulus committed health care fraud by exaggerating the extent of his patients' stenosis in their medical records to receive reimbursement for unnecessary services and defraud a health care benefit program.  The Government relies on this same alleged conduct as a basis for each of the false statement counts.  Therefore, the evidence must prove that Dr. Paulus made a false statement.  At oral argument on these motions, the Court asked the Government to identify the false statement, to which the Government responded: "The percent of stenosis ... That is the lie."  Accordingly, to convict Dr. Paulus under § 1347 or § 1035, the Government must prove,

10

beyond a reasonable doubt, that Dr. Paulus's representation regarding the degree of stenosis constituted a false statement. (Doc. # 269, Instruction Nos. 12 and 14).

Unfortunately, the Court has been unable to find any authority directly addressing the required proof for establishing falsity under § 1347 or § 1035, or addressing whether a cardiologist's reading of an angiogram is subject to proof or disproof. However, the Sixth Circuit has considered the falsity element in other contexts. Specifically, the Sixth Circuit has held that "[i]t is fundamental that a false statement is a 'factual assertion.'" *Williams v. United States*, 458 U.S. 279, 284 (1982) (defining this term in the context of 18 U.S.C. § 1010, which proscribes the making of false statements to HUD); *see also United States v. Waechter*, 771 F.2d 974, 978 (6th Cir. 1985) (describing this term as it is used in 18 U.S.C. § 1014, which prohibits the making of false statements on loan and credit applications). Moreover, the false statement alleged must be a "factual assertion capable of confirmation or contradiction." *United States v. Kurlemann*, 736 F.3d 439, 445 (6th Cir. 2013) (discussing the requirement of a false statement in the § 1014 context).[12]

Thus, the Government "must identify a statement" that the defendant made "which asserts a proposition that is subject to proof or disproof." *Waechter*, 771 F.2d at 978. When the Government produces evidence that "demonstrates that the asserted proposition is untrue," the Government has "established one element of the defendant's guilt." *Id.* If substantial, circumstantial evidence can permit a reasonable jury to conclude beyond a reasonable doubt that the defendant made a false statement. *See e.g. United States v.*

---

12   Any argument that 18 U.S.C. § 1010 and 18 U.S.C. § 1014 proscribe narrower conduct than 18 U.S.C. § 1035 is meritless. The Government's theory hinges on a false statement and the Indictment specifically charges Dr. Paulus with the violation of 18 U.S.C. § 1035(a)(2), which is the false statement portion of that statute. (Doc. # 1 at 14).

*Mathis*, 738 F.3d 719 (6th Cir. 2013).  Therefore, whether the jury's verdict is sustainable comes down to one critical question - did the Government present sufficient evidence for the jury to determine that Dr. Paulus made a false statement regarding the extent of his patients' stenosis?

At the dismissal stage, the Government represented to the Court that interpreting angiograms "is a science" and "not akin to reading tea leaves."  (Doc. # 44 at 21).  Thus, the Government claimed that "angiogram evidence is susceptible to proof" of truth or falsity and "[w]hile there perhaps can be a good faith dispute about the precise percentage of the blockage, there can be no argument that the degree of stenosis the Defendant recorded is false" because inter-observer variability could not account for the stark differences between interpretations.  *Id.* at 22.

At oral argument on Dr. Paulus's dismissal motions, the Court inquired about this exact issue.  In response, the Government assured the Court that the inter-observer variability evidence would show that at most the range of opinion between cardiologists would be "10 percent, maybe 20 percent," but "no more than that," which was similar to the evidence presented in *McLean* and *Patel*.[13]  (Doc. # 107 at 34).  The Government further claimed that inter-observer variability "is not 40 percent, 50 percent, 70 percent, 100 percent."  *Id.*  Although the Government admitted that the prosecution of Dr. Paulus was "a case that will rise and fall upon experts," it stated that there was "significant other information ... to indicate that Dr. Paulus was placing an inordinate amount of stents," a practice that allegedly stopped once the Government's investigation began.  *Id.* at 40.

---

13    *United States v. McLean*, 715 F.3d 129 (4th Cir. 2013); *United States v. Patel*, 485 F. App'x 702 (5th Cir. 2012).

However, the Government's promise of proof did not come to fruition.  When the Court carefully examines the evidence presented at trial, the Government's case fails for two intertwined reasons.  First, the scientific evidence and expert opinion testimony presented by the Government does not prove falsity.  Instead, it proves that when it comes to angiography, there is more than meets the eye.  Second, the circumstantial evidence presented was not substantial enough to prove falsity.  Even when the Court reviews all of the evidence in the light most favorable to the Government, the evidence is insufficient to prove falsity beyond a reasonable doubt.

As explained above, a false statement must be a factual assertion that is subject to proof or disproof.  *Waechter*, 771 F.2d at 978.  Dr. Paulus argues that there is insufficient evidence "to prove that [he] 'knowingly and willfully' made an objectively false statement that is subject to confirmation or contradiction."  (Doc. # 220-1 at 14).  In response, the Government claims that it presented direct evidence of falsity through angiograms and expert opinion testimony that "the Defendant inserted stents into patients whose blockages were below [the 70%] standard, and then lied about the amount of blockage in the patient's records."  (Doc. # 245 at 5).  The Government also asserts that the falsity of those records is supported by circumstantial evidence of profits, testimony of co-workers who believed he was performing unnecessary procedures, testimony of patients, the volume of procedures, and the fact that the number of procedures went down after the investigation began.  *Id.* at 8.  This disagreement between the parties can be distilled down to one issue - whether the degree of stenosis is an *objective fact*, which can be false, or a *subjective opinion*, which is not subject to proof or disproof.

13

Merriam-Webster defines a fact as "a piece of information presented as having objective reality."  On the other hand, an opinion is defined as "a view, judgment, or appraisal formed in the mind about a particular matter" or "a formal expression of judgment or advice by an expert."  While these concepts are elementary, they are essential when examining falsity in a criminal case such as this one, where the defendant claims he was exercising his medical judgment.  The importance of the distinction between fact and opinion is highlighted by the legislative history of § 1347.  The health care fraud statute is "not intended to penalize a person who exercises a health care treatment choice or makes a medical or health care judgment in good faith simply because there is a difference of opinion regarding the form of diagnosis or treatment." H.R. REP. NO. 104-736, at 258 (August 21, 1996), *reprinted in* 1996 U.S.C.C.A.N. 1990, 2071.  Therefore, the statutes targeting health care fraud do not criminalize subjective medical opinions where there is room for disagreement between doctors.  Instead, criminal liability only attaches to Dr. Paulus if the Government proved, beyond a reasonable doubt, that he knowingly and willfully exaggerated the extent of his patients' stenosis in their medical records, for the purpose of defrauding a health care benefit program.

### a.    Angiogram Evidence

The Government's two primary expert witnesses, Dr. Ragosta and Dr. Moliterno, both acknowledged that interpreting angiograms can be a difficult exercise,[14] which results

---

14    Other Government witnesses also shared that belief.  For example, on direct examination by the Government, Dr. Robert Touchon "object[ed]" to the Government's use of the word "unnecessary."  (Doc. # 195 at 37).  However, he would opine that he "saw angiograms, pictures of lesions, blockages that [he] would not have placed a stent in that received stents" because in his opinion "they were less than 50 percent blockages in patients with chronic complaints."  *Id* at 37-38.  Dr. Touchon also testified that the 70% standard is "an imperfect number ... based upon the eye of the beholder."  (Doc. # 195 at 46).

in a level of variability between cardiologists.[15] (Doc. # 203 at 207-208; Doc. # 223 at 144-145). Put simply, when cardiologists interpret angiograms, there is an inherent disagreement between them about the degree of stenosis. This difference of opinion when two or more cardiologists review the same angiogram and arrive at different conclusions regarding the nature and extent of a blockage is known as "inter-observer variability." This variability has been the subject of vigorous debate since the beginning of this case. Although both Doctors Ragosta and Moliterno attempted to minimize the significance of that variability, the evidence established that there is a significant amount of subjectivity and disagreement between cardiologists.

