UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
ASHLAND

CRIMINAL ACTION NO. 15-CR-15-DLB

UNITED STATES OF AMERICA                                                            PLAINTIFF


vs.                            UNITED STATES'S INITIAL
                               <u>SENTENCING MEMORANDUM</u>


RICHARD E. PAULUS, M.D.                                                             DEFENDANT

\* \* \* \* \* \* \* \*

At the direction of the Court, the United States submits the following memorandum in advance of the issuance of a pre-sentence report, outlining the guideline calculation that should apply in sentencing Defendant Paulus.  *See* Docket Entry ("DE") 345.

I. <u>Background</u>

The Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. King*, 553 F. App'x 518, 520 (6th Cir. 2014) (citing *Gall v. United States*, 552 U.S. 38, 49 (2007)).  In calculating the appropriate sentence under the Guidelines, the Court considers as relevant conduct the acts of the defendant, as well as the acts "willfully caused by the defendant" and "all harm that resulted from the acts and omissions." U.S.S.G. § 1B1.3.  Relevant conduct is defined to include "all acts and omissions . . . that were part of the same course of

1

conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). The Guidelines define a "common scheme or plan" as any other offense substantially connected "by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." *Id*. § 1B1.3 cmt. n.9(A). "The burden is on the government to prove, by a preponderance of the evidence, that a particular sentencing enhancement applies." *United States v. Dupree*, 323 F.3d 480, 491 (6th Cir. 2003).

## II. Offense Conduct[1]

Defendant Paulus worked as a cardiologist at King's Daughters Medical Center ("KDMC") in Ashland, Kentucky, specializing in coronary angiograms and stent procedures. DE 195: Tr. at 4382-83. Defendant Paulus performed more angiograms and stent implantations than any of his colleagues—and more, in fact, than the entire cardiology departments at several large national hospitals. DE 195: Tr. at 4227; Trial Exhibit 437e. Between 2006 and 2013, Defendant Paulus and KDMC billed $1.1 billion to Medicare for these procedures, also more than any other cardiologist in the country. DE 198: Tr. at 4573-77. Medicare paid more than $40 million for stent procedures performed by Defendant Paulus during this timeframe. *Id*. at 4560-4574. Defendant Paulus received a $2.5 million salary from KDMC for this productivity. DE 195: Tr. at 4402-09.

---

1   The United States produced to the Probation Office the transcripts, exhibits, demonstratives, expert reports, discovery receipts, reports of interview from the investigation, and legal briefing to assist them in preparing a more detailed Offense Conduct section for Defendant Paulus's Pre-Sentence Report.

2

At trial, the jury heard from cardiologists retained by a regulator, an insurer, and the United States, all of whom reviewed Defendant Paulus's angiograms and records. Each of those cardiologist experts concluded that Defendant Paulus significantly overstated the severity of the blockages on many angiograms, and performed dozens of unnecessary and unjustified stent procedures. *See* DE 223: Tr. at 6654-6708 (Dr. Moliterno); DE 212: Tr. at 5705-19 (Dr. Morrison); DE 203: Tr. at 2001-5116 (Dr. Ragosta). The jury heard from six additional cardiologists who previously worked with Defendant Paulus or treated his patients. All six had reviewed angiograms of stents placed by Defendant Paulus that they believed were unnecessary. *See* DE 195: Tr. at 4238-40 (Dr. Touchon), Tr. at 4315-16 (Dr. Studeny); DE 203: Tr. at 4935-36 (Dr. Shah); DE 204: Tr. at 5237-38 (Dr. Kelleman); DE 206: Tr. at 5509-20 (Dr. Ali); DE 223: Tr. at 6605 (Dr. Elesber). The jury also heard from another KDMC colleague who testified to Defendant Paulus performing unnecessary stress tests. DE 206: 5489-90 (Dr. Raghu). At trial, the United States presented 76 different procedures where Defendant Paulus inserted unnecessary stents.[2]

