**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
ASHLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | INDICTMENT NO. 0:15-CR-15-DLB-EBA |
| | * | |
| RICHARD E. PAULUS, M.D., | * | |
| | * | |
| Defendant. | * | |

**MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE
OF A *PER SE* SIXTH AMENDMENT VIOLATION AND A GOVERNMENT
VIOLATION OF *BRADY v. MARYLAND*, 373 U.S. 83 (1963), AND
MOTION TO DISMISS THE INDICTMENT WITH PREJUDICE**

Pursuant to Federal Rule of Criminal Procedure 33, defendant Richard E. Paulus, M.D., moves for a new trial based on newly discovered evidence. Dr. Paulus also moves the Court to dismiss the indictment with prejudice on the basis of prosecutorial misconduct. The newly discovered evidence supporting a new trial consists of a recently revealed government violation of *Brady v. Maryland*, 373 U.S. 83 (1963), as well as recently revealed pretrial *ex parte* proceedings in which the Court (1) made erroneous evidentiary rulings without notice to or participation by defense counsel, (2) permitted counsel for an adverse third party to assert objections to the admissibility of evidence that only Dr. Paulus had standing to raise, (3) overlooked the government's valid argument that the evidence at issue was exculpatory and required to be disclosed to the defense before trial under *Brady*, and (4) sanctioned and facilitated the government's *Brady* violation by prohibiting disclosure of that material exculpatory evidence.

These *ex parte* proceedings were conducted in clear violation of Dr. Paulus's Sixth Amendment right to counsel. They resulted in suppression by the government and exclusion at trial of evidence that would have provided critical exculpatory context for the angiogram reviews that were the foundation of the government's case-in-chief and would have powerfully supported Dr. Paulus's defense that he lacked criminal intent. With due respect to the Court, these errors and the prosecutors' misconduct in this case egregiously violated Dr. Paulus's constitutional rights to assistance of counsel, due process, and a fair trial. Dr. Paulus requests oral argument on this motion.

## RELEVANT PROCEDURAL HISTORY

In September 2015, Dr. Paulus was indicted on one count of health care fraud and 26 counts of false statements. The government dismissed 11 counts of false statements at the close of its case-in-chief. After a seven-week trial, the jury convicted Dr. Paulus of the single count of health care fraud and ten counts of false statements and acquitted him of five false statements counts. Docket Entry No. 276. In March 2017, the Court granted Dr. Paulus's motion for a judgment of acquittal. Docket Entry No. 319. The government appealed that ruling. In June 2018, the United States Court of Appeals for the Sixth Circuit reinstated Dr. Paulus's convictions. *United States v. Paulus*, 894 F.3d 267 (6th Cir. 2018). This Court then denied Dr. Paulus's renewed motion for a new trial under Federal Rule of Criminal Procedure 33(b)(2) and scheduled Dr. Paulus's sentencing.[1]

A.    The Parties' Sentencing Guidelines Submissions

In preparation for sentencing, the Court directed the government and Dr. Paulus to file Notices addressing the parties' proposed advisory Sentencing Guidelines calculations, including

---

[1]    Sentencing initially was set for March 19, 2019. The Court subsequently rescheduled it to May 2, 2019.

loss and restitution amounts. Docket Entry No. 345. The government's Notice, filed on December 10, 2018, advocated for statistical extrapolation of the loss amount. Docket Entry No. 351. The government noted that "[i]n the course of the investigation, *at least two* randomly selected medical reviews were conducted of Defendant Paulus's stent procedures." *Id*. at 6 (emphasis added). The government then described two very small, purportedly random reviews about which testimony was received at trial (an AdvanceMed review of 19 stent procedures and an Anthem BlueCross BlueShield review of 11 stent procedures) and suggested that the Court utilize the error rates generated from these tiny reviews (36.8% and 45.4%, respectively) to calculate the loss amount for the entire universe of Dr. Paulus's stent procedures conducted over a seven-year period (2006 to 2013), which number in the thousands. *Id*. at 6-8. The government's position on the loss amount echoed a theme that it repeated throughout trial, *i.e.*, that such a large proportion of Dr. Paulus's stent procedures involved what another cardiologist characterized as non-occlusive lesions that only purposeful falsification and fraud, and not innocent mistake or interobserver variability, could explain the discrepancies. In his responsive Guidelines Notice filed on December 31, 2018, Dr. Paulus argued that the two samples on which the government relied were neither random nor of a sufficient size to produce statistically reliable extrapolations. Docket Entry No. 355 at 5-10.

B. Revelation of the Shields Letter

On January 2, 2019, Assistant United States Attorney ("AUSA") Kate Smith sent an email to Dr. Paulus's counsel attaching "a letter from KDMC dated November 8, 2013" and a sealed Order directing that the letter be produced to Dr. Paulus and his counsel. *See* Exhibit A. This Court's Order indicated that the November 2013 letter was being produced to Dr. Paulus in response to the government's "*Ex Parte* Motion to Resolve Discovery Issue" filed under seal on December 14, 2018. Neither the Order nor AUSA Smith's email revealed anything about the

nature of the "discovery issue" addressed by the government's secret motion. Nor did the Order or AUSA Smith's email contain any reference to *Brady v. Maryland*, 373 U.S. 83 (1963). The government just slid the letter to Dr. Paulus across the cyberspace tabletop without explanation.

The more than five-year-old letter was from William Shields, outside counsel for King's Daughters Medical Center ("KDMC") to the then-United States Attorney for the Eastern District of Kentucky, Kerry B. Harvey (the "Shields letter"). The Shields letter shed light on the government's deftly phrased statement in its Guidelines Notice that "*at least two* randomly selected medical reviews were conducted of Dr. Paulus's stent procedures." Docket Entry No. 351 at 6 (emphasis added). It revealed that a third and far broader review of 1049 stent procedures performed by Dr. Paulus was conducted by KDMC (the "KDMC review") and disclosed to the government at a meeting on October 1, 2013. As the Shields letter explains, KDMC retained "independent experts" to review "a random sample of 1049 stent procedures out of the approximately 4600 procedures performed by Dr. Richard Paulus during the period covered by" the government's investigation (*i.e.*, a review of approximately 23% of Dr. Paulus's stent procedures during the relevant years). The Shields letter stated that this independent review found that "in 75 of those 1049 procedures the percentage of occlusion was 30% or less" and that this result was disclosed to the government on October 1, 2013.[2] Thus, the most comprehensive review of Dr. Paulus's stent procedures that, apparently, has ever been conducted revealed that a mere 7% of the procedures involved lesions at or below 30%. The government never disclosed that statistical result to the defense in the long history of this prosecution until January 2019, more than two years after the jury verdict and shortly before Dr. Paulus's sentencing.

_____

[2] A schedule attached to the Shields letter identified the 75 procedures by patient name and other data. Through a check made out to Medicare and enclosed with the Shields letter, KDMC reimbursed the government $1,088,991.21 for those procedures.

4

In fact, in pretrial communications with defense counsel, the government took pains to *avoid* disclosing that statistical result, while still making strategic use of other content of the KDMC review – the 75 flagged procedures – to pressure Dr. Paulus into resolving his criminal and civil cases. In a letter dated May 29, 2014, AUSA Paul McCaffrey informed Dr. Paulus's counsel that KDMC had finalized a civil settlement of certain False Claims Act claims and outlined the government's demand for entering a similar settlement with Dr. Paulus. *See* Exhibit B. In support of his allegation that Dr. Paulus "aggressively operated in a grey area on a daily basis," AUSA McCaffrey noted that government consultants had reviewed 496 of Dr. Paulus's stent procedures and found that 29.4% of them involved angiograms showing "minimal to no occlusion in the artery in which Dr. Paulus placed a stent." *Id*. at 2. AUSA McCaffrey also reported that "[t]he hospital's consultants also reviewed a random selection of Dr. Paulus' procedures, and found 75 angiographic films with less than 30% occlusion in the artery he stented." *Id*. AUSA McCaffrey strategically omitted from his settlement pitch the denominator of the KDMC review – 1049 stent procedures – and thereby concealed the statistical outcome of that review – a 7% rate of minimal occlusions – that would have contradicted and discredited the far higher rate that "the government's consultants" had produced. *Id*.

AUSA Andrew Sparks repeated AUSA McCaffrey's sleight of hand two months later. In a letter dated July 21, 2014, AUSA Sparks offered Dr. Paulus a last chance to pursue "good faith negotiations on a guilty plea." Exhibit C at 8. As part of the inducement, AUSA Sparks wrote that "[i]t is not just the United States that has concluded Dr. Paulus performed unnecessary procedures[.]" *Id*. at 4. "Perhaps most damning," AUSA Sparks wrote, "KDMC – whose building bears Dr. Paulus's name – has also identified numerous individuals who received unnecessary stents." *Id*. Like AUSA McCaffrey, AUSA Sparks omitted information regarding the KDMC

review that would have shown that the "numerous" individuals consisted of just 7% of the 1049 procedures analyzed by KDMC's independent experts.

C.  Dr. Paulus's Motion to Compel Immediate Production of *Brady* Material

The obvious exculpatory value of the KDMC review described in the Shields letter prompted Dr. Paulus to file a Motion to Compel Immediate Production of *Brady* Material in Support of Motion for New Trial and to Hold Sentencing in Abeyance ("Motion to Compel"). Docket Entry No. 358.  Dr. Paulus argued that the information in the Shields letter relating to the KDMC review was material exculpatory evidence withheld by the government in violation of *Brady*.  As explained more fully in this motion, Dr. Paulus argued that if the government had disclosed the Shields letter's description of the KDMC review and its statistical result to the defense in time to make use of it at trial, that information would have directly undermined the strength of the government's case, facilitated potent cross-examination of the government's expert witnesses, directly supported Dr. Paulus's defense that he lacked criminal intent, and fundamentally altered the defense's trial strategy and presentation.  Docket Entry No. 358 at 3-6. Dr. Paulus also explained that he remained "in the dark" about how the Shields letter could have been the subject of a "discovery issue" of which the defense was unaware more than two years after trial.  *Id*. at 7.  Noting that "*[e]x parte* secrecy in criminal proceedings is highly disfavored," Dr. Paulus asked the Court to order the government to disclose its *Ex Parte* Motion to Resolve Discovery Issue, any additional information it possessed regarding the KDMC review, and any purpose for which it intended to use information in the Shields letter at sentencing.  *Id*. at 7-8 (citing *United States v. Carmichael*, 232 F.3d 510, 517 (6th Cir. 2000)).

