CRIMINAL ACTION NO. 15-15-DLB-EBA

UNITED STATES OF AMERICA                                                    PLAINTIFF


v.                            **MEMORANDUM OPINION AND ORDER**


RICHARD E. PAULUS, M.D.                                                  DEFENDANT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

This matter is before the Court on four pending motions filed by Defendant Richard E. Paulus.  Based upon allegations that the United States improperly withheld exculpatory evidence, Paulus has filed a Motion for New Trial—his third such motion—as well as an attendant Motion for Leave to exceed the page limit set forth in the Local Criminal Rules. (Docs. # 365 and 366).  Dr. Paulus also requests oral argument.  (Doc. # 366 at 2). Additionally, Paulus filed two related Motions to Compel, seeking an order requiring the United States to produce the alleged exculpatory evidence and holding sentencing proceedings in abeyance to allow Paulus additional time to litigate this issue.  (Docs. # 358 and 368).  The motions have been fully briefed and are now ripe for review.  The Court finds that oral argument is not necessary in light of the parties' thorough briefing of the issues presented.  (Docs. # 363-369, 371-373).  For the reasons set forth below, all four Motions are **denied**.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

This case presents an extensive procedural history spanning nearly a decade of investigation and criminal proceedings.  On July 25, 2011, the United States subpoenaed

hospital records from King's Daughters Medical Center ("KDMC") in the course of its investigation of unnecessary cardiac procedures at KDMC. In response, KDMC sought to obtain an expert assessment of the medical necessity of those procedures by conducting an independent medical review of approximately 1,049 stent procedures performed by KDMC cardiologist Richard E. Paulus, MD.

On November 8, 2013, counsel for KDMC sent the United States a letter regarding a "confidential settlement communication pursuant to Fed. R. Evid. 408." (Doc. # 352-1). KDMC's counsel noted in the letter that "[a]s [the federal prosecutor] and I have agreed, the disclosure of this information does not waive any attorney-client privilege or attorney work product protection." *Id.* The letter memorialized a discussion between KDMC's counsel and federal prosecutors wherein KDMC informed the United States of the results of its independent medical review. *Id.* The letter revealed that, of the 1,049 stent procedures reviewed, 75 patients were identified as having arterial blockages below 30%—indicating that they were not appropriate candidates for stent placement.[1] *Id.*

---

[1]     Specifically, the letter stated:

During our meeting with you and your colleagues on Oct. 1, 2013, conducted pursuant to Rule 408 of the Federal Rules of Evidence, we informed you that independent experts retained on behalf of KDMC had reviewed a random sample of 1049 stent procedures out of the approximately 4600 procedures performed by Dr. Richard Paulus during the period covered by your investigation. The purpose of that review was to obtain a preliminary and independent assessment of the percentage occlusion of the vessels that were stented. For that reason, the only medical records examined during that review were angiograms and catheterization reports. We also disclosed that those experts had preliminarily assessed that in 75 of those 1049 procedures the percentage of occlusion was 30% or less . . . . [T]o facilitate and expedite a resolution of this matter and pursuant to Rule 408, KDMC has agreed to comply with your request for the disclosure of the identities of those patients and to refund the payments received.

*Id.*

The letter attached a schedule listing the 75 patients' names, medical record numbers, dates of birth, procedure dates, the Bates numbers of the angiograms, and the Medicare payments received for each procedure; further, KDMC enclosed a check payable to Medicare refunding its payments for the 75 unnecessary procedures. *Id.* The United States asserts that KDMC "never identified the medical reviewers used" in its independent medical review; nor did KDMC identify "any further details about the medical review, or the universe of 1,049 procedures from which the 75 unnecessary procedures were found." (Doc. # 363 at 2). Further, the United States asserts that the "sole information" it possesses regarding KDMC's medical review "is contained in the November 8, 2013 letter." (Doc. # 363 at 5).

On September 3, 2015, a federal grand jury returned an Indictment against Paulus. (Doc. # 1). Paulus was charged with committing health care fraud and making false statements. Specifically, Paulus was accused of exaggerating the extent of blockages in his patients' arteries so he could perform and bill for medically unnecessary cardiac stent procedures.[2] *Id.* at 11.

KDMC subsequently informed the United States that it objected to prosecutors' use of the information KDMC disclosed during its settlement negotiations at trial, because disclosure could damage the hospital's ability to defend against pending civil malpractice suits. (Docs. # 367-1 and 367-2). Accordingly, in advance of trial, counsel for the United States filed an *ex parte* motion to address the discoverability of KDMC's privileged settlement negotiations, including the November 8, 2013 letter, in the context of Paulus's

---

[2]    The underlying facts of this case have been set forth in detail by the district court in previous opinions and by the Sixth Circuit on appeal, and will not be revisited herein. *See* (Docs. # 318 and 325).

criminal proceedings.  (Doc. # 156).

On August 24, 2016, the Court held an *ex parte* telephonic status conference with counsel for the United States and KDMC to discuss the United States' *ex parte* Motion to Resolve Privilege Dispute (Doc. # 156).  (Doc. # 163).  KDMC did not wish to disclose the letter, asserting that the disclosure of such privileged communication would "significantly and unfairly impair KDMC's ability to defend itself in other litigation."  *See* (Doc. # 366-4 at 12-14).  The Court—without reaching the privilege issue—found that the letter was not exculpatory and was inadmissible at trial pursuant to Rule 408 of the Federal Rules of Evidence.  (Docs. # 163 and 352-2).  The Court and the United States did contemplate that this information could be viewed as exculpatory at sentencing with respect to calculating the loss amount, and agreed to revisit the issue should sentencing proceedings be initiated at a later date.   (Doc. # 352-2 at 7, 19-20).

