UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
ASHLAND

CRIMINAL ACTION NO. 0:15-CR-00015-DLB-EBA-1

UNITED STATES OF AMERICA,                                                                 PLAINTIFF,

V.                           **MEMORANDUM OPINION & ORDER**

RICHARD E. PAULUS,                                                                        DEFENDANT.

*** *** *** ***

Before this Court is the United States' motion to compel King's Daughters Medical Center (KDMC) to produce certain evidence sought by a May 15, 2020 subpoena, including:

1. Documents identifying the 1,049 procedures reviewed, with patient name and date of procedure;
2. All opinions or conclusions reached by the experts regarding the percentage of occlusion in the stented arteries;
3. All opinions or conclusions reached by the experts regarding the medical necessity of the procedures;
4. All records describing or identifying the sampling methodology and the manner in which the medical review was conducted;
5. All records identifying the independent experts and the procedures each of them reviewed;
6. All correspondence between KDMC and Dr. Paulus regarding the medical review.

[R. 428-2]. In response to the subpoena, KDMC asserted a blanket objection to production based on attorney-client, work product, and settlement privileges. [R. 428-3]. On August 6, 2020, the United States filed the instant motion to compel production of the evidence requested by the May 2020 subpoena. Shortly thereafter, the District Court denied Paulus's motion to dismiss, and Paulus promptly appealed to the Sixth Circuit. [R. 435, 436].

The Sixth Circuit affirmed the District Court's ruling on Paulus's interlocutory appeal and the United States' motion to compel is again before this Court for consideration. The United States argues pursuant to FED. R. EVID. 502(a) that KDMC's previous partial disclosure constitutes a waiver of any

asserted privileges. [R. 428 at pg. 2]. KDMC disagrees, asserting that the parties agreed ahead of time that a partial disclosure of information would not constitute a waiver of the above-named privileges.

## I. FACTS & PROCEDURAL HISTORY

While on appeal from the District Court's denial of Paulus's motion for a new trial, the Sixth Circuit recounted the facts of this case as follows:

> For years Paulus was a successful cardiologist at King's Daughters Medical Center (KDMC). He performed an incredible number of angiograms and was first in the nation for the total amount billed to Medicare for these procedures. But not all was well. Complaints emerged that Paulus was performing medically unnecessary procedures. And several audits indicated that in multiple cases Paulus had reported a higher degree of blockage in his patients' arteries than their angiograms reflected. Meaning, in some cases, the patient's angiogram showed a low degree of blockage and thus that the patient didn't need a stent inserted. Yet Paulus reported a much more severe blockage, inserted a stent, and then billed patients and their insurance companies for the stent procedure.
>
> Eventually, these allegations reached the federal government. At first, the government considered entering into a civil settlement with Paulus. In a letter setting forth its demands, the government stated that its consultants had reviewed 496 of Paulus's procedures and concluded that 146 of them (or about 30%) were unnecessary because the patients' angiograms showed minimal arterial blockage. The government further noted that its experts weren't the only ones who found Paulus's procedures to be problematic: the letter explained that KDMC's "consultants [had] also reviewed a random selection of Dr. Paulus' procedures, and found 75 angiographic films with [minimal blockage] in the artery he stented." But after some back-and-forth, the attempts at a civil settlement fell through, and the government obtained an indictment.
>
> At trial the government called three expert witnesses, Drs. Ragosta, Morrison, and Moliterno, who showed angiograms from 72 different patient files to the jury. While displaying each angiogram, the doctors diagnosed the amount of blockage in the patient's artery and contrasted their diagnosis with that stated in Paulus's report. Based on the differences between what the government's experts saw in the angiograms and what Paulus reported, the experts concluded that Paulus overstated his patients' arterial blockage and inserted medically unnecessary stents. They also emphasized that this was not "an isolated case[.]" Instead, Ragosta presented evidence of overstatements in 62 out of the 250–300 cases he reviewed, and he called the 62 cases a "representative sample"; Morrison noted that over half of the 11 randomly selected procedures he reviewed were unnecessary; and Moliterno asserted that all of the stent procedures he reviewed were unnecessary. Based on this testimony, the government argued that Paulus "saw one thing on the angiogram and consciously wrote down another." And he didn't just do it occasionally. According to the government's closing argument, Paulus did it "frequently, repetitively, daily."
>
> After 23 days of trial, four days of jury deliberations, one judicial pep talk, and one *Allen* charge, the jury convicted Paulus of one count of healthcare fraud and ten counts

