UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
ASHLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | NO. 0:15-CR-15-DLB-EBA |
| | * | |
| RICHARD E. PAULUS, M.D., | * | |
| | * | |
| Defendant. | * | |

**DR. PAULUS'S MOTION TO DISMISS THE INDICTMENT
PURSUANT TO *RUAN V. UNITED STATES*, 597 U.S. -- (2022)**

Under Federal Rule of Criminal Procedure 12, Richard E. Paulus, M.D. moves the Court to dismiss the indictment against him under the authority announced by the United States Supreme Court in *Ruan v. United States*, 597 U.S. __ (2022). The government's theory of criminality in this case is foreclosed by *Ruan*, which held that criminal charges against physicians based on allegedly improper medical decisions must be supported by proof of the physician's own subjective, personal understanding that the decisions were improper, as opposed to the opinions of third parties or an objective examination of relevant medical standards.

The government has represented from the outset of this case that the prosecution of Dr. Paulus "will rise and fall upon experts." Transcript of Oral Argument on Motion to Dismiss, Docket Entry No. 107 at 40. There is no evidence that *Dr. Paulus* ever believed he was performing unnecessary stent procedures or interpreting angiograms improperly. During the government's 2018 appeal of Dr. Paulus's acquittal, the prosecution's reliance on objective, third-party evidence was deemed sufficient to prove intent based on the "inference of fraud" arising therefrom. *Ruan* holds, however, that a case like this requires proof that the defendant personally believed he was

1

engaged in wrongdoing. Expert opinions disagreeing about medical necessity are no longer enough on their own to secure a conviction because, absent evidence of the defendant's subjective belief, alleged medical malpractice can too easily be mischaracterized as fraud. That is precisely what has been happening in this case. The lack of notice regarding when alleged medical malpractice can be charged as fraud also violates due process, further mandating dismissal.

## BACKGROUND

Throughout this prosecution, the government has affirmed that its case is based upon opinions proffered by expert witnesses (and some fact witnesses) about what they perceive to be flaws in Dr. Paulus's medical judgments. While the government at times has represented that it would present other, so-called "plus factor" evidence that was separate and distinct from the expert testimony and would speak to Dr. Paulus's subjective intent, such evidence has never materialized. There is no credible, probative evidence that Dr. Paulus personally and subjectively believed he performed unnecessary stent procedures or improperly interpreted angiograms.

The indictment predicates criminal liability on purported violations of objective, third-party standards. The charges are explicitly premised on the allegation that it is "generally accepted" in the medical community that a stent is unnecessary absent a blockage of 70% or more and accompanying symptoms. Indictment, Docket Entry No. 1 at ¶ 25. The government alleges that Dr. Paulus performed stent procedures in circumstances in which the blockage at issue was less than 70% but described the blockage as being 70% or more to feign compliance with this "rule."[1] To support these two essential prongs of its case, the government relies on expert witnesses' opinions regarding the existence and applicability of the 70% "rule" and the fact that the blockages

---

[1] As Dr. Paulus previously briefed in detail in this case, *see* Docket Entry No. 27-1, and as was unequivocally established during his first trial, this "standard" has never been set forth in a law, regulation, or Medicare National or Local Coverage Determination.

2

evaluated by Dr. Paulus were less than 70% in severity. The indictment does not include a single factual allegation relevant to Dr. Paulus's own, subjective belief about the medical necessity of the relevant procedures. The government admits this case "will rise and fall upon experts," as opposed to direct or circumstantial evidence of Dr. Paulus's state of mind. Docket Entry No. 107 at 40.

