UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
ASHLAND

CRIMINAL ACTION NO. 15-CR-15-DLB

UNITED STATES OF AMERICA                                         PLAINTIFF

vs.        **UNITED STATES'S RESPONSE IN OPPOSITION
TO MOTION TO DISMISS THE INDICTMENT**

RICHARD E. PAULUS, M.D.                                  DEFENDANT

\* \* \* \* \* \* \* \*

Paulus's latest Motion to Dismiss the Indictment, DE 484, regurgitates legally unsupported arguments that this Court and the Sixth Circuit have already rejected, this time in reliance on *United States v. Ruan*, 597 U.S. ___, 142 S. Ct. 2370 (2022), a Controlled Substances Act decision that has nothing to do with the health care fraud or false statement statutes. *Ruan* does not alter the elements of the charged offenses, nor does it add to the government's evidentiary burden. The United States has always been required to prove that Paulus's false statements were "knowing[]" and "willful[]", and that he acted with "intent to defraud" instead of with mistaken but good-faith medical judgment. [DE 293: Jury Instructions at Page ID# 11688, 11690.] The question of Paulus's fraudulent intent must be answered by a jury based on the evidence admitted at trial. [DE 108: Memorandum Order at Page ID# 1566 ("[W]hether Dr. Paulus committed healthcare fraud or merely exercised his medical judgment is a factual dispute that goes

1

to the merits of the case. The Court cannot resolve such a dispute without invading the province of the jury.").]

Paulus's argument that the Court should usurp the role of the jury in determining a Rule 12 motion prior to retrial, because the anticipated evidence may be "the same," is beyond frivolous, especially where the Sixth Circuit already held that this "same evidence" was sufficient to prove his subjective fraudulent intent. *See United States v. Paulus*, 894 F.3d 267, 277-78 (6th Cir. 2018) (*Paulus I*) (upholding jury's verdict that Paulus' "false statements were willful and he acted with intent to defraud," as opposed to "mere mistaken judgments or good-faith efforts to treat patients to the best of his ability."). As discussed below, the evidence of Paulus's fraudulent intent will likely be even more powerful in the new trial. Finally, Paulus's due process argument that the health care fraud and false statement statutes are impermissibly vague is substantively identical to the constitutional argument the Court properly rejected years ago. DE 108: Memorandum Order at Page ID# 1570. The same result holds here.

For these reasons, and as discussed more fully below, the Motion to Dismiss should be denied.

## I. PROCEDURAL HISTORY

### A. The First Trial and *Paulus I*

Paulus is charged with one count of health care fraud, 18 U.S.C. § 1347, and ten counts of making false statements in connection with the delivery of and payment for

health care services, 18 U.S.C. § 1035.[1] [DE 1: Indictment.] Before the first trial in this matter, Paulus filed a host of motions, including a motion to dismiss the Indictment on the grounds that section 1347 could not be used to prosecute a physician's medical judgment, and that the Indictment's use of section 1347 violated his due process rights because the statute did not provide fair notice of when a physician's departure from accepted medical standards could become a criminal act. [DE 29: Motion to Dismiss.] Those same arguments are made again here. The Court properly denied the Motion, [DE 108], and a jury subsequently convicted Paulus of the health care fraud charge and ten false statements charges. [DE 276: Verdict.]

In March 2017, the Court granted Paulus's post-trial Rule 29 motion for judgment of acquittal, and conditionally granted Paulus's motion for new trial under Rule 33. [DE 318.] The Court's decision was predicated on a belief that the trial evidence failed to prove that a cardiologist's interpretations of angiograms were facts capable of proof or disproof, and further failed to prove that Paulus acted with fraudulent intent. [*Id*. at 51.]

The United States appealed, and the Sixth Circuit reversed the judgment of acquittal and reinstated Paulus's conviction, based on the evidence admitted at trial. With respect to whether angiogram readings could be false statements, it held that "[t]he degree of stenosis is a fact capable of proof or disproof. A doctor who deliberately inflates the blockage he sees on an angiogram has told a lie; if he does so to bill a more

---

[1] The Indictment sets forth twenty-six false-statement offenses. Counts 2, 6, 7, 9, 13, 15, 16, 19, 22, 23, and 26 were previously dismissed by the United States, and a jury acquitted Paulus of Counts 3, 11, 14, 17, and 27. Thus, the operative ten charges are Counts 4, 5, 8, 10, 12, 18, 20, 21, 24, and 25.