Specifically, Dr. Ragosta conceded that "[t]here is variability and interpretation in some lesions." (Doc. # 203 at 207). On cross-examination, Dr. Paulus questioned Dr. Ragosta about a passage from his book, *Textbook of Clinical Hemodynamics*, wherein Dr. Ragosta stated: "Angiogram alone is notoriously misleading [in] the subject of lesions that appear only modestly narrow. Not only are experienced interventional cardiologists unable to discriminate significant from non-flow limiting lesions by angiography alone, but also they completely disagree regarding the significance of the same lesion." *Id.* Dr. Paulus also cross-examined Dr. Ragosta on a quote from one of his other books, *Cardiac Catheterization*, where Dr. Ragosta opined that "[t]he wide interobserver variability of

---

15    Dr. Moliterno also discussed the limitations of angiography. For example, a cardiologist "may need to use an [Intra-Vascular Ultra Sound] catheter in some cases if there's some ambiguity" or if "you can't see the lesion." (Doc. # 223 at 144-45). Additionally, Dr. Moliterno discussed how the biology of a specific patient may affect angiography: "Unfortunately, in Kentucky, we have some generous-sized patients, and sometimes you can't always see as well as you can in others. And so you may need something like an [Intra-Vascular Ultra Sound] or a [Fractional Flow Reserve] ... to overcome some of the limitations of angiography in certain cases." *Id.*

coronary angiography is well known." *Id.* at 208.   Dr. Ragosta clarified these statements by explaining that "lesions that are between 50 and 70 percent are difficult to assess by angiography, and angiography can be misleading for lesions" classified as "borderline blockages." *Id.* at 209.   Similarly, Dr. Moliterno stated that inter-observer variability can affect the assessment of angiograms and that it would not "be unusual for cardiologists to disagree over a wide range of stenosis," but claimed that Dr. Paulus's interpretations fell "way outside" of the range of inter-observer variability.[16]   (Doc. # 223 at 121).

Additionally, Dr. Ragosta testified that estimating percentage stenosis can be an imprecise exercise.   Dr. Ragosta stated that he prefers to use categories of stenosis – mild, moderate, severe – as opposed to percentages.   "[U]nless you're making a measurement, which most people don't, I think it's a little, again, misleading that it's an actual percentage.   So I tend to use, like a lot of folks do, categories of stenosis." (Doc. # 204 at 31).   Dr. Moliterno also testified in terms of categories - trivial, mild, moderate, and severe.   (Doc. # 223 at 134-35).

At trial, the evidence showed that inter-observer variability can account for greater than 10-20% variability.   For example, neither party disputes that for patient D.C., who is part of Count One, Doctors Ragosta and Moliterno's stenosis assessments varied up to 24%.[17]   Dr. Ragosta interpreted D.C.'s blockage as 26% (Doc. # 203 at 158); whereas Dr.

---

16    Dr. Ragosta also opined that inter-observer variability is primarily confined to "ambiguous lesions" between "50 to 70 percent," and that in this case, "[m]ost of the ones [he] evaluated were less than that, in the 30 to 40 percent or less range."  (Doc. # 204 at 50).

17    This inter-observer variability increased after the Government's case-in-chief.   In fact, on rebuttal, it came into evidence during the Government's direct of Dr. Moliterno that he had noted at one point that this blockage could have been as high as 50-60%, which makes the range of inter-observer variability between him and Dr. Ragosta as high as 34%. (Doc. # 259 at 155).   The Court also takes note of the fact that there is a 20% range in Dr.

Moliterno originally assessed the blockage as 40-50%. (Doc. # 223 at 112). Dr. Paulus estimated the blockage as 75-80%. (Doc. # 223 at 114). Remarkably, Dr. Moliterno's opinion is essentially as close to Dr. Paulus's percentage as it is to Dr. Ragosta's assessment. The difficulty of interpreting angiograms is further illustrated by another of D.C.'s arteries. During his testimony, Dr. Moliterno highlighted the distal circumflex artery, which he believed was "completely blocked." (Doc. # 223 at 111). However, neither Dr. Paulus nor Dr. Ragosta mentioned or observed the existence of that blockage. (Doc. # 203 at 156-158; Doc. # 249 at 10). When pressed about the variance between the Government's experts and whether disagreement among them necessarily meant one had lied, Dr. Moliterno testified "I would like to believe that neither of us is lying. I know I am not, and I don't think [Dr. Ragosta] was." (Doc. # 223 at 135).

These variations in the Government's experts' estimates significantly undermine the Government's contention that inter-observer variability is irrelevant, and as a result, diminishes the strength of the Government's angiogram and expert opinion evidence. Thus, stenosis, at least to some degree, does seem to be in the eye of the beholder.

The Court recognizes that the examples of variability between the Government's expert witnesses are few. However, it is not the quantity of these disagreements, but the quality of such evidence that persuades the Court. These disagreements also reinforce the experts' admissions that angiograms and blockages are often ambiguous, which cuts to the heart of criminal liability.

---

Moliterno's own estimates – a sort-of *intra*-observer variability, if you will. The Court notes this, even though it came in during the Government's rebuttal, which is only relevant to Dr. Paulus's Renewed Motion for Judgment of Acquittal.

In the *one* case[18] where both of the Government's experts opined, their stenosis estimates varied in excess of 20%.  In addition, the assessments of one artery diverged completely, with one expert finding an artery was "completely blocked," and the other noting nothing about that artery.  More importantly, the Government cannot cure this issue by relying on the testimony of one expert per procedure, as it did in all other cases.  As several courts have observed in the False Claims Act context, the expert testimony of one disagreeing doctor, where reasonable minds can differ, is insufficient to prove falsity.  *See e.g. United States v. AseraCare, Inc.*, 176 F. Supp. 3d 1282 (N.D. Ala. 2016).

Dr. Paulus relies on several False Claims Act cases in support of his argument that the Government's proof is insufficient, where only one expert witness disagreed with his subjective opinion.  (Doc. # 220-1 at 16; Doc. # 311).  In *AseraCare, Inc.*, the district court granted summary judgment to the defendant because the Government's proof on the falsity element failed as a matter of law.  Specifically, the district court found that "[w]hen two or more medical experts look at the same medical records and reach different conclusions about whether those medical records support the certifying physicians' [conclusions], all that exists is a difference of opinion."  *AseraCare, Inc.*, 176 F. Supp. 3d at 1285.  "This difference of opinion among experts regarding the patients' hospice eligibility *alone* is not enough to prove falsity, and the Government has failed to point the court to any *objective* evidence of falsity."  *Id.*  Because the Government "presented no evidence of an objective falsehood for any of the patients at issue," and because "a difference of opinion between physicians and medical experts about which reasonable minds could differ [was] all the

---

18    The Government confirmed at oral argument on these motions that D.C. was the *one* patient that both Doctors Ragosta and Moliterno testified about.

Government ... presented to prove falsity," the court granted summary judgment in favor of the defendant-provider.

Several other courts have reached similar conclusions in False Claims Act cases. *See United States v. St. Mark's Hosp.*, 2017 WL 237615 (D. Utah Jan. 19, 2017); *see also United States v. Vista Hospice Care, Inc.*, 2016 WL 3449833 (N.D. Tex. Jun. 20, 2016). Considering a False Claims Act case against a cardiologist allegedly performing unnecessary medical procedures, the federal district court in Utah held that when a standard is "inherently ambiguous, these representations cannot be objectively false" and dismissed the complaint against the defendant-provider. *St. Mark's Hosp.*, at *11. Under the False Claims Act, "liability 'must be predicated on an objectively verifiable fact.'" *Id.* at *8 (quoting *United States ex rel. Morton v. A Plus Benefits, Inc.*, 139 F. App'x 980, 983 (10th Cir. 2005)). Accordingly, "[e]xpressions of opinion, scientific judgments, or statements as to a conclusion about which reasonable minds may differ cannot be false." *Id.* (quoting *A Plus Benefits, Inc.*, 139 F. App'x at 983).

Not surprisingly, the Government contests the value of these False Claims Act cases, claiming that they are "wrongly decided" and currently on appeal. Moreover, the Government claims that this case is factually distinguishable from the civil cases Dr. Paulus cites. Rather than presenting evidence of one other physician's subjective difference of opinion, the Government claims that it has "presented evidence of *multiple* physicians disputing an *objectively* false statement by the Defendant – the degree of blockage in a given artery – plus ample circumstantial evidence supporting the assertion that the procedures were unnecessary or that the blockage was not as the Defendant recorded it." (Doc. # 245 at 9). However, the Government's attempt to distinguish these cases fails.

19

The evidence presented at trial failed to show that the degree of stenosis is an objective fact, subject to proof or disproof.  And while these False Claims Act cases involve civil liability, the concepts are equally applicable to criminal statutes that require a false statement.[19]

In conclusion, the testimony and evidence presented at trial demonstrated that interpreting angiograms is a difficult task (*See* Doc. # 203 at 207-208; Doc. # 223 at 144-145) and that cardiologists frequently disagree with one another regarding the degree of stenosis. (*See* Doc. # 223 at 111-112; Doc. # 203 at 156-158).  In fact, when more than one of the Government's experts opined on the same procedure, their stenosis assessments varied up to 24%, beyond the 20% maximum that the Government claimed inter-observer variability could account for.  (Doc. # 44 at 22-23).  In fact, the evidence showed that at times, a cardiologist could entirely miss an artery that another cardiologist believed was "completely blocked."  (Doc. # 223 at 111).