To obscure his placement of unnecessary stents, Defendant Paulus lied about the degree of stenosis he listed in his patients' medical records. *See, e.g.*, DE 203: Tr. at 5001-5116 (Dr. Ragosta observing the percent stenosis recorded by Defendant Paulus

---

2   Each of the three expert witnesses reviewed and concluded that additional procedures, beyond the 76, were unnecessary; to streamline the trial, the United States did not present all of those procedures. Dr. Ragosta determined dozens of other procedures were unnecessary (DE 203: Tr. at 5001) (samples discussed at trial were "representative sample"); Dr. Moliterno determined an additional nine procedures were unnecessary (DE 223: Tr. at 6656); and Dr. Morrison determined one additional procedure was unnecessary (DE 212: Tr. at 5704).

3

was not consistent with the angiogram results). As a result of this conduct, the jury convicted Defendant Paulus of one count of health care fraud, in violation of 18 U.S.C. § 1347, and ten counts of false statements, in violation of 18 U.S.C. § 1035. DE 276. He was acquitted of five false statement counts. *Id.* All the counts of conviction direct the Court to calculate the defendant's guideline range pursuant to United States Sentencing Guideline 2B1.1, which provides a base offense level of 6. U.S.S.G. § 2B1.1(a)(1).

### III. Loss Amount Calculation

In fraud cases, a defendant's offense level is adjusted based on the amount of loss involved in the offense. *See* U.S.S.G. § 2B1.1(b)(1). "The district court is to determine the amount of loss by a preponderance of the evidence." *United States v. Mehmood*, No. 16-2639, 2018 WL 3414591, at *9 (6th Cir. July 13, 2018). "The court need only make a reasonable estimate of the loss," *id.* § 2B1.1, cmt. n.3(C), and "[p]recision is not required." *United States v. Sufi*, 456 F. App'x 524, 528 (6th Cir. 2012); *see also United States v. Bertram*, 900 F.3d 743, 752-73 (6th Cir. 2018).

The amount of loss for sentencing purposes "is the greater of actual loss or intended loss." USSG § 2B1.1 cmt. n. 3(A). The Guidelines define "intended loss" as "the pecuniary harm that the defendant purposely sought to inflict . . . and . . . includes intended pecuniary harm that would have been impossible or unlikely to occur." *Id.* § 2B1.1 cmt. n. 3(A)(ii). In health care fraud cases, "the aggregate dollar amount of fraudulent bills submitted to the Government health care program[3] shall constitute prima

---

[3] Although the Application Note references only "bills submitted to Government health care program[s]," this guidance should apply with equal force to bills submitted to any type of payer covered

4

facie evidence of the amount of the intended loss, *i.e.*, is evidence sufficient to establish the amount of the intended loss, if not rebutted." *Id*. § 2B1.1 cmt. n. 3(F)(viii).  This presumption is rooted in "the long-standing presumption in the law that a 'bill is a bill,' that is, that the face amount of a bill is presumptive evidence of the amount that the person who submits it expects to obtain." *United States v. Iwuala*, 789 F.3d 1, 14 (1st Cir. 2015).

At this early stage, the United States presents two possible ways to calculate the intended loss amount of Defendant Paulus's scheme.

    a. <u>Loss Estimate Based on Percentage of Unnecessary Procedures Identified in Experts' Review</u>

At trial, the United States presented the amount Defendant Paulus billed to Medicare, the largest victim of his fraud.  Ashley Marina, on behalf of AdvanceMed, testified that between 2006 and 2013, for in-patient stent procedures, KDMC billed Medicare $121,632,092 and was paid $37,670,015 for stents inserted by Defendant Paulus.  *See* Trial Exhibits 421 (contains billed and paid amounts), 429 (chart of paid amounts); DE 198: Tr. at 4562.  For out-patient stent procedures by Defendant Paulus, KDMC billed Medicare $10,133,906 and Medicare paid KDMC $3,043,168 between 2006 and 2013.  *See* Trial Exhibits 421, 431; DE 198: Tr. at 4567.  For Part B stent procedures by Defendant Paulus, KDMC billed Medicare $11,723,289 and Medicare paid

---

by the federal health care fraud statutes.  Although the United States has not located a case that addresses this question directly, a number of courts seem to apply this rationale to all health care fraud cases, regardless of the type of payer.  *See United States v. Popov*, 742 F.3d 911, 916 (9th Cir. 2014) ("In health care fraud cases, the amount billed to an insurer shall constitute prima facie evidence of intended loss for sentencing purposes.").