D.     Revelation of the Pretrial *Ex Parte* Proceedings

In response to the Motion to Compel, the government asked the Court to authorize disclosure of even more *ex parte* materials, this time dating back to August 2016, just a few weeks before Dr. Paulus's trial began.  Docket Entry No. 359.  On January 15, 2019, the Court authorized the additional disclosures.  Docket Entry No. 361.  The disclosures revealed to defense counsel for the first time that (1) in an *ex parte* motion filed in August 2016, the government acknowledged its *Brady* obligation to disclose information regarding the KDMC review to Dr. Paulus before trial, (2) the Court held an *ex parte* telephonic hearing that included the prosecutors and counsel for KDMC and excluded Dr. Paulus and his counsel, (3) at that *ex parte* hearing, the Court never addressed the government's acknowledged pretrial *Brady* disclosure obligation and overlooked the exculpatory value of the 7% statistical result of the KDMC review, and (4) at the same *ex parte* hearing, the Court heard arguments and made erroneous rulings on the admissibility of evidence at Dr. Paulus's trial relating to the KDMC review described in the Shields letter.  Astoundingly, all these events occurred without any notice to or participation by defense counsel.  These newly discovered *ex parte* proceedings are described below.

1.     *The Government's Ex Parte Motion to Resolve Privilege Dispute*

On August 16, 2016, the government filed an "*Ex Parte* Motion to Resolve Privilege Dispute" in which it reported to the Court the content of the Shields letter pertaining to the KDMC review.  Docket Entry No. 156.  The government explained that it previously understood that KDMC would designate a witness to testify in the government's case "that the hospital conducted a review, identified 75 procedures to the Government, and returned all payments to the Government for these procedures."  *Id*. at 3.  The government's plan for trial was that "[t]he Government's expert would then testify about the appropriateness of the procedures."  *Id*.  The

government reported that "recent discussions" with KDMC revealed that KDMC had changed positions and now intended "to maintain its asserted privilege and refuse[] to consent to disclosure of the information" regarding the KDMC review. *Id*. at 3-4.[3] According to the government, KDMC asserted attorney-client privilege, attorney work product protection, and the "settlement communications privilege." *Id*. at 2 (citing *Goodyear Tire & Rubber Co. v. Chiles Power Supply*, 332 F.3d 976 (6th Cir. 2003)).

The government argued that certain facts surrounding the KDMC review were "relevant to the trial against" Dr. Paulus, because they explained the origin of evidence on which the indictment was based and were "an essential part of the investigation's story." Docket Entry No. 156 at 4. In particular, the government explained that the 75 procedures identified in the KDMC review "were among those sent to the United States's expert cardiologist [Dr. Michael Ragosta] for his own review of the percent stenosis identifiable in the angiograms" and that "many of the patients identified by KDMC form the basis of Count 1 of the Indictment." *Id*. In a section of its pleading

---

[3] The government asserted that it had "discussed the results of the KDMC review with defense counsel prior to indictment" and "specifically referenced" the KDMC review in a letter (dated July 21, 2014) and at the *Daubert* hearing (on July 26, 2016). Docket Entry No. 156 at 3. As already explained, however, AUSA Sparks's letter of July 21, 2014, revealed to defense counsel only that the KDMC review had identified "numerous" individuals who received unnecessary stents and disclosed nothing about the number of procedures reviewed or its 7% statistical result. *See supra* pp. 5-6. At the *Daubert* hearing, AUSA Sparks was even more cryptic. In argument as to why KDMC's 2014 settlement with the government should be admitted at trial, AUSA Sparks stated that "there are facts related to the settlement agreement that are very important[,] . . . [s]uch as with the settlement agreement, the hospital turned over a list of names to us, along with a check with over one million dollars refunding procedures that had been performed." Docket Entry No. 151 at 62-63. The government never disclosed to Dr. Paulus's counsel that the KDMC review found that only 75 out of 1049 randomly selected procedures were problematic. It instead strategically disclosed only the 75 procedures reimbursed by KDMC as a result of the review. *See* Exhibit B. Through this selective disclosure, the government used the procedures flagged in the KDMC review to bolster its offensive litigation and negotiation positions, but concealed the parameters and statistical result of the KDMC review that would have undermined those positions and allowed Dr. Paulus to use the KDMC review defensively as evidence that he lacked intent to defraud. The government's tactics were improper and violated due process and Dr. Paulus's right to a fair trial. *See infra* pp. 31-32, 40-41.

titled, in boldface type, "**The Information Should be Disclosed**," the government argued that the

facts concerning the KDMC review that it intended to present at trial were required to be disclosed

to the defense under Rule 16. *Id*. at 5. *Specifically acknowledging the exculpatory nature of the*

*7% statistical result of the KDMC review*, the government also informed the Court that disclosure

was required under *Brady*:

> Further, the United States is concerned that there is an articulable theory under
> which the information qualifies for disclosure under *Brady* and its progeny. The
> KDMC experts found the Defendant's procedures to be problematic in less than
> 7.5% of the sample reviewed.[4] The United States' experts have found the
> Defendant's procedures to be problematic nearly 50% of the time. Although this
> does not appear to fit into the Defendant's current defense – that all of his
> procedures were medically necessary – *it is highly likely this information could be*
> *viewed as exculpatory at sentencing, assuming he is convicted, or earlier, if his*
> *defense strategy changes*. *Id*. (footnote and emphasis added).

The government contested KDMC's claim that factual information regarding the KDMC

review was protected by any privilege. Docket Entry No. 156 at 5-6. The government stated that

the "underlying facts" relating to the KDMC review "are not confidential attorney-client

communications, nor are they records or impressions of KDMC's counsel or prepared at the

direction of counsel." *Id*. at 5.[5] In addition, the government explained that Federal Rule of

---

[4]  More precisely, 75 procedures out of 1049 is less than 7.2%.

[5]  Under Sixth Circuit precedent, to the extent that any information in the Shields letter relating to
the KDMC review was covered by the attorney-client privilege or the work-product doctrine at
one time, those protections were waived by disclosure of the information to the government. *See*
*In re Columbia/HCA Healthcare Corporation Billing Practices Litigation*, 293 F.3d 289, 302 (6th
Cir. 2002) ("after due consideration, we reject the concept of selective waiver, in any of its various
forms"). The reference in the Shields letter to an "agreement" between KDMC and AUSA Sparks
that those protections would not be waived is ineffectual. *See id*. at 303 (attorney-client privilege
"is not a creature of contract, arranged between parties to suit the whim of the moment").
*Columbia/HCA* involved a comparable agreement between Columbia/HCA and the Department of
Justice, in which the parties "agreed" that their exchange of reports, documents, and/or information
in the context of a civil and criminal fraud investigation did "not constitute a waiver of any
applicable privilege or claim under the work product doctrine." *Id*. at 292. The Sixth Circuit
condemned the agreement and held, as to both attorney-client privilege and the work-product
doctrine, that "once the privilege is waived, waiver is complete and final." *Id*. at 307 (citation

Evidence 408 ("Compromise Offers and Negotiations") "explicitly carves out statements made by a party for use in a criminal case." *Id*.[6] As to the "settlement communications privilege" recognized in the civil case of *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976 (6th Cir. 2003), the government noted that "*Goodyear* does not whole-cloth prohibit disclosure of information disclosed during settlement negotiations, *particularly in the criminal context when disclosure implicates Rule 16 and a defendant's constitutional rights*." Docket Entry No. 156 at 6 (emphasis added).[7]

---

omitted). The court explained that "[t]he investigatory agencies of the Government should act to bring to light illegal activities, not to assist wrongdoers in concealing the information from the public domain" by entering confidentiality agreements that "assist in obfuscating the 'truth-finding process.'" *Id*. at 303. When the Shields letter was written in 2013, *Columbia/HCA* had been the law of this Circuit for more than a decade. AUSA Sparks and Mr. Shields had an obligation to bring this case law to the Court's attention but failed to do so at any time during the *ex parte* proceedings. *See* Ky. Bar Ass'n, Rules of Supreme Court of Kentucky ("SCR") 3.130(3.3(a)(2)) (duty of candor toward the tribunal includes obligation to disclose "published legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel").

[6] Federal Rule of Evidence 408 sets forth certain "Prohibited Uses" of "conduct or a statement made during compromise negotiations about [a] claim" when the conduct or statement is offered by a party for a particular purpose, *i.e.*, "either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction." Fed. R. Evid. 408(a). The rule of exclusion does not apply when evidence of the conduct or statement is offered for other purposes. Fed. R. Evid. 408(b). It also does not apply when the evidence is offered in a criminal case and "the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority." Fed. R. Evid. 408(a)(2).

[7] As courts have recognized, the *Goodyear* ruling is "quite limited." *Holly v. UPS Supply Chain Solutions, Inc*., 2015 WL 3850103, *10 (W.D. Ky. 2015) (internal quotation marks and citation omitted). The question presented in *Goodyear* was whether third-party intervenors in a civil lawsuit between two companies could obtain, under Federal Rule of Civil Procedure 26(b)(1) and for purposes of a different civil lawsuit, statements made by one of the companies during unsuccessful settlement negotiations. *Goodyear*, 332 F.3d at 977-79. The Sixth Circuit recognized a privilege for "*communications* made in furtherance of settlement" and emphasized that "as with other privileges, the relationship itself is not privileged, but only the underlying communications." *Id*. at 981-83 (emphasis added). On this point, the *Goodyear* court cited, *inter alia*, *Upjohn Co. v. United States*, 449 U.S. 383 (1981), in which the Supreme Court held that the attorney-client privilege "only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney." *Goodyear*, 332 F.3d at 982;

The government's position was that "the fact of KDMC's review and repayment [is] admissible evidence at trial *that should be disclosed to the Defendant in advance of trial*." Docket Entry No. 156 at 6 (emphasis added). The government asked the Court to rule "that the information disclosed is not privileged and should be provided to the Defendant." *Id*. The government also advised the Court that KDMC had requested "the opportunity to be heard on this issue and seeks to intervene in the pending criminal action." *Id*.