Although it did not produce the November 8, 2013 letter pursuant to the Court's ruling at the *ex parte* telephonic conference, the United States had already informed Dr. Paulus of the underlying fact of KDMC's independent medical review prior to Paulus's indictment by a grand jury.  Dr. Michael Ragosta, one of the United States' experts, reviewed the 75 procedures and the results of his review were produced to the defense in Dr. Ragosta's expert report.  (Doc. # 367 at 4) (citing Doc. # 366-2 at 2).  Paulus concedes that the United States provided him a list of procedures reviewed by its expert, and the list noted that the patients were previously "red-flagged" by the KDMC independent medical review.  (Doc. # 366 at 13) (conceding that "the government did provide the defense a list of procedures with the caption 'KDMC Red-flagged Patient[s] sent to Ragosta for review on 1-27-14.'").   Additionally, in a May 29, 2014 letter to

Paulus's counsel, the United States informed Paulus that "[t]he hospital's consultants . . . reviewed a random selection of Dr. Paulus's procedures, and found 75 angiographic films with less than 30% occlusion in the artery he stented [and] . . . [o]nly two of the 75 procedures flagged by KDMC had been reviewed by the government's consultants, so these are almost entirely distinct sets of problematic stents." (Doc. # 363-1). The letter to defense counsel omitted the fact that the "random selection" from which the 75 procedures were flagged was a total of 1,049 procedures—and, therefore, that only about 7% of the procedures reviewed during the KDMC's independent medical review were flagged.[3] *See id.* Only 32 of the 75 procedures flagged by KDMC's medical review were used in the United States' case-in-chief at trial.

On October 28, 2016, after twenty-three days of trial and four days of deliberations, a jury convicted Paulus of one count of health care fraud in violation of 18 U.S.C. § 1347, and ten counts of making false statements relating to health care matters in violation of

---

[3]     Additional communications disclosed the fact of KDMC's independent medical review and subsequent settlement, but again omitted the sample size involved. In a July 21, 2014 letter to Paulus's counsel regarding pre-indictment plea negotiations, the United States informed Paulus that in a case with similar facts, the "total stent-related loss was $579,000 . . . [which] is approximately half of the amount KDMC alone reported and offered to repay to Medicare as Dr. Paulus's fraud." (Doc. # 363-2 at 6). Further, the July 21, 2014 letter informed Paulus that:

> It is not just the United States that has concluded Dr. Paulus performed unnecessary procedures . . . . The Kentucky Board of Medical Licensure, an independent organization, has also determined that Dr. Paulus placed inappropriate stents and is a danger to patients. Perhaps most damning, KDMC . . . has also identified numerous individuals who received unnecessary stents. The hospital admitted this fraud, repaid $40.9 million, agreed to assist the United States in its prosecution of Dr. Paulus and faces an uncertain future due to the actions of Dr. Paulus and others.

*Id.* at 5. Counsel for the United States also referenced KDMC's review of Paulus's procedures during the Court's July 26, 2016 *Daubert* motion hearing, stating that KDMC "looked at" a number of procedures and then "turned over a list of names to [the United States], along with a check with over one million dollars refunding procedures that had been performed." (Doc. # 151 at 62-63).

18 U.S.C. § 1035.[4]  (Doc. # 276).  At the close of the Government's case, Paulus filed a Motion for Judgment of Acquittal, the consideration of which was deferred pursuant to Rule 29(b) of the Federal Rules of Criminal Procedure.  (Doc. # 220).  After his conviction, Paulus renewed his Motion for Judgment of Acquittal (Doc. # 263) and filed his first Motion for a New Trial.  (Doc. # 298).

On March 7, 2017, the Court granted Paulus's Motion for Judgment of Acquittal, denied the Renewed Motion for Judgment of Acquittal as moot, and conditionally granted the Motion for a New Trial.  (Docs. # 318 and 319).  However, on June 25, 2018, the Sixth Circuit reversed and reinstated the jury's verdict, finding that the Government produced sufficient evidence to support the guilty verdict.  (Doc. # 325).  The Sixth Circuit also vacated the conditional Order granting a new trial and remanded for reconsideration.  *Id.* The Mandate issued on July 19, 2018, restoring jurisdiction over the matter to this Court. On remand, this Court then denied a new trial based upon the Sixth Circuit's ruling and set this matter for sentencing.  (Docs. # 344 and 362).

After Paulus's sentencing was scheduled, the United States raised the issue of KDMC's settlement negotiations again, as the Court had indicated "if, at sentencing, this [issue] comes up and the [Defendant] is convicted and we have an issue of loss, then I think it might be an issue that would need to be disclosed in a confined setting."  (Docs. # 352 and 352-2 at 18-19).  The Court therefore ordered the United States to produce the November 8, 2013 letter to defense counsel.  (Doc. # 353).

Upon receipt of the letter, Paulus filed the first subject Motion to Compel, requesting all information related to the KDMC review and settlement negotiation.  (Doc.

---

[4]  The jury acquitted Paulus on five other false-statement counts brought under 18 U.S.C. § 1035.  *Id.*

# 358).  The Motion to Compel also alleged a violation of *Brady* and its progeny in failing to produce this document prior to trial, asserting that this information would have significantly changed the defense strategy at trial.  *Id.* at 5.  In response to the motion to compel, the United States sought permission to produce its *ex parte* motion (Doc. # 352) to the defense, as well as the related sealed filings and the transcript of the Court's August 24, 2016 *ex parte* telephone conference with counsel for KDMC and the United States. (Docs. # 156, 163 and 359).  The Court allowed the United States to produce this information to defense counsel on January 15, 2019.  (Doc. # 361).

Now, Paulus—for the third time—seeks a new trial.  Paulus argues that if the United States had disclosed the November 8, 2013 letter from KDMC's counsel containing a "description of the KDMC review and its statistical result to the defense in time to make use of it at trial, that information would have directly undermined the strength of the government's case, facilitated potent cross-examination of the government's expert witnesses, directly supported Dr. Paulus's defense that he lacked criminal intent, and fundamentally altered the defense's trial strategy and presentation."  (Doc. # 366 at 6). Paulus seeks to compel production of *Brady*-related material from the United States related to the KDMC independent medical review and settlement, and to hold the scheduling order in abeyance to halt sentencing proceedings until Paulus litigates these issues.