of making false statements relating to healthcare. But the case didn't proceed to sentencing. The district court vacated the convictions, finding that there was insufficient evidence both that Paulus made false statements and that he had fraudulent intent. But that didn't stand. [The Sixth Circuit] disagreed with the district court's reasoning and reversed its order.

. . . After remand and before sentencing, the government disclosed to Paulus for the first time the "Shields Letter." According to the letter, when KDMC was facing its own legal trouble, it hired a team of independent experts to review Paulus's work. KDMC's consultant reviewed 1,049 of Paulus's cases and flagged 75 of his procedures as unnecessary. In the Shields Letter, KDMC's attorneys explained to the government their consultants' findings and offered to refund Medicare for the payments the hospital had collected for the 75 flagged procedures.

While Paulus already knew that KDMC had identified 75 of his procedures as problematic, he did not know that KDMC consultants had reviewed 974 other procedures that they apparently found non-problematic. The defense viewed this evidence as exculpatory because it meant that the KDMC Review found that the rate of unnecessary surgeries, 75 out of 1,049, or about 7%, was far lower than what the government experts had testified at trial; this lower percentage was less consistent with systemic and purposeful fraud and more consistent with occasional mistakes or diagnostic differences of opinion between cardiologists. Seeking information, Paulus moved to compel the government to produce all information related to the letter.

. . . The government disclosed to Paulus a series of events that had taken place before his trial. Long before Paulus was indicted, KDMC sent the government the Shields Letter. And when the government later elected to charge Paulus, it planned to use the Shield Letter in its case-in-chief and to disclose the letter to Paulus. But KDMC objected, arguing that the letter was both privileged and inadmissible. So, about a month before trial, the government brought the dispute to the district court, and the court scheduled an ex parte hearing, so as to protect KDMC's asserted privilege.

. . . [The District Court] held that the information was inadmissible . . . and that the government wasn't obligated to turn it over to Paulus.

. . . Having discovered this information after his trial, conviction, and remand from [the appeals court], Paulus moved for a new trial. The district court rejected Paulus's arguments and proceeded to sentencing. It sentenced Paulus to five years' imprisonment and ordered him to pay $1,156,102.23 in restitution.

*United States v. Paulus*, 952 F.3d 717, 720–22 (6th Cir. 2020) (internal citations omitted). Paulus appealed, challenging the government's failure to disclose the Shields Letter as a violation of his due process rights under *Brady*. *Id*. at 724. The Sixth Circuit agreed with Paulus, finding that the failure to disclose exculpatory, material evidence to the defense violated his right to due process. For that reason, the Sixth Circuit vacated Paulus's conviction and remanded the case for a new trial. *Id*. at 728.

It was in anticipation of this new trial that the United States issued its May 15, 2020 subpoena seeking, in essence, the balance of KDMC's findings regarding the 1,049 stent procedures its expert reviewed. The United States argues that, by disclosing the information contained in the Shields Letter (a partial disclosure of its expert's findings), KDMC waived any privileges and protections over information included in the letter. [R. 428 at pg. 6]. The United States further argues that the partial disclosure of the procedures that KDMC's expert flagged as problematic (75 of the 1,049 procedures reviewed) extends to undisclosed information concerning the same subject matter. [*Id*. at pg. 9]. Finally, the United States argues that the Court should conduct *in camera* review of email communications between KDMC and Paulus about the review of his procedures. [*Id*. at pg. 12].