During trial, the government relied on an *ad hoc* assemblage of physicians who scrutinized Dr. Paulus's medical judgments in an effort to paint those judgments as improper. Unlike in prior prosecutions alleging unnecessary stent procedures, the government did not present any credible, let alone sufficiently probative, evidence that Dr. Paulus knew or believed his medical decisions were incorrect. Instead, the government's case rested on testimony from its own selected expert witnesses who opined, based on a review of heavily cherry-picked and downscanned angiogram images, that *they* believed Dr. Paulus's angiogram interpretations were incorrect and his decisions to perform the procedures were unreasonable. This evidence was, at most, suggestive of potential medical malpractice. The final question presented to and answered by a witness at trial – the government's sole rebuttal witness, Dr. David Moliterno – made exactly that point:

> Q. And if you would, could you please tell us the ultimate conclusion you reached about Dr. Paulus as a physician. . . . .
>
> A. Yes. I thought that this was gross negligence and malpractice and that he should be asked to cease his practice of cardiology until this was further investigated. I was concerned for the welfare of patients in the state.

Transcript of Trial Testimony, Docket Entry No. 259 at 176-77.

During his closing argument in Dr. Paulus's 2016 trial, former Assistant United States Attorney ("AUSA") Sparks told the jury that if they believed the testimony of the government's expert witnesses, then they should find Dr. Paulus guilty. Transcript of Closing Argument, Docket Entry No. 293 at 98-100. During her rebuttal closing argument, AUSA Smith acknowledged that

Dr. Paulus believed the procedures at issue were necessary, but told the jury they should convict him nonetheless because other cardiologists disagreed and his subjective beliefs were not relevant:

> The defendant promised to bill for medically necessary services. That means something in the cardiology context. Medically necessary doesn't mean that just one doctor in Ashland, Kentucky thinks that this patient needs a procedure. You heard from the cardiologists what that means.

*Id.* at 145.

During post-trial proceedings, the government continued to acknowledge that its case premised criminal liability on the government experts' disagreements with Dr. Paulus's medical decisions. During oral argument on Dr. Paulus's post-trial motion for a judgment of acquittal, for example, AUSA Sparks represented to the Court as follows:

> THE COURT: We'll get to the more. But if all we had was Dr. Paulus says 70, Ragosta says 40 – let's have a standalone 1035 count. No other proof. Pick 12 jurors. I think that this is a 30 percent blockage. Cath report says 70. We rest. That's enough to convict?
>
> MR. SPARKS: It is.

Transcript of Oral Argument, Docket Entry No. 321 at 36; *see id.* at 37 (statement by AUSA Sparks that "the angiograms and the medical records are enough"). While the government continued to argue that other, circumstantial evidence further established Dr. Paulus's knowing and willful violations, the hodgepodge of information it cited had little probative value. *See id.* at 9 (discussion of lack of circumstantial evidence of fraud).

The government has informed the Court that it intends to proceed with a second trial of Dr. Paulus that will rely on the same evidence introduced during the 2016 trial. On July 21, 2022, AUSA Smith stated during a status conference that the government will rely on the same expert witnesses at trial, their lead expert witness will again be Dr. Michael Ragosta, and their case will take the same number of days to present, with perhaps one to two additional days to address the

KDMC Review. Transcript of Telephone Conference, Docket Entry No. 482 at 7-8. There is not going to be any new evidence that the Court has not already heard, save for the presentation of evidence that is exculpatory and that has no bearing on Dr. Paulus's subjective intent.

## STANDARD OF REVIEW

"Rule 12 of the Federal Rules of Criminal Procedure and its component parts encourage district courts to entertain and dispose of pretrial criminal motions before trial if they are capable of determination without trial of the general issues." *United States v. Levin*, 973 F.2d 463, 467 (6th Cir. 1992). "[A] defense may be properly raised pursuant to Rule 12 if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense." *United States v. Ali*, 557 F.3d 715, 719 (6th Cir. 2009) (internal citations omitted). Moreover, "district courts may make preliminary findings of fact necessary to decide questions of law presented by pretrial motions so long as the trial court's conclusions do not invade the province of the ultimate finder of fact." *Levin*, 973 F.2d at 467. If the facts alleged by the indictment do not state an offense, the indictment fails as a matter of law and should be dismissed. *See, e.g.*, *United States v. Landham*, 251 F.3d 1072, 1081-1083 (6th Cir. 2001). A district court is likewise empowered to dismiss an indictment pursuant to Rule 12 where the undisputed evidence shows that the government is incapable of proving an essential element of a charged offense. *See Levin*, 973 F.2d at 470 (concluding that dismissal of health care fraud charges was appropriate where the "government was, as a matter of law, incapable of proving beyond a reasonable doubt the intent required to convict the appellees of the controversial counts of the indictment").