expensive procedure, then he has also committed fraud." *Paulus I*, 894 F.3d at 275. As proof of Paulus's routine exaggerations of the degree of stenosis, the Sixth Circuit pointed to expert testimony regarding seventy-two cases in which Paulus recorded a blockage of 70% or higher and the independent medical experts determined the actual stenosis to be substantially lower. *Id*. at 277. With respect to fraudulent intent, the Sixth Circuit found that the government "carried its burden" with "evidence of Paulus's 'astronomical' billing numbers, his enormous salary, injured patients' testimony, … other evidence about KDMC's behavior that supported an inference that something was amiss . . . . [and] . . . around 100 angiograms [with] expert testimony explaining that Paulus had recorded severe blockages where none existed." *Id*. at 278. The Sixth Circuit's sufficiency holding was necessarily predicated on the evidence admitted at trial and presented to the jury. *Id*. at 274-75.

B. The Shields Letter and *Paulus II*

Prior to sentencing, the Court authorized the United States to disclose to Paulus "the Shields Letter"—a November 2013 letter from Paulus's employer, King's Daughters Medical Center (KDMC), to the United States Attorney's Office, describing certain aspects of an internal review of Paulus' stent procedures conducted by KDMC. The United States had sought to disclose the Shields Letter to Paulus prior to trial but was ordered by the Court not to do so. [DE 163.] The Shields Letter stated that independent experts retained by KDMC had reviewed 1,048 of Paulus's stent procedures, and identified 75 in which the degree of stenosis was 30% or less. The Shields Letter was silent as to the results of the other 973 procedures.

4

Paulus filed a motion for a new trial, arguing that the failure to disclose the Shields Letter before trial violated *Brady v. Maryland*, 373 U.S. 83 (1963). [DE 366: Mot. for New Trial.] Paulus repeatedly averred that his counsel lacked access to the information in the letter before trial and that he was prejudiced by the nondisclosure. For instance, Paulus alleged that the government "hid[] the statistical result" referenced in Shields Letter, thereby "depriv[ing] the defense of the ammunition it needed to disprove the government's claims." [*Id*. at Page ID#13159.] Paulus further stated that, if "the scope and statistical result of the KDMC review had been disclosed," his counsel would have more effectively cross-examined a government expert. [*Id*. at Page ID#13160.] Paulus additionally averred that "disclosure of the KDMC review and the 7% rate of disagreement would have fundamentally shifted [his] trial strategy toward a defense of innocent mistake." [*Id*. at Page ID#13164.]

Paulus's counsel, Hilary LoCicero, submitted a sworn declaration that she learned for the first time in January 2019 that the government had received a letter from KDMC's counsel "report[ing] that outside reviewers engaged by KDMC had reviewed 1049 of Dr. Paulus's stent procedures and identified only 75 in which they assessed the blockage as being 30% or less, a rate of disagreement of just 7%." [DE 366-6: LoCicero Decl. ¶ 4.] LoCicero further averred that she and her co-counsel lacked knowledge of the results of KDMC's internal review at the time of trial. [*See id*. ¶ 9 ("Had we known about the result of the KDMC review …"); *id*. ¶ 14 ("Had Dr. Paulus's counsel known about the result of the KDMC review …"); *id*. ¶ 19 ("Had we been able to make effective use of the result of the KDMC review at trial …").] When the United States argued in response

that Paulus likely knew of KDMC's medical review or could have obtained information about it from the hospital, Paulus again represented that his counsel did not have access to information about KDMC's internal review. [DE 371: Reply at Page ID#13481 ("The claim that Dr. Paulus could have discovered this evidence by pushing the hospital to reveal it is directly contradicted by the record.").]

The Court denied Paulus's motion, sentenced him to sixty months' imprisonment, and ordered him to pay $1,156,120 in restitution. [DE 381: Judgment.] Paulus renewed his *Brady* claim on appeal and focused on the government's failure to disclose "the 7% result of the KDMC Review in time for him to make use of it at trial." 2019 WL 3855507, at *21. In response, the government noted that "no *Brady* violation [occurs] where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information." 2019 WL 5258597, at *32 (quoting *United States v. Castano*, 906 F.3d 458, 466 (6th Cir. 2018)). The government then argued, consistent with this Court's holding, that Paulus and his counsel knew the "essential facts" conveyed in the Shields Letter—that KDMC had performed a random study of his procedures and identified 75 as clearly inappropriate. *Id*. at 33. In his reply brief, Paulus disputed the government's contention that his counsel could have obtained information about the sample size by asking KDMC. *See* 2019 WL 5789869, at *24 ("The government's assertion that Paulus 'could have easily obtained the sample size from KDMC directly' … is belied by the record.") (brackets omitted).