Therefore, the expert testimony and angiogram evidence at trial failed to prove that degree of stenosis is an *objectively verifiable fact* subject to proof or disproof.  Instead, the evidence in this case established that degree of stenosis is a *subjective medical opinion*, incapable of confirmation or contradiction.  Because the degree of stenosis is a subjective opinion, a reasonable jury could not conclude, beyond a reasonable doubt, that Dr. Paulus made a false statement.  Accordingly, the Government did not produce any evidence of

---

19    The Court notes that there is currently a False Claims Act case pending on its docket, involving these same parties and based on the same alleged conduct.  The Court has a difficult time imagining a scenario where Dr. Paulus is held criminally responsible, but the evidence is insufficient to support civil liability.  Accordingly, the Court concludes that simply cannot be the case, and the standard for falsity under § 1347 and § 1035 must be at least as demanding as it is in the False Claims Act context.

falsity from the angiogram evidence, and if this conviction is to be sustained, the circumstantial evidence will have to carry the Government's burden.

### b.   Circumstantial Evidence

If substantial, circumstantial evidence can permit a reasonable jury to conclude beyond a reasonable doubt that the defendant made a false statement. *See*, *e.g.*, *United States v. Mathis*, 738 F.3d 719 (6th Cir. 2013). "However, a line must be drawn between valid circumstantial evidence, and evidence which requires a leap of faith in order to support a conviction." *United States v. White*, 932 F.2d 588, 590 (6th Cir. 1991). Unfortunately for the Government, the circumstantial evidence it presented at trial is insufficient to permit a reasonable jury to conclude, beyond a reasonable doubt, that Dr. Paulus made a false statement.

The Government points to several pieces of circumstantial evidence in support of falsity, including: the volume of procedures, the trends at KDMC pre-Dr. Paulus's arrival and post-investigation, testimony of other cardiologists that they believed Dr. Paulus performed unnecessary procedures, testimony of Dr. Paulus's patients, Dr. Paulus's profits from the alleged scheme, the anonymous complaint to the Kentucky Board of Medical Licensure ("KBML"), and the Agreed Order of Retirement that Dr. Paulus entered into with the KBML. Although the list may seem long, even when viewed in the light most favorable to the Government, this circumstantial evidence is woefully inadequate.

At oral argument on the pending motions, the Government relied heavily on the volume of procedures that Dr. Paulus performed, which included peer comparison data to other doctors in Kentucky and the nation-at-large (Pl. Exs. 435, 436), as well as the trends in the cardiology department at KDMC before Dr. Paulus joined the hospital and after the

investigation commenced.  (Doc. # 216 at 74).  However, in *McLean*, another health care fraud case for medically unnecessary stent procedures, the Fourth Circuit declined to hold that "pattern evidence showing that a physician placed more unnecessary stents than the national average necessarily would be probative of fraud, for such a pattern might only suggest negligence." *United States v. McLean*, 715 F.3d 129, 139 (4th Cir. 2013). Although the Fourth Circuit went on to hold that "McLean repeatedly overstated blockage by a margin well beyond the normal variation between observers," the angiogram and expert evidence in this case did not prove that.  *Id.*  Thus, the volume of procedures and the trends at KDMC do not permit a reasonable jury to make the inference that Dr. Paulus's stenosis assessments were false.

Similarly, the testimony of Dr. Paulus's co-workers and patients do not prove falsity. The Government introduced testimony of other cardiologists who disagreed with Dr. Paulus's decision to stent a patient.  Doctors Shah,[20] Kelleman,[21] and Srinivisan[22] provided generic testimony.  Doctors Ali,[23] Touchon,[24] Studeny,[25] and Elesber[26] testified with slightly

---

20    Dr. Shah testified that when he was shown several angiograms of Dr. Paulus's procedures he thought "[i]t was outrageous" and believed that the arteries stented were not blocked. (Doc. # 203 at 23).

21    Dr. Kelleman testified that Dr. Paulus had unsuccessfully attempted to get exclusive intervention privileges at KDMC.  (Doc. # 204 at 81-82).  Dr. Kelleman also testified that he questioned some of Dr. Paulus's stent procedures after reviewing their angiograms and that he remembered Dr. Paulus doing "lots of caths" on two certain patients, T.W. and somebody with a last name that started with B.  *Id.* at 89-90.  In regards to these two patients, Dr. Kelleman testified that he believed T.W. had underwent "at least a hundred" catheterization procedures and that Mr. B had underwent "around 60" catheterization procedures.  *Id.* at 90.

22    Dr. Srinivisan testified that he did not have direct knowledge of tests ordered by Dr. Paulus that caused concern.  (Doc. # 217 at 16).

23    Dr. Ali testified that he saw angiograms where "there was no significant blockage that would have required stenting by most practicing cardiologists," where Dr. Paulus placed a stent.

more specificity that they believed Dr. Paulus had performed unnecessary stent procedures.

First, the Court notes that the Sixth Circuit has held in the health care fraud context that although "individualized patient testimony" is not required, "[i]f expert testimony is offered in lieu of patient testimony, the expert testimony should be sufficiently specific to the patient, date, and services in the indictment." *United States v. Martinez*, 588 F.3d 301, 315 (6th Cir. 2009). The testimony offered by Shah, Touchon, Studeny, Kelleman, Elesber, and Srinivisan consists of generic disagreement with Dr. Paulus's stenting decisions, and is not sufficiently specific. Nevertheless, the Court will consider the testimony of these doctors as circumstantial evidence of falsity. Even so, this evidence fails to transform Dr.

---

(Doc. # 206 at 28-29). However, Dr. Ali stated that he was unable to provide the number of cases he was familiar with or the patients' names. However, he was able to testify specifically regarding three procedures (F.C., M.C., and R.D.), which were part of Count One. *Id.* at 35-46.

24   Dr. Touchon testified that he believed unnecessary cardiac procedures were performed at KDMC, including on some of Dr. Paulus's patients. As support for his belief, Dr. Touchon testified: "I had the opportunity to see patients, more than one, probably more than ten, who had come into the hospital with complaints of chest discomfort who had invasive procedures, stents performed, who still had the same pain. The procedure did not relieve the pain and required further evaluation and treatment, not necessarily always cardiac." (Doc. # 195 at 34-35).

25   Discussing his review of Dr. Paulus's angiograms and stent placements, Dr. Studeny testified: "I saw stents being placed – as I mentioned earlier in our discussion, you know, usually we put stents in places where blockages are 70 percent or greater. The 50 to 70 percent is a gray zone. There may be reasons to or not to treat. But, you know, I just, I'd see stents placed in places where there were lumps and bumps in arteries and they just weren't that severe." (Doc. # 195 at 113). Dr. Studeny also estimated that this had happened with Dr. Paulus's patients "certainly more than 20, less than 50 times." *Id.* at 113-14.

26   Dr. Elesber testified that he saw "unnecessary stenting" performed by Dr. Paulus at KDMC and had viewed angiograms where "the blockage was definitely less than 50 percent in cases" and that in a "substantial number" of cases, patients "got a stent they didn't need because the blockage obviously was like 10 percent, 20 percent." (Doc. # 223 at 17-18).

Paulus's stenosis assessments from a subjective medical opinion into an objective fact subject to proof or disproof.  In short, additional testimony of vague disagreement with Dr. Paulus's stenosis assessments does not prove falsity.

The Government also relies on several statements Dr. Paulus allegedly made as circumstantial evidence of falsity.  Specifically, the Government has pointed to four alleged statements by Dr. Paulus to patients, which the Government claims "were either inconsistent with the procedures [Dr. Paulus] performed" or "were later shown to be false by other physicians."  (Doc. # 245 at 6).  First, G.J. testified that during his procedure, Dr. Paulus "said he couldn't find any blockage and said that he would look into the heart valve, the outer heart valve," and that Dr. Paulus placed a stent "in [his] heart valve." (Doc. # 201 at 4, 26, and 28).  Second, W.C. testified that Dr. Paulus had told him that he needed another stent, but "the Obama law wouldn't allow him to put it in" and that the other doctors he has consulted have told him that the health problems he has are "not related to [his] heart."  (Doc. # 201 at 10, 18).  The Court is uncertain what reasonable inferences, if any, the jury could draw from these two statements.  The evidence at trial clearly demonstrated that stents are placed in arteries, not valves.  Similarly, there is no reasonable inference of falsity that the jury could have drawn from Dr. Paulus's statement that he did *not* place a stent, for reasons related to the Affordable Care Act or otherwise.

In its briefing, the Government claims that "[C.C.] testified that the Defendant put in two stents, telling [C.C.] that one was 85-90% blocked, while the other was only 20-25% clogged but he would need it 'down the line.'" (Doc. # 245 at 6).  Patient C.C. did testify that Dr. Paulus placed two stents in his arteries after an emergency room visit.  (Doc. # 200 at 78).  C.C. also recalled that he spoke with Dr. Paulus after his stent procedure and that Dr.

24

Paulus told him that he put in a stent that was 90% blocked and "he also put in another one that was either 20 or 30 – 25 percent clogged." *Id.* at 80.  But, C.C. did not testify that *Dr. Paulus* told him he would need the stent "down the line;" rather, C.C. testified that *he* thought he would need it "down the line." *Id.*  While, C.C.'s testimony that Dr. Paulus told him one of his stented arteries was "either 20 or 30 – 25 percent clogged" does constitute circumstantial evidence of falsity, the Government places more weight on this testimony than it can bear.  A single, isolated statement by Dr. Paulus does not prove falsity.