$2,369,299 between 2006 and 2013. *See* Trial Exhibits 421, 433; DE 198: Tr. at 4570. In total, KDMC billed Medicare $143,489,287, and was paid $43,082,482, for stent procedures performed by Defendant Paulus on Medicare beneficiaries between 2006 and 2013. Trial Exhibit 421. In preparation for sentencing, Anthem submitted corresponding data, which showed that between July 24, 2008 and July 31, 2013, Defendant Paulus caused Anthem to be charged $3,948,589 and to pay $1,464,641 for stent procedures for Anthem beneficiaries.[4]

In the course of the investigation, at least two randomly selected medical reviews were conducted of Defendant Paulus's stent procedures. AdvanceMed conducted the first review, after receiving an anonymous complaint. DE 192: Tr: at 4131-34; Trial Exhibit 424. The AdvanceMed cardiology consultant found that of the nineteen stent procedures reviewed, eight had "documentation discrepancies" between the blockage viewed on the angiogram and the blockage recorded by Defendant Paulus. *See* DE 192: Tr. 4147; *see also* AdvanceMed Referral. Of those eight stents, the cardiology consultant deemed seven of them medically unnecessary. DE 192: Tr. 4156-57. This is a rate of 36.8% of medically unnecessary stents. Anthem's expert also conducted a random review of Defendant Paulus's stent procedures, and found that at least half of them were unnecessary. DE 204: Tr. at 5332; DE 212: Tr. at 5703-04. At trial, the United States presented proof beyond a reasonable doubt that in five of the eleven randomly selected

---

4  There are more than a dozen other insurers victimized by Defendant Paulus's scheme. The United States has solicited more complete billing data from them and is in the process of receiving and analyzing that data. As part of a full sentencing and restitution hearing, the United States will present the underlying data demonstrating the victims' losses.

6

procedures reviewed by Dr. Morrison, Defendant Paulus inserted unnecessary stents and lied about the blockage in the patients' medical records. DE 212: Tr. at 5705-21 (discussing four procedures); 5755-61 (discussing one additional procedure). That is a rate of 45.4% of medically unnecessary stents. These two random reviews of Defendant Paulus's stent procedures reached the same conclusion: roughly one third to one half of the stents he placed were unnecessary, and in each instance, the medical records contained a materially false statement about the degree of stenosis.

      The court can reasonably use these findings to estimate the loss caused by Defendant Paulus' relevant conduct. *See United States v. Dierker*, 417 F. App'x 515, 524 (6th Cir. 2011) (the court "need only make a reasonable estimate of the loss, given the available information"); *United States v. Tipton*, 269 F. App'x 551, 561 (6th Cir. 2008) (approving extrapolation as method for estimating fraud loss); *see also United States v. Wallace*, 738 F. App'x 676, 680 (11th Cir. 2018) (accepting a loss amount calculation based on a statistical sample in health care fraud case because there were more than 10,000 claims in total); *United States v. Kolodesh*, 787 F.3d 224, 239-40 (3d Cir. 2015) (upholding loss estimate based on testimony about the percentage of fraudulent claims billed by the defendant and application of that percentage to the amounts billed). For example, applying the more conservative AdvanceMed error rate of 36.8% to the amounts paid for stents inserted by Defendant Paulus, yields an intended loss amount of $52,804,057 for Medicare and $1,453,080 for Anthem and an actual loss amount of $15,854,353 for Medicare and $538,987 for Anthem.