   2.   *The Ex Parte Hearing*

The public docket reflects no motion by KDMC to intervene in Dr. Paulus's criminal case.[8] Nor does the docket reflect the *ex parte* telephonic hearing that was held by the Court on August 24, 2016, or any Order inviting KDMC counsel and the government, *but not Dr. Paulus's counsel*, to participate. *See* Exhibit D.[9] The only mention of the *ex parte* hearing on the docket appears on December 5, 2016, months after Dr. Paulus's trial concluded, when the court reporter filed a sealed

---

*Upjohn*, 449 U.S. at 395. *Goodyear* therefore offers no shield against the compulsion of testimony about the underlying facts of the KDMC review. *See Point/Act of Northern Kentucky, Inc. v. Philadelphia Indemnity Insur. Co*., 2013 WL 12249700, *3 (E.D. Ky. 2013) (company's evaluation of tort case before mediation was not a "communication in furtherance of settlement" under *Goodyear*). And it has no bearing whatsoever on the government's *Brady* obligation to disclose favorable information relating to the KDMC review to Dr. Paulus in this criminal case, especially when the government was presenting the product of the KDMC review – its 75 flagged procedures – as affirmative evidence against Dr. Paulus through the testimony of Dr. Ragosta. *Cf. United States v. Nixon*, 418 U.S. 683, 712 (1974) ("the allowance of the privilege [for confidential Presidential communications] to withhold evidence that is demonstrably relevant in a criminal trial would cut deeply into the guarantee of due process of law and gravely impair the basic function of the courts").

[8]   *See, e.g., United States v. Bergonzi*, 216 F.R.D. 487, 492 (N.D. Cal. 2003) (noting that third parties may move to intervene in a criminal case to challenge production of subpoenaed materials on ground of privilege); *Application of Storer Communications, Inc. v. Presser*, 828 F.2d 330, 335 (6th Cir. 1987) (noting ability of media organizations to move to intervene in criminal cases).

[9]   There are four sealed *ex parte* docket entries from this time frame that still have not been disclosed to the defense (Docket Entry Nos. 157, 158, 159, and 160). Dr. Paulus already has requested that all materials associated with those docket entries be disclosed to him. *See* Docket Entry No. 364 at 4.

transcript, inaccessible to defense counsel, titled "Telephone Conference held on August 24, 2016." Docket Entry No. 303. Throughout the duration of Dr. Paulus's seven-week trial, the fact that a pretrial hearing occurred without the knowledge or participation of defense counsel was completely invisible on the docket. *But see Storer Communications*, 828 F.2d at 335 (when materials are submitted to the court *in camera*, "defense counsel and the public should have notice of the *in camera* proceedings and an opportunity to seek and argue for an open hearing").[10]

At the secret undocketed hearing, Mr. Shields and Ashley Ward appeared for KDMC, and AUSAs Smith and Sparks appeared for the government. Exhibit D at 2. The Court first raised "the admissibility of the underlying information you [*i.e.*, the prosecutors] wish to disclose to Dr. Paulus." *Id.* at 3. The Court stated, incorrectly, that if the information is "something that would otherwise be excluded at the trial, there would be no need to disclose it." *Id. But see, e.g., Barton v. Warden, Southern Ohio Correctional Facility*, 786 F.3d 450, 465 (6th Cir. 2015) (inadmissible evidence can be material under *Brady* if it would lead directly to admissible evidence); *Johnson v. Folino*, 705 F.3d 117, 129-30 (3d Cir. 2013) (*Brady* materiality standard "is not reducible to a simple determination of admissibility").

The Court then asked if the government had already disclosed the pertinent information about the KDMC review to the defense. AUSA Smith confirmed that the government had not done so. She explained that the 75 procedures identified in the KDMC review were "contained in our total universe of 140" procedures that were disclosed, but "the fact that those 75 were identified by someone else [*i.e.*, KDMC] and which 75 those are" were "not contained in what we told" Dr.

---

[10] The maintenance of a "dual docket" in which the occurrence of certain events in a criminal case are "completely hid[den] from public view" is an "unconstitutional infringement on the public and press's qualified right of access to criminal proceedings." *United States v. Valenti*, 987 F.2d 708, 715 (11th Cir. 1993). *See United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1029 & n.15 (11th Cir. 2005) (noting that the "docket sheet forms an integral part of a criminal proceeding" and that "secret docketing procedures" are unconstitutional).

Paulus. Exhibit D at 4.[11] The Court then asked how the government intended to use information about the KDMC review at trial. *Id*. AUSA Smith stated that the government "want[ed] to be able to introduce the evidence that KDMC identified these procedures and remitted payment for them" in order to explain how the government selected this subset of procedures that was sent to its expert for review. *Id*. at 5.

AUSA Smith then reiterated that *Brady* required the government to disclose information about the KDMC review to the defense and corrected the Court's erroneous suggestion that a ruling on admissibility would extinguish the government's constitutional obligation:

> And I do want to address one other point that you said at the outset, that if this is not admissible, we don't have a duty to disclose that because I don't think that that's correct, particularly on the basis of the *Brady* issue. *I mean, we have to tell the defendant about evidence that may be exculpatory*. Exhibit D at 5 (emphasis added).

The Court responded, "How is this exculpatory? Sounds like it's pretty inculpatory." *Id*. AUSA Smith reiterated that the 7% statistical result of the KDMC review was exculpatory both as to Dr. Paulus's guilt or innocence at trial and as to potential future sentencing issues:

> [L]et's say we get to sentencing. Let's say the defendant is convicted, and we're trying to figure out the loss amount of the defendant's fraud. And if you take the universe of all of the stent procedures he performed in the time frame of his scheme to defraud and we want some sort of way to estimate which of those procedures we think is problematic, we are going to come in with our experts and say we think it's 50 percent.
>
> We have these various reviews. Experts have identified in the realm of 50 percent of the procedures they reviewed is problematic. *And here you have another set of*

---

[11]   In a footnote to its *Ex Parte* Motion to Resolve Privilege Dispute, the government likewise noted that "[t]he identity of the 75 procedures" that the KDMC review found to involve occlusions of less than 30% was disclosed to Dr. Paulus within a larger group containing other allegedly problematic procedures. Docket Entry No. 156 at 4 n.1. The government stated that its disclosure of this group "did not notate which of the procedures were first identified by KDMC." *Id*. In candor to the Court, the government did provide the defense a list of procedures with the caption "KDMC Red-flagged Patient sent to Ragosta for review on 1-27-14." But the government never disclosed any information to the defense about the parameters or statistical result of the KDMC review that identified those procedures.

*procedures where someone came in with a very different number. They came in at under seven and a half percent*. If I am a defense attorney, I'm going to argue that is the number you should use in determining the loss amount. . . .

And on the *Brady* thing, you know, we are usually arguing that it's not *Brady*. *But I also don't want to make a determination for a defense attorney before trial. You know, their theory can always change*, and I don't want to be in a position of saying, well, we decided this wouldn't be *Brady* until we got to sentencing. *Id.* at 6-7 (emphases added).

Despite the government's pointed caution that the 7% statistical result was exculpatory evidence that should be disclosed to the defense before trial, the Court did not address *Brady* or Dr. Paulus's due process rights at all. It instead shifted the discussion to KDMC's claim that a "settlement communications privilege" shielded information regarding the KDMC review from disclosure under *Goodyear*. Exhibit D at 8. AUSA Smith correctly noted that *Goodyear* does not "stand[] for the proposition that any single thing said or transmitted or communicated or that was . . . created as a result of settlement discussions can never be disclosed in any context." Exhibit D at 8. *See supra* note 7. Addressing Federal Rule of Evidence 408, AUSA Smith observed that the rule did not apply because the government was not seeking to admit any "statement" made during compromise negotiations (*e.g.*, the Shields letter itself). *Id. See supra* note 6. Instead, the government was seeking to introduce and disclose *historical facts* that explained how the government obtained 75 procedures that would be part of its case-in-chief at trial:

We're not trying to get in statements. We're trying to get in the underlying fact that this review took place, the procedures were identified, and the checks were sent . . . we're trying to get in the actual fact that that took place. *Id.* at 8-9.

Still ignoring the 7% statistical result that the government specifically identified as *Brady* information, the Court focused on KDMC's refund check and the 75 procedures identified in the KDMC review and asked whether the evidence could be excluded under Federal Rule of Evidence 403 as improper "bolstering" of the government's experts. Exhibit D at 10. AUSA Smith argued

that the fact that KDMC "did identify some procedures that were not appropriate is extremely important" and not unduly prejudicial, in part because the government expected "every other person who still works at the hospital to come in and say that they love Dr. Paulus [and] that he would have never done anything like this." *Id*.

The Court invited a response from Mr. Shields. Mr. Shields was not counsel to Dr. Paulus. And Mr. Shields's client, KDMC, was not a party to Dr. Paulus's criminal case. Mr. Shields plainly had no authority to assert constitutional, evidentiary, or trial objections on Dr. Paulus's behalf.[12] But that is exactly what he did. Mr. Shields claimed that the government was improperly trying to present "the hospital's endorsement of the government's findings through the lawyers" and raised hearsay, Rule 403, and Confrontation Clause objections:

> A, that's hearsay. And B, that's irrelevant and unfairly prejudicial to bring in a third party's opinion without allowing *the defense* to cross-examine the hospital's experts who were retained by the hospital's lawyers without allowing them to be cross-examined, and the government is not seeking that testimony. They couldn't.
>
> And for the same reason they shouldn't get this letter we sent in connection with settlement proceedings, they're trying to get a blessing, an imprimatur that the hospital has endorsed the government's findings, and that's not the case at all and it's irrelevant to this jury's determination. Exhibit D at 11 (emphasis added).

Unfazed by Mr. Shields' presumption that he could assert evidentiary positions on behalf of "the defense" when the real "defense" knew nothing about the pretrial proceeding, the Court accepted

---

[12] *See United States v. Carlson*, 547 F.2d 1346, 1357 (8th Cir. 1976) ("The Sixth Amendment right of confrontation is, by its language and historical underpinnings, a personal right of the accused and is intended for his benefit."); *Tate v. Yenoir*, 537 F. Supp. 306, 308 (N.D. Mich. 1982) (rights secured by the Sixth Amendment "are personal to an accused in a criminal trial"); *cf. United States v. Mezzanatto*, 513 U.S. 196, 203 (1995) ("During the course of trial, parties frequently decide to waive evidentiary objections, and such tactics are routinely honored by trial judges.").