## II.    MOTION FOR LEAVE TO FILE EXCESS PAGES

On February 25, 2019, Paulus filed a Motion for a New Trial Based on Newly Discovered Evidence of a *Per Se* Sixth Amendment Violation and a Government Violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and Motion to Dismiss the Indictment with

Prejudice ("Third Motion for New Trial"). (Doc. # 366). The Third Motion for New Trial is 44 pages in length. *See id.* Contemporaneously, Paulus filed a cursory Motion for Leave to File a Motion in Excess of Page Limits, wherein he seeks leave of Court to submit the Third Motion for New Trial in excess of the 25-page limit authorized by Rule 12.1(e) of the Local Criminal Rules. (Doc. # 365). In support of his Motion for Leave, Paulus asserts that excess pages are required because the Third Motion for New Trial "outlines a complex procedural history that led to the current posture of this case and addresses the impact of these constitutional violations on the conduct of a seven-week trial." *Id.* Paulus does not set forth any relevant authority in support of his Motion for Leave.

"The interpretation and application of local rules 'are matters within the district court's discretion.'" *Barnaby v. Witkowski*, No. 18-1121, 2018 WL 6650564, at *3 (6th Cir. Dec. 18, 2018) (citing *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 451 (6th Cir. 2008) (upholding trial court's order striking an excess page from brief that exceeded page limit set forth in local rules)). Accordingly, when a party violates the local rules by filing a motion in excess of the page limit, the Court is afforded discretion to admit the entire filing, strike the filing, or strike the excess pages from the filing. *See id.*

During the Court's telephonic conference with the parties on remand, the Court cautioned defense counsel that the case would be moving forward with sentencing and that further motions to reconsider or other motions seeking to stall further proceedings would not be looked upon favorably. Nevertheless, in a last-ditch attempt to hold sentencing in abeyance, Paulus has filed not only a Third Motion for New Trial but a succession of motions to compel that, at their core, all seek to relitigate trial rulings, unnecessarily complicate the Court's review, and stall the May 2, 2019 sentencing. This

case has indeed presented "a complex procedural history." (Doc. # 365 at 1). However, having presided over the proceedings the Court is intimately aware of them; Paulus has had a full and fair opportunity to litigate this matter and the Court chooses to exercise its discretion and prevent further unnecessary procedural complexities. Accordingly, the Motion for Leave (Doc. # 365) is **denied**, and the Third Motion for New Trial is **stricken** for failure to comply with the Local Rules. Regardless, as set forth *infra*, the Motion for Leave is moot in light of the Court's finding that Paulus's Third Motion for New Trial is meritless.

## III.    THIRD MOTION FOR NEW TRIAL

Paulus makes two main arguments in his Third Motion for New Trial. (Doc. # 366). First, Paulus argues that he is entitled to a new trial under Rule 33 of the Federal Rules of Criminal Procedure because the failure of the United States to disclose KDMC's 1,049-patient sample size violated *Brady v. Maryland*, 373 U.S. 83 (1963). Second, Paulus argues that the participation of KDMC at the *ex parte* telephonic conference without defense counsel present violated Paulus's Sixth Amendment rights.

Alternatively, Paulus argues that in lieu of a new trial, the Indictment should be dismissed due to prosecutorial misconduct in withholding the sample size of 1,049 stent procedures when the United States disclosed the 75 flagged results from KDMC's independent medical review. Each argument will be addressed in turn.

### A.    Paulus is not entitled to a new trial.

#### 1.  New Trial Standard

A new trial may be granted "if the interest of justice so requires." Fed. R. Crim. P. 33. New trial motions "are disfavored and should be granted with caution." *United States*

*v. Willis*, 257 F.3d 636, 645 (6th Cir. 2001). Paulus asserts that he is entitled to a new trial because the recent disclosure of the KDMC letter for sentencing purposes, revealing the 1,049-patient sample size, constitutes new, exculpatory evidence that was not previously given to the defense. (Doc. # 366 at 21). A defendant who asserts he is entitled to a new trial based upon newly-discovered, exculpatory evidence that the government failed to turn over in violation of *Brady* must demonstrate that (1) the evidence was discovered after trial; (2) the evidence could not have been discovered earlier with due diligence; and (3) the evidence is material. *United States v. Frost*, 125 F.3d 346, 382 (6th Cir. 1997).

### 2. Paulus is not entitled to a new trial on the grounds that the United States violated Brady because Defendant knew the essential facts permitting him to take advantage of the information.

Paulus argues that he is entitled to a new trial on the grounds that the United States withheld the 1,049-procedure sample size of KDMC's independent medical review in violation of *Brady*. The Court disagrees. The United States did not withhold evidence in violation of *Brady* because Paulus knew or should have known the essential facts permitting him to take advantage of the information he claims was withheld.

"[S]uppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment,[5] irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87; *United States v. Macias-Farias*, 706 F.3d 775, 780 (6th Cir. 2013). To establish a violation of *Brady*, a defendant "has the burden of showing that the government suppressed evidence, that

---

[5] "The principles in *Brady* have been extended to the disclosure of impeachment evidence in cases where the 'reliability of a given witness may well be determinative of guilt or innocence.'" *Giglio v. United States*, 405 U.S. 150, 154 (1972).

such evidence was favorable to the defense, and that the suppressed evidence was material. *United States v. Smith*, 749 F.3d 465, 489 (6th Cir. 2014) (citing *United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007)). Evidence is material under *Brady* when "there is a 'reasonable probability' that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Smith*, 749 F.3d at 489 (citing *United States v. Mullins*, 22 F.3d 1365, 1371 (6th Cir. 1994)). "A reasonable probability is a probability sufficient to undermine the confidence in the outcome" of the trial. *Id.*

However, the scope of *Brady* is not unlimited. "Not every failure to disclose favorable evidence requires a new trial," particularly when the information was readily available to the defense prior to trial. *United States v. Ferguson*, 385 F. App'x 518, 522 (6th Cir. 2010). Therefore, "there is no *Brady* violation 'if the defendant knew or should have known the essential facts permitting him to take advantage of the information . . . or if the information was available to him from another source.'" *Smith*, 749 F.3d at 489 (citing *Graham*, 484 F.3d at 417). *See also Vaughan v. City of Shaker Heights*, No. 1:10-cv-609, 2015 WL 1650202, at *6 (N.D. Ohio Apr. 14, 2015) (citing *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998) (finding no *Brady* violation when information was available "in a source where a reasonable defendant would have looked" because "[i]t is well-settled that *Brady* 'does not apply to information that is not wholly within the control of the prosecution.'").