In response, KDMC asserts that the information sought is protected by the attorney-client and work product privileges. [R. 432 at pg. 4]. KDMC further argues it did not waive any privileges and that the material sought is protected pursuant to FED. R. EVID. 408 as disclosures made during settlement negotiations. [*Id*. at pg. 19]. KDMC also argues it was in agreement with the United States that the Shields Letter did not waive any of the above-mentioned privileges, and the Court's January 2, 2019 order reflects that contention. [*Id*. at pg. 21–3]. Finally, KDMC asserts it has established that the communications with Paulus were privileged pursuant to a joint defense agreement (JDA). [*Id*. at pg. 23].

## II. ANALYSIS

### A. Disclosure and Waiver of Privilege

When KDMC made its partial disclosure of the expert consultant's findings to the United States, it waived any privilege as to that information. In response to the United States' motion to compel, KDMC describes at great length its process of hiring an independent expert to conduct a review of a sampling of Paulus's procedures. [R. 432 at pg. 4–7]. Indeed, by all accounts, KDMC took great care to ensure that the review would be protected by the work product and attorney-client privileges. First, KDMC hired outside counsel specifically to represent it with respect to compliance

with the subpoenas and interactions with the Department of Justice. Further, outside counsel engaged with the American Medical Foundation (AMF) to conduct the independent expert review of Paulus's procedures. KDMC's outside counsel entered into an agreement with the AMF that explicitly articulated the nature of the parties' relationship and the expectation of privilege in the work product. It is patently apparent that the information resulting from the independent expert review was intended as, and indeed was at one time, protected attorney-client communication and work product.

The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law, and it is meant to encourage clients to communicate freely with their attorneys. *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). However, it is well-established that voluntary disclosure of once-privileged material to a third-party "runs counter to the notion of confidentiality," and therefore waives the privilege held. *In re Grand Jury Proc.*, 78 F.3d 251, 254 (6th Cir. 1996). It does not matter what form the disclosure takes. *Id.* Moreover, the Sixth Circuit has held that disclosure of internal reviews to the government during a healthcare fraud investigation serves as a waiver of privilege with respect to that disclosed information. *In re Columbia/HCA Healthcare Corp. Billing Litigation*, 293 F.3d 289 (6th Cir. 2002).

Similarly, disclosure of once-protected material to a third-party waives work product protection as to the disclosed material. *Id*. at 307. "The work product doctrine is distinct from and broader than the attorney-client privilege" and encompasses "any document prepared in anticipation of litigation by or for the attorney." *In re Antitrust Grand Jury*, 805 F.2d 155, 163 (6th Cir. 1986). Like the selective disclosure of privileged communications, the selective disclosure of work product waives the protection afforded to the material. The Sixth Circuit explained:

> Even more than attorney-client privilege, waiver of the protections afforded by the work product doctrine is a tactical litigation decision. Attorney and client both know the material in question was prepared in anticipation of litigation; the subsequent decision on whether or not to "show your hand" is quintessential litigation strategy. Like attorney-client privilege, there is no reason to transform the work product doctrine into another "brush on the attorney's palette," used as a sword rather than a shield.

*In re Columbia/HCA Healthcare Corp. Billing*, 293 F.3d at 306–07.

The information gleaned from KDMC's expert review of Paulus's procedures was once shielded by the attorney-client privilege and work product doctrine. However, when KDMC deliberately revealed to the United States portions of its expert review findings, it waived both of those protections as to the disclosed information. KDMC deliberately and voluntarily disclosed information to an adversarial party—the United States.

Yet, KDMC maintains that its attorney-client and work product privileges are preserved because of an agreement entered into by the United States and KDMC prior to the disclosure of the Shields Letter. Such an agreement, KDMC asserts, would govern the effect of disclosure under FED. R. EVID. 502(e) and case law interpreting the effect of this type of agreement. Specifically, KDMC points to a case from the Fourth Circuit, which allowed a corporation to maintain its privilege after an initial disclosure to the government because they entered into an agreement limiting the effect of disclosure. *In re Grand Jury 16-3817 (16-4)*, 740 F. App'x 243 (4th Cir. 2018). The Fourth Circuit wrote,

> [The agreement] nullifies the effect of both Doe's initial disclosure of privileged information and the Government's later disclosure of the same information on X Corp.'s ability to assert privilege against the Government. As a result, X Corp. may assert privilege here as if Doe had never disclosed the information in the first instance.