## ARGUMENT

The indictment should be dismissed because this prosecution is foreclosed under *Ruan*. Additionally, there has been no fair notice to doctors about the line of demarcation between

traditional medical malpractice and medical malpractice that raises an inference of fraud, and to permit this case to proceed would violate the Due Process Clause.

I. **The Prosecution of Dr. Paulus Is Foreclosed by *Ruan***

    A. ***Ruan* Narrows The Permissible Methods of Proof in Health Care Fraud Cases**

In *Ruan*, the Supreme Court addressed the *mens rea* required to establish a violation of the Controlled Substances Act ("CSA"), 21 U.S.C. § 841(a), which makes it illegal for an individual to "knowingly or intentionally" prescribe a controlled substance unless "authorized" to do so. An implementing regulation provides that a prescription is only "authorized" if written "for a legitimate medical purpose" and "in the usual course of [] professional practice." 21 C.F.R. § 1306.04(a). In *Ruan*, prosecutors in the Southern District of Alabama relied on this regulatory scheme to argue that Dr. Xiulu Ruan committed a crime when he wrote prescriptions that were illegitimate, as determined by third-party expert witnesses. *Ruan*, 597 U.S. __, __ (slip. op., at 3). Dr. Ruan argued that, regardless of what the experts said about the prescriptions, he always believed he was prescribing properly. The district court refused to instruct the jury as he requested regarding that defense, and Dr. Ruan was convicted. He appealed his conviction to the Eleventh Circuit, which affirmed, and ultimately to the Supreme Court.[2]

In a landmark opinion, the Supreme Court rejected the *Ruan* prosecutors' approach to establishing criminal liability. The Court held unanimously that the statute's *mens rea* requirement applies to the question of authorization, *id.* at 8-9, and that whether a doctor issued a medical prescription "for a legitimate medical purpose" cannot be determined by reference to external, objective standards, but instead turns on his subjective state of mind. *Id.* at 12-13. Stated differently, a jury must consider the individual doctor's own subjective belief to determine whether

---

[2] In the Supreme Court, *Ruan* was consolidated with a similar case from the Tenth Circuit.

6

he or she knowingly and intentionally did something that was unauthorized and therefore criminal. *Id*. at 15; *see id*. at 13 (rejecting "the Government's standard" because it "would turn a defendant's criminal liability on the mental state of a hypothetical 'reasonable' doctor, not on the mental state of the defendant himself or herself"). The Supreme Court explained that a focus on the defendant's subjective understanding is essential when interpreting vague and ill-defined concepts like "legitimate medical purpose." *Id*. at 15. Tethering criminal liability to an after-the-fact disagreement from an expert witness is impermissible because it would allow the government to prosecute a host of non-criminal behavior. *Id*. at 13-14.

In reaching this conclusion, the Court drew from numerous prior, analogous decisions in which a defendant's subjective state of mind and knowledge of the criminality of their actions functioned as the border between the criminal and the lawful. *See id.* at 8 (citing *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72-73 (1994) (holding that *mens rea* requirement in statute criminalizing the knowing transportation or receipt of a video involving the use of a minor engaging in sexually explicit conduct applied to both the transportation or receipt and the criminal nature of the video); *Liparota v. United States*, 471 U.S. 419, 423 (1985) (holding that *mens rea* requirement in statute penalizing the knowing use of food stamps in a manner not authorized by statute applied to both the use of the food stamps and the fact that the use was not authorized); *Rehaif v. United States*, 139 S. Ct. 2191, 2196-97 (2019) (interpreting a statute that made it illegal to "knowingly violat[e]" a separate law prohibiting certain persons from possessing firearms to require proof that a defendant both knew he possessed a firearm and knew he was prohibited from doing so and explaining that "[a]pplying the word 'knowingly' to the defendant's status in § 922(g) helps advance the purpose of scienter, for it helps to separate wrongful from innocent acts.").