At oral argument, the Sixth Circuit inquired into what Paulus knew about KDMC's review of Paulus' procedures prior to trial: "Was there any attempt by Paulus,

relevant or not, to contact the hospital to find out more about the 75 procedures and … whatever sample that came from?" [DE 424-1: Oral Arg. Tr. At Page ID#14656.] Ms. LoCicero responded: "There was an effort and the hospital declined to provide any information." *Id.*

The Sixth Circuit found a *Brady* violation, vacated Paulus's convictions, and remanded the case for a new trial. *United States v. Paulus*, 952 F.3d 717 (6th Cir. 2020) (*Paulus II*). It disagreed with the government's contention on appeal that Paulus "could have gathered the missing detail (the sample size) with 'minimal investigation,'" reasoning that KDMC likely would have resisted inquiries about its internal review on privilege grounds and that Paulus could not easily have recreated the hospital's analysis. *Id*. at 725-726 (citation omitted). The appellate court further held that Paulus suffered prejudice by not knowing the sample-size information. It reasoned that evidence showing KDMC had flagged 75 procedures out of 1,049 (about 7%) could have supported a trial defense that Paulus's conduct involved only "occasional mistakes or … occasional differences of opinion" rather than fraud; and could have also been used "to impeach the government's witnesses by calling into question how representative their samples were." *Id*. at 726-727.

      C.      <u>Paulus Knew Of The Damaging KDMC Review Before Trial</u>

Anticipating retrial, in May 2020 the government subpoenaed KDMC's records seeking the full results of the internal review referenced in the Shields Letter and any communications KDMC had with Paulus or his counsel regarding that review. KDMC asserted that the materials were privileged, and the government moved to compel their

7

production. [DE 428.] Notably, Paulus joined KDMC in fighting disclosure of any further information about the KDMC review, despite his arguments to the Sixth Circuit that such material was exculpatory and would destroy any claim of fraudulent intent. [DE 433.] LoCicero submitted another affidavit about counsel's awareness of the KDMC review, this time swearing "[w]e never knew how KDMC selected the 75 procedures that it gave to the USAO [in the Shields Letter], which review or reviews the 75 procedures came from, who the experts were that had identified the 75 procedures, when the 75 procedures were identified, or how many total procedures had been reviewed to identify the 75 procedures." [DE 433-1: LoCicero Aff. ¶ 5.] A ruling on the motion to compel was stayed pending resolution of Paulus's double jeopardy litigation. Eventually, this Court ordered KDMC to produce the subpoenaed records, *see* DE 449, 464, and the Sixth Circuit denied KDMC's petition for a writ of mandamus challenging that order. *See In re King's Daughters Health Sys., Inc.*, 31 F.4th 520, 522 (6th Cir. 2022).

        1.       The KDMC Review reported that one out of every four stent procedures performed by Paulus was problematic.

On August 5, 2022, KDMC disclosed a May 2012 memo summarizing its review of Paulus's procedures, along with three communications it sent to Paulus's counsel about the review. The memo summarized an expert review of "approximately 1,050 files for Dr. Paulus." Exhibit A.[2] In this investigation, "a cardiologist … review[ed] the DVD [angiogram] film of [each] patient and ma[de] a determination about what

---

[2] The attached exhibits redact patient names and dates of birth. The government will file unredacted copies under seal if this Court so requests.

8

percentage of occlusion [i.e., blockage] was present." *Id*. at A-1. The cardiologist then categorized each patient film into one of three groups: "(1) Less than 50% occlusion, (2) between 50% and 70% occlusion, and (3) greater than 70% occlusion." *Id*. Films showing blockages greater than 50% (an amount of blockage that could justify a stent) were set aside. *Id*. at A-2. However, for patient films showing blockages of 50% or less (which typically would not justify a stent), a second cardiologist reviewed the film. The two cardiologists then had to agree that the film showed "less than 50% occlusion." *Id*. For each patient film where two reviewing cardiologists found less than 50% blockage on the angiogram, the hospital stated that it would "review the medical records of those questionable procedures." *Id.*

KDMC maintained spreadsheets identifying (a) each patient in the study, (b) the procedure date, (c) the identity of the reviewing cardiologists, and (d) the degree of stenosis indicated on the patient's angiogram film (if 50% or lower). *See* Exhibit B at B-3; Exhibit C at C-2 to C-8 and C-13 to C-23; Exhibit D at D-2 to D-31. KDMC also maintained worksheets where the reviewing cardiologists recorded their findings. Ex. B-4 to B-21.