At oral argument, the Government also claimed that Dr. Paulus falsified a patient's medical file to justify a procedure when he recorded that D.C. complained of chest pain.[27] However, D.C.'s testimony at trial did not establish that he did *not* complain of chest pain. In direct examination, D.C. explained his symptoms as: "Not necessarily chest pain, but I just felt tired.  Tired all the time.  No energy.  But as far as chest pain, not – no, none that I can remember."  (Doc. # 201 at 49).  On cross-examination though, D.C. confirmed the accuracy of his chest pain complaint: "Yeah, recurrent chest pain, that would be right." *Id.* at 67.  Then on re-direct, the Government asked if the documentation regarding chest pain was inaccurate.  In response, D.C. stated: "I have arthritis, too, in my neck, shoulders.  And I do have some chest pain.  I never thought it was heart related, though." *Id.* at 69.  Thus, D.C.'s testimony does not establish that the notation of chest pain in his medical records was false, and this testimony does not prove falsity.  In fact, there was no evidence presented at trial that established that Dr. Paulus falsified any patient symptoms in an

---

27   The Government may have been using this example to liken this case to *McLean* and *Patel*, discussed *infra*, pgs. 27-31.  Aside from the lack of clarity in the record about what D.C. told Dr. Paulus, the facts and evidence presented in *McLean* and *Patel* are significantly different from this case.

attempt to justify performing a catheterization or placing a stent.

In addition, the Government relies on an alleged statement made by Dr. Paulus to Dr. Henry Goodman, a neurologist at KDMC. Specifically, Dr. Goodman testified that when he questioned Dr. Paulus about his reasons for performing certain catheterizations, Dr. Paulus responded that "[I]f [he] didn't do it, somebody else would." (Doc. # 192 at 81). This testimony does not prove that Dr. Paulus's stenosis assessments were false. There is no reasonable inference of falsity that the jury could have drawn from Dr. Paulus's alleged statement. In fact, an equally plausible inference is that the catheterizations were necessary, and thus, another cardiologist would have performed them if Dr. Paulus had not.

There is little evidentiary value in the other pieces of circumstantial evidence the Government relies upon. While profits and a financial motive are circumstantial evidence of fraudulent intent, Dr. Paulus's high salary as a cardiologist does not permit a reasonable jury to infer that Dr. Paulus's stenosis assessments were false. Because the majority of the salary Dr. Paulus earned was not necessarily dependent upon the allegedly-fraudulent procedures, the income evidence is relatively weak circumstantial evidence.[28] Likewise, there is no reasonable inference of falsity that a reasonable jury can draw from the anonymous complaint to the KBML or Dr. Paulus's Agreed Order of Retirement. (Pl. Exs.

---

[28] Typically, "income evidence" is "relevant to demonstrate that financial gain was the motive for the crimes charged," and proof of motive is always welcome. *United States v. Logan*, 250 F.3d 350, 369 (6th Cir. 2001) *superseded by rule on other grounds in McAuliffe v. United States*, 514 F. App'x 542 (6th Cir. 2013). This is particularly so when the defendant's "substantial income was necessarily dependent upon" the allegedly criminal activity. *Id.* In a case such as this, where the defendant's alleged crime occurred during the course of his legitimate employment, his profits, while relevant and admissible, bear significantly less evidentiary weight.

402; 523).   Considering the totality of the evidence in the light most favorable to the Government, this circumstantial evidence falls far short of proving that Dr. Paulus's stenosis assessments constituted a false statement.   When the Court compares the evidence in this case to the other cases where courts have upheld convictions for unnecessary stent procedures, this case is easily distinguished and the defects in the evidence against Dr. Paulus become increasingly apparent.

### c.   Case Law from Other Circuits

The Government has relied heavily on two similar convictions, which were upheld by the Fourth and Fifth Circuits.   *See United States v. McLean*, 715 F.3d 129 (4th Cir. 2013); *see also United States v. Patel*, 485 F. App'x 702 (5th Cir. 2012).   At the dismissal stage, the Court was persuaded by those cases and permitted this prosecution to proceed to trial.   However, the proof adduced at trial clearly demonstrated that this case is distinguishable from *McLean* and *Patel* in critical respects.

In *McLean*, an interventional cardiologist was convicted of health care fraud and making false statements in connection with the delivery of or payment for health care services, because he submitted claims for medically unnecessary stent procedures – the very same charges brought against Dr. Paulus.   At trial, the Government proved its case against  McLean with testimony from two expert cardiologists, hospital staff who worked with the defendant, and several of his former employees and patients, as well as evidence of statements by the defendant.   The Government also pointed to peer comparison data, inconsistent statements by the defendant, and his attempt to shred subpoenaed medical records.

Addressing McLean's sufficiency-of-the-evidence arguments, the Fourth Circuit held that the jury's guilty verdict was supported by substantial evidence for both the health care fraud and false statement convictions.  The Fourth Circuit found that "McLean's pattern of overstating blockage by a wide margin and placing unnecessary stents in a large number of cases was direct evidence of a fraudulent scheme."  *McLean*, 715 F.3d at 138. Specifically, the court determined that the "stark disparity between what McLean recorded and what the angiogram showed strongly suggests he intentionally committed fraud."  *Id.* One expert opined that "over 100 of McLean's cases involved blockage of 25% or less" and the other expert concluded that "McLean grossly overstated blockage in the 59 procedures he reviewed."  *Id.*  For example, in one procedure, the expert assessed the blockage as 0% and McLean recorded it as 80% to 90%.  *Id.*

While the Fourth Circuit noted that expert testimony by doctors who disagreed with the defendant's decision-making does not necessarily prove fraud, the court found that there "was also sufficient evidence to rule out non-criminal explanations."  *Id.*  In *McLean*, the experts "admitted that angiogram reading is subjective" but testified that "physicians should be in the same ballpark and inter-reviewer variability should not exceed 10% to 20%."  *Id.*  The jury also had the opportunity to view the angiograms and "determine whether they were within the borderline area where subjectivity could account for McLean's overstatements."  *Id.*  Because the evidence at trial showed that "McLean repeatedly overstated blockage by a margin well beyond the normal variation between observers," the Fourth Circuit held that "the jury could reasonably exclude the phenomenon of inter-reviewer variability as an explanation for McLean's conduct."  *Id.* at 138-39.

28

Moreover, the Fourth Circuit found that McLean's convictions were supported by "separate evidence of fraud," including statements by the defendant which implied he knew a stent was unnecessary; evidence which indicated that the defendant "made other misrepresentations to create the illusion of medical necessity," such as recording symptoms patients did not experience or complain of; inconsistent explanations for his angiogram assessments; his attempt to shred patient files subpoenaed by the Government; and his financial motive. *Id.* at 139. This significant circumstantial evidence, viewed in the light most favorable to the Government, permitted a reasonable jury to conclude beyond a reasonable doubt that McLean was guilty of health care fraud. The Fourth Circuit relied on the same evidence to sustain the jury's verdict on the false statement counts.

Similarly, the Fifth Circuit upheld a conviction  for health care fraud of a cardiologist who intentionally performed unnecessary stent procedures. *Patel*, 485 F. App'x 702.  In *Patel*, the Government relied on expert testimony and "other facts probative of both intent and the absence of medical necessity in [Patel's] procedures." *Id.* at 709.  At trial, "it was *uncontested* that the margin of error with Dr. Patel's technique of visually estimating blockage is approximately 10% in either direction." *Id.* (emphasis added). "In count after count, the divergence between Dr. Patel's estimate in his documentation ... and the government's evidence was vast." *Id.*  For example, in Count Eleven, "the government's expert found zero blockage, whereas Dr. Patel claimed between 60% and 70% blockage." *Id.*  "From this type of evidence, jurors were entitled to disbelieve Dr. Patel's claims of good faith, and instead conclude that his figures had been falsifications." *Id.*

In *Patel*, the Government also presented peer comparison data and evidence of Dr. Patel's post-investigation conduct, where he ordered fewer procedures, revised existing

patient medical findings, and cancelled already-scheduled procedures. *Id.* Moreover, there was evidence that Patel "contributed to the falsification of patient records;" medical charts indicated that his patients had reported chest pain symptoms, but those patients testified that they had "never made those complaints." *Id.* Finally, the Fifth Circuit noted that the district court "viewed Patel's days on the stand as rife with perjury." *Id.* Accordingly, the court held that there was sufficient evidence to sustain Patel's convictions for health care fraud.