7

Based on the Medicare and Anthem actual loss figures alone, the sentencing guideline calculation should be increased by at least 20 levels for an actual loss amount exceeding $9,500,000. U.S.S.G. § 2B1.1(b)(1)(K).

|  | Totals for stents placed by Defendant Paulus | Applying 36.8% medically unnecessary rate | Applying 45.4% medically unnecessary rate |
|---|---|---|---|
| **Medicare Billed Amount** | $143,489,287 | $52,804,057 | $65,144,136 |
| **Medicare Paid Amount** | $43,082,482 | $15,854,353 | $19,559,446 |
| **Anthem Billed Amount** | $3,948,589 | $1,453,080 | $1,792,659 |
| **Anthem Paid Amount** | $1,464,641 | $538,987 | $664,947 |

    b. Procedures Presented at Trial

In the course of the investigation, experts concluded that more than one hundred of Defendant Paulus's procedures were unnecessary. Indeed, the United States initially planned to present on 26 substantive false statement counts and approximately 140 procedures in support of Count 1. To streamline the trial, the United States presented on 15 substantive counts and 76 procedures in support of Count 1. At a minimum, the intended loss amount for those 76 procedures should count towards the defendant's loss amount, although it will dramatically understate the scope of his relevant conduct.

Based on the claim forms presented at trial and data presently available, the intended loss amount for 62 of the procedures presented at trial is at least $2,372,248.18. The United States is in the process of gathering the precise billed amount for the

8

remaining 14 procedures, and the paid amount for all 76 procedures. This figure includes the billed amounts for the five acquitted counts, which the court can include as relevant conduct. *See United States v. White*, 551 F.3d 381 (6th Cir. 2008) (*en banc*) (upholding use of acquitted conduct in calculating defendant's guideline range of imprisonment); U.S.S.G. § 1B1.3, Relevant Conduct (November 2016) (sentencing guideline range should be based on "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant"); *United States v. Dobson*, 623 F. App'x 117, 127-28 (6th Cir. 2015) ("[T]he law is well-settled that a district court may consider both acquitted and uncharged conduct in determining a defendant's relevant conduct, provided that such conduct is similar to the conduct underlying the offense of conviction and is established by a preponderance of the evidence.") (citing *United States v. Watts*, 519 U.S. 148, 157 (1997) and *White*, 551 F.3d at 385).[5]

Based on these figures—which are incomplete—the sentencing guideline calculation should be increased by at least 16 levels for an intended loss amount exceeding $1,500,000. U.S.S.G. § 2B1.1(b)(1)(I).

## IV.   Other Enhancements

### a. The offense involved 10 or more victims

Defendant Paulus's guideline calculation should be increased by 2 levels because the offense involved ten or more victims. U.S.S.G. § 2B1.1(b)(2)(A)(i). Just based on

---

5   Excluding the five procedures corresponding to counts 3, 11, 14, 17, and 27 reduces the billed amount to $2,105,000.68.

the procedures presented at trial, Defendant Paulus defrauded more than ten *insurance* victims.  *See* Trial Exhibit 4E (Aetna); 5E (Kentucky Medicaid); 8E (United); 10E (Medicare); 20E (Humana); 21E (West Virginia Medicaid); 24E (Medical Mutual); 101E (Champ VA, secondary payor); 108E (Anthem BC/BS); 152E (Bluegrass Family Health); 178E (United Mine Workers, secondary payor); 180E (Ohio Medicaid); 204E (AARP).

In addition, the patients who received unnecessary stents are financial victims as well as physical victims.  According to hospital accounting records, which the United States will present at sentencing, at least fourteen of the victims whose procedures were presented at trial also had substantial financial responsibility for their unnecessary procedures.  *See, e.g.*, DE 198:  Tr. at 4676-4677 (Patient D.C. discussing the $2,500 deductible he paid two years in a row for two separate stent procedures).  As outlined below, *infra* pp. 11-12, all the patients discussed at trial were also victimized by suffering a serious physical injury in the form of an invasive cardiac procedure they did not need. There are plainly more than ten victims and the guideline range should be increased by 2 levels pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i).