Mr. Shields' view that "the method in which [the government] want[s] to admit the testimony is likely . . . not appropriate." *Id.* at 13.[13]

The Court then asked Mr. Shields why "[t]he disclosure of these privileged communications will significantly and unfairly impair KDMC's ability to defend itself in other litigation." Exhibit D at 13.[14] Mr. Shields claimed that the KDMC review was "attorney work product" because the experts who conducted it "were retained by the attorneys to KDMC" to help defend against the government's allegations. *Id.* at 13-14. *But see supra* note 5. Mr. Shields further claimed, without legal or logical support, that allowing the government to disclose information within the Shields letter to Dr. Paulus in fulfillment of its unique constitutional obligations in a criminal case "would force us to disclose to every litigant, not only the government, but all these civil litigants our attorney work product and our attorney-client communications, and that's not the way civil litigation is conducted." *Id.* at 14.[15]

The Court offered the government "the last word." Exhibit D at 15. AUSA Smith stated that the government "want[ed] to subpoena the people who identified the claim repayment and can

---

[13]  The Court also noted, "hypothetically," that if appropriate witnesses were called to testify about the KDMC review, "it wouldn't be hearsay" and "would be testimony of an expert witness who potentially could be subject to cross-examination." Exhibit D at 12.  Information regarding the KDMC review and its 7% statistical result also readily could have been admitted into evidence through a factual stipulation between Dr. Paulus and the government.  *See Mezzanatto*, 513 U.S. at 203 ("evidentiary stipulations are a valuable and integral part of everyday trial practice").

[14]  As the government repeatedly made clear, it was not seeking to disclose "communications." Its *Brady* obligation arose from the exculpatory *facts* relating to the KDMC review that were reflected in the Shields letter (and, apparently, also were disclosed to the government orally on October 1, 2013).  Those exculpatory facts could have been disclosed to the defense, as *Brady* required, without disclosure of the Shields letter itself.  *See* Justice Manual § 9-5.002 Step 3.C (Criminal Discovery – Form of Disclosure) (explaining that *Brady* information can be provided in a letter to defense counsel).

[15]  Mr. Ward agreed that KDMC's concern was with "protect[ing] that letter as confidential from any disclosure in" pending *civil* litigation.  Exhibit D at 14-15.

speak to the fact that the hospital identified some procedures for which it should not have received payment by Medicare[.]" *Id.* AUSA Smith also made clear, again, that the government did not intend to admit into evidence the Shields letter, any "statements" covered by Federal Rule of Evidence 408, or any privileged communications:

> And we're also not trying to get in the attorney letter. We're trying to get in the underlying fact, which is that this review was conducted and this check was sent. And I don't think that that is any sort of attorney-client communication or actual work product.
>
> The angiogram review is not work product. I get the attorney telling somebody to do that is a confidential communication, but that is not what we're getting at. We're not even getting at why they conducted this review. *Id.* at 16.

Without notifying defense counsel of the evidentiary and *Brady* issues the Court was addressing, or even the bare fact that matters of this nature were being adjudicated, the Court ruled that information in the Shields letter relating to the KDMC review was inadmissible at trial under Federal Rule of Evidence 408. A cascade of errors produced this flatly incorrect result. First, the Court erroneously assumed that the KDMC review was unfavorable to Dr. Paulus, despite the government's repeated emphasis on the exculpatory value of the 7% statistical result. Second, the Court erroneously assumed that the government was seeking to admit "statements" from the Shields letter (as opposed to facts regarding the KDMC review) when AUSA Smith repeatedly informed the Court that this was wrong. Third, the Court ignored the plain language of Rule 408 by suggesting it applies to "information" as well as statements and then contorted Rule 408's purpose by ruling that evidence of the KDMC review was inadmissible because KDMC was *not* a party to the criminal case.[16]

---

[16]    The purpose of Rule 408 is "to ensure that parties may make offers during settlement negotiations without fear that those same offers will be used to establish liability should settlement efforts fail." *Rhoades v. Avon Products, Inc.*, 504 F.3d 1151, 1161 (9th Cir. 2007). As the purpose suggests, Rule 408 comes into play when a party makes a "statement" in settlement negotiations and is a party to litigation in which that "statement" subsequently is offered as evidence to prove

The Court ruled as follows:

[T]he Court finds that . . . this evidence that's sought to be disclosed; that is, the fact that KDMC conducted its own review of these procedures, identified 75 patients with minimal arterial blockage and submitted a check for almost $1.1 million, I simply believe that that information is not admissible in the case involving Dr. Paulus pursuant to Rule 408(a)(2).

For that reason – and I'm intentionally not going to make a ruling on the privilege question at this point. *Of course, it's not to be disclosed*.

We've got a trial in less than three weeks now and the parties . . . trial prep should have been under way, and I'm sure it was long ago.[17] The statements here and sought to be disclosed to Dr. Paulus – or the information. We'll say information. Whether it's statements, whether it's information, I mean they were not from Paulus. They were from King's Daughters. . . .

[I]f King's Daughters was a defendant, then the U.S.'s argument that Federal Rule of Evidence 408(a)(2) doesn't bar its admissibility would have far greater weight.

Here, that rule doesn't apply because the statements and the information the U.S. seeks to admit against Dr. Paulus in his criminal case were not his own statements but rather were the statements of King's Daughters Medical Center's lawyers in a letter to the U.S. during their attempt to settle their underlying civil litigation.

If Dr. Paulus had participated in the settlement discussions and made himself incriminating statements, then the Court's ruling would likely be different. . . . .

_____

or disprove the validity or amount of the claim being litigated. In this situation, the party's out-of-court "statement" would avoid the bar against hearsay, because it would qualify as a statement of an opposing party under Federal Rule of Evidence 801(d)(2). The limited exclusionary policy of Rule 408(a) then potentially could block admission of this otherwise admissible evidence. Rule 408 had no application here, both because KDMC was not a party to this case (and, thus, any out-of-court "statement" by KDMC would be inadmissible hearsay if offered against Dr. Paulus) and because the government was not seeking to introduce "statements" of any kind.

[17] In this regard, the Court was correct. At the time of the *ex parte* proceedings, trial was just a few weeks away. In its *ex parte* motion, the government acknowledged its disclosure obligations relating to the KDMC review under both Rule 16 and *Brady*. Docket Entry No. 156 at 5. Even if the Court had ordered those disclosures as it should have, the government was dilatory in presenting the issue to the Court so close to the trial date. *See, e.g.*, *United States v. Presser*, 844 F.2d 1275, 1285 (6th Cir. 1988) (*Brady* doctrine requires disclosure of exculpatory evidence "in time for effective use at trial"); *United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007) (*Brady* information must be disclosed "in sufficient time that the defendant will have a reasonable opportunity to act upon the information efficaciously," either by using it at trial or by using it to obtain evidence for use in the trial).

> That's the ruling [of] the Court. I'm not going to be entering a written decision. I have the sealed transcript of this if any reviewing court ever needs to look at it.
>
> So for all of these reasons, the U.S.'s sealed motion, Docket 156, is going to be denied because the Court finds the information sought to be admitted is not otherwise admissible. So that's the ruling of the Court. Exhibit D at 16-18 (emphasis and footnote added).

Upon this ruling, the government did not remind the Court of the exculpatory 7% statistical result that the Court failed to address. AUSA Sparks instead asked for a single clarification: "We are not to disclose it to the defendant?" Exhibit D at 18. The Court responded:

> *Correct. You are not to disclose it*. Now Miss Smith did mention the idea of *Brady* and loss and sentencing. I recognize that you have an obligation, pursuant to *Brady v. Maryland*, to disclose potential exculpatory information to a defendant.
>
> Now, since this is something that is otherwise not going to be admitted during the trial, I don't really think and can't really envision how it would otherwise be exculpatory during the trial because it won't come in.
>
> However, if, at sentencing, this comes up and the defendant's convicted and we have an issue of loss, then I think it might be an issue that would need to be disclosed in a confined setting. And, of course, I won't order any disclosure, Mr. Shields, Mr. Ward, until I figure out the best way under Rule 502 to do it. But at this point, it's not necessary to do that.
>
> I appreciate your bringing the *Brady* issue to the Court's attention because, of course, as officers of the Court, you need to do that. *Id*. at 18-19 (emphasis added).

At this *second* opportunity to correct the Court's course by reiterating the exculpatory value of the 7% statistical result and the significant discrepancy between that result and the testimony the government would present at trial of a "nearly 50%" rate of problem stents in Dr. Paulus's cases, the government said nothing. Docket Entry No. 156 at 5-6; Exhibit D at 5-7. It silently acquiesced in the Court's inattention to the central *Brady* issue. After the *ex parte* hearing, the Court issued a Sealed Order, inaccessible to the defense, memorializing its ruling that "the evidence sought to be admitted and disclosed to defendant Paulus" was not admissible pursuant to Rule 408(a)(2) and

Rule 403[18] and that "[t]herefore, *the evidence shall not be disclosed to the Defendant.*" Docket Entry No. 163 at 1 (emphasis added).

## ARGUMENT

I. **DR. PAULUS IS ENTITLED TO A NEW TRIAL UNDER FEDERAL RULE OF CRIMINAL PROCEDURE 33 BASED ON NEWLY-DISCOVERED EVIDENCE OF BOTH A *PER SE* SIXTH AMENDMENT VIOLATION AND THE GOVERNMENT'S VIOLATION OF *BRADY v. MARYLAND,* 373 U.S. 83 (1963).**

Put simply but also necessarily bluntly, the *ex parte* proceedings conducted by the Court were a *per se* violation of Dr. Paulus's Sixth Amendment right to counsel and resulted in the suppression of material exculpatory evidence in violation of *Brady* and due process. The fact and gravity of these compounded constitutional errors are not close questions. Settled case law from the United States Supreme Court and the Sixth Circuit establishes that "a complete absence of counsel at a critical stage of a criminal proceeding is a *per se* Sixth Amendment violation warranting reversal of a conviction, a sentence, or both, as applicable, without analysis for prejudice or harmless error." *Van v. Jones*, 475 F.3d 292, 311-12 (6th Cir. 2007) (citations omitted). The *ex parte* proceedings here, in which the Court made rulings on the admissibility of evidence and the exculpatory value of *Brady* material completely outside the presence of defense counsel, were clearly a "critical stage" at which there was a "reasonable probability that [Dr. Paulus's] case could suffer significant consequences from his total denial of counsel at the stage."

---

[18]  The Court's written order expanded its evidentiary ruling to include Federal Rule of Evidence 403, which provides that relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The Court conducted no balancing of these Rule 403 considerations on the record as the Sixth Circuit requires. *See United States v. Franco*, 484 F.3d 347, 352 (6th Cir. 2007) ("We have explained that a district court ruling on the admissibility of evidence should expressly weigh its probative value and prejudicial effect under Rule 403."). Nor could the Court possibly conduct the balancing required by Rule 403 without input from defense counsel regarding the probative value and prejudicial effect (if any) of the evidence, from the perspective of the defense.

*Id.* at 313. Prejudice is presumed in this context, but the record demonstrates that Dr. Paulus suffered substantial adverse consequences from the Sixth Amendment violation that were not harmless beyond a reasonable doubt. Favorable admissible evidence was excluded at trial without his counsel's knowledge, input, or consent, and those consequences infected the entire criminal proceeding. This newly discovered evidence of a Sixth Amendment violation, standing alone, requires relief under Rule 33.