In *Smith*, for instance, a defendant argued that the prosecutor violated *Brady* for failing to specifically disclose that Irwin—a prosecution witness and co-defendant who participated in fraudulent activity as a salesman at the *Smith* defendant's Target Oil and Gas Corporation—engaged in subsequent fraudulent activity when he worked at Summit

Energy Corporation following his employment at Target Oil. *Id.* at 490. The Sixth Circuit found it sufficient that the prosecutor emailed defense counsel prior to trial that "Irwin was involved for a short time with another oil and gas company after leaving Target Oil and may have engaged in conduct arguably similar to the activities at Target Oil." *Id.* The Sixth Circuit reasoned that "[a]lthough the email did not specifically name Summit Energy, the communication put [the defendant] on notice that Irwin had engaged in potentially fraudulent conduct at another energy company." *Id.*

Here, just as in *Smith*, there was no *Brady* violation because Paulus knew "the essential facts permitting him to take advantage of the information."[6] *Id.* at 489. While the prosecutor did not give all the identifying facts of the KDMC independent medical review, such as the sample size of stent procedures reviewed, it was sufficient that prosecutors informed Paulus's counsel of KDMC's independent medical review and resultant settlement long before trial.

Paulus concedes that the United States provided the defense a list of procedures reviewed by its expert; the United States notated the list as patients that were "red-flagged" by KDMC. (Doc. # 366 at 13). Further, just as the prosecutor in *Smith* emailed defense counsel, in a May 29, 2014 letter to Paulus's counsel, the United States informed Paulus that "[t]he hospital's consultants . . . reviewed a random selection of Dr. Paulus's

---

[6] Further, it is not clear that the evidence is favorable to the defense, as the Court observed at the August 24, 2016 *ex parte* telephonic hearing. (Doc. # 352-2 at 5, 16-19). KDMC conducted the independent medical review in order to mitigate its own liability, yet nonetheless it agreed with the Government experts' finding that Paulus performed scores of stenting procedures that were not medically indicated. Paulus's Third Motion for New Trial makes much of the Government's statement at the *ex parte* conference that the sample size of the KDMC independent medical review could implicate *Brady*. (Doc. # 366 at 9). However, the United States conceded only that "this information could be viewed as exculpatory at sentencing." (Doc. # 156 at 5). Looking at the transcript of the proceedings, it is clear that the Court found the evidence implicated *Brady* for *sentencing* purposes to determine a loss amount, not at trial. (Doc. # 366-4 at 20) ("However, if, at sentencing, this comes up and the defendant is convicted and we have an issue of loss, then I think it might be an issue that would need to be disclosed in a confined setting").

procedures, and found 75 angiographic films with less than 30% occlusion in the artery he stented." (Doc. # 363-1). The letter to defense counsel omitted the fact that the sample size from which the 75 procedures were flagged was a total of 1,049 procedures— and, therefore, that only about 7% of the procedures reviewed during the KDMC's independent medical review were flagged. However, the information that the prosecution provided was clearly more than just the "essential facts permitting him to take advantage of the information." *Smith*, 749 F.3d at 489. Defendant knew or should have known to look into the details of KDMC's independent medical review.

Thus, there is no *Brady* violation justifying a new trial because defense counsel had the "essential facts" all the way back in 2014 and the evidence could have been discovered earlier with due diligence. *Frost*, 125 F.3d at 382. That Defendant has now identified what he believes would have been a better defense strategy does not shake the Court's confidence in the verdict. *See Hutchinson v. Bell*, 303 F.3d 720, 744 (6th Cir. 2002) (finding that a defendant's "claim that nondisclosure of [a witness] statement prejudiced his trial strategy is insufficient to establish materiality."). The *Brady* protections do not extend to raise "trial strategy to the dignity of a constitutional right." *Brady*, 373 U.S. at 90-91. While he expounds at length about how key the sample size of the independent medical review was to his defense, Paulus has simply failed to show how this evidence could not have been discovered earlier with due diligence. The May 29, 2014 letter provided more than enough facts from which defense counsel could have identified the sample size issue. Paulus could have sought more information from KDMC or conducted his own widespread review of procedures to make the same point. *See, e.g.*, (Doc. # 65) (Defendant's Rule 17 Subpoena to KDMC). He chose not to do so. He

is now foreclosed from grasping at this issue on the eve of sentencing using the pretext of "newly-discovered" information. Paulus has not shouldered his burden to show that the interest of justice requires the disfavored remedy of a new trial. Accordingly, Paulus's Third Motion for New Trial on the grounds of a *Brady* violation is **denied**.

### 3. Paulus is not entitled to a new trial on the grounds that the ex parte proceedings violated his Sixth Amendment rights.

Paulus next argues that he is entitled to a new trial because the Court's August 24, 2016 *ex parte* telephonic status conference with counsel for the United States and KDMC violated Paulus's Sixth Amendment right to counsel. (Doc. # 163). The Court disagrees. The conference was held to discuss the United States' *ex parte* Motion to Resolve Privilege Dispute (Doc. # 156). Prosecutors are permitted to submit possible *Brady* materials for *in camera* review to obtain a pretrial determination of whether disclosure is required, and Paulus's failure to object to the *ex parte* proceedings prior to trial forecloses him from post-trial sandbagging.