*Id.* at 249.

Importantly, in the Fourth Circuit case, there was no dispute among the parties as to the existence of a written agreement. The Fourth Circuit's holding turned on whether the agreement "limited the effect" of a disclosure that, otherwise, would injure a party's right to assert a privilege "against the Government, the other contracting party." *Id.* at 246. The limiting nature of such an agreement also is supported by FED. R. EVID. 502(e), which provides that, "An agreement on the effect of disclosure in a federal proceeding is binding only on the parties to the agreement, unless it is incorporated into a court order."

Although Rule 502(e) may allow parties to a valid agreement control the effect of a disclosure in federal proceedings, other than unilateral statements in correspondence sent by KDMC's outside counsel, KDMC has not produced evidence of any agreement that would govern the effect of disclosure of the Shields Letter. In responsive filings to the instant motion to compel, KDMC has failed to establish the existence of an agreement beyond correspondence containing similar unilateral and conclusory statements such as that contained in the Shields Letter. Thus, KDMC cannot retroactively limit the effect of the disclosure of privileged materials to an adversarial party.

### B. Extension of Waiver to Undisclosed Information

KDMC's deliberate waiver of portions of the review (namely, the information about Paulus's stent procedure patients on with less than 30% occlusion) extends to undisclosed records and information concerning the same subject matter. "When [a] disclosure is made in a federal proceeding or to a federal office or agency and waives the attorney-client privilege or work product protection, the waiver extends to an undisclosed communication or information in a federal or state proceeding only if: (1) the waiver is intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) they ought in fairness to be considered together." FED. R. EVID. 502(a)(1)–(3). KDMC's partial disclosure of the consultant's findings waives any privilege to those findings and necessitates disclosure of the balance of the findings.

It is clear from the record, to say nothing of KDMC's own admission in response to the instant motion, that the disclosure of a portion of the expert review findings was intentional. In a letter to the United States, from KDMC's attorney wrote that "KDMC identified the names of 75 patients in which the reviewer found the total occlusion of the vessel was 30% or less." [R. 432 at pg. 8]. KDMC contends that waiver was not intentional because the disclosure was made in the context of FED. R. EVID. 408, which governs statements made in the context of settlement negotiations. [R. 432-1 at pg. 2–3]. Whether Rule 408 preserves attorney-client or work product privileges in this case is a separate inquiry. *See infra* Part II(C). Rather, in determining whether waiver was intentional under Rule 502(a), the

Court need only find that the disclosure itself was intentional. *See e.g., Lott v. Tradesmen Int'l, Inc.*, No. 5:09-CV-183-KKC, 2013 WL 308853, at *2 (E.D. Ky. Jan. 25, 2013) (intentional waiver requirement under FED. R. EVID. 502(a)(1) was met when "the disclosure was 'intentional'"). The record, along with representations made by KDMC in its responsive filings, demonstrates that the disclosure of the Shields Letter to the United States was undoubtedly intentional.

Furthermore, the undisclosed portions of the review concern the same subject matter as the already-disclosed information. The United States' subpoena is relatively narrow in scope, seeking only to discover the complete expert review. [R. 428-2 at pg. 6]. Specifically, the United States asks what procedures were reviewed, how those procedures were selected, what the method of review was, and what the results of the review were. [R. 428 at pg. 10]. In support of its position, the United States cites *In re Grand Jury Proc. Oct. 12, 1995*, 78 F.3d 251 (6th Cir. 1996), where the Sixth Circuit held that a laboratory owner's disclosure of an attorney's advice on elements of a marketing plan constituted a subject matter waiver as to those "specific points on which a waiver did occur." *Id*. at 256. The Court, however, stopped short of extending the waiver to parts of the plan concerning other subjects. *Id*.