7

The Court also drew upon *Elonis v. United States*, 575 U.S. 723, 737 (2015), which reversed a conviction in which a defendant's conduct had been judged based upon a reasonableness standard. The defendant in *Elonis* was indicted under 18 U.S.C. § 875(c), which makes it a crime to transmit in interstate commerce "any communication containing any threat . . . to injure the person of another" based on social media posts that he testified were meant to be facetious and artistic expression, but his wife and others had found threatening. *Id.* at 731-32. At trial, the government was not required to prove that Elonis himself intended his words to be threatening; instead, his conviction "was premised solely on how his posts would be understood by a reasonable person." *Id.* at 737. The Supreme Court rejected that approach, holding that "a 'reasonable person' standard is a familiar feature of civil liability in tort law, but is inconsistent with 'the conventional requirement for criminal conduct – awareness of some wrongdoing.'" *Id.* at 737-38 ("Having liability turn on whether a 'reasonable person' regards the communication as a threat – regardless of what the defendant thinks – reduces culpability on the all-important element of the crime to negligence, and we have long been reluctant to infer that a negligence standard was intended in criminal statutes.") (internal citations and quotations omitted). As the Court succinctly stated, "Under [long-established] principles, 'what [Elonis] thinks does matter.'" *Id.* at 738.

In briefing and during oral argument in *Ruan*, the Office of the Solicitor General argued that requiring CSA Section 841(a) prosecutions to be supported by subjective evidence of the defendant's intent would render the statute unworkable, because it would allow doctors to escape liability by feigning belief in the legitimacy of their decisions (a position also pressed by the government in this case, *see* Docket Entry No. 321 at 58). The Supreme Court disagreed:

> [T]he Government argues that requiring it to prove that a doctor knowingly or intentionally acted not as authorized will allow bad-apple doctors to escape liability by claiming idiosyncratic views about their prescribing authority. This kind of argument, however, can be made in many cases imposing scienter requirements,

8

> and we have often rejected it on bases similar to those we have set forth in Part II of this opinion.
>
> We do the same here. The Government, of course, can prove knowledge of a lack of authorization through circumstantial evidence. And the regulation defining the scope of a doctor's prescribing authority does so by reference to objective criteria such as "legitimate medical purpose" and "usual course" of "professional practice." As we have said before, "the more unreasonable" a defendant's "asserted beliefs or misunderstandings are," especially as measured against objective criteria, "the more likely the jury . . . will find that the Government has carried its burden of proving knowledge." But the Government must still carry this burden. And for purposes of a criminal conviction under § 841, this requires proving that a defendant knew or intended that his or her conduct was unauthorized.

597 U.S. __, __ (slip op., at 14-15) (internal citations omitted). The Court affirmed that use of a subjective intent standard is crucial to avoid an overbroad interpretation of the statute that would sweep up innocent conduct. *Id*. at 7 (explaining that "[a] strong scienter requirement helps to diminish the risk of 'overdeterrence,' *i.e.*, punishing acceptable and beneficial conduct that lies close to, but on the permissible side of, the criminal line").

### B.   The Reasoning of *Ruan* Is Applicable To This Prosecution

To be sure, this case depends on the *mens rea* elements of 18 U.S.C. §§ 1347(a) and 1035(a), whereas *Ruan* considered the *mens rea* element of 21 U.S.C. § 841(a). However, the reasoning of *Ruan* and its ultimate holding are instructive for several reasons.

First, the reasoning of *Ruan* is consistent with the legislative history of the health care fraud statute, which makes it clear that Congress did not intend the term "defraud" in Section 1347 to apply to disagreements about medical judgments. The statute "is not intended to penalize a person who exercises a health care treatment choice or makes a medical or health care judgment in good faith simply because there is a difference of opinion regarding the form of diagnosis or treatment." H.R. Rep. No. 104-736 at 258 (1996) (Conf. Rep.), 1996 U.S.C.C.A.N. 1990, 2071.