The memorandum stated that the outside expert cardiologists flagged 272 of Paulus's procedures as problematic, representing **26%** of the total sample reviewed. Ex. A-2 to A-4. This, of course, is strikingly different than the 7% "rate of disagreement" suggested by the Shields Letter and parroted by Paulus to this Court and the Sixth Circuit when he claimed that the KDMC review was exculpatory.

2. KDMC disclosed its review and findings to Paulus's counsel well before trial.

KDMC shared the May 2012 memo and all the underlying spreadsheets and worksheets with Paulus's counsel in June 2012. *See* Ex. B (June 12, 2012 email to Paulus's counsel), Ex. C. (June 22, 2012 email to Paulus' counsel), and Ex. D (June 25, 2022 email to Paulus's counsel) ("you now have copies of the results of all reviews of Dr. Paulus's procedures that were conducted . . . on behalf of KDMC."). The 75 procedures listed in the Shields Letter were part of this review, and are easily identified within the materials Paulus received from KDMC in 2012. Thus, prior to trial, Paulus and his lawyers knew the sample size of roughly 1,050 procedures, and knew the results for the 272 procedures that KDMC's experts had flagged as having less than 50% stenosis.

It is clear from this recent disclosure, which Paulus and KDMC strenuously resisted, that no *Brady* violation actually occurred because counsel received the full results of the KDMC review in advance of trial. *Castano*, 906 F.3d at 466. It is also clear that Paulus's and his counsel's representations to this Court and the Sixth Circuit about what they knew about the KDMC review prior to trial were, at best, wildly inaccurate. Finally, it is clear that evidence of the KDMC review's results – where independent cardiologists found that one out of every four patients Paulus stented had less than 50% stenosis – will add considerably to the government's proof of Paulus's fraudulent intent at retrial.

Knowing this, Paulus now seeks dismissal of the Indictment based on a Supreme Court decision concerning the Controlled Substances Act. [DE 484.]

## II. THE *RUAN* DECISION

In *Ruan*, the Supreme Court addressed the scienter element of 21 U.S.C. § 841 in the context of a physician's distribution of controlled substances via prescription. Section 841 states that "*except as authorized* . . . it shall be unlawful for any person knowingly and intentionally . . . to manufacture, distribute, or dispense . . . a controlled substance." 21 U.S.C. § 841(a)(1) (emphasis added). Controlled substances can be distributed lawfully by physicians pursuant to prescriptions, but prescriptions are only authorized when the doctor issues it "for a legitimate medical purpose . . . acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a). In this context, "it is the fact that the doctor issued an *unauthorized* prescription that renders his or her conduct wrongful." *Ruan*, 142 S. Ct. at 2377. The issue in *Ruan* was "what *mens rea* applied to § 841's authorization exception." *Id.* at 2376. The Court held that § 841's "knowingly and intentionally" clause applied to its "except as authorized" clause, meaning that the jury must find that the doctor knowingly and intentionally acted in an unauthorized manner in order to find him guilty. *Id.*

In so holding, the *Ruan* Court rejected an "objectively reasonable good-faith effort" or "objective honest-effort standard" where the defendant's *mens rea* would be measured against the mental state of a hypothetical "reasonable doctor." *Id.* at 2381. But the Court did not hold that proof of the defendant's departure from objective medical standards, or expert opinion about whether a defendant's conduct comported with those standards, were irrelevant. To the contrary:

> The Government, of course, can prove knowledge of a lack of authorization through circumstantial evidence. And the regulation defining the scope of a doctor's prescribing authority does so by reference to objective criteria such as "legitimate medical purpose" and "usual course of professional practice." As we have said before, "the more unreasonable" a defendant's "asserted beliefs or misunderstandings are," especially as measured against objective criteria, "the more likely the jury . . . will find that the Government has carried its burden of proving knowledge."

*Id.* at 2382 (internal citations omitted).

*Ruan* did not address the fraud and false-statement statutes at issue in this case. Other courts have expressed skepticism that *Ruan* has any application to a health care fraud prosecution: Because § 1347 already requires proof that the defendant acted knowingly and willfully, with intent to defraud, and because standard health care fraud and good-faith jury instructions refer to the defendant's own mental state, no possibility exists that a fraud defendant would be convicted based on an objective, "reasonable doctor" standard. *See United States v. Agresti*, Case No. 18-cr-80124-RAR, 2022 WL 2966680 at *3 (S.D. Fla. July 27, 2022).