As detailed above, the evidence presented at trial against Dr. Paulus was vastly different from the evidence presented against Doctors McLean and Patel. In both *McLean* and *Patel*, the evidence established that inter-observer variability could account for, at most, a 20% difference between cardiologists' stenosis assessments. Here, the evidence failed to establish that. The Government did not prove that degree of stenosis is an objectively verifiable fact subject to proof or disproof, or that inter-observer variability could not account for Dr. Paulus's alleged overstatements. Therefore, the Government did not present sufficient evidence of falsity and a reasonable jury could not conclude, beyond a reasonable doubt, that Dr. Paulus made a false statement, as opposed to a good faith difference of medical opinion.

At oral argument on these motions, when pressed by the Court, the Government attempted to point to facts that make this case more akin to *McLean* and *Patel*. However, those attempts fail. First, both *McLean* and *Patel* had significantly stronger angiogram and expert opinion evidence that proved falsity. More importantly, the primary distinguishing factor between this case and *McLean* and *Patel* is the stark difference in the circumstantial evidence.

In *McLean*, the Government had evidence of statements by the defendant, the falsification of patient symptoms to justify procedures, inconsistent explanations regarding the defendant's eye condition, and an attempt to shred patient files, in addition to a financial motive.  Considering the totality of this evidence, the Fourth Circuit held that McLean's convictions were supported by substantial evidence.  *McLean*, 715 F.3d at 140.  Likewise, in *Patel*, the Government produced substantial evidence in addition to expert testimony, including peer comparison data, evidence that the defendant falsified patients' files by recording complaints of chest pain, and evidence that after the Government executed its search warrant the defendant ordered fewer procedures, revised existing patient medical findings, and cancelled already-scheduled procedures.  *Patel*, 485 F. App'x at 709.

In this case, the Government has far less compelling circumstantial evidence.  Notably, incriminating statements by the defendant, falsification and revision of patient records to justify procedures, and evidence destruction, as well as a proven false statement, were critical in *McLean* and *Patel*, but are entirely absent here.  Accordingly, the Court finds that both *McLean* and *Patel* are significantly distinguishable from this case.

### ii.    The Government failed to prove fraudulent intent.

Both § 1347 and § 1035 require the Government to prove as an element that Dr. Paulus acted with intent to defraud.  (Doc. # 269, Instruction Nos. 12 and 14). In the Sixth Circuit, fraud requires the "specific intent to deceive or defraud."  *Frost*, 125 F.3d at 354. "[A] scheme to defraud must involve 'intentional fraud, consisting [of] deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end designed."  *Id.* (quoting *American Eagle Credit Corp. v. Gaskins*, 920 F.2d 352, 353 (6th Cir. 1990)).

"At the outset, it should be noted that 'the question of intent is generally considered to be one of fact to be resolved by the trier of the facts ... and the determination thereof should not be lightly overturned.'" *White*, 492 F.3d at 394 (quoting *United States v. Wagner*, 382 F.3d 598, 612 (6th Cir. 2004)).   Moreover, "circumstantial evidence alone can sustain a guilty verdict[, and it] need not remove every reasonable hypothesis except that of guilt." *United States v. Martinez*, 588 F.3d 301, 314 (6th Cir. 2009) (quoting *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007)).   "However, a line must be drawn between valid circumstantial evidence, and evidence which requires a leap of faith in order to support a conviction."   *White*, 932 F.2d at 590.

As the Sixth Circuit has observed, "it is difficult to prove intent to defraud from direct evidence" and "a jury may consider circumstantial evidence of fraudulent intent and draw reasonable inferences therefrom."   *United States v. Davis*, 490 F.3d 541, 549 (6th Cir. 2007) (internal quotation marks omitted).   "Intent can be inferred from efforts to conceal the unlawful activity, from misrepresentation, from proof of knowledge, and from profits."   *Id.* (internal quotation marks omitted).   The Government claims that Dr. Paulus employed each of these mechanisms – concealment, misrepresentation, knowledge, and profits, as well as others – which establish fraudulent intent.   While the Government's theory of the case is that Dr. Paulus made a misrepresentation regarding the extent of his patients' blockages, concealed that misrepresentation by recording at least a 70% blockage in his patients' medical records, and profited from each procedure; without a proven false statement, this house of cards falls apart.

The Government relies on exactly the same circumstantial evidence for fraudulent intent as it does for falsity.   (Doc. # 245 at 8).   Specifically, the Government points to the

32

volume of procedures, the trends at KDMC pre-Dr. Paulus's arrival and post-investigation, statements by co-workers that they believed Dr. Paulus performed unnecessary procedures, testimony of Dr. Paulus's patients, Dr. Paulus's profits, the anonymous complaint to the KBML, and the Agreed Order of Retirement that Dr. Paulus entered into with the KBML.

While this circumstantial evidence is slightly more persuasive in the fraudulent intent context than it was for falsity, it ultimately falls short.  As stated above, even considering the totality of the evidence in the light most favorable to the Government, this circumstantial evidence does not permit a jury to conclude, beyond a reasonable doubt, that Dr. Paulus acted with specific intent to defraud.  The incriminating statements by the defendant, falsification of patient records to justify procedures, and evidence destruction, as well as a proven false statement, that existed in *McLean* and *Patel*, are glaringly absent here.   In this case, the Government has far less compelling circumstantial evidence, in addition to failing to prove falsity.  Drawing all reasonable inferences in the Government's favor, there is insufficient evidence to permit a reasonable jury to infer that Dr. Paulus acted with fraudulent intent.

The evidence presented at trial, even construed in the light most favorable to the Government, is insufficient to support Dr. Paulus's convictions for health care fraud and false statements relating to a health care matter.  Thus, a rational trier of fact could not conclude, beyond a reasonable doubt, that Dr. Paulus knowingly and willfully exaggerated the extent of his patients' stenosis in their medical records, for the purpose of defrauding a health care benefit program.  Unfortunately for the Government, this issue infects each count of conviction.

### c.   Dr. Paulus's Motion for Judgment of Acquittal is granted.

The Court appreciates the seriousness of allegations that a doctor unnecessarily performed invasive medical procedures on patients, which is prohibited by the health care fraud statutes.[29]  The Court also recognizes that if every doctor can hide behind the guise of subjective medical judgment, the health care fraud statutes may be rendered useless for prosecuting unnecessary services fraud.  However, that is not what this Court has held. Every doctor cannot hide behind the guise of subjective medical judgment.  Instead, where the necessity of the service is capable of confirmation or contradiction and the doctor's stated "opinion" can be proven to be objectively false, that case (if proven beyond a reasonable doubt) can sustain a conviction.  That is not this case.

Rather, this case appears to be the very scenario Congress had in mind when it stated that the health care fraud statute is "not intended to penalize a person who exercises a health care treatment choice or makes a medical or health care judgment in good faith simply because there is a difference of opinion regarding the form of diagnosis or treatment." H.R. REP. NO. 104-736, at 258 (August 21, 1996), *reprinted in* 1996 U.S.C.C.A.N. 1990, 2071.  Here, the Government's evidence failed to prove that stenosis estimates were subject to proof or disproof or that Dr. Paulus's assessments constituted false statements.  The evidence at trial proved only that there was a difference of opinion regarding the form of diagnosis or treatment.  Neither § 1347 nor § 1035 are intended to

---

29   "The broad language of § 1347 shows that Congress intended for this statute to include within its scope a wide range of conduct so that all forms of health care fraud would be proscribed, regardless of the kind of specific schemes unscrupulous persons may concoct." *Davis*, 490 F.3d at 547 (citing *United States v. Lucien*, 347 F.3d 41, 51 (2d Cir. 2003)). *See also* H.R. REP. NO.104-747 (Aug. 2, 1996), "Health Care Fraud: All Public and Private Payers Need Federal Criminal Anti-Fraud Protections," 1996 WL 440279.

penalize such conduct.

Thus, the Government has failed to prove, beyond a reasonable doubt, that Dr. Paulus made a false statement and did so with fraudulent intent, and the evidence is insufficient to support the convictions for health care fraud, as well as the false statement counts. Accordingly, Dr. Paulus's Motion for Judgment of Acquittal (Doc. # 220) is **granted** as to all counts of conviction.

### B.   *Motion for a New Trial*[30]

#### 1.   **Standard of Review**

Federal Rule of Criminal Procedure 33 allows a defendant to request that any judgment be vacated and that a new trial be granted if the "interest of justice so requires." That motion can be granted if the verdict "was against the manifest weight of the evidence," or if a "substantial legal error" occurred during the proceedings. *United States v. Callahan*, 801 F.3d 606, 616 (6th Cir. 2015) (quoting *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010)). When considering whether a verdict was against the weight of the evidence, the district court acts "in the role of the thirteenth juror," and may consider the credibility of witnesses and the weight of the evidence. *Callahan*, 801 F.3d at 616 (quoting *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998)). Any legal error that is significant enough to require reversal on appeal is an adequate ground for granting a new trial. *Munoz*, 605 F.3d at 373 (quoting with approval *United States v. Wall*, 389 F.3d 457, 474 (5th Cir.