### b. The offense involved loss to a Government health care program of more than $1 million

Defendant Paulus's guideline calculation should be increased by at least 2 levels because the Defendant was convicted of a Federal health care offense involving a Government health care program and the loss under 2B1.1(b)(1) to the Government health care program was more than $1,000,000.  U.S.S.G. § 2B1.1(b)(7)(B)(i). Depending on how loss amount is calculated, additional enhancements could be

10

warranted under U.S.S.G. § 2B1.1(b)(7)(B)(ii) or (iii) (noting a loss amount of more than $7 million warrants a 3 level increase and a loss amount of more than $20 million warrants a 4 level increase).

### c. The offense involved the conscious risk of death or serious bodily injury

Defendant Paulus's guideline calculation should be increased by 2 levels because the offense involved the conscious or reckless risk of death or serious bodily injury. U.S.S.G. § 2B1.1(b)(16)(A). Every single patient who received an unnecessary stent from Defendant Paulus underwent an invasive cardiac procedure that involved operating on the patient's heart to insert a stent that patient did not need. That unnecessary stent remains in their heart for the rest of their lives. Further, as multiple cardiologists explained, every stent procedure presents risks, including the risk of stroke, heart attack, and death. The testimony at trial consistently acknowledged the dangers of receiving a stent. As Dr. Studeny testified, "placing a stent essentially gives a patient a new disease," with a 1-3% chance of a blood clot forming at the stent and causing a heart attack. DE 195: Tr. at 4304. Dr. Ragosta echoed this, noting a stent can clot and cause a heart attack. DE 203: Tr. at 4996-98. Dr. Ali noted, "the heart attack that happens because of the stent actually carries a higher risk of morbidity and mortality than for the natural course of the heart attack." DE 205: Tr. at 5500; *see also* DE 223: Tr. at 6601-02 (Dr. Elesber noting there is a 1% chance a patient receiving a stent will have a stroke, heart attack, or die).

11

Patients were also unnecessarily subjected to the risks inherent in heart surgery. As Dr. Morrison explained, the surgery involves blocking the blood flow through the artery, which carries risks, and the artery can be dissected or perforated. DE 212: Tr. at 5700-5701. Dr. Moliterno also discussed the possibility of puncturing or rupturing the artery. DE 223: Tr. at 6645-46. Finally, all of the cardiologists noted that following a stent placement, patients have to take blood thinners for at least a year, which can cause complications ranging from excessive bleeding to having to delay other needed medical procedures. DE 203: Tr. at 4996-98 (Dr. Ragosta); DE 223: Tr. at 6645-46 (Dr. Moliterno). Even Defendant Paulus and his expert, Dr. Kahn acknowledged these risks. *See* DE 244: Tr. at 8558 (Dr. Kahn); DE 258: Tr. at 9923 (Paulus acknowledging the risks of clotting, dissection of the arteries, stroke, heart attack, and death).

One patient who testified at trial experienced just such a complication. Patient B.K. got a blood clot immediately after receiving an unnecessary stent from Defendant Paulus. DE 206: Tr. at 5553-55. As a result, he was hospitalized for three nights. Defendant Paulus visited him in the hospital and told B.K., "that hadn't happened to him in 20 years, somebody having a blood clot after his surgery." There is no question the defendant himself understood he was subjecting his patients to risk of death or serious bodily injury when he performed unnecessary stent procedures, when he admitted he caused B.K.'s blood clot. Subjecting patients to risk laden heart surgery they did not need, and inserting an unnecessary piece of metal in their hearts, indisputably constituted a "risk of death or serious bodily injury."