The *Brady* violation that was sanctioned by the Court likewise requires a new trial. The government withheld evidence regarding the KDMC review that it recognized to be exculpatory because it contradicted expert testimony on which the government grounded its entire case at trial, *i.e.*, testimony that "the Defendant's procedures [were found] to be problematic nearly 50% of the time." Docket Entry No. 156 at 5; Ex. D at 6-7. The Court never addressed this crucial point at the *ex parte* hearing. Rather than pressing the issue to ensure its *Brady* obligations were fulfilled, the government acquiesced in the Court's omission and abdicated its constitutional responsibilities. It suppressed evidence that it knew was exculpatory and that it knew directly undercut the continuous refrain pressed by the prosecutors at trial about the allegedly high rate of Dr. Paulus's "problem stent" cases. It is inescapable that the government knew these things, because the prosecutors said so on the record. The suppressed evidence was material under *Brady*, and a new trial is required on this ground as well.

**A.  The Rule 33 Standard**

Federal Rule of Criminal Procedure 33 authorizes the Court to grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). When a motion for a new trial is based on newly discovered evidence, the defendant ordinarily must demonstrate that:

> (1) [T]he new evidence was discovered after trial; (2) the evidence could not have been discovered earlier with due diligence; (3) the evidence is material and not

merely cumulative or impeaching; and (4) the evidence would likely produce an acquittal.

*United States v. Frost*, 125 F.3d 346, 382 (6th Cir. 1997) (citation omitted). "[W]hen the defendant asserts that the new evidence at issue is exculpatory evidence which the government failed to turn over in violation of *Brady*," however, "he should not have to satisfy the severe burden of demonstrating that newly discovered evidence probably would have resulted in acquittal." *Id.* (internal quotation marks and citation omitted). In this circumstance, the defendant instead "must show only that the favorable evidence at issue was 'material,' with 'materiality' defined according to opinions interpreting the *Brady* doctrine." *Id.* (citations omitted). Under *Brady*, favorable evidence is material "if there is a *reasonable probability* that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (emphasis in original) (*quoting Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995)). "A reasonable probability is shown 'when the government's evidentiary suppression undermines confidence in the outcome of the trial.'" *LaMar v. Houk*, 798 F.3d 405, 415-16 (6th Cir. 2015) (*quoting Kyles*, 514 U.S. at 434). *See Gumm v. Mitchell*, 775 F.3d 345, 363 (6th Cir. 2014) (under *Brady* materiality standard, defendant need not show that evidence would have led to acquittal; "defendant must establish only that in the absence of the evidence he did not receive a fair trial," *i.e.*, a trial resulting in a verdict worthy of confidence); *Schledwitz v. United States*, 169 F.3d 1003, 1011-12 (6th Cir. 1999) (same).

"Newly discovered evidence need not relate directly to the issue of guilt or innocence to justify a new trial, 'but may be probative of another issue of law.'" *United States v. Campa*, 459 F.3d 1121, 1151 (11th Cir. 2006) (*quoting United States v. Beasley*, 582 F.2d 337, 339 (5th Cir. 1978)). *Accord United States v. Bowen*, 799 F.3d 336, 349 (5th Cir. 2015) (newly discovered evidence "may be relevant to any controlling issue of law"); *United States v. Scrushy*, 721 F.3d 1288, 1304 (11th Cir. 2013) (same; considering motion for a new trial based in part on newly

discovered *ex parte* contacts); *Richardson v. United States*, 360 F.2d 366, 368 (5th Cir. 1966) (claim that improper communication occurred between principal prosecuting witness and a juror "rests squarely upon newly discovered evidence within the purview of Rule 33"). A motion for a new trial "based on newly discovered evidence that demonstrates constitutional or statutory error" may be brought under Rule 33 and "should be granted 'if the interest of justice so requires.'" *United States v. O'Malley*, 833 F.3d 810, 815 (7th Cir. 2016) (quoting Fed. R. Crim. P. 33(a)). *Accord Bowen*, 799 F.3d at 349 (new trial would be warranted "in the interest of justice" upon a finding, based on newly discovered evidence, of a miscarriage of justice harming a defendant's substantial rights).

### B. A New Trial Is Required in the Interest of Justice, Because the Pretrial *Ex Parte* Proceedings Violated Dr. Paulus's Sixth Amendment Right to Counsel.

#### 1. Sixth Amendment Principles

The Sixth Amendment of the Constitution guarantees a criminal defendant the right "to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. The right to the assistance of counsel attaches upon commencement of a criminal prosecution and "requires effective assistance of counsel at critical stages of a criminal proceeding," including "pretrial critical stages that are part of the whole course of a criminal proceeding[.]" *Lafler v. Cooper*, 566 U.S. 156, 165 (2012). As the Supreme Court has expressed: "Lawyers in criminal cases are necessities, not luxuries. Their presence is essential because they are the means through which the other rights of the person on trial are secured." *United States v. Cronic*, 466 U.S. 648, 653 (1984) (internal quotation marks and footnote omitted).

The Sixth Circuit has defined a "critical stage" as one in which there is "a reasonable likelihood" that "significant consequences" will arise "from complete absence of counsel." *Van*,

475 F.3d at 313. Critical stages include but are not limited to (1) the period between arraignment and trial, *see Mitchell v. Mason*, 325 F.3d 732, 741-43 (6th Cir. 2003), (2) a pretrial suppression hearing, *see Henderson v. Frank*, 155 F.3d 159, 169-172 (3d Cir. 1998), (3) a post-indictment, pretrial lineup, *see United States v. Wade*, 388 U.S. 218, 236-37 (1967), (4) reinstruction of a jury, *see French v. Jones*, 332 F.3d 430, 436 (6th Cir. 2003), and (5) the return of a jury verdict, *see United States v. Smith*, 411 F.2d 733, 736-37 (6th Cir. 1969). "It is settled that a complete absence of counsel at a critical stage of a criminal proceeding is a *per se* Sixth Amendment violation warranting reversal of a conviction, a sentence, or both, as applicable, without analysis for prejudice or harmless error." *Van*, 475 F.3d at 311-12 (citations omitted). *See Cronic*, 466 U.S. at 658-60; *French*, 332 F.3d at 438; *Mitchell*, 325 F.3d at 741-42; *United States v. Benitez*, 521 F.3d 625, 630 (6th Cir. 2008) (violation of a defendant's right to counsel at a critical stage is a structural error).

 2. <u>Analysis</u>

The Sixth Circuit has cautioned that "in all but the most exceptional circumstances, *ex parte* communications with the court are an extraordinarily bad idea." *Carmichael*, 232 F.3d at 517.[19] "An *ex parte* communication between the prosecution and the trial judge can only be justified and allowed by compelling state interest" (such as matters of national security or the safety of witnesses or jurors), and the government "bears a heavy burden in showing that the

---

[19]  *Accord Haller v. Robbins*, 409 F.2d 857, 859 (1st Cir. 1969) ("[N]ot only is it a gross breach of the appearance of justice when the defendant's principal adversary is given private access to the ear of the court, it is a dangerous procedure."); *In re Taylor*, 567 F.2d 1183, 1187-88 (2d Cir. 1977) ("In camera proceedings are extraordinary events in the constitutional framework because they deprive the parties against whom they are directed of the root requirements of due process[.]"); *United States v. Innamorati*, 996 F.2d 456, 487 (1st Cir. 1993) ("the *ex parte* submission of information from a party to the court and the court's ruling on that information without notice to or participation of the opposing party is fundamentally at odds with our traditions of jurisprudence and can be justified only in the most extraordinary circumstances" (internal citation omitted)).

defendant was not prejudiced" by any such communication. *United States v. Barnwell*, 477 F.3d 844, 850-51 (6th Cir. 2007) (internal quotations marks and citations omitted).[20] The newly discovered *ex parte* proceedings conducted by this Court not only violated these norms but also completely denied Dr. Paulus the assistance of counsel at an adversarial hearing in which the Court heard legal arguments, made substantive rulings on the admissibility of evidence at trial, and barred the government from disclosing *Brady* material that the government conceded was exculpatory.[21] These proceedings soared past the "extraordinarily bad idea" threshold, eclipsed the zone of limited *ex parte* communications that on rare occasion are tolerated to protect a compelling state interest, and landed squarely in the territory of structural constitutional error.

The *ex parte* proceedings conducted in this case were initiated to address the validity of KDMC's claim of privilege over information regarding the KDMC review, which the government informed the Court was exculpatory to Dr. Paulus and part of its intended case-in-chief at trial. On the Court's own initiative, *see* Exhibit D at 3, the proceedings evolved into a full hearing on the legal admissibility of this evidence. Exacerbating the constitutional dangers of any *ex parte* proceeding in a criminal case, the Court then permitted counsel for KDMC – an adverse third party

---

[20] *See United States v. Madori*, 419 F.3d 159, 171 (2d Cir. 2005) ("Even where a compelling necessity for secrecy exists, it must be weighed against the extent of the intrusion, if any, upon the interests of the excluded defendant."); *Taylor*, 567 F.2d at 1189 (*in camera* proceedings were improper where "valuable rights" of the defendant and his attorney "far outweigh[ed]" the interests of the government).

[21] *But see* Code of Conduct for United States Judges Canon 3(A)(4) (stating a general rule that a judge should not permit *ex parte* communications concerning a pending matter made outside the presence of the parties or their lawyers and allowing for exceptions "when circumstances require it" for "scheduling, administrative or emergency purposes, *but only if the ex parte communication does not address substantive matters* and the judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result of the ex parte communication") (emphasis added); *Carroll v. President and Commissioners of Princess Anne*, 393 U.S. 175, 183 (1968) (value of a judicial proceeding is substantially diluted where the process is *ex parte*, "because the Court does not have available the fundamental instrument for judicial judgment: an adversary proceeding in which both parties may participate").

who attended the secret hearing without any notice to Dr. Paulus's counsel – to serve as a purported advocate for "the defense," hijacking the role the Sixth Amendment reserves for Dr. Paulus's counsel alone. Completing the rout of Dr. Paulus's Sixth Amendment rights, Mr. Shields asserted legal and evidentiary positions diametrically opposed to those the Court would have received from Dr. Paulus's attorneys if they had been aware of the hearing and permitted to participate.