"It is settled that a complete absence of counsel at a *critical stage* of a criminal proceeding is a per se Sixth Amendment violation warranting a reversal of a conviction." *Van v. Jones*, 475 F.3d 292, 311-12 (6th Cir. 2007) (emphasis added). However, the Sixth Circuit has "refused to label *ex parte* communications critical stages in all cases." *Hereford v. Warren*, 536 F.3d 523, 530 n.4 (6th Cir. 2008). Rather, the Court is given latitude to regulate discovery; accordingly, the Rules provide that "[a]t any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief." Fed. R. Crim. P. 16(d)(1). "Simply, holding such proceedings is within the discretion of the court." *United States v. Hanna*, 661 F.3d 271, 294 (6th Cir. 2011) (denying defendant's motion for new trial and rejecting defendant's argument that the

judge erred in deciding the motion based on *ex parte*, *in camera* submissions without making them available to the defense). Additionally, courts are permitted to conduct evidentiary hearings, including "an *in camera* inspection of . . . documents withheld on grounds of asserted privilege." *United States v. White*, 492 F.3d 380, 413 (6th Cir. 2007). "Several courts of appeals have approved the practice of prosecutors submitting possible *Brady* materials *in camera* to the trial court in order to obtain a pretrial determination of whether disclosure is required." *Application of Storer Comm'ns, Inc.*, 828 F.2d 330, 334 (6th Cir. 1987).

Because the application of the Sixth Amendment in this context is highly fact-specific, there is a dearth of on-point authority regarding the interplay between a defendant's right to have counsel present at critical stages in proceedings and the Court's ability to hold *in camera, ex parte* proceedings to assess documents withheld on grounds of asserted privilege. *See Van v. Jones*, 475 F.3d 292 (6th Cir. 2007) (collecting cases). Generally, the "common thread" in a finding that a criminal proceeding constitutes the requisite "critical stage" is "the likelihood that significant consequences might have resulted from the absence of counsel at the stage of the criminal proceedings." *Hereford v. Warren*, 536 F.3d 523, 529 (6th Cir. 2008) (internal citation omitted). Moreover, there is some authority holding that a pretrial *ex parte* hearing to resolve a privilege claim embedded within the Government's disclosure obligation under *Brady* is not a *per se* critical hearing. *See Ray v. Bauman*, 326 F. Supp. 3d 445, 462 (E.D. Mich. 2018) (citing *United States v. Johnson*, 65 F. App'x 628, 630 (9th Cir. 2003) (noting that *Johnson* defendant's right to counsel was not violated when defense counsel "was obviously knowledgeable about the nature of the proceeding" and the *in camera* hearing "involved

a preliminary evidentiary question, not the merits of the charges")).

The Sixth Circuit rejected a defendant's Sixth Amendment challenge to *ex parte* communications in *United States v. Carmichael*, 232 F.3d 510, 517 (6th Cir. 2000). During trial proceedings in *Carmichael*, counsel for the government "approached the bench alone in order to explain to the judge—out of the earshot of Carmichael and his attorney—what was on the wiretap recordings, and why none of it implicated [the government's witness] Adams in drug dealing or other illegal activities." *Id.* Carmichael argued that such *ex parte* communications violated his Sixth Amendment right to counsel, particularly because Carmichael suspected that the sealed transcripts of the wiretap recordings might contain *Brady* material. *Id.* The Sixth Circuit was critical of Carmichael's delay in raising the issue until the appeal process, noting that "[t]o now allow the *ex parte* communications to be objected to after-the-fact is a form of 'sandbagging' that we will not permit in the absence of proof that the content of what was in fact communicated adversely affected Carmichael's substantial rights." *Id.* at 518. The Sixth Circuit reasoned that "[i]f counsel had been concerned about this they could have voiced their concern to the district court" at trial. *Id.* Combined with the fact that "the colloquy between the district court and the government" was reviewed and "nothing in the content of what was actually communicated . . . adversely affected Carmichael's substantial rights," the Sixth Circuit concluded that a new trial was not warranted. *Id.*

The issues at hand are similar to those in *Carmichael*. Here, the Government's Motion to Resolve Privilege Dispute was filed *ex parte* "out of an abundance of caution," *see* (Doc. # 367 at 5), because of KDMC's position that the substance of its settlement negotiations were privileged and therefore protected from disclosure. *See, e.g.*, (Doc. #

367-1 and 367-2).  The United States and KDMC explained this to the Court, and upon review of this information the Court reasonably believed that no party would gain a procedural, substantive, or tactical advantage as a result of the *ex parte* communication. The Court found that the evidence was inculpatory for trial purposes and further did not impact Paulus because "the statements of King's Daughters Medical Center's lawyers in a letter to the U.S. during their attempt to settle their underlying civil litigation" was inadmissible at trial.  (Doc. # 366-4 at 7, 18-20).

Just as in *Carmichael*, where the Sixth Circuit was critical of Carmichael's delay in raising the issue until the appeal process, here the Court is critical of Paulus's attempt to raise the issue now on the eve of sentencing.  The United States asserts that counsel for Paulus inquired about the *ex parte* motion at the time it was filed on the docket.  (Doc. # 367 at 5).  On August 17, 2016, prosecutors spoke with defense counsel Michael Kelly and Karla Aghedo and conveyed that the *ex parte* motion pertained to a third-party privilege claim.  (Docs. # 367 at 5 and 371-1 at 3).  Mr. Kelly asked if it was the hospital's claim, and the Government confirmed that it was.[7]  *Id.*

 Paulus concedes that prior to the filing of the *ex parte* motion, the United States had disclosed the fact of KDMC's patient review.  *See* (Doc. # 36 at 13).  The Court's discovery order had also provided that "[i]f the Government is unsure as to the nature of any evidence and the proper time for disclosure, then it may request an *in camera* hearing

---

[7]     Paulus's Reply brief attaches the Declarations of Attorneys Kelly and Aghedo.  Kelly attests that he has "no recollection of the telephone call described in the government's pleading."  (Doc. # 371-2 at 2). Aghedo attests that the call occurred on August 17, 2016 where the Government "explained that the ex parte motion related to the production of documents and a privilege claim by a third party."  (Doc. # 371-1 at 3).  Aghedo further attests that "[t]he USAO's office assured Mr. Kelly and I that the ex parte motion was not related to anything of substance impacting Dr. Paulus; the filing was simply a procedural formality related to the third party."  Neither Kelly nor Aghedo deny in their carefully-worded Declarations that the Government confirmed to defense counsel that the *ex parte* motion involved the hospital's privilege claim.

for the purpose of resolving this issue." (Doc. # 17). Yet Paulus chose not to file contemporaneous objections to the discovery order provision or to the *ex parte* motion. In this context, "to now allow the *ex parte* communications to be objected to after-the-fact is a form of 'sandbagging'" that is impermissible in light of the fact that "nothing in the content of what was actually communicated . . . adversely affected [Paulus's] substantial rights."[8] *Carmichael*, 232 F.3d at 518.