Here, the information sought by the instant motion to compel is analogous to the former classification of information, not the latter. KDMC intentionally disclosed the following facts in the Shields Letter:

- Outside counsel for KDMC retained independent experts to review a random sample of approximately 4,600 procedures performed by Paulus;
- 1,049 stent procedures were included in the random sample analyzed by the independent experts;
- For the purpose of the review, the independent experts only examined angiograms and catheterization reports;
- The independent experts identified 75 patients with a percentage of occlusion that was 30% or less; and
- The names and information of the 75 patients that independent experts identified as having less than 30% occlusion.

[R. 428-2 at pg. 7–8]. The United States' subpoena and motion to compel seek information of the same character and regarding the same subject matter as that which was intentionally disclosed by the Shields

Letter.  If the United States sought all privileged information KDMC had regarding Paulus's actions, one could argue that request would be overly broad.  However, the United States' desire to get a fuller picture of that which was already disclosed is narrowly tailored enough to comply with FED. R. EVID. 502(a)(2).

Finally, fairness principles dictate that the disclosed and undisclosed information be considered together in this case.  *In re Grand Jury Proc.*, 78 F.3d 251 at 256 (citing *In re Dayco Corp. Derivative Securities Litigation*, 99 F.R.D. 616, 619 (S.D. Ohio 1983); *In re Von Bulow*, 828 F.2d 94, 102 (2nd Cir.1987)).  Specifically, the Advisory Committee Note to Rule 502 explained, "[A] subject matter waiver (of either privilege or work product) is reserved for those unusual situations in which fairness requires a further disclosure of related, protected information, in order to prevent a *selective and misleading* presentation of evidence to the disadvantage of the adversary." FED. R. EVID. 502 advisory committee's note (emphasis added).  Moreover, the "animating principle" of the fairness requirement is that a "misleading presentation that is unfair to the adversary opens itself up to a more complete and accurate presentation."  *Id.*

The contents of the Shields Letter are highly selective compared to the body of information reviewed by KDMC's independent consultants.  Although KDMC's counsel disclosed the identity of 75 patients with an occlusion of 30% or less, the nature and results of the review of the remaining 974 patients remain undisclosed.  In other words, the Shields Letter only discloses roughly 7% of the data compiled and examined by KDMC's independent experts.  The disclosure is patently selective and does not offer a full picture of the rate of occlusion among the remaining patients out of a sample of 1,049. Fairness demands that the information within the same subject matter as the initial disclosure be evaluated alongside the information contained in the Shields Letter.

### C. Settlement Privilege

KDMC is adamant that the information sought by the United States' subpoena is protected by the so-called *Goodyear* settlement privilege.  The Sixth Circuit, in *Goodyear Tire & Rubber Co. v.*

*Chiles Power Supply*, explicitly created a settlement privilege, holding that "any communications made in furtherance of settlement are privileged." 332 F.3d 976, 983 (6th Cir. 2003). In essence, KDMC asserts that the settlement privilege covers not only the Shields Letter, but also the underlying review. [R. 432 at pg. 19]. The United States maintains that the settlement privilege does not apply to the letter or the underlying review because KDMC's medical review and related information are not compromise offers or statements made during negotiations. [R. 438 at pg. 4, 8].

The settlement privilege, like other recognized privileges, shields communications from discovery. *See Goodyear*, 332 F.3d at 979 (citing FED. R. CIV. P. 26(b)(1)). The Sixth Circuit emphasized that "the right to discovery is not absolute." *Id.* The issue presented in *Goodyear* specifically addressed whether statements made in furtherance of settlement negotiations were shielded from discovery by third-parties. *Id.* at 977. Further, the Sixth Circuit's policy rationale for the creation of a settlement privilege cites to a district court that solely addressed third-party discovery of settlement negotiations. *Id.* at 981 (citing *Allen Cty. v. Reilly Indus., Inc.*, 197 F.R.D. 352 (N.D. Ohio 2000)).