9

Second, the statutory schemes are analogous. Sections 1347(a) and 1035(a) require proof that a defendant acted "knowingly and willfully, which is analogous to Section 841(a)'s requirement that the defendant acted "knowingly or intentionally." The statutes all carry severe potential consequences. In both cases, the statutes are being enforced by reference to vague and ill-defined implementing concepts – "medically necessary" and "legitimate medical purpose," respectively. *Ruan* held that proof of a defendant's subjective belief is critical when interpreting and applying such concepts, and the undisputed evidence in this case regarding the confusing, contradictory, and oft-shifting concept of medical necessity with respect to coronary artery stent procedures is legion. Thus, *Ruan* provides important guidance about how to implement Sections 1347 and 1035 in medical necessity cases. *See Northcross v. Bd. of Educ. of Memphis City Schs.*, 412 U.S. 427, 428 (1973) (stating that when statutes have similar language, this is "a strong indication that the two statutes should be interpreted pari passu," particularly when they also have a similar purpose).

Third, the evidence is analogous. As in *Ruan*, the government hopes to prove that Dr. Paulus performed medically unnecessary procedures and misinterpreted angiograms through the introduction of expert witness testimony regarding relevant medical standards (more precisely, the government experts' *opinions* of the alleged standards) and their disagreements with his angiogram interpretations. Like the prosecutors in *Ruan*, they intend to argue that Dr. Paulus's culpability is established because his conduct did not comply with the purported standards and therefore violated rules stating that health insurers will only pay for procedures that are "medically necessary."

Fourth, this case, like *Ruan*, hinges on the evaluation of conduct that is not inherently problematic and therefore, a nuanced scienter requirement is necessary to "help[] to separate wrongful from innocent acts." *Ruan*, 593 U.S. at ___, ___ (slip. op., at 6) (*citing Rehaif*, 139 S. Ct.

at 2191).³ As now-former Justice Stephen Breyer wrote in *Ruan*, our Supreme Court has long held that "wrongdoing must be conscious to be criminal." *Id*. at 5 (quoting *Elonis*, 575 U.S. at 734; *Morissette v. United States*, 342 U.S. 246, 252 (1952)). If a defendant-physician does not subjectively know or believe that what he or she is doing is improper, no crime has been committed. Thus, proof of Dr. Paulus's subjective intent to misinterpret an angiogram or perform an unnecessary procedure is integral to proving the charges in this case.

    C.    **The Government's Case Fails Under *Ruan***

In this case, the intent requirements of Sections 1347(a) and 1035(a) must be applied holistically to the charges against Dr. Paulus, including both their elements and the implementing concept of medical necessity, which, while not an element itself, "separate[s] wrongful from innocent acts." *Ruan*, 597 U.S. __, __ (slip op., at 12) (explaining that the *mens rea* requirement in Section 841(a) must be applied to the concept of authorization because although it is not an element it plays a crucial role "in distinguishing morally blameworthy conduct from socially necessary conduct"); *Elonis*, 575 U.S. at 737 (explaining that "the crucial element separating legal innocence from wrongful conduct" is the threatening nature of the communication. The mental state requirement must therefore apply to the fact that the communication contains a threat") (cleaned up)). This cannot be done by way of expert witness testimony or objective measurement. The government must establish beyond a reasonable doubt that *Dr. Paulus himself* knew that the procedures were not "medically necessary" and that his angiogram interpretations were improper.

---

³ *See also United States v. Paulus* ("*Paulus I*"), 894 F.3d 267, 276 (6th Cir. 2018) (stating that "we would never fault a doctor for simply misreading an angiogram"); *Id*. at 277 (stating that "[a] doctor may not be convicted of fraud for mere mistaken judgments or good-faith efforts to treat patients to the best of his ability"); *United States v. McLean*, 715 F.3d 129 (4th Cir. 2013) (explaining that proof of a physician's failure to meet medical standards by itself could not sustain a conviction for healthcare fraud).