### III. ARGUMENT

A motion to dismiss under Federal Rule of Criminal Procedure 12 is appropriate "when it raises questions of law rather than fact." *United States v. Ali*, 557 F.3d 715, 719 (6th Cir. 2009); *see also United States v. Kurleman*, No.10-CR-14-3, 2010 WL 3585681, *3 (S.D. Ohio Sept. 10, 2010) ("A defense raised in a motion to dismiss an indictment is 'capable of determination if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense.'") (citations

12

omitted). A defendant may ask the court to make "preliminary findings of facts necessary to decide questions of law" only if "the trial court's conclusions do not invade the province of the ultimate finder of fact." *United States v. Levin*, 973 F.2d 463, 467 (6th Cir. 1992); *see also United States v. Sisco*, 7:20-cr-23-REW, 2021 WL 4066665 at **2-3 (E.D. Ky. Sept. 7, 2021) (denying motion to dismiss wire fraud and health care fraud indictment "which would require the Court to credit [the defendant's] pretrial narrative," as "the jury will sift the proof . . . and have its say."); *Kurleman*, 2010 WL 3585681 at *11 (denying a motion to dismiss false statement charges because "[t]here are a number of disputed facts in this case that must be resolved by the jury."). As this Court has already held, issues of intent must be determined by the jury. [DE 108: Memorandum Order at Page ID# 1566 ("[W]hether Dr. Paulus committed healthcare fraud or merely exercised his medical judgment is a factual dispute that goes to the merits of the case. The Court cannot resolve such a dispute without invading the province of the jury.").]

Consistent with his approach to this litigation from the outset, Paulus asks the Court to depart from these well-established standards, assume the role of the jury, and rule that he "merely exercised his medical judgment" instead of "committed healthcare fraud." [DE 484: Motion to Dismiss at Page ID# 15455-56.] According to Paulus, invading the province of the jury is acceptable here, because "this Court has already seen and evaluated the evidence that the government intends to present." [*Id.* at 15455.] There is no support for this position, legally or factually. Legally, such action would improperly invade the province of the jury. Factually, even if the government's proof was exactly the same (it will be stronger), a jury already convicted him based on that

13

evidence, and the Sixth Circuit found that evidence sufficient to prove that Paulus knowingly and willfully committed healthcare fraud and made false statements. *Paulus I*, 894 F.3d at 277-78.

*Ruan* does not change a thing about this case. It does not address the offenses at issue here, and its core holding – that under 21 U.S.C. § 841, the government must prove the defendant doctor knowingly and intentionally acted in an unauthorized manner – reflects a *mens rea* standard already inherent in 18 U.S.C. §§ 1347 and 1035. The jury in the first trial was instructed that "the government must prove that the defendant knew his conduct was unlawful," was explicitly told that it should not equate health care fraud with medical malpractice, and was further instructed on the good faith defense. [DE 293: Transcript (Jury Instructions) at Page ID# 11690-91.] *Ruan* does not require more than that. Paulus has always argued that his egregious conduct was simply the subjective exercise of his medical judgment. The United States has always argued that he knew the stents he placed were unnecessary, intentionally lied about the degree of stenosis in his medical records, and caused the submission of bills to insurers for those procedures in order to enrich himself.

The proof at trial will be more than enough to meet the government's evidentiary burden on intent. Paulus is correct that some of it will be "the same" – multiple expert witnesses describing his extreme deviation from accepted medical standards and wildly exaggerated stenosis recordings; peer physicians offering first-hand accounts of Paulus's unnecessary procedures and lies; evidence of Paulus's astronomical RVU numbers and multi-million dollar annual salary pursuant to his "eat-what-you-kill" contract with

14

KDMC; Paulus's agreement with the Kentucky Board of Medical Licensure and the conclusions of the underlying Board investigation; patient testimony of incriminating statements by Paulus; and more.