---

30    Federal Rule of Criminal Procedure 29(d)(1) provides: "If the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed." *See also United States v. Crumpton*, 824 F.3d 593 (6th Cir. 2016) ("In granting Crumpton's motion for judgment of acquittal, the district court was required to 'conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed.'")

2004)).

### 2.   The Court did not commit a substantial legal error which necessitates a new trial.

Dr. Paulus points to several legal errors that he claims necessitate a new trial.   In order for a legal error to be "substantial" it must be egregious enough that it would warrant reversal on appeal.   *Munoz*, 605 F.3d at 373.   The Court has carefully examined each of these alleged errors and concludes that none necessitate a new trial.

### a.   Angiogram Evidence

First, Dr. Paulus makes several arguments regarding the angiogram evidence. Specifically, Dr. Paulus claims that the Court erred by admitting the "altered" angiograms into evidence and permitting the Government's expert witnesses to opine on the "altered" angiograms.   (Doc. # 298-1 at 27-32).   The Government disagrees, arguing that the angiograms accurately depict patients' arteries and accurately reflect the true degree of blockage.   (Doc. # 306 at 7-19).   The Government also claims that the angiograms were properly admitted, because they were not "altered" nor were they "unduly prejudicial" under Rule 403, and therefore, the Government's experts' reliance upon them was appropriate. *Id.* at 25-27.

The Court declines the invitation to reconsider its prior *Daubert* Order (Doc. # 155); however, the Court will briefly address Dr. Paulus's arguments regarding the authentication and admissibility of the angiograms, as well as the reliability of Doctor Ragosta's and Doctor Moliterno's opinions based on the angiograms.

### i.   Authentication

The angiograms were admissible under Federal Rules of Evidence 901 and 1003.

36

Rule 901 requires the proponent of evidence to "produce evidence sufficient to support a finding that the item is what the proponent claims it is," to authenticate an item of evidence. FED. R. EVID. 901(a).   As the Court held in its prior Order, a coronary angiogram is essentially a x-ray, which is a "photograph" for purposes of authentication and admission. (Doc. # 155 at 7).   *See* FED. R. EVID. 1002 Advisory Committee's Note.   "To prove the content of a photograph, the original is required *except* as provided by the Rules." *Id.* (citing FED. R. EVID. 1002) (emphasis added).   One exception the Federal Rules make is for duplicates.

A "duplicate" is "a counterpart produced by a mechanical, photographic, chemical, electronic, or other equivalent process or technique that accurately reproduces the original." FED. R. EVID. 1001(e).   "A counterpart produced by means of photograph, including enlargements and miniatures, is a duplicate under" Rule 1001(4). 31 Fed. Prac. & Proc. Evid. § 7167(4).   Therefore, a "duplicate is admissible to the same extent as an original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." FED. R. EVID. 1003.

After extensive briefing, argument, and testimony, the Court concluded that the archived, compressed, and downscaled angiograms are a "counterpart produced by electronic processes" and "accurately reproduce the original," and thus, constitute "duplicates" under Rule 1003. (Doc. # 155).   While the archived angiograms are of a *lesser quality* than the originals Dr. Paulus viewed, the angiograms are not of such *poor quality* that there were suspicions regarding the angiograms' reliability.   And while the angiograms were compressed and downscaled during the archiving process, the changes were not material or misleading.

Accordingly, the angiograms' admission comports with Rules 901, 1002, and 1003. Dr. Paulus was free to challenge the angiogram evidence through cross-examination and the testimony of his own expert witnesses, which he did.  In fact, the parties even entered into a stipulation, which the Court read to the jury before the Defendant rested his case. The Court explicitly told the jury that "the United States stipulates that the images that were viewed live in the cath lab at whatever date are not what was on the films that were presented during the trial."  (Doc. # 259 at 136).  Thus, the angiograms were properly authenticated, and it was up to the jury to determine how much weight, if any, to give to the angiograms.

### ii.    Rule 403 Considerations

Dr. Paulus also argues that the "altered" angiograms should have been excluded under Rule 403 because the Government's reliance upon them "lulled the jury into speculating that Dr. Paulus must have seen the same thing." (Doc. # 298-1 at 29-30).  This argument is meritless.  The Court told the jury that the Government had stipulated that the angiograms were not the same as what Dr. Paulus saw in the catheterization lab. (Doc. # 259 at 136).

Relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence." FED. R. EVID. 403.  "'Unfair prejudice' in the context of Rule 403 means an undue tendency to suggest a decision based on improper considerations; it does not include the prejudicial 'damage to a defendant's case that results from the legitimate probative force of relevant evidence.'" *United States v. Wright*, 102 F. App'x 972, 979 (6th

38

Cir. 2004) (citing *United States v. Bilderbeck*, 163 F.3d 971, 978 (6th Cir. 1999) & *United States v. Lucas*, 357 F.3d 599, 606 n.2 (6th Cir. 2004)).

The angiograms were highly relevant, and the probative value of that evidence was not substantially outweighed by the danger of unfair prejudice. Although the angiograms introduced into evidence were not the original live images viewed by Dr. Paulus, the jury was aware of that fact, and Dr. Paulus was entitled to, and did, attack the angiogram evidence through cross-examination and the testimony of his own expert witnesses. Therefore, for the reasons stated above, it was not substantial error to admit the altered angiograms.

### iii.    Opinions of the Government's Expert Witnesses

Lastly, Dr. Paulus argues that the Court committed a substantial legal error "in permitting Dr. Ragosta and Dr. Moliterno to testify about the altered angiograms." (Doc. # 298-1 at 30). Dr. Paulus does not challenge either experts' qualifications or the relevancy of their testimony. Instead, Dr. Paulus claims that because "neither Dr. Moliterno nor Dr. Ragosta knows what was changed in the altered angiograms, their testimony is not reliable and cannot pass the *Daubert* standard." *Id.* at 31.

Under Rule 702, a proposed expert's opinion is admissible if (1) the witness is qualified by knowledge, skill, experience, training, or education; (2) the testimony of that expert witness is relevant, meaning that it will assist the trier of fact to understand the evidence or to determine a fact in issue; and (3) the testimony of that expert is reliable. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008). The proponent of the evidence has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence. *See Bourjaily v. United States*, 483 U.S. 171

(1987); *see also Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001).

To satisfy Rule 702, Dr. Moliterno's and Dr. Ragosta's methods and conclusions must be reliable. *See Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671 (6th Cir. 2010) (rejecting an expert's conclusions as too speculative and attenuated). In judging the reliability of the doctors' methods, the Court primarily looks to the four *Daubert* factors: (1) testing, (2) peer review, (3) error rates, and (4) "acceptability" in the relevant scientific community. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-94 (1993). The Court previously found that all four of the *Daubert* factors weighed in favor of admitting the angiograms and that Dr. Moliterno's and Dr. Ragosta's opinions were sufficiently reliable. The evidence at trial did not present any reason to disturb the Court's prior decision. Therefore, Dr. Moliterno's and Dr. Ragosta's expert testimony was sufficiently reliable under *Daubert*, and it was not legal error to permit such testimony.

As the Court previously ruled, the angiogram evidence is certainly not "misleading junk science" that should be excluded under Rule 702 and *Daubert*. *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176-77 (6th Cir. 2009). Instead, the angiogram and expert opinion testimony was the quintessential "shaky but admissible evidence" that *Daubert* permits. *Daubert*, 509 U.S. at 596. Rather than exclusion, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the ... appropriate means of attacking" the angiogram evidence in this case. *Id.*

"Once a court admits the testimony, 'then it is for the jury to decide whether any, and if any what, weight is to be given to the testimony.'" *United States v. Bonds*, 12 F.3d 540, 563 (6th Cir.1993) (citing *United States v. Stifel*, 433 F.2d 431, 438 (6th Cir. 1970)). "In the context of scientific evidence, this means that 'conflicting testimony concerning the

40

conclusions drawn by experts, so long as they are based on a generally accepted and reliable scientific principle, ordinarily go to the weight of the testimony rather than its admissibility.'" *Id.* (citing *Unitea States v. Brown*, 557 F.2d 541, 556 (6th Cir. 1977)). Therefore, "[q]uestions about the certainty of the scientific results are matters of weight for the jury." *Ia.*

Unfortunately for the Government, despite clearing the *Daubert* hurdle and having the evidence admitted, the angiogram and expert opinion evidence failed to establish that the degree of stenosis is an objectively verifiable fact capable of confirmation or contradiction. Therefore, although admissible, the evidence is insufficient to prove falsity and cannot sustain the conviction.

### b.    Jury Instructions

Dr. Paulus also takes issue with the jury instructions and claims that the Court erred by failing to instruct the jury that a mere difference of opinion among physicians was not sufficient to demonstrate fraud, failing to include a jury instruction on an essential element of the offense, and failing to provide a "unanimity of theory" instruction. *Id.* at 32-38.