12

### d. The "Vulnerable Victim" enhancement also applies

Defendant Paulus's guideline calculation should be increased by two levels because Defendant Paulus "knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1). A "vulnerable victim" is "a person . . . who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1, cmt. n. 2. The government is not required to show that Defendant Paulus specifically "lured the vulnerable to his practice;" rather, it is sufficient if he "knew or should have known of the vulnerability of his patients." *Patel*, 485 F. App'x at 719.

The Application Notes instruct that the enhancement would apply in "a fraud case in which the defendant marketed an ineffective cancer cure," while it would not apply "in a case in which the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile." *Id*. Thus, in cases involving medical providers, "the traditional doctor-patient relationship, on its own, provides an insufficient basis for applying the vulnerable-victim enhancement." *United States v. Stokes*, 392 F. App'x 362, 371 (6th Cir. 2010). Instead, "the district court must find that the victim-patient was more vulnerable to the crime than the average patient upon whom the doctor could prey" for the enhancement to apply. *Id*.

A number of courts have applied the enhancement in health care fraud cases where defendant doctors knew or should have known that their patients were in particularly vulnerable states. *See*, *e.g*., *United States v. Persaud*, Case No. 1:14-CR-276, DE 133 at 1634-35 (N.D. Ohio 2015) (applying enhancement); *United States v. Volkman*, 797 F.3d

13

377, 398 (6th Cir. 2015) (enhancement warranted because of the "mental and emotional frailties of some of Volkman's patients"); *Patel*, 485 F. App'x at 719 (applying enhancement where cardiologist performed unnecessary stent procedures); *United States v. Valdez*, 726 F.3d 684, 693 (5th Cir. 2013) (enhancement applied because "pain management patients who needed medication were vulnerable to [the defendant doctor's] conduct of requiring they receive the injections so he could fraudulently bill for them"); *United States v. Moon*, 513 F.3d 527, 541 (6th Cir. 2008) (enhancement applied to physician who provided only partial chemotherapy doses in fraud scheme); *United States v. Sidhu*, 130 F.3d 644, 655 (5th Cir. 1997) (affirming vulnerable victim enhancement for doctor who involved patients "debilitated by pain or depression" in his fraudulent billing scheme); *United States v. Burgos*, 137 F.3d 841, 844 (5th Cir. 1998) (finding that patients were victims where they 'were often admitted to the hospital needlessly or their stays in the hospital were extended beyond what was necessary").

The same holds true here. Virtually every patient agreed to undergo an invasive cardiac procedure because he or she "trusted" Defendant Paulus to treat what he or she perceived as a significant health problem with their hearts. *See*, *e.g*., DE 192: Tr. at 4186 (Patient A.M. saying she never discussed doing other tests with Paulus because she "really, really trusted him" even after receiving 13 stents and 30 caths); DE 198: Tr. at 4540 (Patient G.J. saying he did not object to getting a stent even though Paulus said he could not find a blockage because "I just took it that he was the doctor and he knew what he was doing."). Given the patients' conditions and circumstances, and the fact that the treatment offered by Defendant Paulus pertained to their most essential organ, these

14

patients were "unusually vulnerable" or were "otherwise particularly susceptible to" to Defendant Paulus's suggestion that they needed stents, much like the cancer patients contemplated in the Application Note.  *See* U.S.S.G. § 3A1.1, cmt. n. 2.

### e. The Defendant used a special skill

The guideline calculation should be increased by two levels because Defendant Paulus "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3.  A "special skill" is defined as "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing." U.S.S.G. § 3B1.3 cmt. n. 4.  The Guideline note specifically lists doctors as one group of individuals possessing special skills.  Defendant Paulus's medical license and training was essential to the commission and concealment of the offense, and his offense level should be enhanced by two levels to reflect the use of a special skill in committing the offense.  *United States v. Fata*, 650 F. App'x 260, 263 (6th Cir. 2016), *cert. denied*, 137 S. Ct. 2175 (2017) (affirming enhancement for physician defendant under abuse of trust prong); *United States v. Volkman*, 797 F.3d 377, 399 (6th Cir. 2015) (affirming special skill enhancement for physician defendant); *United States v. Lewis*, 156 F.3d 656, 659 (6th Cir. 1998) (affirming special skill enhancement for physician defendant who exaggerated the nature of medical procedures being performed).