Under Sixth Circuit precedent, these *ex parte* adversarial proceedings addressing the exculpatory value of *Brady* material and the legal admissibility of evidence at trial were a "critical stage" in this criminal prosecution at which there was a "reasonable likelihood" that Dr. Paulus would suffer "significant consequences" from the absence of his attorney. *Van*, 475 F.3d at 313. *See United States v. Pleitez*, 876 F.3d 150, 158 (5th Cir. 2017) (critical stage is one in which the accused requires aid in coping with legal problems or meeting his adversary); *Henderson*, 155 F.3d at 166 (pretrial hearing considering suppression of defendant's confession is a critical stage); *Ray v. Bauman*, 326 F. Supp. 3d 445, 461-62 (E.D. Mich. 2018) (*ex parte* hearing in which Court and prosecutor addressed material exculpatory *Brady* information was a critical stage). Without the participation of defense counsel making legal arguments on Dr. Paulus's behalf with knowledge of the defense's trial strategy and alternative trial strategies the defense might adopt with the benefit of exculpatory evidence, the evidentiary and *Brady* rulings made by the Court lacked essential input and had the grave potential (which was actually realized at trial) to deprive Dr. Paulus of evidence that was "necessary to mount a meaningful defence." *Van*, 475 F.3d at 312 (*quoting Wade*, 388 U.S. at 225).[22]  Under *Van*, the reasonable likelihood of these significant

_____

[22]   If Dr. Paulus's counsel had participated in the *ex parte* hearing and been informed of the 7% statistical result of the KDMC review, counsel would not have asserted objections to the admissibility of that review, as Mr. Shields purportedly did on behalf of "the defense." Exhibit D at 11. Defense counsel instead would have argued that the 7% statistical result was critical evidence that supported Dr. Paulus's defense that he lacked criminal intent and that provided essential exculpatory context for the purportedly high rate of disagreement by the government's

consequences, standing alone, establishes a *per se* Sixth Amendment violation requiring a new trial in the interest of justice without any further demonstration of prejudice.  *See Van*, 475 F.3d at 313 (if a hearing constitutes a "critical stage," prejudice is presumed from the complete absence of counsel).  Sixth Circuit precedent compels this result.

In *United States v. Minsky*, 963 F.2d 870 (6th Cir. 1992), the Sixth Circuit held that an *ex parte* bench conference conducted with the prosecutors during trial required reversal of the defendant's fraud convictions.  *Id*. at 873-74.  Before the bench conference, the district court had conducted an *in camera* review of FBI 302 reports, summarizing interviews with two key prosecution witnesses, that the defense had requested under the Jencks Act.  *Id*. at 872.  During the trial testimony of one of those witnesses, the district court judge "held a sidebar conference with *only* the prosecutors present" that the court characterized as "part of my *in camera* review of the materials submitted by the United States."  *Id*. at 873 (emphasis in original).  In the *ex parte* bench conference, the district court judge conversed with the prosecutors about what disclosures had been made to the defense under the Jencks Act and *Brady*.  *Id*.  The judge then ordered the prosecution to recall a witness for certain purposes in order to "ensure that the defense was apprised adequately" of certain information.  *Id*.

The Sixth Circuit held that while the district court's *in camera* review of the FBI 302s was proper, "[a]n *in camera* review is not an open justification for an *ex parte* bench conference."  *Minsky*, 963 F.2d at 874.  The court noted that "[t]he constitution requires that a defendant be represented at every critical stage of his trial" and that "*[e]x parte* proceedings 'can only be

---

expert, Dr. Ragosta.  Dr. Paulus's counsel would have argued that the basic facts of the KDMC review – *i.e*., the fact that it studied a random sample of 1049 procedures and produced a 7% statistical result – was probative admissible evidence under Federal Rules of Evidence 401 and 403 that could be presented either through a KDMC witness with personal knowledge of the review or through a factual stipulation.  *See infra* pp. 32-38.

justified and allowed by compelling state interests.'" *Id*. (citations omitted). The Sixth Circuit found that the government "proffered no explanation why the defense was denied an opportunity to participate in a conference at such a critical stage of the proceedings," *i.e.*, when the defense was "arguing that the FBI 302s were subject to disclosure" and the "release of this material would have allowed the defense to undermine the credibility" of a key government witness. *Id*. As the court wrote: "We hold that the *ex parte* sidebar conference violated Minsky's right to a fair trial and was a Sixth Amendment Violation" that required a new trial. *Id*.

Just last year, relying on *Minsky*, the United States District Court for the Eastern District of Michigan granted habeas relief to a state criminal defendant in another case presenting facts similar to those here. The state trial court in *Ray v. Bauman*, *supra*, conducted an *ex parte* conference with the prosecutor and case detectives at which *Brady* information relating to the key prosecution witness was discussed and a detective provided testimony about it. *Ray*, 326 F. Supp. 3d at 460-61. The *Brady* information was not disclosed to the defense, and the hearing transcript was sealed and not revealed to defense counsel during trial. *Id*. at 461. The district court held that the *ex parte* hearing was a critical stage of the proceedings, a *per se* Sixth Amendment violation occurred, and a new trial was required without a specific showing of prejudice. *Id*. at 461-64. As the court explained in an analysis that applies equally to Dr. Paulus:

> What was the impact of defense counsel's absence from that hearing? Critically, Ray's attorney was given no opportunity to contest the basis of the trial court's ruling that the exculpatory impeaching evidence . . . should not be disclosed. The value of that information to Ray's defense was substantial. . . . But the loss of a chance even to make an argument for disclosure cut off that line of impeachment before it got started. This was, by any reasonable reading of the clear Supreme Court holdings on point, a proceeding in which an available avenue of defense was lost, the presence of counsel for the defendant was necessary to assure a meaningful defense, substantial prejudice to the defendant's rights inhered in the particular confrontation, and the presence of counsel would have helped to avoid the resulting prejudice.

*Id*. at 461.

That a new trial was ordered in both *Minsky* and *Ray* necessarily means that a new trial is required for Dr. Paulus. The *ex parte* bench conference and hearing in *Minsky* and *Ray* were more limited in scope and far less offensive to the Sixth Amendment than the *ex parte* proceedings held in Dr. Paulus's case. Unlike the *ex parte* proceedings in *Minsky* and *Ray*, this Court adjudicated substantive evidentiary matters in addition to *Brady* issues, permitted an adverse third party to usurp the role of defense counsel, and denied Dr. Paulus's counsel any notice that the *ex parte* hearing even occurred. The complete exclusion of defense counsel from these substantive pretrial proceedings was structural error requiring a new trial. *See, e.g., Henderson*, 155 F.3d at 170 (deprivation of right to counsel at suppression hearing is structural defect in constitution of trial mechanism); *Mitchell*, 325 F.3d at 748 (counsel's absence during seven-month period before trial was *per se* prejudicial); *cf. Caver v. Straub*, 349 F.3d 340, 350 (6th Cir. 2003) (under *Cronic*, if counsel was absent during jury reinstruction, "a structural error occurred in the trial court proceeding, and either relief from judgment or a writ of habeas corpus could be properly granted on this ground"); *United States v. Yamashiro*, 788 F.3d 1231, 1236 (9th Cir. 2015) (absence of counsel from portion of sentencing was structural error; "the error was complete when the right to counsel was denied" and no additional showing of prejudice was required).

Although Dr. Paulus need not show prejudice to merit relief for this Sixth Amendment violation, the record demonstrates that the effects of the constitutional violation "pervade[d] the entire proceeding" and therefore could never be shown by the government to be harmless beyond a reasonable doubt. *Satterwhite v. Texas*, 486 U.S. 249, 256 (1988). Because defense counsel was prevented from attending (or even knowing about) the pretrial hearing that addressed substantive *Brady* and evidentiary matters, the Court made erroneous decisions on the government's disclosure

obligations that effectively buried exculpatory information that would have been key evidence in the defense case and fundamentally shifted the defense's trial strategy. The materiality and helpfulness to the defense of the suppressed evidence is addressed fully in the *Brady* argument that follows. *See infra* pp. 32-38. As in *Lafler* (involving ineffective assistance of counsel in pretrial plea negotiations), "[f]ar from curing the [Sixth Amendment] error, the trial caused the injury from the error." *Lafler*, 566 U.S. at 166. A new trial is required – one that honors Dr. Paulus's Sixth Amendment right to the assistance of counsel at all critical stages of the criminal proceeding.

C.    **A New Trial is Required Based on Newly Discovered Evidence that the Government Violated *Brady v. Maryland*, 373 U.S. 83 (1963)**

1.    *Brady* Principles

"A prosecutor's suppression of evidence violates a criminal defendant's due process rights when the evidence is favorable to the accused and material either to guilt or punishment." *Thomas v. Westbrooks*, 849 F.3d 659, 663 (6th Cir. 2017) (*citing Brady*, 373 U.S. at 87). A successful *Brady* claim requires a three-part showing that: (1) the evidence in question is favorable; (2) the government suppressed the evidence, and (3) the suppressed evidence was material, in that "its absence deprive[d] the defendant of a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* (internal quotation marks and citations omitted). The good faith or bad faith of the prosecution is irrelevant to *Brady* analysis. *Brady*, 373 U.S. at 87. *See United States v. Agurs*, 427 U.S. 97, 110 (1976) ("If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor."). So is any role the Court played, on an *ex parte* basis, in the government's nondisclosure. *See Taylor*, 567 F.2d at 1188 (*in camera* examination of evidence by a court will not "suffice to sustain a judgment of conviction where the Government, because of a claim of privilege, has failed to disclose to a defendant information which might be material to his defense"). "If the undisclosed evidence

'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict,' then a *Brady* violation has occurred." *Gumm*, 775 F.3d at 363 (*quoting Kyles*, 514 U.S. at 435).

2. Analysis

In addition to violating Dr. Paulus's Sixth Amendment right to counsel, the newly discovered *ex parte* proceedings have revealed that the government violated *Brady* by failing to disclose to the defense before trial material exculpatory information in its immediate possession, *i.e.*, information regarding the KDMC review and its statistical result that was conveyed to the United States Attorney, both orally and in the Shields letter, nearly three years before Dr. Paulus's trial. This evidence was clearly "favorable" to Dr. Paulus, for reasons that AUSA Smith articulated in the *ex parte* proceedings: the KDMC review of Dr. Paulus's stent procedures was much larger and more comprehensive, by a substantial margin, than any of the reviews the government presented in its case in chief, and its 7% statistical result was minuscule in comparison to those of the more limited reviews. The glaring contrast between the *incriminatory* statistical results the government presented at trial and the *exculpatory* statistical result it strategically suppressed, *see supra* pp. 4-6, resolves the issue of the "favorability" of the evidence.