Paulus relies on *United States v. Minsky*, 963 F.2d 870, 873 (6th Cir. 1992), which predated *Carmichael*, 232 F.3d 510. As the Sixth Circuit noted in *Carmichael*, the *ex parte* communications in *Minsky* were problematic because "[t]he government in *Minsky* was unable to articulate any justification for denying defense counsel the opportunity to participate in the conference, and the information discussed in the ex parte communication was found to constitute a *Brady* violation." *Carmichael*, 232 F.3d at 518 (citing *Minsky*, 963 F.2d at 874-75). The Sixth Circuit in *Carmichael* distinguished the circumstances in *Minsky*, where "the government provided a reasonable justification for its request, defense counsel did not object, and we find nothing in the ex parte communications that adversely affected Carmichael's substantial rights." *Id.*

Here, just as in *Carmichael*, the Government provided a reasonable justification for the *ex parte* conference—a request for adjudication of KDMC's assertion of its privilege. Likewise, just as in *Carmichael*, defense counsel did not object, and nothing in the *ex parte* communications adversely affected Paulus's substantial rights. The

---

[8] In support of his assertion that the *ex parte* conference had significant consequences adversely affecting his substantial rights, Paulus's Third Motion for New Trial makes much of the Government's statement at the *ex parte* conference that the sample size of the KDMC independent medical review could implicate *Brady*. (Doc. # 366 at 9). As set forth *supra*, however, it is clear that the evidence implicates *Brady* for *sentencing* purposes to determine a loss amount, not for trial purposes. (Doc. # 366-4 at 20).

information at issue was not found to constitute a *Brady* violation.  *See supra*.  Moreover, the *Minsky* court did not discuss the *ex parte* issue in the context of the "critical stage" analysis outlined in later decisions.  Accordingly, Paulus's reliance on *Minsky* is misplaced.

Paulus further seeks to rely on the district court opinion in *Ray v. Bauman*, 326 F. Supp. 3d 445 (E.D. Mich. 2018) in support of his Sixth Amendment claim.  However, the district court in *Ray* clearly stated that "this case is sharply distinguishable from cases where an *in camera* evaluation . . . has been found not to be a critical stage" and where defense counsel "was obviously knowledgeable about the nature of the proceeding."  *Id.* at 462.  Paulus's reliance on *Ray* is therefore misplaced.

Finally, Paulus seeks to rely on *United States v. Barnwell* in support of his Sixth Amendment claim.  477 F.3d 844, 850 (6th Cir. 2007).  The circumstances in *Barnwell* are also distinguishable.  There, the Court and counsel for the United States engaged in five *ex parte* communications in the middle of jury deliberations and directly influenced the declaration of a mistrial.  *Id.* at 850-53.  Significantly, defense counsel in *Barnwell* had no knowledge that the *ex parte* communications were even taking place.  *Id.* at 851-52.  Here, Paulus knew there were several *ex parte* filings on the docket and even knew they related to a privilege claim by the hospital.  The Court's resolution of that privilege claim through an *ex parte* proceeding was clearly within the Court's discretion as specifically contemplated by Rule 16.  Accordingly, a new trial is unwarranted on these grounds, and Paulus's Third Motion for New Trial is **denied**.

**B.** **Paulus failed to demonstrate any prosecutorial misconduct warranting dismissal of the Indictment.**

Paulus argues, in the alternative to his argument that a new trial is warranted, that

the Indictment should be dismissed due to prosecutorial misconduct. (Doc. # 366 at 40). Specifically, Paulus argues that the prosecution's failure to disclose the 1,049-patient sample size constituted "outrageous government conduct" that "results in a due process violation" resulting in prejudice. *Id.* at 41. In support of his claim that the withholding of this information caused prejudice, Paulus asserts that the Government's conduct requires his first trial to "become a nullity" and that "[i]f he faces trial again, he will have to defend conduct that is more than a decade old" when "patients have died, memories have faded, and evidence has been lost." *Id.* at 42. The Court disagrees with Paulus's characterizations, and finds that dismissal of the Indictment is not warranted.

Defendants "face a high burden in seeking to reverse a conviction because of prosecutorial misconduct." *United States v. Collins*, 927 F.2d 605, 610 (6th Cir. 1991). The remedy of not reversing a conviction, but *dismissing an indictment*, requires "outrageous" conduct that "shocks the conscience." *United States v. Russell*, 411 U.S. 423, 431 (1973).

Paulus's claim that the Government's omission of the 1,049-patient sample size in KDMC's independent medical review "shocks the conscience" is specious at best. First, Paulus provides no authority on point showing that an indictment has been dismissed under similar circumstances. Further, Paulus points to no such "outrageous" conduct. The Government disclosed to defense counsel the fact that KDMC conducted an independent medical review of Paulus's stent procedures before Paulus was even indicted. The Government further sought to disclose KDMC's November 8, 2013 communication prior to trial, and out of an abundance of caution for KDMC's privilege assertion brought the matter before the Court to adjudicate the issue of whether the letter

should be disclosed to Paulus. That Paulus disagrees with the Court's determination does not transform the Government's actions into misconduct. Paulus has completely failed to meet his "high burden" to show that dismissal is proper. Accordingly, Paulus's Motion for dismissal of the Indictment on this basis is **denied**.