Following *Goodyear,* several other district courts in this circuit have made clear that the settlement privilege is narrow. *Graff v. Haverhill N. Coke Co.*, No. 1:09-CV-670, 2012 WL 5495514, at *31 (S.D. Ohio Nov. 13, 2012) ("[D]istrict court decisions applying the settlement privilege subsequent to *Goodyear* make clear that the ruling in that case is 'quite limited.'"). Courts that have analyzed the application of *Goodyear* tend to do so when a third-party requests documents or communications that were made in furtherance of a settlement or negotiation. *See e.g.*, *In re Skelaxin (Metaxalone) Antitrust Litig.*, No. 1:12-MD-2343, 2014 WL 12769616 (E.D. Tenn. July 29, 2014) (denying motion to compel discovery of documents related to settlement agreements entered into by plaintiff with other insurers). Scotts Co. LLC v. Liberty Mut. Ins. Co., No. CIV.A. 2:06-CV-899, 2007 WL 1723506 (S.D. Ohio June 11, 2007) (denying motion to compel because settlement privilege applied to confidential settlement negotiations from past litigation). "*Goodyear* does not create a broad privilege protecting from discovery any document or communication arguably related to settlement

negotiations, fruitful or otherwise." *Westlake Vinyls, Inc. v. Goodrich Corp.*, No. 5:03-CV-00240-R, 2007 WL 1959168, at *3 (W.D. Ky. June 29, 2007). Nor does *Goodyear* create a broad privilege preventing discovery of settlement communications by *any* party, including a party to the settlement itself. Here, the parties to the agreement were KDMC, the United States, and the Commonwealth of Kentucky.[1] The United States' instant motion to compel KDMC to produce the balance of the review of Paulus's claims is not a motion by a third-party, but rather by a party to the very settlement at issue. Thus, the *Goodyear* settlement privilege does not apply to the Shields Letter nor the underlying review.

Throughout the briefing of this motion, KDMC and the United States invoke FED. R. EVID. 408, which governs the admissibility of communications made during settlement or compromise negotiations, to support their positions. KDMC argues that the information sought by the subpoena is plainly inadmissible under Rule 408; in turn, the United States insists that that Rule 408(a)(2) offers an exception that applies to the Shields Letter and underlying review. The admissibility of the Shields Letter and the underlying expert review is an evidentiary issue that should be addressed by the District Court Judge. The admissibility of the letter does not affect whether the records and documents pertaining to KDMC's expert review are privileged.

**D. January 2019 Court Order Limiting Effect of Disclosure**

KDMC's partial disclosure by way of the November 2013 Shields Letter resulted in waiver of both attorney-client and work product privileges. Yet, KDMC maintains that this Court's January 2, 2019 order (2019 Order) prevents the waiver of these privileges and that, accordingly, the Court should deny the instant motion to compel. KDMC derives this proposition from Rule 502(d), which provides, "A federal court may order that the privilege or protection is not waived by disclosure connected with the litigation pending before the court—in which event the disclosure is also not a waiver in any other

---

[1] Although the record does not document the settlement negotiations between KDMC, the United States, and the Commonwealth of Kentucky, the record does reflect that parties reached a settlement less than a year after the Shields Letter was sent. *See* [R. 156 at pg. 3] (linking to settlement agreement between United States, KDMC, and the Commonwealth of Kentucky).

federal or state proceeding." FED. R. EVID. 502(d). Indeed, the Court's 2019 Order [R. 357] stated, in relevant part,

> Pursuant to FED. R. EVID. 502(d) that the disclosure of these documents and the information contained in them to Defendant Richard E. Paulus, M.D. and his attorneys in this proceeding is not a waiver of King's Daughters Medical Center's attorney-client privilege, settlement privilege or work product protection in any other federal or state proceeding[.]

[R. 357 at pg. 2]. The 2019 Order specifically addressed the disclosure by KDMC to Paulus, and the limitations of waiver ordered by this Court were imposed upon that disclosure alone. The Court's order had no effect on the disclosure which occurred nearly six years prior when KDMC's counsel delivered the Shields Letter to the United States in November 2013.