11

It is not enough to show that a "reasonable" cardiologist would not have made the same decisions as he did. *See Elonis*, 575 U.S. at 737-38.

The undisputed evidence shows that the government cannot satisfy that burden. Both the government and this Court have recognized that Dr. Paulus personally believed the stent procedures at issue were necessary. *See* Docket Entry No. 293 at 145 (government's rebuttal closing argument that Dr. Paulus's belief in the necessity of the procedures was not enough to establish their necessity); Transcript of Sentencing, Docket Entry No. 389 at 283 (statement that "[t]he Court does not doubt your sincerity in wanting to help your patients, not one bit. I listened to you testify. I believe you were honestly concerned with their cardiological care"); *see also Elonis*, 575 U.S. at 732 (reversing conviction in case in which "[t[he Government's closing argument emphasized that it was irrelevant whether Elonis intended the postings to be threats – 'it doesn't matter what he thinks.'"). While the government argued post-trial that Dr. Paulus lied about the degree of stenosis, *see, e.g.,* Docket Entry No. 321 at 34, its only proof regarding the supposed "lies" was third-party expert opinion, which is insufficient under *Ruan*. The prosecutors' promise that they also would present evidence of Dr. Paulus's subjective intent went unfulfilled. The proof here amounts to no more than evidence of alleged medical malpractice. As has been recognized repeatedly, this case is totally distinguishable from prior prosecutions like *McLean* in which there "also was sufficient evidence to rule out non-criminal explanations." 715 F.3d at 138.

The government may respond that it is entitled to present its case nevertheless and attempt to meet its burden of proof, but this Court has already seen and evaluated the evidence that the government intends to present. The government has indicated that, aside from addressing the KDMC Review (which the Sixth Circuit has held was sufficiently material and exculpatory under *Brady* to merit a new trial), its presentation of evidence will be the same: same experts, same

evidence, same basis of criminal liability. There is, in essence, no dispute as to the facts: Dr. Paulus believed his treatment decisions to be correct and medically necessary, and the government's experts disagree. Under *Ruan*, this presentation fails as a matter of law and is a proper basis for dismissal. *See Levin*, 973 F.2d at 463 (affirming pretrial dismissal of counts of indictment alleging health care fraud and observing that "a defense is 'capable of determination' if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense") (cleaned up). A trial would "be of no assistance" in determining the validity of Dr. Paulus's defense under *Ruan* (*i.e.*, that he lacked the requisite *mens rea*) because the Court is already aware of the evidence that will be presented on that point, on the basis of which the Court previously acquitted him. *See id.* Thus, dismissal is appropriate.

II.     **The Indictment Violates Due Process**

The government's proposed re-prosecution of Dr. Paulus, based as it is on expert witness testimony, also must be dismissed because it would violate due process. In addition to the fact that the government's theory of prosecution – that objective disagreements by expert witnesses are sufficient to raise an inference of fraud – has been foreclosed by *Ruan*, the government has never been able to articulate the quantum of proof it believes is necessary to support such an inference and the resulting indictment of a doctor who has engaged in conduct traditionally thought to be addressable in medical malpractice or civil enforcement actions.

The government has recognized in this case, as it must, that it has no direct evidence of Dr. Paulus's subjective mental state in allegedly knowingly and willfully committing fraud. Instead (and as was addressed at length in prior appeals) the government's case is based entirely on scanty circumstantial evidence and its argument that Dr. Paulus performed objectively unreasonable procedures so frequently that only fraud could explain his conduct. The obvious response, of

13

course, is that negligence could explain the conduct equally well. In seeking reversal of Dr. Paulus's post-trial acquittal, the government argued it had satisfied its burden to prove guilt beyond a reasonable doubt by presenting evidence of very small, cherry-picked reviews in which other doctors disagreed with 30-50% of his angiogram interpretations. The Sixth Circuit decided that proof was adequate to raise an inference of fraud sufficient to support the jury verdict. *Paulus I*, 894 F.3d at 278. In the second appeal, when Dr. Paulus showed that the government had improperly withheld exculpatory evidence, the government's proof was undercut by the much larger KDMC Review, in which the rate of disagreement was only 7% – a rate that would not even trigger a federal billing audit. *United States v. Paulus* ("*Paulus II*"), 952 F.3d 717 (6th Cir. 2020).