But the proof at trial will also include newly discovered evidence. In particular, the government finally received the results of KDMC's independent expert review (Paulus had them in 2012, a fact he did not disclose to this Court or the Sixth Circuit in pursuing his *Brady* claim). That review examined roughly 1,048 of Paulus's stent cases, and the hospital's experts found 272 "questionable procedures" involving stenosis of less than 50%.[3] That reflects 26% of the KDMC sample, or one out of every four cases Paulus performed. This finding is not the "7% rate of disagreement" that Paulus continues to misrepresent to the Court; these are not mistakes.[4] [DE 484: Motion to Dismiss at Page ID# 15457-58.] To the contrary, the KDMC review supplies compelling evidence that Paulus "systematically overstate[d] his patients' arterial blockages," engaged in a "lengthy pattern of fraudulent over-diagnosing," and "intentionally defrauded his patients, their health insurance companies, and the government." *Paulus II*, 952 F.3d at 726; *Paulus I*, 894 F.3d 267, 278. Given the comprehensive nature of the

---

[3] The reviewers determined that another 126 angiograms showed occlusion of 50%. The accepted medical standard was occlusion of 70% or greater before proceeding with this invasive procedure. KDMC's experts found that Paulus stented in circumstances where the patient's blockage was at least 20% less than this standard, outside the range of interobserver variability, in 398 of 1,048 cases.

[4] Paulus's counsel received the KDMC review results in June 2012. The United States produced a copy of it again on August 22, 2022, after receiving it from KDMC. Paulus's continued assertion that "the overall rate of disagreement in the KDMC Review was 7%" in light of this evidence is demonstrably false and cannot be explained by faulty memory or incomplete information.

15

KDMC review and its damaging findings regarding Paulus's procedures, ample evidence at retrial will support a finding that Paulus acted with the intent to defraud. *See Ruan*, 142 S. Ct. at 2382 ("[T]he more unreasonable a defendant's asserted beliefs or understandings are, especially as measured against objective criteria, the more likely the jury will find that the Government has carried its burden of proving knowledge.") (internal citations and quotations omitted).

In sum, Paulus's arguments about *Ruan*'s application to this case, and his false narrative about the anticipated trial evidence, should be rejected. A jury must decide the question of Paulus's fraudulent intent.

Paulus's due process arguments are equally meritless. They rehash the same ones he already made, and the Court already rejected, years ago. "A criminal statute is unconstitutionally vague if it defines an offense in such a way that ordinary people cannot understand what is prohibited or if it encourages arbitrary or discriminatory enforcement." *United States v. Kernell*, 667 F.3d 746, 750 (6th Cir. 2012) (internal quotations omitted). As this Court held:

> Here, an ordinary person would understand that the statute prohibited Dr. Paulus from knowingly and willfully executing a scheme to defraud Medicare and Medicaid by placing stents in arteries with little to no blockage and falsely certifying that they were medically necessary. Moreover, § 1347's *mens rea* requirement "mitigates any ambiguity arising from the [alleged] lack of clear medical guidance." *McLean*, 715 F.3d at 136-37; *see also United States v. Franklin-El*, 554 F.3d 903, 910-11 (10th Cir. 2009) (similarly rejecting the defendant's claim that the health care fraud statute was impermissibly vague because it included a specific intent requirement); *United States v. Bohonus*, 628 F.2d 1167, 1174 (9th Cir. 1980) (noting, in the context of a vagueness

16

challenge to the mail fraud statute, that the specific intent requirement "eliminate[s] the objection that the statute punishes the accused for an offense of which he was unaware"). Because § 1347 is not unconstitutionally vague as applied to Dr. Paulus, the Motion to Dismiss the Medically Unnecessary Services Theory (Doc. # 29) must be denied, to the extent that it is predicated on constitutional vagueness grounds.

[DE 108: Order at Page ID# 1570 (following *United States v. McLean*, 715 F.3d 129 (4th Cir. 2013)).] Paulus offers no reason to depart from this law of the case.

## IV.  CONCLUSION

This litigation has been unprecedented in several respects, not least of which is the recent production showing that Paulus knew of the damaging KDMC review and its results in 2012, and yet succeeded in having his conviction reversed by insisting in a *Brady* claim that he did not know, and could not have known, those facts. Paulus now asks the Court to inject further error into the proceedings by usurping the role of the jury and dismissing the Indictment. The Court should reject Paulus's arguments in their entirety and deny the Motion to Dismiss.

Respectfully Submitted,

CARLTON S. SHIER, IV
UNITED STATES ATTORNEY

By:  /s/ Paul McCaffrey
Paul McCaffrey
Kate K. Smith
Assistant United States Attorneys
260 W. Vine Street, Suite 300
Lexington, Kentucky 40507-1612
(859) 685-4885
Kate.Smith@usdoj.gov
Paul.McCaffrey@usdoj.gov

CERTIFICATE OF SERVICE

On September 22, 2022, I electronically filed this document through the ECF system, which provided notice to counsel of record.

/s/ Paul McCaffrey<br>Assistant United States Attorney