A court's choice of jury instructions is reviewed for abuse of discretion. *United States v. Ross*, 502 F.3d 521, 527 (6th Cir. 2007). "A trial court has broad discretion in crafting jury instructions and does not abuse its discretion unless the jury charge fails" to "accurately ... reflect the law." *Id.* (internal citations and quotation marks omitted). Therefore, to prevail on this argument, Dr. Paulus must demonstrate that "the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *United States v. Harrod*, 168 F.3d 887, 892 (6th Cir. 1999) (quoting *Beard v. Norwegian Caribbean Lines*, 900 F.2d 71, 72-73 (6th Cir. 1990)).

Dr. Paulus argues that the Court's refusal to include certain instructions was error. "[A] district court's refusal to deliver a requested instruction is reversible only if that instruction is '(1) a correct statement of the law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense.'" *United States v. Mack*, 159 F.3d 208, 218 (6th Cir. 1998) (quoting *United States v. Williams*, 952 F.2d 1504, 1512 (6th Cir. 1991)).  Dr. Paulus's three arguments regarding the jury instructions fail to meet this three-pronged standard.

First, Dr. Paulus claims that the jury should have received "more extensive and particularized instructions concerning a physician's right to choose the appropriate treatment." (Doc. # 298-1 at 38).  In particular, Dr. Paulus points to three excerpts from his proposed instructions that the Court did not include:

> (1) "A mere difference of opinion between physicians, without more, is not enough to show falsity."  (Doc. # 293 at 3).

> (2) "A defendant does not act with an intent to defraud if he is exercising his medical judgment in good faith when deciding how to treat a patient.  If you find that Dr. Paulus was exercising his medical judgment in good faith (regardless of whether other physicians disagree and think that the treatment was inappropriate), you must find him not guilty of this charge."  *Id.* at 3-4.

> (3) "In deciding whether Dr. Paulus was exercising his medical judgment, you must allow Dr. Paulus to make his determination in light of all attendant circumstances – psychological and emotional, as well as physical – that might be relevant to the well-being of the patient."  *Id.* at 4.

The Court's refusal to include these instructions did not constitute error.  Even assuming that these requested instructions satisfy the first and third prongs of the test, Dr. Paulus's argument fails because he cannot satisfy the second prong.  All of Dr. Paulus's proposed  instructions were substantially covered by the charge actually delivered to the

jury.

In fact, the Court instructed multiple times on the very concepts that Dr. Paulus now claims were omitted in error.  Instruction No. 12, which instructed the jury on the elements of health care fraud, also cautioned: "The health care fraud statute is not intended to punish physicians for making judgment calls.  It is also not intended to criminalize questionable decision making or even medical malpractice."  (Doc. # 269, Instruction No. 12).  Moreover, the Court gave a lengthy good faith instruction.  *Id.*, Instruction No. 13.  The Court also provided the jury with a detailed description of Dr. Paulus's defense theory in Instruction No. 16, which explained that: "The defense states that Dr. Paulus believed in good faith that his patients suffered from serious heart conditions and that he exercised his medical judgment in providing treatment that he believed to be in the best interest of the patients." *Id.*, Instruction No. 16.  Furthermore, the Court instructed the jury on the voluntary nature of the medical guidelines and ensuring that the jury understood that "[i]t does not violate any criminal law if physicians do not comply with these guidelines, which change over time, and the guidelines are not intended to replace clinical judgment of the physician." *Id.*, Instruction No. 17.  The Court also reminded the jury that it was up to them "to decide what weight, if any, to give to these guidelines when deciding whether the Defendant was exercising his medical judgment." *Id.*  Accordingly, the "more extensive and particularized instructions concerning a physician's right to choose the appropriate treatment" that Dr. Paulus requested were substantially covered by the charge actually delivered to the jury.  As a result, the Court's refusal to give Dr. Paulus's preferred and "more particularized" instructions does not amount to a substantial legal error.

43

Second, Dr. Paulus argues that the jury instructions "failed to include an instruction on an essential element" for the false statement counts. (Doc. # 298-1 at 41). Specifically, Dr. Paulus contends that the Court should have instructed the jury that it must find "the statement concerned a fact capable of confirmation." *Id.* The Court agrees that Dr. Paulus's requested instruction is an accurate statement of the law. However, this proposed instruction was substantially covered in Instruction No. 14. Importantly, the Court instructed the jury that a "materially false" statement or representation was an essential element of the § 1035 counts. (Doc. # 269, Instruction No. 14). The Court further instructed the jury: "A representation is 'false' if it is known to be untrue or is made with reckless indifference as to its truth or falsity." *Id.* The Court may not have defined "false statement" with the exact language that Dr. Paulus wished, but the Court did adequately define falsity. Accordingly, the refusal to include this precise definition of falsity does not constitute a substantial legal error.

Third, Dr. Paulus claims that the jury should have received a "unanimity of theory" instruction for the health care fraud count. (Doc. # 298-1 at 36). However, that proposed instruction was not a correct statement of the law, and therefore, Dr. Paulus has failed to satisfy the first prong of the standard.

"[A] jury in a federal criminal case cannot convict unless it unanimously finds that the Government has proved each element." *Richardson v. United States*, 526 U.S. 813, 817 (1999). However, "a federal jury need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element, say, which of several possible means the defendant used to commit an element of the crime." *Id.* (internal citations omitted).

Therefore, this distinction between elements and means is critical.  A jury need only unanimously agree that the Government proved all the elements of the crime charged, not the means, in order to return a guilty verdict.  "Where, for example, an element of robbery is force or the threat of force, some jurors might conclude that the defendant used a knife to create the threat; others might conclude he used a gun.  But that disagreement – a disagreement about means – would not matter as long as all 12 jurors unanimously concluded that the Government had proved the necessary related element, namely, that the defendant had threatened force."  *Id.*

To determine whether something is an element of the crime or a means used to commit the crime, courts look first to the language of the statute.  *Id.* at 817-18.  The health care fraud statute, 18 U.S.C. § 1347, proscribes the knowing and willful execution of a "scheme or artifice" intended "to defraud any health care benefit program" or "to obtain, *by means of* false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program," in connection with the delivery or payment for health care benefits.  18 U.S.C. § 1347(a) (emphasis added).  That language suggests that false representations are a "means" by which a scheme to defraud may be carried out, not a separate element of the crime.

As Dr. Paulus concedes in his Motion for a New Trial, "the Court was right that a unanimity-of-theory instruction is not necessarily required in every health care fraud case." (Doc. # 298-1 at 37).  Nevertheless, Dr. Paulus claims that such an instruction was warranted because the Sixth Circuit has "consistently recognized that the need [for a specific unanimity instruction] arises when it is shown that there is a genuine risk that the jury is confused or that a conviction may occur as the result of different jurors concluding

that a defendant committed different acts."  *Id.* (quoting *United States v. Algee*, 599 F.3d 506, 514 (6th Cir. 2010)).  However, as in *Algee*, the Government alleged that Dr. Paulus made "substantially the same false statement" – that the stenosis was at least 70% when it was less than that – in each of the patients' medical records.  *Id.*  Therefore, there was no risk of jury confusion, and the unanimity-of-theory instruction was not required. Accordingly, the Court did not commit a substantial legal error in instructing the jury, and a new trial is not warranted on those grounds.

### c.    *Allen* Charge

Finally, Dr. Paulus claims that the Court committed substantial legal error by commenting on specific pieces of evidence during the *Allen* charge, which "undermined two central theories of Dr. Paulus's defense."  (Doc. # 298-1 at 38-42).

The Sixth Circuit has recognized that "the presiding judicial officer is in the best position to decide when to give the charge."  *United States v. Sawyers*, 902 F.2d 1217, 1220 (6th Cir. 1990).  "The relevant inquiry is 'whether, in its context and under all the circumstances, [the charge] ... was coercive.'"  *United States v. Clinton*, 338 F.3d 483 (6th Cir. 2003) (quoting *Frost*, 125 F.3d at 373).  When considering whether an *Allen* charge was coercive, the Court should consider the "totality of the circumstances."  *United States v. Reed*, 167 F.3d 984, 990 (6th Cir. 1999).  "Although circumstances alone can render an *Allen* charge coercive," the Sixth Circuit has typically "found an *Allen* charge coercive when the instructions themselves contained errors or omissions, not when a defendant alleges that the circumstances surrounding an otherwise correct charge created coercion."  *Frost*, 125 F.3d at 375.

After the jury indicated that it was having difficulty reaching a verdict on some of the counts, the Court delivered a slightly modified *Allen* charge.   The vast majority of the charge tracked the Sixth Circuit's pattern *Allen* charge verbatim.   (Doc. # 272 at 4, 6-9). At Dr. Paulus's request, the Court also instructed the jury that the burden of proof was on the Government.   *Id.* at 5, 9-11.   In doing so, the Court noted the complexity of this case, and concluded that further explanation was required.   Therefore, the Court reminded the jury that the Government must prove each and every element beyond a reasonable doubt. *Id.* at 10-11.