### V. Summary of Recommended Guideline Calculations

Depending on which loss amount methodology is used, Defendant Paulus's offense level should be calculated as follows:

15

| Base offense level | 6 |
|---|---|
| **Loss Amount** (2B1.1(b)(1)(I) or (L)) | **+16** (or **+22**) |
| **More Than 10 Victims** (§ 2B1.1(b)(2)(A)(i)) | **+2** |
| **Loss To Government Health Care Program of more than $1 Million** (2B1.1(b)(7)(B)(i)) | **+2** |
| **Risk of Death or Serious Bodily Injury** (2B1.1(b)(15)(A)) | **+2** |
| **Vulnerable Victim** (3A1.1) | **+2** |
| **Special Skill or Position of Trust** (3B1.3) | **+2** |
| **Total Offense Level**[6] | **32** |

Given Defendant Paulus's criminal history (Category I), the advisory Guidelines range in this case is 121-151 months. The statutory maximum for 18 U.S.C. § 1347 is 120 months. The foregoing offense level calculation is based upon the lowest loss amount calculation, one that dramatically understates the scope of Defendant Paulus's conduct. The United States presents this calculation here to explain what it believes to be the minimum offense level, and reserves the right to argue for a higher offense level based upon other judicially accepted loss estimate methodologies as outlined in Section III(a) or additional financial information submitted by victims.

Defendant Paulus is also eligible for supervised release for up to three years, a fine in the range of $35,000 to $350,000 and a mandatory special assessment in the amount of $1,500. *See* 18 U.S.C. § 3583(b)(2); U.S.S.G. §§ 5D1.1, 5E1.2, 5E1.3; 18 U.S.C. § 3013(a)(2). "The court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine."

---

[6] The United States relied on the Sentencing Guidelines in effect as of November 1, 2018 in preparing this memorandum and has not detected any meaningful differences between the 2016 and 2018 versions for the relevant guidelines, but defers to the expertise of the Probation Office on this determination.

U.S.S.G. § 5E1.2(a); *United States v. Powell*, 423 F. App'x 602, 610-11 (6th Cir. 2011) (affirming imposition of fine notwithstanding PSR's finding that defendant was unable to pay, where defendant failed to meet his burden of proving inability to pay fine).

## VI. Restitution

"In the case of an identifiable victim, the court shall enter a restitution order for the full amount of the victim's loss" pursuant to 18 U.S.C. § 3663. *See also* U.S.S.G. § 5E1.1. "The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense lies with the government, and any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence." *United States v. Carmichael*, 676 F. App'x 402, 412 (6th Cir. 2017) (citing 18 U.S.C. § 3664(e)). As of the date of this filing, there are more than a dozen insurance victims and dozens of patient victims, some of whom are also financial victims. The United States is in the process of notifying all of those victims and soliciting information as to the financial harm attributable to the crimes of conviction. As it is received, the United States will provide the amounts potentially subject to restitution to the probation officer, in accordance with 18 U.S.C. § 3664.

                                            Respectfully Submitted,

                                            ROBERT M. DUNCAN, JR.
                                            UNITED STATES ATTORNEY

                            By:    s/ Kate K. Smith
                                    Kate K. Smith
                                    Assistant United States Attorney
                                    260 W. Vine Street, Suite 300

                                          Lexington, Kentucky 40507-1612
                                          (859)685-4855
                                          Kate.Smith@usdoj.gov

## CERTIFICATE OF SERVICE

On December 10, 2018, I electronically filed this document through the ECF system which provided notice to counsel of record.

                                          s/ Kate K. Smith
                                          Assistant United States Attorney