The "materiality" of the suppressed evidence is similarly straightforward. Looking first at the government's case, by concealing the 7% statistical result of the KDMC review from the defense, the government improperly suppressed evidence that would have directly undermined its prosecution theory and the arguments for conviction that it repeatedly pressed before the jury. A central component of the government's trial presentation was showing, through its experts, that *such a large proportion* of Dr. Paulus's stent procedures involved non-occlusive lesions that only purposeful falsification and fraud, and not innocent mistake or interobserver variability, could

explain the discrepancies. *See Paulus*, 894 F.3d at 276 ("the government claims that Paulus repeatedly and systematically saw one thing on the angiogram and consciously wrote down another"). The government inundated the jury with sanctimonious arguments about the "high" rates of disagreement with Dr. Paulus's angiogram interpretations, ranging from at least 36.8% to 50%. All the while, the government knew of, but hid, the statistical result that showed its arguments to be disingenuous. The defense challenged the credibility of the government's claims by asserting in its opening statement and throughout trial that one "torpedo in the government's case" was that the prosecution had been "highly selective in taking a small number of cases, not the thousands that [Dr. Paulus] did . . . and have built their case on that." Docket Entry No. 213 at 33. But the government's suppression of the favorable 7% statistical result deprived the defense of the ammunition it needed to disprove the government's claims. The government's improper tactics and its emphasis on "high" rates of disagreement throughout trial, standing alone, demonstrate the materiality of the suppressed evidence.[23]

But there is more. Turning to the defense case, if Dr. Paulus had known of the 7% statistical result of the KDMC review, his defense presentation at trial, and his defense preparation before trial, would have changed dramatically, as is explained below and in the attached Appendix, which tracks the numerous times when the information about the KDMC review would have been helpful to the defense at trial. *See* Exhibit E: Appendix. If Dr. Paulus's counsel had been permitted to participate in the *ex parte* proceedings, counsel would have explained to the Court exactly why the information in the Shields letter regarding the KDMC review was material and exculpatory as to

---

[23] *See Presser*, 844 F.2d at 1282 (tenet on which the *Brady* doctrine is based is "that it is fundamentally unfair for the government to achieve a conviction through the concealment of evidence which undermines the strength of the government's case against the defendant"); *Gumm*, 775 F.3d at 368 (*Brady* violation found based on suppression of evidence that defense counsel "would have used to undermine the prosecution's case").

both the guilt/innocence phase of the case and sentencing. *See* Exhibit F: Declaration of Hilary Holt LoCicero.

First, the information in the Shields letter regarding the KDMC review was essential to effective cross-examination of Dr. Ragosta, the government's retained expert who reviewed a "sample" of Dr. Paulus's stent procedures that included most of the 75 procedures that had been prescreened as problematic in the KDMC review. In other words, the KDMC review was already embedded in the government's evidence at trial. By suppressing the information in the Shields letter regarding the scope and statistical result of the KDMC review that produced those 75 procedures, the government stymied defense counsel's ability to confront this key prosecution witness through cross-examination. If the evidence regarding the scope and statistical result of the KDMC review had been disclosed to Dr. Paulus, his counsel would have cross-examined Dr. Ragosta about any awareness he had that, out of the "250-300" procedures provided to him for review, 75 had been prescreened as problematic in an earlier review of 1049 randomly selected procedures. This would have been followed by additional questions about Dr. Ragosta's knowledge, if any, of the 7% statistical result of the KDMC review.

Dr. Paulus's counsel would have cross-examined Dr. Ragosta regarding the uncontroversial fact that large, randomized reviews produce more reliable results than small, non-randomized reviews. Testimony elicited from Dr. Ragosta on these questions would have allowed the defense to argue that the KDMC review and its 7% statistical result more accurately reflected Dr. Paulus's practice than the manipulated sample of procedures the government provided to Dr. Ragosta. During the cross-examination, counsel also would have utilized the stark difference between the results of Dr. Ragosta's review and the KDMC review (an "unnecessary stent" rate of as much as 50% versus 7%) as evidence that Dr. Ragosta reviewed angiograms more

conservatively than his fellow professionals. Cross-examination of this nature would have supported Dr. Paulus's argument to the jury that the significant differences in the way cardiologists interpret angiograms provided reasonable doubt regarding the reliability of the primary "evidence" of fraud that the government had offered to prove Dr. Paulus's guilt.

With respect to this last point, Dr. Paulus's counsel would have similarly cross-examined other government expert witnesses, including Dr. David Moliterno (who reviewed only 15 procedures, all selected by the government, and then predictably disagreed with all 15 for a manufactured result that the United States touted as a 100% rate of disagreement), Dr. Howard Morrison (who opined that he disagreed with at least half of the procedures he reviewed), and Dr. Ahmad Elesber (who testified that one-third to one-half of the procedures he saw involved minimal blockages). Each of these witnesses opined that they disagreed with a high percentage of Dr. Paulus's stent procedures that they had reviewed. Testimony of that nature was central to the government's trial strategy, and the prosecutors emphasized it throughout trial, from opening statements to closing arguments. *The prosecutors also knew that it was directly undercut by the 7% statistical result reflected in the Shields letter that the government knowingly suppressed*. The *Brady* information contained in the Shields letter was crucial to the defense's ability to effectively cross-examine all of these witnesses and rebut the government's repeated "high disagreement rate" arguments to the jury. The government's suppression of that valuable exculpatory information gutted Dr. Paulus's cross-examinations and denied him a fair trial.

Second, during his case-in-chief, Dr. Paulus's counsel would have used the information from the Shields letter as affirmative evidence supporting his defense that he did not knowingly falsify angiogram results and had no fraudulent intent. *See Bies*, 775 F.3d at 399 (materiality inquiry should evaluate, *inter alia*, the nature and strength of the evidence the defense was

prevented from presenting).  Disclosure to the defense of the *Brady* information contained in the Shields letter clearly would have led to admissible evidence describing the essential facts of the KDMC review.  The evidence might have taken the form of a stipulation with the government, given that the prosecutors made clear in the *ex parte* proceedings that they believed facts regarding the KDMC review should be before the jury as "an essential part of the investigation's story." Docket Entry No. 156 at 4.  *See Mezzanatto*, 513 U.S. at 203.  Alternatively, the evidence might have been presented through a witness with knowledge of the KDMC review who could describe its scope and the 7% statistical result.

With this evidentiary foundation, Dr. Paulus's counsel would have introduced testimony through an expert statistician about why the KDMC review was the most reliable review of Dr. Paulus's stent procedures that was presented at trial.  As one example, through defense expert Dr. Richard Baer, counsel would have introduced testimony and evidence about how Medicare treats small so-called "probe reviews" (like the review of 19 procedures conducted by AdvanceMed in this case) as less probative than large, randomized reviews like the KDMC review.[24]  Counsel also would have elicited testimony from Dr. Baer that the Medicare Program Integrity Manual advises contractors that when a review reveals only a 7% error rate or rate of disagreement, corrective action generally does not result.  Dr. Paulus's counsel also would have elicited testimony from Dr. Baer about the American College of Cardiology's Appropriate Use Criteria, which state that if the national average of appropriate procedures is 80%, further review may be warranted for a cardiologist with an average of 40% appropriateness.  Counsel would have asked Dr. Baer how

---

[24] Dr. Baer formerly served as the Medical Director for the Medicare Administrative Contractor responsible for Medicare Part A billing in Kentucky.  A declaration from Dr. Baer, describing testimony he would have provided if he had been aware of the KDMC review and its 7% statistical result, is attached as Exhibit G.

that guidance might influence Medicare's resolution of a review showing a 7% rate of disagreement, as the KDMC review did.

Though Dr. Baer or others, Dr. Paulus also would have introduced testimony about the relevant dates of the 1049 procedures included in the KDMC review, to demonstrate to the jury the sporadic nature of the KDMC experts' disagreement and the lack of any pattern indicative of fraud. Dr. Paulus also would have questioned Dr. Baer about the propriety of the way that the United States used the procedures flagged in the KDMC review to manipulate the outcome of Dr. Ragosta's review. In Dr. Paulus's trial, former AUSA Sparks even asked Dr. Baer on cross-examination if he was aware of Dr. Ragosta's disagreement with 62 of Dr. Paulus's angiogram interpretations. If the exculpatory evidence relating to the KDMC review had been disclosed, Dr. Baer would have explained that Dr. Ragosta's rate of disagreement was meaningless, because it was the product of the government planting prescreened procedures into the set of angiograms Dr. Ragosta reviewed. Dr. Baer would have testified that the 7% result from the KDMC review was more reflective of the true nature of Dr. Paulus's practice.

Disclosure of the statistical result of the KDMC review also would have allowed the defense to elicit exculpatory testimony from other defense witnesses. Through Kim Boyd, who served as Dr. Paulus's billing and coding assistant at KDMC, defense counsel would have demonstrated the very small amount of money Dr. Paulus earned for his performance of the 75 problematic stent procedures identified in the KDMC review and how that amount compared with his overall salary. To further explain the insignificance of the amount of money at issue and its rebuttal of any inference that Dr. Paulus acted with intent to defraud, counsel would have introduced testimony about the percentage of Dr. Paulus's income that was the result of stent procedures (approximately 15% to 20%) and the total dollars Dr. Paulus earned from the

performance of just 7% of those procedures (*i.e.*, assuming a salary of approximately $2.5 million, the dollar amount would be just $35,000 before taxes). Through Ms. Boyd and other witnesses such as Kristy Turley, counsel would have introduced testimony about the pro bono care provided by Dr. Paulus each year and how its value far eclipsed the amounts he received for the allegedly inappropriate procedures. All of this evidence would have supported Dr. Paulus's argument that the government's claim throughout trial that Dr. Paulus's total salary showed he had a financial motive to perform unnecessary stent procedures was bogus and unsubstantiated. The 7% result would have allowed the defense to quantify the raw-dollar compensation actually at issue and urge the jury to conclude that the absence of evidence of a financial motive to commit fraud was grounds for reasonable doubt. By informing Dr. Paulus only of small reviews with 30% to 50% rates of disagreement and suppressing evidence of the far larger KDMC review and its 7% result, the government smothered an entire line of defense.