### C.    Paulus is not entitled to an evidentiary hearing or oral argument.

Paulus requests "an evidentiary hearing or oral argument in connection with" his Third Motion for New Trial "to fully examine the government's *Brady* violation." (Doc. # 371 at 9). A district court has discretion in determining whether "to grant an evidentiary hearing before ruling on a motion for new trial." *United States v. Allen*, 254 F. App'x 475, 477-78 (6th Cir. 2007) (citing *United States v. O'Dell*, 805 F.2d 637, 643 (6th Cir. 1986)). This issue has been extensively briefed by the parties, with Defendants' Third Motion for New Trial alone far exceeding the page limits set forth in the Local Criminal Rules in addition to the subsequent related filings. *See* (Docs. # 363, 364, 365, 366, 367, 368, 369, 371, 372, and 373). The Court has reviewed the voluminous filings in this case, including the voluminous exhibits, as well as the transcripts attached to the parties' briefings. The Court concludes that an evidentiary hearing is not necessary in this case, as the issues presented by Paulus are sufficiently presented in the extensive written record. Accordingly, Paulus's request for an evidentiary hearing or oral argument on this basis is **denied**.

### D.    Paulus's request to supplement his Third Motion for New Trial is improper.

The final paragraph of Paulus's Reply brief in support of his Third Motion for New Trial raises a new request for relief. Paulus asserts that "evidence of an additional *Brady/Giglio* violation came to light on March 20, 2019, and was reported to the Court

through a Notice" filed by defense counsel on March 21, 2019. (Doc. # 371) (citing Doc. # 369). Paulus requests "leave to supplement his [Third] Motion for a New Trial to address the recently-revealed matters and asks the Court to enter an Order directing a schedule for this supplemental briefing." (Doc. # 371 at 10). Paulus also requests that the Court continue his May 2, 2019 sentencing "in order to permit for this additional briefing, a hearing, and a ruling by the Court" on yet another basis for a new trial. *Id.*

### 1.    *Background*

The "new evidence" Paulus purports to rely upon in support of what would essentially become a *fourth* motion for a new trial relates back to Paulus's "request for leave to file supplemental briefing" in support of his second Motion for New Trial on remand on July 27, 2018. (Doc. # 330). At that time, Paulus indicated that he may be entitled to a new trial based upon an alleged *Brady/Giglio* violation discovered when the University of Kentucky was ordered to disclose documents under the Kentucky Open Records Act in pending state-court proceedings. (Doc. # 330 at 2) (citing *University of Kentucky v. Lexington H-L Services, Inc., d/b/a Lexington Herald Leader*, Case Nos. 16-CI-3065 & 16-CI-3594). The documents related to an investigation that the University of Kentucky (UK) conducted beginning in 2014 regarding allegedly "problematic Medicare/Medicaid billing practices engaged in by one of UK's affiliates—the Appalachian Heart Center (AHC) in Hazard, Kentucky." (Doc. # 330 at 2). Paulus claims that the documents revealed Dr. Moliterno—one of the Government's experts at Paulus's trial— while serving as Chairman of the Department of Internal Medicine at the University of Kentucky was informed by outside counsel that AHC had engaged in conduct that required an overpayment refund to Medicare and Medicaid. *Id.* at 3. Paulus asserted in

his July 27, 2018 "request for leave to file supplemental briefing" that such evidence "raises substantial questions as to whether, at the time of his testimony, Dr. Moliterno had an undisclosed motive to curry favor with the government either to avoid or to resolve a potential or pending government investigation of AHC."  *Id.* at 4.

On July 31, 2018, Paulus filed a Motion for Leave to File Supplemental Briefing on the same basis.  (Doc. # 332).  Paulus asserted that this newly-discovered evidence *could* show that Dr. Moliterno "had an undisclosed motive to curry favor" with the United States. *Id.* at 4.  Such evidence, according to Paulus, "raises substantial questions as to whether the government knew of Dr. Moliterno's bias and motive to curry favor . . . but failed to disclose material impeachment evidence related to its key witness to the defense" in violation of *Brady* and its progeny.  Defense counsel indicated he "is presently investigating these issues and respectfully advises the Court of Dr. Paulus's intent to seek discovery from the government to facilitate his investigation and his potential preparation of a[nother] motion for a new trial on the basis of this newly discovered evidence."  *Id.* at 5.  However, Paulus did not address this issue in his Supplemental Brief in Support of Motion for New Trial [Second Motion for New Trial].  (Doc. # 335).  Rather, in his Supplemental Reply Brief on September 26, 2018, Paulus merely noted in passing that he "continues to investigate that claim and, if warranted, will file a separate motion for a new trial on that ground."  (Doc. # 343 at 2).

Paulus's Third Motion for New Trial (Doc. # 366) did not raise the issue of the purported new evidence of Dr. Moliterno's bias.  Rather, Paulus again only mentioned in passing that he would be filing something in the future.  This culminated in the March 15, 2019 filing of his [Second] Motion to Compel, which consists of over one hundred pages

of documents that read like a conspiracy theory. (Doc. # 368). Now, on the eve of sentencing—nearly nine months after first referencing this "new evidence"—Paulus seeks to continue sentencing and to litigate what will essentially become Paulus's Fourth Motion for New Trial. Paulus also asks the Court to consider this potential issue collectively in adjudicating the instant Third Motion for New Trial. *Id.* at 4. In doing so, Paulus vaguely asserts that the fact that an affiliate of UK endured fraud allegations about cardiac procedures and managed to resolve them without government intervention is relevant to whether Dr. Moliterno had a motive to curry favor with the United States. Such impeachment evidence, Paulus argues, warrants a new trial. *Id.* at 10-11.