Although the 2019 Order does have the effect of limiting the disclosure discussed therein, it cannot govern an entirely separate disclosure that occurred in a different proceeding. As contemplated by the Advisory Committee to Rule 502, federal courts may not "enter an order determining the waiver effects of a separate disclosure of the same information in other proceedings, state or federal." FED. R. EVID. 502(d) advisory committee's note. The disclosure at issue occurred in November 2013, during a healthcare fraud investigation that did not come before this Court or any other judicial body. Consequently, the 2019 Order does not retroactively limit the effect of KDMC's disclosure of the Shields Letter in November 2013 and the resulting waiver of attorney-client and work product privileges.

### E.  *In Camera* Review

KDMC's response to the May 2020 subpoena [R. 428-2] identified three emails between counsel for KDMC and Paulus that are subject to review by the Court *in camera*. Initially, the United States' argument for *in camera* review was that a joint defense agreement (JDA) between KDMC and Paulus may not have been in effect at the time the emails were sent. KDMC's privilege log identified three emails sent between June 12, 2012 and June 25, 2012, totaling 76 pages. Based on responses by KDMC and Paulus [R. 432, 433], the United States now concedes KDMC's emails were sent during

the time in which the JDA was operative. [R. 433 at pg. 7]. Still yet, the United States maintains that an *in camera* review of the emails remains necessary because subject matter waiver may extend to the emails if they contain information related to KDMC's independent review of Paulus's 1,049 stent procedures.

The JDA between KDMC and Paulus merely put into writing the common interest that they shared during the United States' healthcare fraud investigation. "The common interest privilege is not an independent source of privilege or confidentiality." *United States ex rel. Scott v. Humana Inc.*, No. 3:18-CV-61-GNS-CHL, 2021 WL 1221487 (W.D. Ky. Mar. 30, 2021) (citing *In re Com. Money Ctr., Inc., Equip. Lease Litig.*, 248 F.R.D. 532 (N.D. Ohio 2008)). As Magistrate Judge Robert Goebel explained,

> The common interest privilege is not an independent basis for privilege, but an exception to the general rule that the attorney-client privilege is waived when privileged information is disclosed to a third party. For this reason, it assumes the existence of a valid underlying privilege. Additionally, it assumes there is a valid basis for exchanging information with a third party without undermining the requirement of confidentiality for the attorney-client privilege to apply. In effect, it states that privileged communications shared among and within some group of people will be deemed to have been made in confidence.

*Broessel v. Triad Guar. Ins. Corp.*, 238 F.R.D. 215, 219–20 (W.D. Ky. 2006) (internal citations omitted). Thus, the common interest privilege—memorialized by a JDA—may shield information from discovery so long as there is some other basis for privilege besides the mere existence of a JDA.

In its privilege log, KDMC asserts attorney-client and work product privileges for each of the three emails at issue. [R. 428-2 at pg. 7]. However, if the subject matter of the emails pertains to KDMC's independent review of Paulus's 1,049 stent procedures, the attorney-client and work product privileges are waived as discussed above. *See supra* Part II(B). Absent one of these privileges, neither a JDA nor the common interest privilege preserve the confidentiality of otherwise privileged information after disclosure to a third-party. *See In re Grand Jury Proceedings*, 78 F.3d 251, 254 (6th Cir. 1996). Thus, to determine whether the emails sent between KDMC and Paulus's counsel fall

within the scope of KDMC's subject matter waiver as to the independent expert review, *in camera* inspection of the emails by the Court is necessary.

### III. CONCLUSION

For the reasons stated herein, having considered the matter fully and being otherwise duly and sufficiently advised,

**IT IS ORDERED** that:

1. The United States' motion to compel [R. 428 ] is **GRANTED**; and

2. The United States' request for *in camera* review [R. 428] is **GRANTED**.

3. KDMC is **DIRECTED** to submit the documents to the undersigned at atkins_chambers@kyed.uscourts.gov for *in camera* review.

Signed September 30, 2021.

Signed By:
*Edward B. Atkins* EBA
United States Magistrate Judge