During oral argument in *Paulus II*, Sixth Circuit Judge David McKeague questioned whether the evidence, clarified by way of the belated *Brady* disclosure, properly supported a criminal indictment:

> JUDGE MCKEAGUE: Well, we can agree that if you found one case out of the 4,600 procedures this doctor did, you wouldn't accuse him of fraud in federal court.
>
> DAVID LIEBERMAN: Correct.
>
> JUDGE MCKEAGUE: So, you accused him of fraud when one of your studies showed [the rate of disagreement] was about 50%. Well, I mean, that sounds reasonable to me. So, there's got to be some sort of a line between one and 50%. And you seem to say…it -- doesn't matter if it's 7% or if it's 50%. Intuitively it doesn't seem to make sense.

Transcript of Oral Argument, *United States v. Paulus*, No. 19-5532, February 4, 2020, Docket Entry No. 424-1 at 24-25; *see also McLean*, 715 F.3d at 139 (Fourth Circuit declined to hold that "pattern evidence showing that a physician placed more unnecessary stents than the national average necessarily would be probative of fraud, for such a pattern might only suggest negligence"). Judge McKeague also was careful to note that the fact that one government expert witness had disagreed with Dr. Paulus's interpretation of an angiogram did not establish that Dr.

14

Paulus had made an error, but instead, amounted only to "a disagreement in medical judgment." *Id*. at 36. The government's counsel was unable to answer Judge McKeague's inquiry. That insightful question remains unanswered: how much alleged malpractice is enough to justify a criminal indictment? This problem takes on an added dimension in the face of further exculpatory evidence: while the overall rate of disagreement in the KDMC Review was 7%, the review was conducted by numerous cardiologists, some of whom had individual rates of disagreement that were even lower. Should the average rate of disagreement control the inquiry, or something else?

This lack of notice to physicians about where civil liability ends and criminal liability begins presents an unacceptable due process problem. "A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010). "[A] regulation is not vague because it may at times be difficult to prove an incriminating fact but rather because it is unclear as to what fact must be proved." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (holding that television stations did not have fair notice that "fleeting expletives" constituted a violation). This can arise, for example, from "statutes that tie[ ] criminal culpability to . . . wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *United States v. Williams*, 553 U.S. 285, 306 (2008).

Whether a criminal statute is impermissibly vague is a question of law for the court that "must be made on the basis of the statute itself and the other pertinent law, rather than on the basis of an ad hoc appraisal of the subjective expectations of particular defendants." *Bouie v. City of Columbia*, 378 U.S. 347, 355 n.5 (1964). The analysis of whether fair notice has been provided "should be conducted bearing in mind the context in which the statute is applied." *United States v.*

15

*Beason*, 523 Fed. Appx. 932, 934 (4th Cir. 2013) (reversing a conviction because an inmate did not have fair notice that possession of a cell phone in a federal prison constituted a federal criminal offense, even though the inmate knew he could be subject to administrative sanctions for possessing it). In the context of the practice of medicine, the Supreme Court has criticized, on vagueness grounds, statutes that do "not afford broad discretion to the physician" but instead attempt to "condition[] potential criminal liability on confusing and ambiguous criteria" and "therefore present[] serious problems of notice, discriminatory application, and chilling effect on the exercise of constitutional rights." *Colautti v. Franklin*, 439 U.S. 379, 394 (1979), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022).