Dr. Paulus takes issue with two of the Court's statements during the *Allen* charge. First, the Court acknowledged that the jury had "spent quite a bit of time reviewing films, angiograms."   *Id.* at 9.   Dr. Paulus claims that this statement lent credence to the Government's position that the angiograms were reliable, a fact that Dr. Paulus had vigorously contested throughout the trial.   However, this comment cannot reasonably be viewed as a statement on the evidence that undermined Dr. Paulus's "altered" angiogram theory.  Instead, the Court's statement was in direct reference to a previous Jury Question. Specifically, on October 26, 2016 – the third day of deliberations – the Jury asked: "We are missing the C.D. of the angiogram for [C.C.].  Can this be provided?"  (Doc. # 267).  Thus, the Court and all parties were aware of the fact that the jury had been reviewing angiograms.   Regardless, this statement was not coercive.

Dr. Paulus also claims that the Court erred when the Court reminded the jury that the Government had the burden to prove each and every element and summarized the elements required by Instruction Nos. 12 and 14.  Explaining the false statement/material misrepresentation element, the Court explained: "The material misrepresentation, the

alleged material misrepresentation. Writing down in the cath report whatever the particular stenosis was vis a vis what you think it might have been based upon the evidence that you heard, that's one element, the material misrepresentation." (Doc. # 272 at 10). Dr. Paulus asserts that because of the Court's statement, "the jury may have been more inclined to believe that a particular stenosis could be proven by looking at the altered angiograms and other evidence." (Doc. # 298-1 at 47). However, the Court's statement was not coercive; rather, it simply reiterated that the jury must find a false statement to convict on all counts. Accordingly, neither the Court's decision to administer the *Allen* charge nor the specific language it used constitute a substantial legal error warranting a new trial.

### 3.   Dr. Paulus's conviction was against the manifest weight of the evidence.

Dr. Paulus claims that the verdict was against the manifest weight of the evidence. (Doc. # 298-1 at 5-26). Specifically, Dr. Paulus argues that there was insufficient evidence of criminal intent, insufficient evidence of falsity, and that the jury's verdict could not be properly supported by speculation about altered angiograms,[31] the Government's repeated misstatements of the evidence, or improper evidentiary inferences that the Government raised. *Id.*

Where the defendant raises both a Rule 29 motion for acquittal and a Rule 33 motion for a new trial post-conviction, and where the district court grants the motion for acquittal in whole or in part, that court must still make a conditional ruling on the defendant's motion for a new trial in the event that the conviction is reinstated on appeal.

---

31   The Court has thoroughly addressed Dr. Paulus's "altered" angiogram argument in the preceding section and will not devote additional time to that claim.

FED. R. CRIM. P. 29(d)(1); *see also Crumpton*, 824 F.3d at 609-10.  Accordingly, even though the Court has determined that Dr. Paulus should be acquitted of all counts, it still must determine if he should be granted a new trial.  If the Court's decision to acquit Dr. Paulus of all counts is overturned on appeal, Dr. Paulus still should be granted a new trial.

Dr. Paulus takes issue with several pieces of evidence, which he claims were inappropriate for a variety of reasons, including the KBML Settlement Agreement, the generic testimony of other cardiologists, evidence of his compensation, evidence regarding the volume of procedures, and the Government's "repeated misstatements of the evidence."  (Doc. # 298-1 at 19-24).  Specifically, Dr. Paulus argues that the Court, sitting as the thirteenth juror, should "not credit" Dr. Paulus's overall compensation, the overall number of procedures, the generic testimony from other cardiologists, or the KBML Settlement Agreement[32] as probative evidence of fraudulent intent.  The Court thoroughly considered all of this evidence in the acquittal section and found it to be insubstantial circumstantial evidence.  Accordingly, no further discussion is warranted.

Dr. Paulus also claims that the Government made "repeated misstatements of the evidence," producing a lengthy list of cites to the transcript where the prosecutor allegedly

---

[32]   Dr. Paulus also claims that it was "error for the KBML settlement to be admitted ... at all." (Doc. # 289-1 at 26).  Early in this case, Dr. Paulus filed a Motion to Strike Surplusage from the Indictment, related to the KBML Settlement. (Doc. # 27).  This Court adopted Magistrate Judge Atkins's Report and Recommendation (Doc. # 47), wherein he recommended that the Court grant in part and deny in part Dr. Paulus's Motion.  (Doc. # 77).  This evidence was not the subject of a motion in limine.  The KBML Settlement was read into evidence when Jon Marshall, a KBML investigator, testified, without objection from Dr. Paulus. (Doc. # 195 at 63-72).  On the fourteenth day of trial, Dr. Paulus objected to questions regarding the KBML Settlement, and the Court sustained that objection pursuant to Rule 403, finding that the questioning was cumulative.  (Doc. # 239 at 65-66).

The admission of the KBML Settlement, which was relevant and not unduly prejudicial under Rule 403, did not constitute a substantial legal error.  However, as the Court noted above, the KBML Settlement had little evidentiary value for proving falsity or intent.

misstated the evidence on critical issues. (Doc. # 289-1 at 31-32). Dr. Paulus asks the Court to "consider how the jury's verdict was shaped by the government's misstatements of the evidence and frequent use of innuendo in the place of probative evidence." *Id.* at 33.

The Sixth Circuit employs a "two-step approach for determining when prosecutorial misconduct warrants a new trial." *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001) (citing *United States v. Carroll*, 26 F.3d 1380, 1385-87 (6th Cir. 1994)). First, the court determines "whether the prosecutor's conduct or comments and remarks were improper." *Id.* (citing *Carroll*, 26 F.3d at 1387). "If the remarks were improper, the court must then consider and weigh four factors in determining whether the impropriety was flagrant and thus warrants reversal." *Id.* "These four factors are as follows: (1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct and remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong." *Id.* "When reviewing challenges to a prosecutor's remarks at trial, [the Court must] examine the prosecutor's comments within the context of the trial to determine whether such comments amounted to prejudicial error." *Id.* (citing *United States v. Young*, 470 U.S. 1, 11-12 (1985)). Courts must "afford wide latitude to a prosecutor during closing argument, analyzing disputed comments in the context of the trial as a whole and recognizing that inappropriate comments alone do not justify reversal where the proceedings were 'otherwise fair.'" *United States v. Henry*, 545 F.3d 367, 377 (6th Cir. 2008) (citing *Young*, 470 U.S. at 11).

An examination of the entirety of the prosecutor's alleged misstatements about Dr. Samei's testimony; Lance White's testimony; the identity of the individual who first raised

50

the "altered" angiogram issue; the mischaracterization of arteries as "not blocked," when even the Government's experts' had found at least a mild blockage; and specifics of A.L.'s medical history, demonstrates that the alleged misconduct does not rise to the level of "prosecutorial misconduct."  After considering the context in which the alleged errors were made, the Court concludes that the purported misstatements did not prejudice Dr. Paulus or mislead the jury.  And even if the prosecutor did err, these seven misstatements were isolated and do not warrant a new trial.

Most importantly, and as detailed in the analysis of Dr. Paulus's Rule 29 motion, the Government failed to produce sufficient evidence to sustain Dr. Paulus's conviction and he is entitled to an acquittal on all counts.  Specifically, the Government failed to prove, beyond a reasonable doubt, that Dr. Paulus made an objectively false statement or acted with fraudulent intent.  Under the acquittal standard, the Court places its thumb on the scale in favor of the Government.  When the Court removes its thumb from the scale and considers the evidence as the thirteenth juror, without drawing all reasonable inferences in favor of the Government, the Court must also conclude that the jury's verdict was against the manifest weight of the evidence.  Therefore, Dr. Paulus is entitled to a new trial on all counts.

### III.    Conclusion

Accordingly, for the reasons stated herein,

**IT IS ORDERED** as follows:

(1)    Defendant Dr. Richard Paulus's Motion for Judgment of Acquittal (Doc. # 220) is **granted**;

(2)      Dr. Paulus's Renewed Motion for Judgment of Acquittal (Doc. # 263) is **denied as moot**;

(3)      Defendant Dr. Richard Paulus is hereby **acquitted** of Counts One, Four, Five, Eight, Ten, Twelve, Eighteen, Twenty, Twenty-One, Twenty-Four, and Twenty-Five;

(4)      Defendant Dr. Richard Paulus's Motion for a New Trial (Doc. # 298) is **conditionally granted**;

(5)      A **Judgment** reflecting the acquittal on Counts One, Four, Five, Eight, Ten, Twelve, Eighteen, Twenty, Twenty-One, Twenty-Four, and Twenty-Five, will be filed contemporaneously herewith;

(6)      The April 25, 2017 sentencing is **vacated**; and

(7)      This is a final and appealable Order.

This 7th day of March, 2017.



Signed By:

*David L. Bunning*

United States District Judge

K:\DATA\Opinions\Ashland\15-15 MOO on MFA and MNT FINAL.wpd