Third, disclosure of the KDMC review and the 7% rate of disagreement would have fundamentally shifted Dr. Paulus's trial strategy toward a defense of innocent mistake. In the years leading up to Dr. Paulus's indictment and during trial, the government repeatedly asserted to defense counsel and the jury that reviews of Dr. Paulus's stent procedures by other cardiologists invariably had resulted in disagreements regarding the necessity of as much as half of his procedures. Based on these government representations, now shown to be blatantly misleading since at least 2013 when the USAO became aware of the statistical result of the KDMC review, defense counsel believed that a defense of mistake was effectively foreclosed. With knowledge of the suppressed exculpatory result of the KDMC review, the entire case and Dr. Paulus's defense would have been placed in a different light. Instead of spending five days on the witness stand defending each and every stent procedure challenged by the United States, Dr. Paulus could have

relied instead on the 7% statistical result of the KDMC review to argue to the jury that the minimal disagreements with his angiogram interpretations reflected in that review could be the result of interobserver variability, differences in angiogram quality and clinical information (including communication with the patient) available to the parties, and/or innocent mistake by Dr. Paulus.[25] Based on that evidence, defense counsel would have argued that the government could not prove beyond a reasonable doubt that Dr. Paulus committed systemic fraud. If Dr. Paulus elected to testify, he could have credibly acknowledged the possibility that he was mistaken on a small percentage of his angiogram interpretations while truthfully maintaining (as he did in his prior testimony) that he never knowingly falsified his results. With the 7% statistical result before the jury at trial, the jury's focus would have shifted from whether Dr. Paulus's angiogram interpretations were correct (which was never supposed to have been the ultimate issue in the criminal trial) to whether the government proved beyond a reasonable doubt that Dr. Paulus acted with criminal intent, which was the gravamen of the charges against him.

In assessing the materiality of suppressed favorable evidence under *Brady*, the dispositive question is whether the Court "remains confident that the outcome would be the same even if the jury heard the suppressed evidence." *United States v. Tavera*, 719 F.3d 705, 713 (6th Cir. 2013) (*citing Kyles*, 514 U.S. at 434). "If consideration of the additional evidence shakes the court's confidence in the verdict, a new trial should be ordered even if there remains sufficient evidence to sustain a conviction." *Id*. (citations omitted). The evidence regarding the KDMC review and its 7% statistical result suppressed by the government must shake, vigorously and to the core, the

---

[25] The United States clearly knew that, in light of the (misleadingly) high rates of expert disagreement they had described to Dr. Paulus, he would conclude he had no choice but to testify. In his July 21, 2014 letter to counsel for Dr. Paulus, former AUSA Sparks wrote, "[I]f Dr. Paulus testifies, *as he seemingly must*, it is likely he will receive a 2-level enhancement for perjury." Exhibit C at 6 (emphasis added).

Court's confidence in the split verdict returned against Dr. Paulus. As shown above and in the attached Appendix, Declaration of Hilary LoCicero, and Declaration of Dr. Baer, disclosure to the defense of the information about the KDMC review contained in the Shields letter would have fundamentally altered defense counsel's cross-examination of crucial government witnesses, led to the admission of favorable evidence in the defense case, and opened up a line of defense that, without the suppressed evidence, Dr. Paulus was unable to pursue. The suppressed evidence regarding the KDMC review affected the entire factual and legal framework in which Dr. Paulus's case was presented to the jury.

And the government's case was not strong. *See Jells v. Mitchell*, 538 F.3d 478, 502 (6th Cir. 2008) (*Brady* materiality analysis considers the withheld information "in light of the evidence available for trial that supports" the conviction). The government faced the difficult burden of proving beyond a reasonable doubt that Dr. Paulus (a physician who worked around the clock, was a generous philanthropist, and did not live a lavish lifestyle) knowingly falsified angiogram results just to make more money, with no direct evidence that any such thing occurred. *See Paulus*, 894 F.3d at 276 ("the government might have a hard time proving that Paulus saw one thing but willfully recorded another"). As the Sixth Circuit noted, "[i]t would not be unreasonable if, faced with the evidence now cited to us, a jury concluded that Paulus was acting in good faith and that the government's experts were 'unfairly second-guessing his reasonable decisions' and making incorrect assumptions about the medical science." *Id*. (citation omitted). The Sixth Circuit wrote that sentence *before* the suppressed 7% statistical result even came to light. There is *at least* a reasonable probability that the suppressed KDMC review would have tipped the scales in favor of a jury finding that Dr. Paulus "acted in good faith" and was being "unfairly second-guessed" by government experts who touted their high rates of disagreement with Dr. Paulus but never faced

cross-examination about why their review of Dr. Paulus's work differed so significantly from the far broader random review conducted by KDMC. As in *Bies*, "[g]iven the strength of the exculpatory evidence that was suppressed by the [government], and the relative weakness of the [government's] case against [Dr. Paulus], the failure to disclose the evidence unquestionably put the whole case in such a different light as to undermine confidence in the verdict." *Bies*, 775 F.3d at 399. A new trial is required.

## II. THE COURT SHOULD DISMISS THE INDICTMENT WITH PREJUDICE BASED ON PROSECUTORIAL MISCONDUCT

The government's conduct in this case over the last five years – starting at least as early as its receipt of the Shields letter and continuing through its briefing on sentencing issues – has revealed a willingness to shade, manipulate, and misstate the evidence in an effort to win. As explained *supra*, the prosecutors in this case, primarily acting through former AUSA Sparks, did more than simply violate *Brady* and its progeny. Former AUSA Sparks entered into an improper agreement with Mr. Shields regarding selective waiver of the information in the Shields letter. *See supra* note 5; *Columbia/HCA*, 293 F.3d at 302-03. He then used the information reflected in the letter selectively, sometimes ignoring the hospital's privilege claim and sometimes standing behind it (despite it being contrary to Sixth Circuit law) when it suited his purposes. *See In re Lott*, 424 F.3d 446, 453 (6th Cir. 2005) ("[T]he attorney-client privilege cannot at once be used as a shield and a sword." (citation omitted)). Former AUSA Sparks used the hospital's submission of the list of 75 procedures (presented without essential context about the denominator of the KDMC review) as a weapon to try to scare Dr. Paulus into pleading guilty. *See supra* pp. 5-6 & note 3. The prosecutors added the 75 pre-screened procedures from the KDMC review to the review set provided to Dr. Ragosta, thereby inflating Dr. Ragosta's rate of disagreement with Dr. Paulus, and elicited testimony from Dr. Ragosta about dozens of them. They did this knowing full

well that defense counsel would not dare cross-examine Dr. Ragosta about the origin of the procedures he had reviewed, because of the (falsely) ominous impression they had created about the KDMC review and because Dr. Paulus had been deprived of essential exculpatory information regarding the results of that review.

This misconduct was not an isolated incident. To the contrary, it was strikingly similar to the manner in which former AUSA Sparks manufactured the result he desired from the Kentucky Board of Medical Licensure, providing 15 pre-screened procedures to the Board and receiving exactly what he wanted in return – a consultant's opinion disagreeing with each and every one of the procedures, a result he touted repeatedly as a 100% rate of disagreement with Dr. Paulus. And all of this occurred against the backdrop of the numerous misstatements of the evidence and improper arguments at trial. *See* Docket Entry No. 298-1 at 24-27; *see also* Docket Entry No. 318 at 49-51.

Former AUSA Sparks told the Court pretrial that this was a case that would "rise and fall upon experts." Docket Entry No. 107 at 40. The prosecutors then presented a case to the jury that centered on expert witness testimony they knew they had manipulated. *See* Appendix. This misconduct was outrageous, shocking, and contrary to any notion of due process or fundamental fairness.

This Court is empowered to dismiss an indictment when "outrageous government conduct" results in a due process violation and the defendant is prejudiced as a result. *United States v. Napier*, 787 F.3d 333, 341 (6th Cir. 2015); *United States v. Allen*, 619 F.3d 518, 525 (6th Cir. 2010) ("The Supreme Court has indicated that outrageous government conduct outside the grand jury process could result in dismissal on due process grounds if such conduct is so outrageous that it violates 'fundamental fairness' or is 'shocking to the universal sense of justice.'" (quoting *United*

*States v. Russell*, 411 U.S. 423, 432 (1973))).  In the absence of a due process violation, the Court can exercise its supervisory power to dismiss the indictment where there is both demonstrated and longstanding prosecutorial misconduct and prejudice to the defendant.  *United States v. Adamo*, 742 F.2d 927, 942 (6th Cir. 1984); *United States v. Smith*, 687 F.2d 147, 152–53 (6th Cir. 1982).

As explained *supra*, Dr. Paulus has suffered a serious deprivation of his rights to due process and a fair trial.  Because of the misconduct in this case, led primarily by former AUSA Sparks, he endured a seven-week trial that must now become a nullity.  If he faces trial again, he will have to defend conduct that is more than a decade old.  Since the time his trial ended in October 2016, patients have died, memories have faded, and evidence has been lost.  Dr. Paulus poured irretrievable resources into developing a trial strategy in 2016 that he now knows hinged on a fiction.  He will never be able to reverse the harm caused by the misconduct that led him down that path, even if he does have a second trial.  Dismissal of the charges against him with prejudice is the only fair outcome.

## CONCLUSION

Based on newly-discovered evidence that Dr. Paulus was denied his Sixth Amendment right to counsel at a critical stage in his criminal case and that the government committed a *Brady* violation that deprived Dr. Paulus of critical exculpatory evidence at his trial, a new trial should be ordered.  Additionally, because of the outrageous prosecutorial misconduct that caused these egregious violations of Dr. Paulus's rights to due process and a fair trial, the indictment should be dismissed with prejudice.

Dated: February 25, 2019

Respectfully submitted,

/s/ Robert S. Bennett
Robert S. Bennett
Hilary H. LoCicero
SCHERTLER & ONORATO, LLP
901 New York Avenue, N.W.
Suite 500W
Washington, DC 20001
Tel: (202) 628-4199
Fax: (202) 628-4177
E-mail: rbennett@schertlerlaw.com
E-mail: hlocicero@schertlerlaw.com

/s/ C. David Mussetter
C David Mussetter
MUSSETTER LAW OFFICE
P.O. Box 192
2709 Louisa Street
Catlettsburg, KY 41129-0192
Tel: (606) 931-0050
Fax: (606) 931-0051
E-mail: attmuss@windstream.net

COUNSEL FOR DR. RICHARD E. PAULUS

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Motion For A New Trial Based On Newly Discovered Evidence Of A *Per Se* Sixth Amendment Violation And A Government Violation Of *Brady v. Maryland*, 373 U.S. 83 (1963), And Motion To Dismiss The Indictment With Prejudice has been served on all counsel of record this 25th day of February, 2019, by filing a copy of the same with the Electronic Court Filing System of the United States District Court for the Eastern District of Kentucky and by emailing it to counsel for the United States.

/s/ Robert S. Bennett
Counsel for Defendant, Richard E. Paulus M.D.