On March 21, 2019, Paulus—without leave of Court—filed another supplemental "Notice" regarding the same "untimely disclosure of *Brady/Giglio* material" and attached more documents in support of his impeachment-evidence argument. (Doc. # 369). Paulus argued therein that despite the Government's assurance that "[n]o member of the prosecution team possesses information about UK's investigation or repayments, beyond the publicly available materials" cited by the defense, *see* (Doc. # 369-2 at 3), "[n]ewly-discovered documents show that . . . UK administrators disclosed the issues surrounding the AHC repayments" to a civil Assistant United States Attorney for the Eastern District of Kentucky prior to trial, *see* (Doc. # 369-4). (Doc. # 369 at 2). Paulus asserts that "[t]he government's lead trial counsel in the *Paulus* case . . . was copied on correspondence about a potential investigation of UK . . . and at least one other member of the *Paulus* prosecution team was involved in the communications with UK about the repayments." (Doc. # 369 at 2). Thus, Paulus claims that the prosecution had this information and the failure to disclose it to the defense constitutes a *Brady* violation.

### 2. Supplementation is unwarranted because Paulus failed to demonstrate the requisite materiality.

Rather than demonstrating materiality, Paulus merely provides speculation in support of a proposed fishing expedition. This is improper. It is well-settled that "the *Brady* doctrine is not intended to serve as a post-trial discovery device." *United States v. Corona*, No. 3:05-cr-148, 2010 WL 99477, at *2 (E.D. Tenn. Jan. 7, 2010). Paulus has failed to show why this evidence is sufficiently material to warrant a new trial. "The evidence does not directly address [Paulus's] culpability and ignores the mountain of documentary and other testimonial evidence," including the testimony of *nine* other cardiologists that Paulus performed unnecessary stenting procedures. *United States v. Smith*, No. 6:13-cr-34-KKC, 2015 WL 4458891, at *17 (E.D. Ky. July 21, 2015).

Paulus suggests that the lack of a governmental enforcement action against UK following an investigation of its affiliate, AHC, had something to do with Dr. Moliterno "currying favor" by testifying in this case. The defense's tinfoil-hat speculation fails to show how a billing issue at a UK affiliate has any bearing on Dr. Moliterno's credibility as a witness. There is no evidence—nor does Paulus allege—that Dr. Moliterno worked at AHC or that he was one of the physicians identified in UK's internal investigation. Moreover, Dr. Moliterno was selected as an expert not by the United States but by the Kentucky Board of Medical Licensure, and he issued his report on June 18, 2014, prior to identification of any issues at AHC.

Paulus's vague, eleventh-hour attempt to attack the jury's verdict in any way possible falls short of his burden to demonstrate "a 'reasonable probability' that, had the evidence been disclosed to the defense, the result of [Paulus's trial] would have been

different."[9]  *Smith*, 749 F.3d at 489.  Instead, Paulus is only able to offer speculation and raise "new questions."  (Doc. # 368 at 15).  This is simply not sufficient to undermine the Court's confidence in the outcome of the trial.  *Id.*  The Court concludes that this "newly discovered" evidence would not, had it been presented at trial, have yielded a different outcome.  Nothing Paulus identifies would have changed the outcome at trial, and Paulus has wholly failed to demonstrate a basis to indulge his last-minute attempts to delay his sentencing.  Accordingly, a new trial is unwarranted, and Paulus's Third Motion for a New Trial on this basis is **denied**.

## IV.    MOTIONS TO COMPEL

In his First and Second Motions to Compel (Docs. # 358 and 368), Paulus seeks to compel production of documents and information related to his *Brady* arguments from the United States.[10]  Further, Paulus seeks to hold the scheduling order in abeyance, halting sentencing proceedings until Paulus completes the litigation of this new issue.  The proper remedy for a *Brady* violation "is not an order compelling the United States to provide the information to the Defendant as additional post-conviction discovery."  *United States v. Corona*, No. 3:05-cr-148, 2010 WL 99477, at *2 (E.D. Tenn. Jan. 7, 2010).  Rather, a defendant "properly seeks redress of a *Brady* violation by moving for a  reversal

---

[9]     The Court further questions the materiality of this evidence when it likely would have been inadmissible at trial.  Review of the materials in support of Paulus's Third Motion for New Trial (Doc. # 366) and Second Motion to Compel (Doc. # 368) call for an expedition deep into the weeds of speculation; exclusion would likely be called for under Rule 403 of the Federal Rules of Evidence as the probative value of this evidence would be substantially outweighed by confusion of the issues and misleading the jury.  Fed. R. Evid. 403.  A court's determination that inadmissible evidence might lead to the discovery of evidence admissible at trial may not, as it does in the instant circumstances, rest on "mere speculation."  *Wood v. Bartholomew*, 516 U.S. 1, 6 (1995).

[10]    Paulus acknowledges that a portion of his "motion to compel production of *Brady/Giglio* information is now partially moot because the United States Attorney's Office ("USAO") has produced some of the materials at issue."  (Doc. # 373 at 1).

of his conviction and a new trial," as "the *Brady* doctrine is not intended to serve as a post-trial discovery device." *Id.* (citing *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68 (2009)). Particularly where, as here, Paulus did not demonstrate that the evidence is material, *see supra*, the Court "decline[s] to order discovery based on mere speculation as to whether material would contain exculpatory evidence because to do so would convert *Brady* into a discovery device and impose an undue burden upon the district court." *Corona*, 2010 WL 99477, at * 2 (citing *United States v. Aguilar*, 286 F. App'x 716, 723 (11th Cir. 2008)). Accordingly, in light of the Court's finding, *supra*, Paulus's First and Second Motions to Compel are **denied as moot**.

## V.    CONCLUSION

Accordingly, for the reasons set forth herein, **IT IS ORDERED** as follows:

(1)    Defendant's First Motion to Compel (Doc. # 358) is **denied**;

(2)    Defendant's Motion for Leave to File Excess Pages (Doc. # 365) is **denied** and the Third Motion for New Trial (Doc. # 366) shall be **stricken** for violating the Court's Local Rules;

(3)    Defendant's Third Motion for New Trial and to Dismiss Indictment (Doc. # 366) is **denied** on the merits; and

(4)    Defendant's second Motion to Compel (Doc. # 368) is **denied**.

This 18th day of April, 2019.



Signed By:

*David L. Bunning*

United States District Judge