The lack of notice here is obvious. When federal prosecutors who specialize in health care fraud prosecutions and federal judges do not know the answer to these questions about when allegations regarding unnecessary stent procedures should trigger an indictment, it goes without saying that physicians also lack sufficient notice of when alleged medical malpractice could subject them to criminal prosecution. And there is no guarantee that the next set of prosecutors who investigate a doctor based on allegations of medically unnecessary procedures will answer the questions in the same way. The lack of notice is further exacerbated by the prosecution's dependence on medical standards that are constantly changing and often equivocal. *See Fox Television Stations*, 567 U.S. 239 at 253-54 (concluding there was a due process violation and holding that there was no fair notice when the government "changed course" in its interpretation of its own guidelines); *cf. Levin*, 973 F.2d at 469 (affirming dismissal of health care fraud indictment pretrial where the government had issued numerous opinion letters that appeared to approve the practices set forth in the indictment and reflected the ambiguity of the statute).

16

This Court should decline to endorse such a broad and standardless interpretation of the health care fraud statutes. The Supreme Court has "traditionally exercised restraint in assessing the reach of a federal criminal statute, both out of deference to the prerogatives of Congress, and out of concern that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *Arthur Andersen v. United States*, 544 U.S. 696, 703 (2005) (internal citations omitted). That restraint is "particularly appropriate . . . where the act underlying the conviction . . . is by itself innocuous," *id*., such as a doctor providing medical care to a patient. *See also Ruan*, 597 U.S. at __ (slip op., at 6) (explaining that, in the context of Section 841, "authorization plays a crucial role in separating innocent conduct – and, in the case of doctors, socially beneficial conduct – from wrongful conduct") (internal quotations omitted). That is why, in *Ruan*, the Supreme Court held that a criminal conviction based on prescriptions issued not "for a legitimate purpose" must be supported by evidence that the doctor in question personally, subjectively believed the prescriptions were not legitimate. Without that particularized *mens rea*, negligence can too easily be recast as crime, and a person like Dr. Paulus can be blindsided by the assertion that alleged mistakes he made in his medical practice warrant an indictment.

This prosecution violates due process because there has been no notice to physicians about where the line falls between civil liability for medical malpractice and criminal liability for fraud. This is another reason why the indictment should be dismissed.

## CONCLUSION

The government has told this Court repeatedly that it understands the difference between a medical malpractice case and a fraud prosecution, yet it intends to retry Dr. Paulus by again presenting the same third-party expert opinions disagreeing with his medical judgments. Under

*Ruan*, as a matter of law, this is insufficient to establish criminal liability. Furthermore, should this case proceed, a jury improperly will be called upon to answer an unanswerable question about where to draw the line between medical malpractice and fraud. The lack of notice to doctors about where the line is drawn would render any resulting conviction a deprivation of due process. For these reasons, Dr. Paulus respectfully asks the Court to dismiss the indictment. Dr. Paulus also respectfully requests oral argument on this motion.

Dated: September 9, 2022                                Respectfully submitted,

/s/Robert S. Bennett
Robert S. Bennett
Hilary H. LoCicero
BENNETT LOCICERO & LIU LLP
1707 L Street, NW
Suite 1030
Washington, DC 20036
Tel: (202) 880-2309
E-mail: rsbennett@bllfirm.com
E-mail: hhlocicero@bllfirm.com

/s/ C. David Mussetter
C. David Mussetter
MUSSETTER LAW OFFICE
P.O. Box 192
2709 Louisa Street
Catlettsburg, KY 41129-0192
Tel: (606) 931-0050
Fax: (606) 931-0051
E-mail: attmuss@windstream.net

COUNSEL FOR DR. RICHARD E. PAULUS

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing Motion to Dismiss the Indictment Pursuant to *Ruan v. United States*, 597 U.S. ___ (2022) has been served on all counsel of record this 9th day of September, 2022, by filing a copy of the same with the Electronic Court Filing System of the United States District Court for the Eastern District of Kentucky.


/s/Robert S. Bennett
Robert S. Bennett
Counsel for Defendant, Richard E. Paulus M.D.